**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 25-5197**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

TRAVIS LEBLANC; EDWARD FELTEN,

Plaintiffs-Appellees,

v.

U.S. PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, et al.

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**APPENDIX**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
ADAM C. JED
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7243*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *202-514-8280*

# TABLE OF CONTENTS

**Page**

District Court Docket Sheet ...................................................................A1

First Amended Complaint, Dkt. No. 8 ....................................................A7

Plaintiffs' Statement of Undisputed Material Facts, Dkt. No. 10-2 ....................A35

Declaration of Travis LeBlanc (with exhibits), Dkt. No. 10-3 ...........................A42

Declaration of Edward Felten (with exhibits), Dkt. No. 10-4 .............................A52

Defendants' Statement of Material Facts As To Which There Is
    No Genuine Dispute, Dkt. No. 12-2 ...................................................A61

Plaintiffs' Response To Defendants' Statement Of Undisputed
    Material Facts, Dkt. No. 15-1 ..........................................................A72

Supplemental Declaration Of Travis LeBlanc (with exhibits),
    Dkt. No. 15-2 ...........................................................................A76

Supplemental Declaration Of Edward Felten (with exhibits),
    Dkt. No. 15-3 ...........................................................................A86

Redline of PCLOB Statute, Dkt. No. 18-1 ...............................................A96

PCLOB, Policy 102-01, *Sub-Quorum Authorities and Operations
    When the Position of Chair is Vacant* (Oct. 23, 2024), Dkt. No. 18-2..........A105

Second Supplemental Declaration Of Travis LeBlanc, Dkt. No. 20-1...............A120

Redacted Second Supplemental Declaration Of Edward Felten,
    Dkt. No. 20-2 ...........................................................................A123

Memorandum Opinion, Dkt. No. 24......................................................A126

Order, Dkt. No. 25 .........................................................................A197

Defendants' Notice of Appeal, Dkt. No. 26 .............................................A199

Order, Dkt. No. 30 .........................................................................A201

APPEAL,CLOSED,TYPE–C

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25–cv–00542–RBW

| | |
|---|---|
| LEBLANC et al v. UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD et al | Date Filed: 02/24/2025 |
| Assigned to: Judge Reggie B. Walton | Date Terminated: 05/22/2025 |
| Case in other court:  USCA, 25–05197 | Jury Demand: None |
| Cause: 42:2000e Job Discrimination (Employment) | Nature of Suit: 890 Other Statutory Actions |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**TRAVIS LEBLANC**     represented by     **Daniel Reuben Yablon**
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
202–942–5009
Email: Daniel.Yablon@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Elisabeth S. Theodore**
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC 20001
(202) 942–5891
Fax: (202) 942–5999
Email: elisabeth.theodore@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EDWARD FELTEN**     represented by     **Daniel Reuben Yablon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elisabeth S. Theodore**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD**     represented by     **Douglas C. Dreier**
U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
601 D Street NW
Washington, DC 20053
(202) 252–2551
Email: douglas.dreier@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Emily Margaret Hall**
DOJ–Civ
Civil Division, Office of the Assistant Attorney General
950 Pennsylvania Ave. NW
Washington, DC 20530
202–307–6482

A1

Email: emily.hall@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**
**BETH A WILLIAMS**                          represented by  **Douglas C. Dreier**
*in her official capacity as a Board*                     (See above for address)
*Member of the United States Privacy and*                 *LEAD ATTORNEY*
*Civil Liberties Oversight Board*                         *ATTORNEY TO BE NOTICED*

                                                          **Emily Margaret Hall**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**
**JENNY FITZPATRICK**                        represented by  **Douglas C. Dreier**
*in her official capacity as Executive*                   (See above for address)
*Director of the United States Privacy and*               *LEAD ATTORNEY*
*Civil Liberties Oversight Board*                         *ATTORNEY TO BE NOTICED*

                                                          **Emily Margaret Hall**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**
**TRENT MORSE**                              represented by  **Douglas C. Dreier**
*in his official capacity as Deputy*                      (See above for address)
*Director of Presidential Personnel*                      *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Emily Margaret Hall**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**
**DONALD J. TRUMP**                          represented by  **Douglas C. Dreier**
*in his official capacity as President of the*            (See above for address)
*United States of America*                                *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Emily Margaret Hall**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**
**STATE OF FLORIDA**                         represented by  **Jeffrey Paul DeSousa , I**
                                                          OFFICE OF THE ATTORNEY
                                                          GENERAL/FL
                                                          PL–01, The Capitol
                                                          Tallahassee, FL 32399
                                                          850–414–3830
                                                          Email: jeffrey.desousa@myfloridalegal.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**
**19 OTHER STATES**

**Amicus**
**ARIZONA LEGISLATURE**

# A2

| Date Filed | # | Docket Text |
|---|---|---|
| 02/24/2025 | 1 | COMPLAINT against JENNY FITZPATRICK, TRENT MORSE, DONALD J. TRUMP, UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, BETH A WILLIAMS (Filing Fee $405 receipt number ADCDC−11500318) filed by TRAVIS LEBLANC, EDWARD FELTEN. (Attachments: # 1 Civil Cover Sheet)(Theodore, Elisabeth) Modified on 2/25/2025 as to the payment of filing fee (zmtm). (Entered: 02/24/2025) |
| 02/24/2025 | 2 | REQUEST FOR SUMMONS TO ISSUE *as to the Civil Process Clerk* filed by TRAVIS LEBLANC, EDWARD FELTEN. Related document: 1 Complaint, filed by TRAVIS LEBLANC, EDWARD FELTEN. (Attachments: # 1 Summons as to the Attorney General Pamela Bondi, # 2 Summons as to Trent Morse, # 3 Summons as to President Donald Trump, # 4 Summons as to Beth A. Williams, # 5 Summons as to Jenny Fitzpatrick, # 6 Summons as to the United State Privacy and Civil Liberties Oversight Board)(Theodore, Elisabeth) (Entered: 02/24/2025) |
| 02/24/2025 | 3 | NOTICE of Appearance by Daniel Reuben Yablon on behalf of TRAVIS LEBLANC, EDWARD FELTEN (Yablon, Daniel) (Entered: 02/24/2025) |
| 02/25/2025 | | Case Assigned to Judge Reggie B. Walton. (zmtm) (Entered: 02/25/2025) |
| 02/25/2025 | 4 | SUMMONS (7) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zmtm) (Entered: 02/25/2025) |
| 02/25/2025 | 5 | GENERAL ORDER FOR CIVIL CASES BEFORE THE HONORABLE REGGIE B. WALTON. Signed by Judge Reggie B. Walton on February 25, 2025. (lcrbw2) (Entered: 02/25/2025) |
| 03/04/2025 | 6 | NOTICE of Appearance by Douglas C. Dreier on behalf of All Defendants (Dreier, Douglas) (Entered: 03/04/2025) |
| 03/04/2025 | 7 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 2/25/2025. Answer due for ALL FEDERAL DEFENDANTS by 4/26/2025. (Theodore, Elisabeth) (Entered: 03/04/2025) |
| 03/12/2025 | 8 | AMENDED COMPLAINT against JENNY FITZPATRICK, TRENT MORSE, DONALD J. TRUMP, UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, BETH A WILLIAMS filed by TRAVIS LEBLANC, EDWARD FELTEN. (Attachments: # 1 Exhibit First Amended Complaint − Redline)(Theodore, Elisabeth) (Entered: 03/12/2025) |
| 03/12/2025 | 9 | Joint MOTION to Expedite *Consideration of Cross−Motions for Summary Judgment and to Set a Briefing Schedule* by TRAVIS LEBLANC. (Attachments: # 1 Text of Proposed Order)(Theodore, Elisabeth) Added MOTION for Briefing Schedule on 3/13/2025 (znmw). (Entered: 03/12/2025) |
| 03/12/2025 | 10 | MOTION for Summary Judgment by TRAVIS LEBLANC, EDWARD FELTEN. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Declaration of Travis LeBlanc, # 4 Declaration of Edward Felten, # 5 Text of Proposed Order)(Theodore, Elisabeth) (Entered: 03/12/2025) |
| 03/13/2025 | 11 | ORDER. In accordance with the attached Order, it is hereby ORDERED that the parties' 9 Joint Motion for Expedited Consideration of Cross−Motions for Summary Judgment and to Set a Briefing Schedule is GRANTED. It is further ORDERED that the plaintiffs shall file their motion for summary judgment on or before March 12, 2025. It is further ORDERED that, on or before April 3, 2025, the defendants shall file their combined opposition to the plaintiffs' motion for summary judgment and cross−motion for summary judgment. It is further ORDERED that, on or before April 16, 2025, the plaintiffs shall file their combined opposition to the defendants' cross−motion for summary judgment and a reply in support of their motion for summary judgment. It is further ORDERED that, on or before April 23, 2025, the defendants shall file a reply in support of their cross−motion for summary judgment. It is further ORDERED that, on April 30, 2025, at 2:00 p.m., the parties shall appear before the Court for a motion hearing. The parties shall appear for the motion hearing before the Court in Courtroom 16 on the 6th floor at the E. Barrett Prettyman United States Courthouse, 333 Constitution Avenue, N.W., Washington, D.C. 20001. It is |

A3

| | | |
|---|---|---|
| | | further ORDERED that, on May 14, 2025, at 9:30 a.m., the parties shall appear before the Court for a status conference, via teleconference, by calling 646–828–7666, entering Meeting ID 161 591 8885 followed by the pound key (#), and then entering the Passcode 984979 followed by the pound key (#). This status conference will serve as a target date for the resolution of the parties' summary judgment motions. In the event that the Court is unable to resolve the motions by this date, the parties will be advised in advance that the status conference will be continued to a later date. Signed by Judge Reggie B. Walton on March 13, 2025. (lcrbw2) (Entered: 03/13/2025) |
| 04/03/2025 | 12 | Cross MOTION for Summary Judgment by UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, BETH A WILLIAMS, JENNY FITZPATRICK, TRENT MORSE, DONALD J. TRUMP. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Text of Proposed Order)(Dreier, Douglas) (Entered: 04/03/2025) |
| 04/03/2025 | 13 | Memorandum in opposition to re 10 Motion for Summary Judgment, *Duplicate of ECF No. 12* filed by UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, BETH A WILLIAMS, JENNY FITZPATRICK, TRENT MORSE, DONALD J. TRUMP. (Dreier, Douglas) (Entered: 04/03/2025) |
| 04/10/2025 | 14 | AMICUS BRIEF *in Support of Defendants and in Opposition to Plaintiffs' Motion for Summary Judgment* by STATE OF FLORIDA. (DeSousa, Jeffrey) (Entered: 04/10/2025) |
| 04/16/2025 | 15 | RESPONSE re 12 Cross MOTION for Summary Judgment *and REPLY to opposition to motion re 10 MOTION for Summary Judgment* filed by EDWARD FELTEN, TRAVIS LEBLANC. (Attachments: # 1 Statement of Facts Plaintiffs Response to Defendants Statement of Undisputed Material Facts, # 2 Declaration Supplemental Declaration of Travis Leblanc, # 3 Declaration Supplemental Declaration of Edward Felten)(Theodore, Elisabeth) (Entered: 04/16/2025) |
| 04/16/2025 | 16 | REPLY to opposition to motion re 10 Motion for Summary Judgment, filed by EDWARD FELTEN, TRAVIS LEBLANC. (See Docket Entry 15 to view document). (znmw) (Entered: 04/17/2025) |
| 04/23/2025 | 17 | NOTICE of Appearance by Emily Margaret Hall on behalf of All Defendants (Hall, Emily) (Entered: 04/23/2025) |
| 04/23/2025 | 18 | REPLY to opposition to motion re 12 Motion for Summary Judgment, filed by JENNY FITZPATRICK, TRENT MORSE, DONALD J. TRUMP, UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, BETH A WILLIAMS. (Attachments: # 1 Appendix – Redline of Statutory Provisions, # 2 Exhibit 1 – Sub–Quorum Policy)(Dreier, Douglas) (Entered: 04/23/2025) |
| 04/30/2025 | | MINUTE ORDER. The public is permitted to attend the motion hearing currently scheduled for April 30, 2025, at 2:00 p.m., by calling 1–833–990–9400, and entering the Meeting ID 011366756. Signed by Judge Reggie B. Walton on April 30, 2025. (lcrbw2) (Entered: 04/30/2025) |
| 04/30/2025 | | Minute Entry for proceedings held before Judge Reggie B. Walton: Motion Hearing held on 4/30/2025 re 10 Plaintiff's Motion for Summary Judgment and 12 Defendants' Cross–Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment. Oral arguments heard. Written Opinion forthcoming via Chambers. (Court Reporter: Elizabeth Davila) (zalh) (Entered: 04/30/2025) |
| 05/09/2025 | 19 | ORDER. In accordance with the attached Order, it is hereby ORDERED that, on or before May 12, 2025, at 12:00 p.m., the plaintiffs shall file supplemental declarations from each plaintiff explaining the plaintiffs' basis for asserting at the April 30, 2025, motion hearing that they would not be entitled to any back pay under the Back Pay Act, based on the difference between their compensation as part–time members of the Board and their compensation through other employment. Specifically, the Court requires more than a general assertion that their other compensation exceeds their compensation as members of the Board. The plaintiffs may move to file any exhibits to those supplemental declarations under seal, should they wish to do so. Signed by Judge Reggie B. Walton on May 9, 2025. (lcrbw2) (Entered: 05/09/2025) |

# A4

| 05/12/2025 | 20 | NOTICE *of Filing of Supplemental Declarations* by EDWARD FELTEN, TRAVIS LEBLANC (Attachments: # 1 Declaration – Second Supplemental Declaration of Travis LeBlanc, # 2 Declaration – Second Supplemental Declaration of Edward Felten)(Theodore, Elisabeth) (Entered: 05/12/2025) |
|---|---|---|
| 05/12/2025 | 21 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by EDWARD FELTEN, TRAVIS LEBLANC (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Declaration Second Supplemental Declaration of Edward Felten, # 2 Text of Proposed Order, # 3 Certificate of Service)(Theodore, Elisabeth) (Entered: 05/12/2025) |
| 05/12/2025 | 23 | SEALED DECLARATION filed by EDWARD FELTEN, TRAVIS LEBLANC. re 21 Sealed Motion for Leave to File Document Under Seal,. (This document is SEALED and only available to authorized persons.)(zdp) (Entered: 05/16/2025) |
| 05/13/2025 | | MINUTE ORDER. The Court requiring additional time to consider the pending cross−motions for summary judgment in this case, it is hereby ORDERED that the status conference currently scheduled for May 14, 2025, is CONTINUED to May 21, 2025, at 9:30 a.m. The parties shall appear before the Court via teleconference, by calling 646−828−7666, entering Meeting ID 161 591 8885 followed by the pound key (#), and then entering the Passcode 984979 followed by the pound key (#). This status conference will serve as a target date for the resolution of the pending cross−motions for summary judgment. In the event that the Court is unable to resolve the motions by this date, the parties will be advised in advance that the status conference will be continued to a later date. Signed by Judge Reggie B. Walton on May 13, 2025. (lcrbw2) (Entered: 05/13/2025) |
| 05/20/2025 | | MINUTE ORDER. In light of the forthcoming Memorandum Opinion to be issued by the Court, it is hereby ORDERED that the status conference currently scheduled for May 21, 2025, is VACATED. Signed by Judge Reggie B. Walton on May 20, 2025. (lcrbw2) (Entered: 05/20/2025) |
| 05/21/2025 | 24 | MEMORANDUM OPINION. Signed by Judge Reggie B. Walton on May 21, 2025. (lcrbw2) (Entered: 05/21/2025) |
| 05/21/2025 | 25 | ORDER. In accordance with the Memorandum Opinion issued on this same date, it is hereby ORDERED that the 10 Plaintiffs' Motion for Summary Judgment is GRANTED. It is further ORDERED that the 12 Defendants' Cross−Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment is DENIED. It is therefore DECLARED that the terminations of the plaintiffs, Travis LeBlanc and Edward Felten, were unlawful, in violation of 42 U.S.C. § 2000ee, and therefore null and void. It is further ORDERED that the plaintiff Travis LeBlanc remains a member of the Privacy and Civil Liberties Oversight Board ("PCLOB" or "the Board"), having been appointed by the President and confirmed by the Senate to a term expiring on January 29, 2028, and he may be removed by the President prior to expiration of his term only for cause. It is further ORDERED that the plaintiff Edward Felten remains a member of the PCLOB, having been appointed by the President and confirmed by the Senate to a term expiring on January 29, 2025, and being eligible to serve at his discretion until either his successor is confirmed or one year after the date of the expiration of his current term, i.e., January 29, 2026, whichever occurs first, and he may be removed by the President prior to expiration of his holdover term only for cause or upon the confirmation of a successor to his position on the Board. It is further ORDERED that the Privacy and Civil Liberties Oversight Board, defendant Beth A. Williams, defendant Jenny Fitzpatrick, and defendant Trent Morse, as well as their subordinates, agents, and employees, are ENJOINED from treating the plaintiffs as having been removed from their positions as Board members of the Privacy and Civil Liberties Oversight Board during their terms as members of the Board, and from taking any action that would deprive the plaintiffs of their ability to exercise the functions of their office during their terms as members of the PCLOB or deprive the plaintiffs of any right or benefit of that office during their terms as members of the PCLOB. It is further ORDERED that this case is CLOSED. Signed by Judge Reggie B. Walton on May 21, 2025. (lcrbw2) (Entered: 05/21/2025) |
| 05/27/2025 | 26 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 24 Memorandum & Opinion, 25 Order on Motion for Summary Judgment,,,,,,,,,,,,,,, by TRENT MORSE, UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, DONALD J. TRUMP, BETH A WILLIAMS, JENNY FITZPATRICK. Fee Status: No Fee Paid. |

A5

| | | |
|---|---|---|
| | | Parties have been notified. (Hall, Emily) (Entered: 05/27/2025) |
| 05/28/2025 | 27 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 26 Notice of Appeal to DC Circuit Court,. (znmw) (Entered: 05/28/2025) |
| 05/28/2025 | 28 | MOTION to Stay re 25 Order on Motion for Summary Judgment,,,,,,,,,,,,,,,,,, by JENNY FITZPATRICK, TRENT MORSE, DONALD J. TRUMP, UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, BETH A WILLIAMS. (Hall, Emily) (Entered: 05/28/2025) |
| 05/29/2025 | | USCA Case Number 25–5197 for 26 Notice of Appeal to DC Circuit Court, filed by BETH A WILLIAMS, UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, DONALD J. TRUMP, JENNY FITZPATRICK, TRENT MORSE. (zdp) (Entered: 05/29/2025) |
| 05/29/2025 | 29 | Memorandum in opposition to re 28 MOTION to Stay re 25 Order on Motion for Summary Judgment,,,,,,,,,,,,,,,, filed by EDWARD FELTEN, TRAVIS LEBLANC. (Yablon, Daniel) (Entered: 05/29/2025) |
| 05/29/2025 | 30 | ORDER. In accordance with the attached Order, it is hereby ORDERED that the 28 Defendants' Motion to Stay the Court's Order Pending Appeal is DENIED. Signed by Judge Reggie B. Walton on May 29, 2025. (lcrbw2) (Entered: 05/29/2025) |
| 06/05/2025 | 31 | TRANSCRIPT OF PROCEEDINGS, before Judge Reggie B. Walton, held on 04–30–2025; Page Numbers: 1 – 76. Date of Issuance: 6–05–2025. Court Reporter: Elizabeth Davila, Telephone number: 202–354–3242. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 6/26/2025. Redacted Transcript Deadline set for 7/6/2025. Release of Transcript Restriction set for 9/3/2025.(Davila, Elizabeth) (Entered: 06/05/2025) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TRAVIS LEBLANC and EDWARD FELTEN,
    601 Massachusetts Ave NW,
    Washington, DC 20001

          *Plaintiffs*,

      v.

UNITED STATES PRIVACY AND CIVIL
LIBERTIES OVERSIGHT BOARD,
    800 N. Capitol St NW, Suite 565
    Washington, DC 20002,

BETH A. WILLIAMS, in her official capacity as a
Board Member of the United States Privacy and
Civil Liberties Oversight Board,
    800 N. Capitol St NW, Suite 565
    Washington, DC 20002,

JENNY FITZPATRICK, in her official capacity as
Executive Director of the United States Privacy and
Civil Liberties Oversight Board,
    800 N. Capitol St NW, Suite 565
    Washington, DC 20002,

TRENT MORSE, in his official capacity as Deputy
Director of Presidential Personnel,
    1600 Pennsylvania Ave NW
    Washington, DC 20050,

    and

DONALD J. TRUMP, in his official capacity as
President of the United States of America,
    1600 Pennsylvania Ave NW
    Washington, DC 20050.

          *Defendants*.

Civil Action No. 1:25-cv-00542-RBW

**FIRST AMENDED COMPLAINT**

A7

# INTRODUCTION

1.    Plaintiffs Travis LeBlanc and Edward Felten are Senate-confirmed members of the United States Privacy and Civil Liberties Oversight Board ("PCLOB" or "the Board"), which Congress established to provide independent oversight of the executive branch's counterterrorism policies and to "protect the precious liberties that are vital to our way of life." 42 U.S.C. § 2000ee(b)(2). On January 27, 2025, Defendants purported to remove Plaintiffs from the Board, without cause. This suit challenges those unlawful purported removals.

2.    The Board is a multi-member, nonpartisan, independent body of experts charged with reviewing the government's use of surveillance and other counterterrorism powers, commenting and advising on existing and proposed legislation, and reporting to the legislative branch and the public on how the government balances national security activities with privacy and civil liberties protections. The Board could not carry out these critical functions or provide candid, independent advice to Congress if its members feared that criticizing the executive branch could lead to their dismissal. Nor could it do so if its members' views had to be submitted to the executive branch for approval, revision, or censorship. And without the Board's candid, independent analysis, Congress could not obtain the advice and information it needs to exercise its own constitutionally mandated legislative and oversight authorities, including considering whether counterterrorism authorities need to be amended to better protect privacy and civil liberties.

3.    Congress recognized that securing the Board's independence was essential. Every feature of the Board's organic statute demonstrates that the President lacks authority to remove Board members at will. Using mandatory language, the statute directs that Board members shall serve a defined term of six years. It requires members to be selected on the basis of their professional qualifications and relevant expertise "without regard to political affiliation." It

# A8

requires the President to consult with congressional leadership on appointments of members who are not affiliated with the party of the President. And though a prior version of the Board's organic statute placed the Board within the Executive Office of the President and stated that members would serve at the President's "pleasure," Congress subsequently took the Board out of the Executive Office of the President, established it as an "independent agency," required Senate confirmation of all members, and removed the statutory language that had previously authorized the President to remove members at his "pleasure"—precisely to insulate the Board's oversight and advice functions from presidential control. Text, structure, and history all thus confirm that Congress protected Board members from removal without cause.

4.      In defiance of Congress's legislative authority, President Trump has now purported to fire all three of PCLOB's Democratic members without cause, two of whom bring this current suit. President Trump did not fire Plaintiffs in any effort to supervise or direct the officials who wield executive power on his behalf. Indeed, the PCLOB does not exercise any executive power—it cannot regulate, impose penalties, or compel anyone to do anything—and removing its members does not enable any exercise of executive power that the President supports or prevent any exercise of executive power that he opposes. Rather, the purpose and result of the terminations will be to deny the Board a quorum, prevent Congress and the public from learning about how this Administration respects privacy and civil liberties, and starve Congress of the information it needs to legislate and to oversee the executive branch.

5.      The President's actions strike at the heart of the separation of powers.  Not only do Plaintiffs' removals eradicate a vital check on the infringement of ordinary Americans' civil liberties, they also hobble an agency that Congress created to assist it with oversight of the

executive branch. This Court must declare Defendants' actions unlawful, and reinstate Plaintiffs to their positions on the Board.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701-06.

7.    Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because this action seeks relief against federal agencies and officials acting in their official capacities; at least one defendant is located in this district; and a substantial part of the events giving rise to the claim occurred in this district.

## PARTIES

8.    Plaintiff Travis LeBlanc is a Board member of the United States Privacy and Civil Liberties Oversight Board. Mr. LeBlanc was first nominated to that role by President Trump and has served as a Board member since July 2019 following his unanimous confirmation by the U.S. Senate. On March 29, 2022, President Biden renominated Mr. LeBlanc to the Board for a second term and he was subsequently reconfirmed unanimously by the Senate on September 14, 2022. Mr. LeBlanc's term expires on January 29, 2028. Mr. LeBlanc resides in Virginia.

9.    Plaintiff Edward Felten is a Board member of the United States Privacy and Civil Liberties Board. Mr. Felten was first nominated to that role by President Trump, and Mr. Felten has served as a member since October 2018 following his unanimous confirmation by the U.S. Senate. On March 14, 2019, President Trump renominated Mr. Felten to the Board for a second term and he was subsequently reconfirmed unanimously by the Senate on June 27, 2019.  Mr.



Felten's term ran through January 29, 2025, and he is entitled by statute to stay on the Board through January 29, 2026, unless a successor is confirmed.  Mr. Felten resides in Virginia.

10.    Defendant the United States Privacy and Civil Liberties Oversight Board is an independent agency charged with ensuring that national security needs are balanced with privacy and civil liberties. The PCLOB is headquartered at 800 N. Capitol Street NW,  Suite 565, Washington, DC 20002.  The Board members are the collective head of the agency, which is composed of approximately 35 employees.

11.    Defendant Beth A. Williams is a Board member of the United States Privacy and Civil Liberties Oversight Board. Ms. Williams maintains an office at 800 N. Capitol Street NW, Suite 565, Washington, DC 20002. She is sued in her official capacity only.  Ms. Williams resides in Virginia.

12.    Defendant Jenny Fitzpatrick is the Executive Director of the United States Privacy and Civil Liberties Oversight Board. Ms. Fitzpatrick maintains an office at 800 N. Capitol Street NW, Suite 565, Washington, DC 20002. Plaintiffs have great respect for the civil service employees at the Board and sue Ms. Fitzpatrick in her official capacity only pursuant to relevant precedent.

13.    Defendant Trent Morse is the Deputy Director of Presidential Personnel. Mr. Morse maintains an office at 1600 Pennsylvania Avenue NW, Washington DC 20050. He is sued in his official capacity only.

14.    Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity only.

A11

## STATUTORY BACKGROUND

15.    Following the September 11, 2001 terrorist attacks, Congress conferred expansive new national-security authorities on the Executive. In 2004, to help ensure that those powers would be exercised consistent with Americans' civil liberties, Congress created the Privacy and Civil Liberties Oversight Board, an advisory body charged with ensuring that privacy and civil liberties are appropriately considered in the creation and implementation of the nation's counterterrorism policies and practices. *See* Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA) § 1061, Pub. L. No. 108-458, 118 Stat. 3638, 3684-88.

16.    From the outset, the Board was designed in part to enable congressional oversight of executive branch activities. The 9/11 Commission had recommended that Congress create "a board within the executive branch to oversee adherence to the guidelines [the Commission] recommend[ed] and the commitment the government makes to defend our civil liberties." *The 9/11 Commission Report*, National Commission on Terrorist Attacks Upon the United States 395 (2004). And as Congress found in implementing that recommendation, the "potential shift of power and authority to the Federal Government" after September 11 "calls for an enhanced system of checks and balances to protect the precious liberties that are vital to our way of life." IRTPA § 1061(a)(2), 118 Stat. 3684.  The Board is a key feature of the post-9/11 enhanced system of checks and balances.

17.    As originally constituted in 2004, the Board proved unable to adequately and independently monitor and safeguard civil liberties. IRTPA had established the Board "within the Executive Office of the President," giving the Executive the ability to closely control the Board's operations. *Id.* § 1061(b), 118 Stat. 3684. Only two of the Board's five members (the chair and vice-chair) were appointed with advice and consent of the Senate; the remaining three were

6

# A12

appointed directly by the President, meaning that the President could exercise total control over the Board at any time. *Id.* § 1061(e), 118 Stat. 3686-87. There was no requirement of partisan balance among Board members; no requirement that members be appointed on the basis of any relevant expertise; and no requirement that all members be confirmed by the Senate or be made available to appear before Congress. *Id.* And all of the Board's members, by statute, "serve[d] at the pleasure of the President," with no defined tenure of office. *Id.* § 1061(e)(1)(E), 118 Stat. 3687.

18.      The results were predictable. In the Board's first annual report to Congress, "the Bush administration made more than 200 revisions," "including the deletion of a passage on anti-terrorism programs that intelligence officials deemed 'potentially problematic' intrusions on civil liberties."[1] Rather than provide candid reporting to Congress, the Board operated essentially as the President's mouthpiece, which a White House spokesperson claimed "was appropriate because the board remains legally under the supervision of the Executive Office of the President."[2]

19.      As one of the Board's members testified to Congress after resigning, "it simply was not possible to have independent oversight while being treated as if [the Board Members] were a part of the White House staff." *Privacy in the Hands of Government: The Privacy and Civil Liberties Oversight Board and the Privacy Officer for the U.S. Department of Homeland Security, Hearing Before the Subcomm. on Commercial and Administrative Law of the H. Comm. on the Judiciary*, 110 Cong. 33 (testimony of Lanny J. Davis).

20.      Congress acted swiftly to reform the Board, guarantee its independence, and refocus its purpose and functions. Less than a month after Mr. Davis's congressional testimony,

---

[1] John Solomon and Ellen Nakashima, *White House Edits to Privacy Board's Report Spur Resignation*, The Washington Post (May 15, 2007), https://www.washingtonpost.com/archive/national/2007/05/15/white-house-edits-to-privacy-boards-report-spur-resignation/c7967467-c99f-4bb5-aa8a-261c6b6273ed/.

[2] *Id.*

Congress removed the Board from the Executive Office of the President and established it "as an independent agency." Implementing Recommendations of the 9/11 Commission Act of 2007 (9/11 Commission Act) § 801(a), Pub. L. No. 110-53, 121 Stat. 266, 352 (codified as amended at 42 U.S.C. § 2000ee).

21.    To further insulate Board members from presidential control, the 9/11 Commission Act deleted language from the prior statute stating that members served at the President's "pleasure." *Id.*, 121 Stat. 356. The Act required Senate confirmation for all members of the Board, and instructed that they "shall serve a term of 6 years." *Id.*; *see* 42 U.S.C. § 2000ee(h)(4). The statute now further provides that, after the expiration of a member's term of office, the member "may continue to serve for up to one year after the date of expiration, at the election of the member," until appointment of a successor. 42 U.S.C. § 2000ee(h)(4)(D).

22.    The 9/11 Commission Act also deleted language from the prior statute stating that "[t]he Board shall perform its functions within the executive branch and under the general supervision of the President." IRTPA § 1061(k), 118 Stat. 3688.

23.    In addition to insulating the Board from presidential control, the 9/11 Commission Act also added substantive requirements to ensure that the Board would be nonpartisan and that its members would be independent experts selected on nonpolitical grounds. Members "shall be selected solely on the basis of their professional qualifications, achievements, public stature, expertise in civil liberties and privacy, and relevant experience, and without regard to political affiliation," with "no more than 3 members" belonging "to the same political party." 42 U.S.C. § 2000ee(h)(2). And the President "shall, before appointing an individual who is not a member of the same political party as the President, consult with the leadership of that party, if any, in the Senate and House of Representatives." *Id.* The Act further insulates Board members from

presidential control by prohibiting the President from appointing any existing "elected official, officer, or employee of the Federal Government," to the Board, and by forbidding Board members from taking on those roles while simultaneously serving on the Board.  *Id.* § 2000ee(h)(3).

24.    The 9/11 Commission Act also refocused the Board's purpose and obligations to include a far more substantial role advising Congress itself. For example, Congress deleted statutory language stating that the Board should carry out various advisory functions "[f]or the purpose of providing advice to the President or to the head of any department or agency of the executive branch." *Compare* IRTPA § 1061(c)(1), 118 Stat. 3684, *with* 42 U.S.C. § 2000ee(d)(1). Congress replaced language directing the Board to "review proposed regulations and executive branch policies related to efforts to protect the Nation from terrorism" with language directing the Board to "review proposed *legislation*, regulations, and policies related to efforts to protect the Nation from terrorism"—expanding the Board's remit well beyond executive branch policies. *Compare* IRTPA § 1061(c)(1)(A), 118 Stat. 3684, *with* 42 U.S.C. § 2000ee(d)(1)(A) (emphasis added). Congress likewise replaced language directing the Board to "review implementation of laws, regulations, and executive branch policies" with language directing the Board to "review the implementation of *new and existing legislation*, regulations, and policies." *Compare* IRTPA § 1061(c)(1)(B), 118 Stat. 3684-85, *with* 42 U.S.C. § 2000ee(d)(1)(B) (emphasis added). And Congress expanded the Board's reporting obligations, requiring semi-annual reports to congressional committees each year detailing the Board's activities and oversight-related conclusions, requiring those reports to contain "minority views," and requiring Board members to appear and testify before Congress.  42 U.S.C. § 2000ee(d)(4), (e)(1), (e)(2).

25.    Pursuant to its organic statute, the Board now serves two purposes: to "(1) analyze and review actions the executive branch takes to protect the Nation from terrorism, ensuring that

the need for such actions is balanced with the need to protect privacy and civil liberties; and (2) ensure that liberty concerns are appropriately considered in the development and implementation of laws, regulations, and policies related to efforts to protect the Nation against terrorism." *Id.* § 2000ee(c). To fulfill that purpose, the Board by statute performs four principal functions, each designed to provide an independent voice ensuring that Congress and the public are aware of the extent to which the executive branch protects civil liberties and operates consistent with legal requirements.

26.    First, the Board reviews proposed and existing legislation, regulations, and policies relating to counterterrorism—as well as the implementation thereof—to provide advice to Congress, the Executive Branch, and the courts on compliance with civil liberties protections and on proposals to retain or enhance government counterterrorism powers. *Id.* § 2000ee(d)(1). For example, after the Edward Snowden leaks in 2013, Congress asked the Board to investigate and report on the operation of two National Security Agency surveillance programs detailed in those leaks.[3]  The Board issued two reports[4] about those programs and about the operation of the Foreign Intelligence Surveillance Court (FISC), ultimately offering 22 recommendations to Congress, the Executive Branch, and the FISC.[5] As another example, Congress recently required the Board, by

---

[3] PCLOB, *Report on the Telephone Call Records Program Conducted Under Section 215 of the USA PATRIOT Act and on the Operations of the Foreign Intelligence Surveillance Court* at 1-2 (Jan. 23, 2014), https://documents.pclob.gov/prod/Documents/OversightReport/cf0ce183-7935-4b06-bb41-007d1f437412/215-Report_on_the_Telephone_Records_Program%20-%20Completed%20508%20-%2011292022.pdf.

[4] *See id.*; *see also* PCLOB, *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* (July 2, 2014), https://documents.pclob.gov/prod/Documents/OversightReport/ba65702c-3541-4125-a67d-92a7f974fc4c/702-Report-2%20-%20Complete%20-%20Nov%2014%202022%201548.pdf.

[5] *See* PCLOB, *Recommendations Assessments Report* at 1 (Jan. 29, 2015), https://documents.pclob.gov/prod/Documents/OversightReport/a97a9918-775d-42eb-b426-2ae01838c2a3/Recommendations_Assessment-Report_2015%20-%20Complete%20-%20Nov%202%202022%201544.pdf.

statute, to produce a report with recommendations to mitigate privacy and civil liberties impacts associated with the government's effort to counter foreign racially motivated violent extremism. *See* Intelligence Authorization Act for Fiscal Year 2022, § 824(b)(3), Pub. L. No. 117-103, 136 Stat. 963, 1022. The Board's recommendations included imposing additional obligations on the Director of National Intelligence.[6]

27. The Board is often called upon to provide recommendations to Congress when particular authorities are approaching their statutory sunset. In 2023, in the lead-up to Congress's consideration of the re-authorization of the Section 702 surveillance program, the PCLOB issued a comprehensive report about that program, closing with 19 recommendations—7 of which were for Congress, 11 of which were for executive agencies, and 1 of which was for all of government.[7] Congress considers these reports in determining whether and on what terms to reauthorize surveillance authorities.

28. Article III courts frequently rely on the Board's independent reports in their own work assessing the legality of government surveillance programs. *E.g.*, *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 798-99, 815-18 (2d Cir. 2015); *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F. 3d 193, 202-04, 211 (4th Cir. 2017).

29. Second, the Board performs an "oversight" function: it is charged to "continually review" executive branch counterterrorism policies, practices, and activities to "determine whether

---

[6] *See* PCLOB, *Assessments and Recommendations: Authorities Addressing Foreign Racially Motivated Extremism & Privacy and Civil Liberties Impacts* at 4 (Jan. 21, 2025), https://documents.pclob.gov/prod/Documents/OversightReport/2810538d-331d-4316-af48-435aa88a631b/PCLOB%20Assessment%20and%20Recommendations%201.17.25%20-%20Completed%20508%20-%20Feb%206%202025.pdf.

[7] PCLOB, *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* (Sept. 28, 2023) (2023 FISA Report), https://documents.pclob.gov/prod/Documents/OversightReport/d21d1c6b-6de3-4bc4-b018-6c9151a0497d/2023%20PCLOB%20702%20Report,%20508%20Completed,%20Dec%203,%202024.pdf.

such actions (i) appropriately protect privacy and civil liberties; and (ii) are consistent with governing laws, regulations, and policies regarding civil liberties." 42 U.S.C. § 2000ee(d)(2).

30.    Third, the Board reviews reports from privacy officers and civil liberties officers, making recommendations as appropriate. *Id.* § 2000ee(d)(3).

31.    Fourth, "[t]he members of the Board shall appear and testify before Congress upon request." *Id.* § 2000ee(d)(4).

32.    To carry out its functions, the Board must "periodically submit, not less than semiannually, reports" to Congress and the President—reports eventually made public so far as classification authorities permit. *Id.* § 2000ee(e)(1). Those reports, which are directed to the Intelligence, Homeland Security, and Judiciary Committees, must include "information on the findings, conclusions, and recommendations of the Board resulting from its advice and oversight" of the executive branch. *Id.* § 2000(e)(2)(B). These reports are required to include "the minority views on any findings, conclusions, and recommendations of the Board resulting from its advice and oversight functions." *Id.* § 2000ee(e)(2)(C).

33.    The President has recognized the PCLOB's independent status in its executive orders.  For example, in Executive Order 14086, the President imposed binding requirements on various arms of the executive branch, but did not attempt to impose any requirements on the Board. The President instead "encouraged" the Board to oversee and certify the procedures of the Data Protection Review Court, Exec. Order No. 14086, 87 Fed. Reg. 62,283 (Oct. 14, 2022), a judicial oversight function the Board has accepted.[8]

---

[8] *See* PCLOB, *Statement on PCLOB Review Under Section 3 of Executive Order 14086* (Nov. 5, 2024),    https://documents.pclob.gov/prod/Documents/EventsAndPress/6e6c7a7b-6036-4d6d-b635-ffb53f68e4f4/Statement%20on%20PCLOB%20Review%20Under%20Section%203%20of%20EO%2014086,%20Completed%20508,%20Nov%207%202024.pdf.

A18

34.    Board members are entitled to compensation for their service.    42 U.S.C.
§ 2000ee(i)(1).

35.    The Board does not exercise any power of the executive branch. It cannot fine or
punish anyone. It does not exercise any enforcement power, any power to prescribe regulations,
or any power for compulsory process.  It does not have independent litigating authority.  To obtain
information by subpoena, the Board must submit a request to the Attorney General, which the
Attorney General has authority to issue or deny in her discretion. *Id.* § 2000ee(g).

## FACTUAL ALLEGATIONS

36.    On March 19, 2018, President Trump nominated Plaintiff Edward Felten to be a
Board Member on the PCLOB, to fill out the remainder of an existing term. The Senate confirmed
Mr. Felten on October 11, 2018. He was subsequently renominated to a second term by President
Trump on March 14, 2019, and confirmed by the Senate on June 27, 2019. Mr. Felten's six-year
term ended on January 29, 2025. Because no replacement has been confirmed, however, Mr. Felten
chose to exercise his statutory right to serve one additional year, until January 29, 2026.

37.    On August 16, 2018, President Trump nominated Plaintiff Travis LeBlanc to be a
member of the PCLOB.  The Senate confirmed Mr. LeBlanc on June 27, 2019. He was
subsequently renominated to a second term by President Biden on March 29, 2022, and confirmed
by the Senate on September 14, 2022. Mr. LeBlanc's term will not end until January 29, 2028. If
his seat is not filled at that time, he is eligible at his election to serve an additional year, until
January 29, 2029.

38.    Mr. LeBlanc and Mr. Felten have been issued Presidential commissions that are
duly executed by both the President and the Secretary of State.  Mr. LeBlanc's Presidential
commission states that the President "appoint[s] him a Member of the Privacy and Civil Liberties

Oversight Board for a term expiring January 29, 2028, and do[es] authorize and empower him to execute and fulfill the duties of that Office according to law, and to have and to hold the said Office, with all the powers, privileges, and emoluments thereunto of right appertaining … subject to the conditions prescribed by law." Mr. Felten's commission is substantially similar. Neither Mr. LeBlanc's nor Mr. Felten's commission states that they "serve during the pleasure of the President of the United States for the time being."

39.    At the time President Trump took office, four of the Board's five seats were filled. One seat was filled with an appointee affiliated with the Republican Party—Defendant Williams. Three seats were filled with appointees affiliated with the Democratic Party—Plaintiffs LeBlanc and Felten, as well as chair Sharon Bradford Franklin, whose term would have fully expired on January 29, 2025.

40.    Although the Board is required by statute to be bipartisan, the President purported to terminate only the Democratic members, without cause, and to leave the lone Republican member as the sole remaining member of the Board. On information and belief, that member— Defendant Williams—encouraged the White House to fire her fellow Board Members, including Plaintiffs LeBlanc and Felten, without cause.

41.    On Tuesday, January 21, 2025, at 6:54 p.m., Plaintiffs LeBlanc and Felten each separately received an email from Defendant Morse, sent from a White House email address, with the subject line "Privacy and Civil Liberties Oversight Board." Defendant Morse wrote:

> On behalf of President Donald J. Trump, I am writing to request your resignation as a Member of the Privacy and Civil Liberties Oversight Board. Please submit your resignation to me by the close of business on Thursday, January 23, 2025. If we have not received your resignation by that time, your position will be terminated. Should the President determine your services are still needed, you will receive additional correspondence.

Defendant Morse did not allege any cause or offer any explanation for the requested resignation or for the threatened termination.

42.     Plaintiffs did not resign.

43.     One Board member, Defendant Williams, unlawfully ordered PCLOB staff to stay past the close of business on the night of Thursday, January 23, 2025, to effectuate the anticipated removals of her fellow Board members, including having them removed from the PCLOB website. Defendant Williams was not the Chair of the Board, did not consult the existing Board members on her staff directives to oust the other members from office, and lacked authority to order the PCLOB staff to stay late to effectuate other members' removals.

44.     Plaintiffs did not receive notice of any termination by the President on Thursday, January 23.  Nor did they receive any notice of termination on Friday, January 24; Saturday, January 25; or Sunday, January 26.

45.     On Monday, January 27, 2025, Defendant Morse notified Defendant Williams to terminate Plaintiffs (as well as Ms. Bradford Franklin).

46.     Defendant Williams then directed PCLOB staff to cut off Plaintiffs' access to their PCLOB email accounts and terminate them from the agency.

47.     Under Defendant Williams's direction and without prior communication to the Plaintiffs, Plaintiffs received notifications on January 27, 2025 via Microsoft Outlook that they had been locked out of their PCLOB email accounts. The staff at the PCLOB responsible for cutting off Plaintiffs' email access report to Defendant Fitzpatrick, who in turn reports to the full Board.

A21

48.    Subsequently on January 27, 2025, Plaintiffs received, via their non-government email addresses, identically-worded "termination" emails from Defendant Morse. Those emails stated in their entirety:

Hello,

This email confirms that your position on the Privacy and Civil Liberties Oversight Board was terminated on Thursday, January 23, 2025 at 17:01.

49.    Defendant Morse's one-sentence emails did not allege any cause or offer any explanation for either Plaintiff's termination.

50.    Both Plaintiffs requested a copy of the official Presidential action terminating them. Defendant Morse did not respond to Plaintiff Felten. He responded to Plaintiff LeBlanc: "This email serves as the Presidential action."

51.    President Trump also terminated the Board's third Democratic member and Chair, Sharon Bradford Franklin, on January 27, 2025. He did not provide cause for Ms. Franklin's termination. President Trump terminated Ms. Franklin even though her hold-over term would have expired two days later, on January 29, 2025.

52.    President Trump's actions left in place a single Republican member, Defendant Williams, who works part-time at the agency. The Board now lacks the quorum necessary to perform any of its statutorily-mandated functions.

53.    Promptly after Plaintiffs received emails from Defendant Morse on Monday, January 27, the Board issued a press release stating that "the White House terminated Chair Sharon Bradford Franklin, and Members Ed Felten and Travis LeBlanc from their positions as of 5 p.m. last Thursday." On information and belief, Defendant Williams directed the drafting and publishing of that press release.

16

A22

## LEGAL ALLEGATIONS

54.     Congress may protect members of an independent agency from removal in two ways: in the statute's text, or "through the statutory structure and function of an office." *Severino v. Biden*, 71 F.4th 1038, 1044 (D.C. Cir. 2023) (citing *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2206-07 (2020)). Text, structure, and function all demonstrate that the 9/11 Commission Act bars removal of PCLOB members without good cause.

55.     Under the 9/11 Commission Act, "[e]ach member of the Board *shall serve* a term of 6 years." 42 U.S.C. § 2000ee(h)(4) (emphasis added). "It is . . . fixed usage that 'shall' means something on the order of 'must' or 'will.'" *FTC v. Tarriff*, 584 F.3d 1088, 1090 (D.C. Cir. 2009). Thus, the plain statutory text mandates that members serve a fixed six-year term, not only so long as the President chooses to keep them.  Although the D.C. Circuit has previously concluded that language providing that "[t]he term of each member" is "3 years" did not support a removal restriction, *Severino*, 71 F.4th at 1044-45, the 9/11 Commission Act's "shall serve" language is materially distinct.  It is mandatory and unambiguous.

56.     Even if "shall serve" could be read in isolation to mean less than a command, that interpretation would be untenable in the context where it appears. In amending PCLOB's organic statute in 2007 to insert the "shall serve" language, Congress also specifically removed language providing that Board members would "serve at the pleasure of the President." *Compare* IRTPA § 1061(e)(1)(E), 118 Stat. 3638, 3687 *with* 42 U.S.C. § 2000ee(h)(4). Congress's choice to "remove[] language that expressly" authorized removal without cause, while simultaneously adding a tenure provision with mandatory language, confirms that the statute bars removal without cause. *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 306 (2017); *see also Rumsfeld v. F. for Acad. &*

17

# A23

*Institutional Rts., Inc.*, 547 U.S. 47, 58 (2006) (refusing to interpret statute "in a way that negates its recent revision").

57.    Other amendments in the 9/11 Commission Act confirm that its tenure provision means what it says. For one, Congress indicated its intent to eliminate direct presidential control of Board members by removing the Board from the Executive Office of the President and making it an independent agency instead, *compare* IRTPA § 1061(b), 118 Stat. 3684 *with* 42 U.S.C. § 2000ee(a), by removing language stating that the "Board shall perform its functions … under the general supervision of the President," IRTPA § 1061(k), 118 Stat. 3688, and by prohibiting Board members from contemporaneously serving as executive branch officials. 42 U.S.C. § 2000ee(h)(3). And at the same time, Congress imposed new requirements of partisan balance and consultation with Congress on appointments, *see* 42 U.S.C. § 2000ee(h)(2)—provisions that would be rendered ineffectual if the President had unilateral authority to remove members without cause. As the Supreme Court has repeatedly held, courts "must normally seek to construe Congress's work 'so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant.' " *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698-99 (2022) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). Reading the statute to permit removal without cause would both contravene the statute's literal meaning and fundamentally undermine the scheme of agency independence that Congress deliberately designed.

58.    The context of the removals challenged in this case only underscore that point. The President must appoint Board members "without regard to political affiliation." 42 U.S.C. § 2000ee(h)(2). That provision would be nugatory if the President could turn around and fire Board members based on their political affiliation, as he has purported to do here.

A24

59.     The Board's structure and function also demonstrate that the President may not remove members without cause. "[T]he most reliable factor for drawing an inference regarding the President's power of removal . . . is the nature of the function that Congress vested in" the body to which the removed officials belong. *Wiener v. United States*, 357 U.S. 349, 353 (1958); *see also Mistretta v. United States*, 488 U.S. 361, 411 (1989).

60.     First, PCLOB exercises no executive power whatsoever. The Supreme Court has recognized that the President has at-will removal authority over certain single-director agencies that exercise substantial executive power. *Seila Law*, 591 U.S. at 220. Unlike the agencies in cases like *Seila Law*, the Board has no authority to impose penalties or fines, promulgate regulations, undertake enforcement actions, or bind members of the executive branch or the public in any way. Instead, it solely operates to provide information about the government's consideration and respect for privacy and civil liberties in conducting counterterrorism activities. That oversight function, adjunct to the legislative process, involves no executive authority and raises no presumption of presidential control.

61.     Second, "when Congress assigns to an agency quasi-judicial or quasi-legislative functions that are deemed to be operationally incompatible with at-will Presidential removal, that can be a relevant signal that Congress meant for members of that agency to be shielded from Presidential removal, even without an explicit textual statement to that effect." *Severino*, 71 F.4th at 1047 (citing *Humphrey's Executor v. United States*, 295 U.S. 602, 625-26 (1935); *Wiener*, 375 U.S. at 356-57). Courts thus look for an adjudicatory or legislative feature that would "signal a need for some measure of independence from Presidential control." *Severino*, 71 F.4th at 1049.

62.     For example, in *Wiener*, Congress required the War Claims Commission to "adjudicate according to law," meaning that even though it was housed in the executive branch, it

could not perform its quasi-judicial function if its decisions on individual claims could be influenced by the President. 375 U.S. at 355-56. And that meant "a fortiori, must it be inferred that Congress did not wish to hang over the Commission the Damocles' sword of removal." *Id.* As the Supreme Court has long recognized, "one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will." *Humphrey's Executor*, 295 U.S. at 269.

63.    Similarly, in *Humphrey's Executor*, because the FTC made "investigations and reports thereon for the information of Congress," it performed "specified duties as a legislative or as a judicial . . . aid" and, therefore, required insulation from Presidential interference in the form of removal protections. 295 U.S. at 628.

64.    PCLOB's structure and functions confirm that Congress intended to prevent the President from removing its members without cause. One of PCLOB's primary functions is to conduct "oversight" of the actions of the executive branch relating to privacy and civil liberties and to report any findings to Congress and the public. 42 U.S.C. § 2000ee(d)(2). As Congress recognized in reforming the Board's structure in response to White House interference with the Board's oversight functions, it cannot perform this function without independence. That the Board's very purpose would be subverted if the President could remove its members at will is as clear an indication as any that Congress intended their tenures to be protected. If the President could edit the Board's reports before they go to Congress or fire members who took positions the Administration disliked, the Board would simply be an arm of the executive branch unable to perform its key functions, including oversight of the executive branch.

65.    PCLOB also functions as a "legislative . . . aid." *Humphrey's Executor*, 295 U.S. at 628. It is required to submit reports, "not less than semiannually," to a long list of Congressional

Committees, the contents of which must include "information on the findings, conclusions, and recommendations of the Board resulting from its advice [including to the President] and oversight functions," as well as any minority views. 42 U.S.C. §§ 2000ee(e)(1)(B); (e)(2)(B). The requirement to include minority and majority views reflects that Congress intended the Board to operate independently of the President and report its members' positions, not a monolithic executive branch position. The importance of the Board's legislative aid function is emphasized by the additional enumerated requirement that it inform Congress if it advised the executive branch against a certain proposal, but the executive branch implemented it anyway. *Id.* § 2000ee(e)(2)(D). The Board is also required, to the extent possible, to report its oversight findings to the public. *Id.* § 2000ee(f). The Board can and has commenced oversight investigations at the express request of Congress, and Congress relies on the Board's reports in considering whether to authorize or reauthorize surveillance and other counterterrorism powers.

66.    In addition to its oversight and quasi-legislative functions, PCLOB also serves as a "judicial aid." *Humphrey's Exexcutor*, 295 U.S. at 268. It supplies advice and recommendations to the Foreign Intelligence Surveillance Court—an Article III court—and holds responsibility for certifying the procedures of the Data Protection Review Court—an administrative body that serves adjudicative functions. *See, e.g.*, 2023 FISA Report, *supra*; PCLOB, *Statement on PCLOB Review Under Section 3 of Executive Order 14086*, *supra*.

67.    The structure of the Board further indicates that Congress intended to insulate board members from at-will Presidential removal. PCLOB members serve staggered six-year terms—i.e., terms that deliberately outlast individual Presidential terms. 42 U.S.C. § 2000ee(h)(4). As the D.C. Circuit has explained, "staggered terms promote 'the independence, autonomy, and non-partisan nature' of an agency." *Severino*, 71 F.4th at 1049 (quoting *United States v. Wilson*, 290

F.3d 347, 359 (D.C. Cir. 2002)). The fact that Board members must be appointed "without regard to political affiliation," but rather based on qualifications alone, and that the Board must be divided between the political parties, further reinforce that Congress intended to insulate the Board from political control. *Humphrey's Executor*, 295 U.S. at 624-25.

68.    These features easily distinguish PCLOB from the Administrative Conference of the United States that was at issue in *Severino*. There, members sat for three-year terms and many of them were executive branch officials who were otherwise subject to removal by the President. Most important, the *sole* purpose of the Administrative Conference was to provide advice to the President: "a quintessential example of a purely executive function." 71 F.4th at 1049 (internal quotation omitted). The agency had no "adjudicatory or legislative features that would clearly signal a need for some measure of independence from Presidential control." *Id*.

69.    PCLOB, conversely, conducts oversight of the executive branch—clearly signaling the need for independence from Presidential control. 42 U.S.C. § 2000ee(d)(2). Unlike with the Administrative Conference, PCLOB members cannot simultaneously be executive branch officials. 42 U.S.C. § 2000ee(h)(3). And in the 9/11 Commission Act amendments, Congress specifically *removed* language that had been present in the prior version of the PCLOB's organic statute stating that the Board should carry out various advisory functions "[f]or the purpose of providing advice to the President or to the head of any department or agency of the executive branch." *Compare* IRTPA § 1061(c)(1), 118 Stat. 3684, *with* 42 U.S.C. § 2000ee(d)(1). The current statute reflects that the PCLOB's purpose is much broader, and includes critical responsibilities providing advice to the Judiciary and to Congress—including about whether the executive branch is complying with privacy and civil liberties protections. It would be impossible

for the Board to discharge these functions and to provide candid advice to Congress if the President could fire members for providing advice he dislikes.

## CLAIMS FOR RELIEF

### *FIRST CLAIM FOR RELIEF*
### Administrative Procedure Act—Contrary to Law
### (Against all Defendants Except the President and Morse)

70.     Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

71.     The text, structure, and history of the 9/11 Commission Act demonstrate that it does not permit removal of PCLOB members without good cause.

72.     By purporting to remove Plaintiffs from their positions as Senate-confirmed PCLOB members without citing any cause for removal, Defendants have acted "not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations"; and "without observance of procedure required by law." 5 U.S.C. § 706.

73.     By removing Board members solely on the basis of their political affiliation, Defendants have also violated the requirement that members be selected "without regard to political affiliation."  For that reason too, Defendants have acted "not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations"; and "without observance of procedure required by law." 5 U.S.C. § 706.

74.     The Court must accordingly hold Plaintiffs' purported removals unlawful and set them aside.

### *SECOND CLAIM FOR RELIEF*
### Violation of Due Process
### (Against All Defendants)

75.     Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

# A29

76.    Plaintiffs have a protected property interest in their employment as PCLOB members.

77.    By purporting to remove Plaintiffs from their positions as Senate-confirmed PCLOB members without citing any cause for removal, or indeed providing any process at all, Defendants have deprived Plaintiffs of a protected property interest without due process of law.

78.    Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' unconstitutional actions, to obtain reinstatement from the date of the unlawful removals, and to obtain all other appropriate relief.

### THIRD CLAIM FOR RELIEF
### Ultra Vires
### (Against All Defendants)

79.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

80.    The text, structure, and history of the 9/11 Commission Act demonstrate that it does not permit removal of PCLOB Members without good cause.

81.    By purporting to remove Plaintiffs from their positions as Senate-confirmed PCLOB members without citing any cause for removal, Defendants exceeded their lawful authority.

82.    By purporting to remove Plaintiffs from their positions as Senate-confirmed PCLOB members based solely on their political affiliation, Defendants exceeded their lawful authority.

83.    Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' ultra vires actions, to obtain reinstatement from the date of the unlawful removals, and to obtain all other appropriate relief.

## FOURTH CLAIM FOR RELIEF
### Mandamus
### (Against All Defendants Except the President)

84.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

85.    The text, structure, and history of the 9/11 Commission Act demonstrate that it does not permit removal of PCLOB members without good cause. Plaintiffs have a clear right to remain in office until the expiration of their tenure or until lawfully removed for good cause.

86.    Because the purported removals of Plaintiffs were unlawful, Defendants have a clear, non-discretionary, and ministerial duty to treat Plaintiffs as if those purported removals had no legal effect.

87.    If no other remedy is available through which the purported terminations can be declared unlawful and set aside, Plaintiffs are entitled to a writ of mandamus pursuant to 28 U.S.C. § 1361 compelling Defendants not to interfere with Plaintiffs' exercise of their duties as PCLOB members.

## FIFTH CLAIM FOR RELIEF
### Equitable Relief for Statutory and Constitutional Violations
### (Against All Defendants)

88.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

89.    By purporting to remove Plaintiffs from their positions as Senate-confirmed PCLOB members without citing any cause for removal, Defendants have acted unlawfully.

90.    By purporting to remove Plaintiffs from their positions as Senate-confirmed PCLOB members based solely on their political affiliation, Defendants have acted unlawfully.

91.    Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' unlawful actions, to obtain reinstatement from the date of the unlawful removals, and to obtain all other appropriate relief.

A31

## PRAYER FOR RELIEF

**NOW, THEREFORE,** Plaintiffs requests judgment in their favor against Defendants as follows:

1.      Declare that Defendants have no authority to remove Plaintiffs from their positions as Members of the Privacy and Civil Liberties Oversight Board without good cause;

2.      Declare that Defendants have no authority to remove Plaintiffs from their positions as Members of the Privacy and Civil Liberties Oversight Board based on their political affiliation;

3.      Hold unlawful and set aside the purported removals of Plaintiffs from their positions as Members of the Privacy and Civil Liberties Oversight Board;

4.      Enjoin Defendants (other than the President) from removing Plaintiffs from their positions as Members of the Privacy and Civil Liberties Oversight Board without good cause and enjoin Defendants (other than the President) to restore them to those positions and to treat them as Members of the Privacy and Civil Liberties Oversight Board;

5.      Issue a writ of mandamus compelling Defendants (other than the President) to treat the purported removals of Plaintiffs from their positions as Members of the Privacy and Civil Liberties Oversight Board as having no legal effect and to take no action to interfere with the exercise of Plaintiffs' duties.

6.      Award Plaintiffs reasonable attorneys' fees and costs; and

7.      Grant such other and further relief as the Court may deem appropriate.

A32

Dated: March 12, 2025                    Respectfully submitted,

                                         */s/ Elisabeth S. Theodore*
                                         Elisabeth S. Theodore (D.C. Bar No. 1021029)
                                         Daniel Yablon (D.C. Bar. No. 90022490)
                                         ARNOLD & PORTER
                                             KAYE SCHOLER LLP
                                         601 Massachusetts Ave., NW
                                         Washington, DC 20001-3743
                                         Tel: (202) 942-5000
                                         elisabeth.theodore@arnoldporter.com
                                         daniel.yablon@arnoldporter.com

                                         Caleb Thompson*
                                         ARNOLD & PORTER
                                             KAYE SCHOLER LLP
                                         250 West 55th St.
                                         New York, NY 10019
                                         Tel: (212) 836-8000

                                         *Counsel for Plaintiffs Travis LeBlanc and Edward
                                         Felten*

                                         *application for admission pending

**CERTIFICATE OF SERVICE**

I hereby certify that on March 12, 2025, the foregoing amended complaint was served via

ECF to all counsel of record.

*/s/  Elisabeth S. Theodore*

Elisabeth S. Theodore
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000

A34

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TRAVIS LEBLANC, *et al.*, | |
| *Plaintiffs*, | Civil Action No. 25-542 (RBW) |
| v. | |
| UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, *et al.*, | |
| *Defendants*. | |

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

In support of their motion for expedited summary judgment, Plaintiffs Travis LeBlanc and Edward Felten submit the following Statement of Undisputed Material Facts:

1.    Plaintiff Travis LeBlanc was nominated by President Trump in August 2018 to be a Board member of the United States Privacy and Civil Liberties Oversight Board ("PCLOB" or "the Board"), and confirmed unanimously by the Senate in July 2019, for a term expiring January 29, 2022.  *See* LeBlanc Decl. ¶ 2.

2.    Mr. LeBlanc was renominated by President Biden on March 29, 2022, and confirmed unanimously by the Senate on September 14, 2022, for a second term expiring on January 29, 2028.  *See id* ¶ 3.

3.    Plaintiff Edward Felten was nominated by President Trump in March 2018 to be a Board member of the PCLOB, and confirmed unanimously by the Senate in October 2018, for a term expiring January 29, 2019.  *See* Felten Decl. ¶ 2.

A35

4.      Dr. Felten was renominated by President Trump on March 14, 2019 and reconfirmed unanimously by the Senate on June 27, 2019, for a second term that initially ran through January 29, 2025.  *See id*.

5.      No successor to Dr. Felten has been confirmed, and Dr. Felten is therefore eligible at his election to serve until January 29, 2026.  *See id*.

6.      Defendant PCLOB is an independent agency composed of individuals with expertise in civil liberties and privacy.  42 U.S.C. §§ 2000ee(a); (h)(2).

7.      Plaintiffs have expertise in civil liberties and privacy and experience relevant to their service on the PCLOB.  *See* LeBlanc Decl. ¶ 4; Felten Decl. ¶ 3.

8.      Defendant Beth A. Williams is a Board member of the PCLOB.  *See* PCLOB, *Board Members*, https://www.pclob.gov/Board/Index (last visited Mar. 9, 2025).

9.      Defendant Jennifer Fitzpatrick is the Executive Director of the PCLOB.  *See* PCLOB, *Board Staff*, https://www.pclob.gov/Staff/Index (last visited Mar. 9, 2025).

10.     Defendant Trent Morse is the Deputy Director of Presidential Personnel.  *See* LeBlanc Decl. Ex. A; Felten Decl. Ex. A.

11.     As of January 20, 2025, PCLOB had four members: Plaintiffs, Defendant Williams, and Sharon Bradford Franklin, the chair.  *See* LeBlanc Decl. ¶ 5; Felten Decl. ¶ 4.

12.     Ms. Bradford Franklin's term, which had been extended by one year pursuant to the statutory holdover provision, was set to expire on January 29, 2025.  *See* LeBlanc Decl. ¶ 5; Felten Decl. ¶ 4.

13.     Plaintiffs and Ms. Bradford Franklin are Democrats, while Defendant Williams is a Republican.  *See* LeBlanc Decl. ¶ 5; Felten Decl. ¶ 4.

14.    On Tuesday, January 21, 2025, at 6:54 p.m., Plaintiffs each received separate emails from Defendant Morse, sent from a White House email address, with the subject line "Privacy and Civil Liberties Oversight Board."  The emails stated

> On behalf of President Donald J. Trump, I am writing to request your resignation as a Member of the Privacy and Civil Liberties Oversight Board. Please submit your resignation to me by the close of business on Thursday, January 23, 2025. If we have not received your resignation by that time, your position will be terminated. Should the President determine your services are still needed, you will receive additional correspondence.

*See* LeBlanc Decl. Ex. A; Felten Decl. Ex. A.

15.    Defendant Morse did not identify any cause or offer any explanation for the requested resignation or for the threatened termination of Mr. LeBlanc.  *See* LeBlanc Decl. Ex. A.

16.    Defendant Morse did not identify any cause or offer any explanation for the requested resignation or for the threatened termination of Dr. Felten.  *See* Felten Decl. Ex. A.

17.    Plaintiffs were not provided advance notice, a hearing, or any other process prior to the President's decision to terminate them.  *See* LeBlanc Decl. ¶ 9; Felten Decl. ¶ 8.

18.    Plaintiffs did not, and have not, resigned.  *See* LeBlanc Decl. ¶ 10; Felten Decl. ¶ 9.

19.    On Thursday, January 23, 2025, Defendant Williams informed PCLOB staff that the three Democratic Board members would be terminated that evening.  *See* LeBlanc Decl. ¶ 11; Felten Decl. ¶ 10.

20.    Defendant Williams ordered PCLOB staff to stay past the close of business on Thursday, January 23, 2025, for the purpose of effectuating Plaintiffs' anticipated removals from the Board.  *See* LeBlanc Decl. ¶ 11; Felten Decl. ¶ 10.

21.    Plaintiffs did not receive any notice of any termination by the President on Thursday, January 23; Friday, January 24; Saturday, January 25; or Sunday, January 26.  *See* LeBlanc Decl. ¶ 12; Felten Decl. ¶ 11.

22.     Plaintiffs continued working on PCLOB matters through Monday, January 27.  *See* LeBlanc Decl. ¶¶ 12-14; Felten Decl. ¶¶ 11-13.

23.     On Monday, January 27, 2025, Defendant Morse notified Defendant Williams to terminate Plaintiffs.  *See* LeBlanc Decl. ¶ 13; Felten Decl. ¶ 12.

24.     Defendant Williams then directed PCLOB staff to cut off Plaintiffs' access to their PCLOB email accounts, revoke their access to the PCLOB's offices, remove them from the PCLOB website as active Board members, and terminate them from the agency.  *See* LeBlanc Decl. ¶ 13; Felten Decl. ¶ 12.

25.     On Monday, January 27, Plaintiffs received notifications via Microsoft Outlook that they had been locked out of their PCLOB email accounts.  *See* LeBlanc Decl. ¶ 14; Felten Decl. ¶ 13.

26.     Subsequently on Monday, January 27, Plaintiffs received, via their non-government email addresses, separate emails from Defendant Morse, with the subject line "Privacy and Civil Liberties Oversight Board."  The emails stated:

Hello,

This email confirms that your position on the Privacy and Civil Liberties Oversight Board was terminated on Thursday, January 23, 2025 at 17:01.

*See* LeBlanc Decl. Ex. B; Felten Decl. Ex. B.

27.     Plaintiffs both requested a copy of the official Presidential action terminating them. LeBlanc Decl. ¶ 15; Felten Decl. ¶ 14; LeBlanc Decl. Ex. B; Felten Decl. Ex. B.

28.     Defendant Morse did not respond to Dr. Felten.  Felten Decl. ¶ 14.

29.     He responded to Mr. LeBlanc: "This email serves as the Presidential action." LeBlanc Decl. Ex. B.

30.    Ms. Bradford Franklin was also purportedly terminated on Monday, January 27, 2025.  *See* LeBlanc Decl. ¶ 18; Felten Decl. ¶ 17.

31.    Defendant Morse's January 27 email did not identify any cause or offer any explanation for Plaintiffs' purported terminations.  *See* LeBlanc Decl. ¶ 16; Ex. B; Felten Decl. ¶ 15; Ex. B.

32.    The President has not informed Mr. LeBlanc in any other way that he believes that Mr. LeBlanc has committed neglect of duty or malfeasance or that there is any other cause for removal.  *See* LeBlanc Decl. ¶ 17.

33.    The President has not informed Dr. Felten in any other way that he believes that Dr. Felten has committed neglect of duty or malfeasance or that there is any other cause for removal.  *See* Felten Decl. ¶ 16.

34.    The President did not identify any cause for the termination of Ms. Bradford Franklin.  *See* LeBlanc Decl. ¶ 8; Felten Decl. ¶ 7; PCLOB, *Press Release*, https://documents.pclob.gov/prod/Documents/EventsAndPress/994df0d6-6bae-4284-a95f-3f3699e0a0f0/PCLOB%20press%20release%20(1-27-25)%20-%20508%20Complete.pdf.

35.    The President terminated all three Democratic members of the Board but did not terminate Ms. Williams, the sole Republican member of the Board.  *See* LeBlanc Decl. ¶¶ 5, 18; Felten Decl. ¶¶ 4, 17.

36.    Promptly after Plaintiffs received emails from Defendant Morse on Monday, January 27, Defendant Williams directed the Board to issue a press release stating that "the White House terminated Chair Sharon Bradford Franklin, and Members Ed Felten and Travis LeBlanc from their positions as of 5 p.m. last Thursday."  *See* PCLOB, *Press Release*,

https://documents.pclob.gov/prod/Documents/EventsAndPress/994df0d6-6bae-4284-a95f-

3f3699e0a0f0/PCLOB%20press%20release%20(1-27-25)%20-%20508%20Complete.pdf.

37.    The PCLOB now lacks the quorum necessary to conduct its statutorily mandated

functions.  *See* 42 U.S.C. § 2000ee(h)(5).

38.    Prior to their purported terminations, Plaintiffs were working on PCLOB's

mandatory semi-annual report to Congress, a report on the use of facial recognition technology in

aviation security, and a forthcoming report to Congress on Section 702 of the Foreign Intelligence

Surveillance Act.  *See* LeBlanc Decl. ¶ 20; Felten Decl. ¶ 19.

39.    The statutory authorization for Section 702 is set to expire in April 2026.  *See*

LeBlanc Decl. ¶ 20; Felten Decl. ¶ 19.

40.    Drafting the PCLOB's report on Section 702 will take many months and the report

will need to clear an extensive accuracy and classification review.  *See* LeBlanc Decl. ¶ 20; Felten

Decl. ¶ 19.

41.    If Plaintiffs are not reinstated, it is highly unlikely that the PCLOB's report on

Section 702 will be completed before Congress is required to act on the Section 702

reauthorization.  *See* LeBlanc Decl. ¶ 20; Felten Decl. ¶ 19.

Dated: March 12, 2025                    Respectfully submitted,

                                         /s/ Elisabeth S. Theodore
                                         Elisabeth S. Theodore (D.C. Bar No. 1021029)
                                         Daniel Yablon (D.C. Bar. No. 90022490)
                                         ARNOLD & PORTER
                                            KAYE SCHOLER LLP
                                         601 Massachusetts Ave., NW
                                         Washington, DC 20001-3743
                                         Tel: (202) 942-5000
                                         elisabeth.theodore@arnoldporter.com
                                         daniel.yablon@arnoldporter.com

                                         Caleb Thompson*
                                         ARNOLD & PORTER
                                            KAYE SCHOLER LLP
                                         250 West 55th St.
                                         New York, NY 10019
                                         Tel: (212) 836-8000

                                         *Counsel for Plaintiffs Travis LeBlanc and Edward Felten*

                                         *application for admission pending

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TRAVIS LEBLANC, et al.,

     *Plaintiffs*,

  v.

UNITED STATES PRIVACY AND CIVIL
LIBERTIES OVERSIGHT BOARD, et al.,

     *Defendants*.

Civil Action No. 25-542 (RBW)

## <u>DECLARATION OF TRAVIS LEBLANC</u>

I, Travis LeBlanc, declare as follows:

1. This declaration is based on my personal knowledge and belief. I am over eighteen years of age and competent to testify to the matters set forth herein.

2. In August 2018, I was nominated by President Donald J. Trump to be a Board member of the United States Privacy and Civil Liberties Oversight Board ("PCLOB" or "the Board") for a term expiring January 29, 2022. In January 2019, President Trump renominated me to be a Board member on the PCLOB, also for a term expiring January 29, 2022. President Trump consulted with Senate Minority Leader Chuck Schumer and then-Speaker Nancy Pelosi on my nomination and re-nomination. On June 27, 2019, the U.S. Senate unanimously confirmed me as a Board member of the PCLOB for a term expiring January 29, 2022. I became a PCLOB Board member in July 2019 after President Trump and Secretary of State Michael Pompeo executed the Presidential commission appointing me to serve on the Board for a term expiring January 29, 2022.

3. On March 29, 2022, during my first term holdover period, I was renominated by President Joseph R. Biden, Jr. for a term expiring on January 29, 2028. On September 14, 2022, I was

A42

reconfirmed unanimously by the Senate to a term expiring on January 29, 2028.  On September 16, 2022, President Biden and Secretary of State Antony Blinken executed the Presidential commission appointing me to continue to serve on the Board for a term expiring on January 29, 2028.

      4.      By statute, PCLOB Board members are required to be appointed "on the basis of their professional qualifications, achievements, public stature, expertise in civil liberties and privacy, and relevant experience."  I have extensive experience and expertise in civil liberties and privacy that are relevant to my service as a Board member.  Currently, I am the global co-chair of the cyber/data/privacy practice at Cooley LLP where I have been a partner since 2019.  Previously, I worked at the Department of Justice's Office of Legal Counsel.  I have also served as a senior adviser and a special assistant attorney general of California, where I oversaw litigation and policy in areas including cybersecurity and privacy.  From 2014 to 2017, I was chief of the Enforcement Bureau at the Federal Communications Commission, where my responsibilities included overseeing all enforcement of U.S. telecommunications laws, including consumer protection and national security, privacy, cybersecurity, and public safety.  During President Trump's first administration, the Department of Commerce and the European Commission jointly appointed me an arbitrator for disputes under the EU-US Data Privacy Framework, a now-defunct bilateral agreement between the United States and Europe that permitted organizations to transfer personal data about Europeans to the United States (consistent with the terms of the agreement).  Additionally, I have served on the nonprofit boards of the International Association of Privacy Professionals, Center for Democracy & Technology, Truman Center for National Policy, as well as the advisory boards of the Electronic Privacy Information Center and the Center for Information Technology Policy.  I have an LL.M. from the University of Cambridge, a J.D. from Yale Law School, an M.P.A. from Harvard Kennedy School, and an A.B. from Princeton University.

A43

5.      As of January 20, 2025, the Board had a quorum with four members: myself, Ed Felten, Beth Williams, and Sharon Bradford Franklin, the chair.  Ms. Bradford Franklin's term, which had been extended by one year pursuant to the statutory holdover provision, was set to expire on January 29, 2025.  Dr. Felten, Ms. Bradford Franklin, and I are Democrats, while Ms. Williams is a Republican.

6.      On Tuesday, January 21, 2025, at 6:54 p.m., I received an email from Deputy Director of Presidential Personnel Trent Morse, sent from a White House email address, with the subject line "Privacy and Civil Liberties Oversight Board."  The email stated:

> On behalf of President Donald J. Trump, I am writing to request your resignation as a Member of the Privacy and Civil Liberties Oversight Board. Please submit your resignation to me by the close of business on Thursday, January 23, 2025. If we have not received your resignation by that time, your position will be terminated. Should the President determine your services are still needed, you will receive additional correspondence.

A copy of that email is attached as Exhibit A.

7.      Mr. Morse's email did not identify any cause or offer any explanation for the requested resignation or for the threatened termination.

8.      Dr. Felten and the chair of the PCLOB, Ms. Bradford Franklin, advised me that they received similar emails threatening to terminate them without cause.

9.      I was not provided advance notice, a hearing, or any other process prior to the President's decision to terminate me.

10.      I did not, and have not, resigned.

11.      On Thursday, January 23, staff members at the PCLOB advised me that another PCLOB Board member, Beth Williams, had informed staff that the three Democratic Board members would be terminated that evening.  Staff members also advised me that she ordered PCLOB staff to stay past the close of business that day for the purpose of effectuating our

anticipated removals from the Board, including removing us as active Board members on the PCLOB website.

12.     I did not receive any notice of any termination by the President on Thursday, January 23; Friday, January 24; Saturday, January 25; or Sunday, January 26.

13.     PCLOB staff have advised me that, on Monday, January 27, 2025, Mr. Morse notified Ms. Williams to terminate me and my fellow Board members Dr. Felten and Ms. Bradford Franklin.  PCLOB staff advised me that Ms. Williams then directed PCLOB staff to cut off my access to my PCLOB email account, revoke my access to the PCLOB's offices, remove me from the PCLOB website as an active Board member, and terminate me from the agency.

14.     On Monday, January 27, I received a notification via Microsoft Outlook that I had been locked out of my PCLOB email account.

15.     Subsequently on Monday, January 27, I received, via my non-government email address, an email from Mr. Morse, with the subject line "Privacy and Civil Liberties Oversight Board."  The email stated:

Hello,

This email confirms that your position on the Privacy and Civil Liberties Oversight Board was terminated on Thursday, January 23, 2025 at 17:01.

I responded with an email requesting a copy of the Presidential action.  Mr. Morse responded with an email stating in its entirety: "This email serves as the Presidential action."  A copy of this email exchange is attached as Exhibit B.

16.     Mr. Morse's email did not offer any cause or offer any explanation for my termination.

17.     The President has not informed me in any other way that he believes that I have committed neglect of duty or malfeasance or that there is any other cause for my removal.

18.    Dr. Felten and Ms. Bradford Franklin were also purportedly terminated on January 27, 2025.

19.    The PCLOB now lacks the quorum necessary to conduct its statutorily-mandated functions.

20.    Prior to my purported termination, I was working on PCLOB's mandatory semi-annual report to Congress, an important report on the use of facial recognition technology in aviation security, and a forthcoming report to Congress on Section 702 of the Foreign Intelligence Surveillance Act (among other projects).  Authority for Section 702 is set to expire in April 2026, and Congress will be considering whether to re-authorize Section 702, and under what terms, in the coming year.  Collecting information and drafting the report will take many months, after which the report will need to clear an extensive accuracy and classification review—meaning that if Dr. Felten and I are not reinstated, it is highly unlikely that Congress will have the benefit of this nonpartisan report before Congress is required to act on the Section 702 reauthorization.

21.    As a result of the purported termination, I am unable to carry out my statutorily mandated duties as a Senate-confirmed member of the PCLOB.

22.    I seek reinstatement so that I can fulfill the duties for which the President nominated and the Senate confirmed me, and a monetary award would not adequately compensate me for the injury caused by my purported termination.

I declare under penalty of perjury of the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in London, England, on March 12, 2025.


*Travis LeBlanc*
_____
Travis LeBlanc

A46

Exhibit A

**From:** Morse, Trent M. EOP/WHO <Trent.M.Morse@who.eop.gov>
**Sent:** Tuesday, January 21, 2025 6:54 PM
**To:** travis.leblanc@pclob.gov; LeBlanc, Travis <tleblanc@cooley.com>; grleb61@gmail.com; leblanc112001@yahoo.com
**Subject:** Privacy and Civil Liberties Oversight Board

**[External]**

Travis,

On behalf of President Donald J. Trump, I am writing to request your resignation as a Member of the Privacy and Civil Liberties Oversight Board. Please submit your resignation to me by the close of business on Thursday, January 23, 2025. If we have not received your resignation by that time, your position will be terminated. Should the President determine your services are still needed, you will receive additional correspondence.

Trent Morse

Deputy Director of Presidential Personnel

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

A48

Exhibit B

**From:** Morse, Trent M. EOP/WHO <Trent.M.Morse@who.eop.gov>
**Sent:** Monday, January 27, 2025 3:28 PM
**To:** LeBlanc, Travis <tleblanc@cooley.com>
**Cc:** Richard Morgan (Richard.Morgan@pclob.gov) <Richard.Morgan@pclob.gov>
**Subject:** RE: Privacy and Civil Liberties Oversight Board

## [External]

This email serves as the Presidential action.

**From:** LeBlanc, Travis <tleblanc@cooley.com>
**Sent:** Monday, January 27, 2025 3:20 PM
**To:** Morse, Trent M. EOP/WHO <Trent.M.Morse@who.eop.gov>
**Cc:** Richard Morgan (Richard.Morgan@pclob.gov) <Richard.Morgan@pclob.gov>
**Subject:** [EXTERNAL] RE: Privacy and Civil Liberties Oversight Board

Hi Trent –

Could you please send me a copy of the Presidential action? As a Board Member, I can assume office only with the nomination of the President, confirmation by the Senate, and a commission executed by the President. I would appreciate if you could send me the official Presidential action or notify me of whom I should contact to receive that.


Thanks,

Travis


**From:** Morse, Trent M. EOP/WHO <Trent.M.Morse@who.eop.gov>
**Sent:** Monday, January 27, 2025 2:44 PM
**To:** Morse, Trent M. EOP/WHO <Trent.M.Morse@who.eop.gov>
**Cc:** Richard Morgan <Richard.Morgan@pclob.gov>
**Subject:** Privacy and Civil Liberties Oversight Board

## [External]

Hello,

This email confirms that your position on the Privacy and Civil Liberties Oversight Board was

terminated on Thursday, January 23, 2025 at 17:01.

# A50

**From:** Morse, Trent M. EOP/WHO
**Sent:** Tuesday, January 21, 2025 6:55 PM
**Subject:** Privacy and Civil Liberties Oversight Board

On behalf of President Donald J. Trump, I am writing to request your resignation as a Member of the Privacy and Civil Liberties Oversight Board. Please submit your resignation to me by the close of business on Thursday, January 23, 2025. If we have not received your resignation by that time, your position will be terminated. Should the President determine your services are still needed, you will receive additional correspondence.

Trent Morse

Deputy Director of Presidential Personnel

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

TRAVIS LEBLANC, *et al.*,

        *Plaintiffs*,

    v.

UNITED STATES PRIVACY AND CIVIL
LIBERTIES OVERSIGHT BOARD, *et al.*,

        *Defendants*.

Civil Action No. 25-542 (RBW)

## DECLARATION OF EDWARD FELTEN

I, Edward Felten, declare as follows:

1.      This declaration is based on my personal knowledge and belief.  I am over eighteen years of age and competent to testify to the matters set forth herein.

2.      In March 2018, I was nominated by President Donald J. Trump and in October 2018 I was confirmed unanimously by the United States Senate to serve as a Board member of the United States Privacy and Civil Liberties Oversight Board ("PCLOB" or "the Board").  On March 14, 2019, I was renominated by President Trump and reconfirmed unanimously by the Senate on June 27, 2019, for a second term that initially ran through January 29, 2025.  I am eligible at my election to serve until January 29, 2026, because no successor has been confirmed to take my place.

3.      By statute, Board members are required to be appointed "on the basis of their professional qualifications, achievements, public stature, expertise in civil liberties and privacy, and relevant experience."  I have extensive experience and expertise in technology, civil liberties, and privacy that are relevant to my service as a Board member.  Between 1993 and 2021, I was a professor of computer science and public affairs at Princeton University; I am now an emeritus

A52

professor. I founded, and for over a decade led, Princeton's Center for Information Technology Policy, which focuses on issues including data security and privacy. I previously served as Chief Technologist of the Federal Trade Commission and Deputy United States Chief Technology Officer. Before joining PCLOB, I served on advisory groups or working groups, or as a consultant, to the Departments of Defense, Justice, Homeland Security, and Commerce. I am a member of the National Academy of Engineering and the American Academy of Arts and Sciences. In 2023-24 I served as co-chair of a National Academies report committee on facial recognition technology. According to Google Scholar, my academic publications have been cited more than 27,000 times in the research literature.

4.      As of January 20, 2025, the Board had four members: myself, Travis LeBlanc, Beth Williams, and Sharon Bradford Franklin, the chair. Ms. Bradford Franklin's term, which had been extended by one year pursuant to the statutory holdover provision, was set to expire on January 29, 2025. Mr. LeBlanc, Ms. Bradford Franklin, and I are Democrats, while Ms. Williams is a Republican.

5.      On Tuesday, January 21, 2025, at 6:54 p.m., I received an email from Deputy Director of Presidential Personnel Trent Morse, sent from a White House email address, with the subject line "Privacy and Civil Liberties Oversight Board." The email stated:

> On behalf of President Donald J. Trump, I am writing to request your resignation as a Member of the Privacy and Civil Liberties Oversight Board. Please submit your resignation to me by the close of business on Thursday, January 23, 2025. If we have not received your resignation by that time, your position will be terminated. Should the President determine your services are still needed, you will receive additional correspondence.

A copy of that email is attached as Exhibit A.

6.      Mr. Morse's email did not offer any cause or offer any explanation for the requested resignation or for the threatened termination.

7.    Mr. LeBlanc and the chair of the PCLOB, Ms. Bradford Franklin, advised me that they received similar emails threatening to terminate them without cause.

8.    I was not provided advance notice, a hearing, or any other process prior to the President's decision to terminate me.

9.    I did not, and have not, resigned.

10.    Staff members at the PCLOB have advised me that on Thursday, January 23, another PCLOB Board member, Beth Williams, informed PCLOB staff that the three Democratic Board members would be terminated that evening.  Staff members also advised me that she ordered PCLOB staff to stay past the close of business that day for the purpose of effectuating our anticipated removal from the Board, including removing us as active Board members on the PCLOB website.

11.    I did not receive any notice of any termination by the President on Thursday, January 23; Friday, January 24; Saturday, January 25; or Sunday, January 26.

12.    PCLOB staff have advised me that, on Monday, January 27, 2025, Mr. Morse notified Ms. Williams to terminate me and my fellow Board members Mr. LeBlanc and Ms. Bradford Franklin.  PCLOB staff advised me that Ms. Williams then directed PCLOB staff to cut off my access to my PCLOB email account, revoke my access to PCLOB's offices, remove me from the PCLOB website as an active Board member, and terminate me from the agency.

13.    On Monday, January 27, I received a notification via Microsoft Outlook that I had been locked out of my PCLOB email account.

14.    Subsequently on Monday, January 27, I received, via my non-government email address, an email from Mr. Morse, with the subject line "Privacy and Civil Liberties Oversight Board."  The email stated:

Hello,

This email confirms that your position on the Privacy and Civil Liberties
Oversight Board was terminated on Thursday, January 23, 2025 at 17:01.

I responded with an email requesting a copy of the President's order. Mr. Morse did not respond.

A copy of this email exchange is attached as Exhibit B.

15.    Mr. Morse's email did not offer any cause or offer any explanation for my termination.

16.    The President has not informed me in any other way that he believes that I have committed neglect of duty or malfeasance or that there is any other cause for my removal.

17.    Mr. LeBlanc and Ms. Bradford Franklin were also purportedly terminated on January 27, 2025.

18.    The PCLOB now lacks the quorum necessary to conduct its statutorily mandated functions.

19.    Prior to my purported termination, I was working on PCLOB's mandatory semi-annual report to Congress, an important report on the use of facial recognition in aviation security, and a forthcoming report to Congress on Section 702 of the Foreign Intelligence Surveillance Act (among other projects). Authority for Section 702 is set to expire in April 2026, and Congress will be considering whether to re-authorize Section 702, and under what terms, in the coming year. Collecting information and drafting the report will take many months, after which the report will need to clear an extensive accuracy and classification review—meaning that if Mr. LeBlanc and I are not reinstated, it is highly unlikely that Congress will have the benefit of this nonpartisan report before Congress is required to act on the Section 702 reauthorization.

20.    As a result of the purported termination, I am unable to carry out my statutorily mandated duties as a Senate-confirmed member of the PCLOB.

4

A55

21.    I seek reinstatement so that I can fulfill the duties for which the President nominated and the Senate confirmed me, and a monetary award would not adequately compensate me for the injury caused by my purported termination.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Alexandria, Virginia on March 12, 2025.

Edward Felten

A56

Exhibit A

From: **Morse, Trent M. EOP/WHO** <Trent.M.Morse@who.eop.gov>
Date: Tue, Jan 21, 2025 at 6:54 PM
Subject: Privacy and Civil Liberties Oversight Board
To: ed.felten@pclob.gov <ed.felten@pclob.gov>, ed@felten.com <ed@felten.com>,
felten@CS.Princeton.EDU <felten@cs.princeton.edu>, ed@princeton.edu
<ed@princeton.edu>

Edward,

On behalf of President Donald J. Trump, I am writing to request your resignation as a Member
of the Privacy and Civil Liberties Oversight Board. Please submit your resignation to me by
the close of business on Thursday, January 23, 2025. If we have not received your resignation
by that time, your position will be terminated. Should the President determine your services
are still needed, you will receive additional correspondence.

Trent Morse

Deputy Director of Presidential Personnel

Exhibit B

From: **Ed Felten** <ed@felten.com>
Date: Mon, Jan 27, 2025 at 4:36 PM
Subject: Re: FW: Privacy and Civil Liberties Oversight Board
To: Morse, Trent M. EOP/WHO <Trent.M.Morse@who.eop.gov>
Cc: Richard Morgan <Richard.Morgan@pclob.gov>

Please send a copy of the President's order.

On Mon, Jan 27, 2025 at 2:52 PM Morse, Trent M. EOP/WHO
<Trent.M.Morse@who.eop.gov> wrote:

> Hello,
>
> This email confirms that your position on the Privacy and Civil Liberties Oversight Board
> was terminated on Thursday, January 23, 2025 at 17:01.
>
>
>
>
> **From:** Morse, Trent M. EOP/WHO
> **Sent:** Tuesday, January 21, 2025 6:55 PM
> **Subject:** Privacy and Civil Liberties Oversight Board
>
>
> On behalf of President Donald J. Trump, I am writing to request your resignation as a
> Member of the Privacy and Civil Liberties Oversight Board. Please submit your resignation
> to me by the close of business on Thursday, January 23, 2025. If we have not received your
> resignation by that time, your position will be terminated. Should the President determine
> your services are still needed, you will receive additional correspondence.
>
>
> Trent Morse
> Deputy Director of Presidential Personnel

A60

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRAVIS LEBLANC, et al.,

Plaintiffs,

v.

UNITED STATES PRIVACY AND CIVIL
LIBERTIES OVERSIGHT BOARD, et al.,

Defendants.

Civil Action No. 25-0542 (RBW)

**DEFENDANTS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE DISPUTE**

Pursuant to Local Civil Rule 7(h) and ¶ 13 of the Court's General Order (ECF No. 5), Defendants, the U.S. Privacy and Civil Liberties Oversight Board ("Board" or "PCLOB"), Beth A. Williams, Jennifer Fitzpatrick, Trent Morse, and Donald J. Trump, respectfully submit this statement of material facts as to which there is no genuine dispute and response to Plaintiffs' statement of facts (ECF No. 10-2).

| **Plaintiffs' Statement of Fact** | **Defendants' Response** |
|---|---|
| 1. Plaintiff Travis LeBlanc was nominated by President Trump in August 2018 to be a Board member of the United States Privacy and Civil Liberties Oversight Board ("PCLOB" or "the Board"), and confirmed unanimously by the Senate in July 2019, for a term expiring January 29, 2022.  *See* LeBlanc Decl. ¶ 2. | 1. Defendants' disputes with this paragraph are not material to either party's motion—namely, Plaintiff LeBlanc was confirmed by a voice vote, which is not necessarily unanimous and where the tally of votes is not recorded.  *See, e.g.*, Senate, *About Voting*, https://www.senate.gov/about/powers-procedures/voting.htm (last accessed Apr. 3, 2025).  Otherwise, undisputed. |

A61

| | |
|---|---|
| 2. Mr. LeBlanc was renominated by President Biden on March 29, 2022, and confirmed unanimously by the Senate on September 14, 2022, for a second term expiring on January 29, 2028. *See id* ¶ 3. | 2. Defendants incorporate their response to ¶ 1, as Plaintiff LeBlanc was confirmed by voice vote in 2022, too. Indeed, six Senators voted "nay" on Plaintiff LeBlanc in committee. *See, e.g.*, Senate Judiciary Comm., *Results of Executive Business Meeting – September 8, 2022*, at 1.[1] Otherwise, undisputed. |
| 3. Plaintiff Edward Felten was nominated by President Trump in March 2018 to be a Board member of the PCLOB, and confirmed unanimously by the Senate in October 2018, for a term expiring January 29, 2019. *See* Felten Decl. ¶ 2. | 3. Defendants incorporate their response to ¶ 1, as Plaintiff Felten was likewise confirmed by voice vote. Otherwise, undisputed. |
| 4. Dr. Felten was renominated by President Trump on March 14, 2019 and reconfirmed unanimously by the Senate on June 27, 2019, for a second term that initially ran through January 29, 2025. *See id*. | 4. Undisputed that Plaintiff Felten was renominated by President Trump on March 14, 2019. Defendants incorporate their response to ¶ 1, as Plaintiff Felten was likewise confirmed by voice vote by the Senate on June 27, 2019, for a second term scheduled to run through January 29, 2025. The word "initially," as used in ¶ 4, is a conclusion of law. Plaintiff Felten was confirmed to a term that expired on January 29, 2025. |
| 5. No successor to Dr. Felten has been confirmed, and Dr. Felten is therefore eligible at his election to serve until January 29, 2026. *See id*. | 5. Undisputed that no successor to Plaintiff Felten has been confirmed, and undisputed that Plaintiff Felten, if he had not been removed, would have been eligible at his election to serve until January 29, 2026, or until his successor was confirmed, whichever came first. *See* 42 U.S.C. § 2000ee(h)(4)(D)(ii) (limiting the one-year election for Board Members who have already served one term, such as Plaintiff Felten, to expiring at the lesser of "one year after the date of expiration" or "until the member's successor has been appointed and qualified"). |

---

[1]    https://www.judiciary.senate.gov/imo/media/doc/EBM%20Results%20-%202022-09-08.pdf.

A62

| | |
|---|---|
| 6. Defendant PCLOB is an independent agency composed of individuals with expertise in civil liberties and privacy. 42 U.S.C. §§ 2000ee(a); (h)(2). | 6. Undisputed that the Board is "an independent agency within the executive branch," 42 U.S.C. § 2000ee(a), although Plaintiffs' brief mistakes the legal meaning of "independent agency," as described in Defendants' brief, and Plaintiffs' brief does not include the rest of the clause: "within the Executive Branch." Undisputed that the Board is comprised of individuals with expertise in civil liberties and privacy. |
| 7. Plaintiffs have expertise in civil liberties and privacy and experience relevant to their service on the PCLOB. *See* LeBlanc Decl. ¶ 4; Felten Decl. ¶ 3. | 7. Undisputed. |
| 8. Defendant Beth A. Williams is a Board member of the PCLOB. *See* PCLOB, *Board Members*, https://www.pclob.gov/Board/Index (last visited Mar. 9, 2025). | 8. Undisputed. |
| 9. Defendant Jennifer Fitzpatrick is the Executive Director of the PCLOB. *See* PCLOB, *Board Staff*, https://www.pclob.gov/Staff/Index (last visited Mar. 9, 2025). | 9. Undisputed. |
| 10. Defendant Trent Morse is the Deputy Director of Presidential Personnel. *See* LeBlanc Decl. Ex. A; Felten Decl. Ex. A. | 10. Undisputed. |
| 11. As of January 20, 2025, PCLOB had four members: Plaintiffs, Defendant Williams, and Sharon Bradford Franklin, the chair. *See* LeBlanc Decl. ¶ 5; Felten Decl. ¶ 4. | 11. Undisputed. |
| 12. Ms. Bradford Franklin's term, which had been extended by one year pursuant to the statutory holdover provision, was set to expire on January 29, 2025. *See* LeBlanc Decl. ¶ 5; Felten Decl. ¶ 4. | 12. Defendants' disputes with this paragraph are not material to either party's motion—namely, Ms. Franklin's term expired on January 29, 2024, but she was, at the time of her term's expiration, eligible at her election to serve for up to one year or until her successor was confirmed, as described further in Defendants' response to ¶ 5 above. |
| 13. Plaintiffs and Ms. Bradford Franklin are Democrats, while Defendant Williams is a Republican. *See* LeBlanc Decl. ¶ 5; Felten Decl. ¶ 4. | 13. Undisputed. |

A63

| | |
|---|---|
| 14. On Tuesday, January 21, 2025, at 6:54 p.m., Plaintiffs each received separate emails from Defendant Morse, sent from a White House email address, with the subject line "Privacy and Civil Liberties Oversight Board." The emails stated[:] "On behalf of President Donald J. Trump, I am writing to request your resignation as a Member of the Privacy and Civil Liberties Oversight Board.    Please submit your resignation to me by the close of business on Thursday, January 23, 2025. If we have not received your resignation by that time, your position will be terminated. Should the President determine your services are still needed, you will receive additional correspondence." *See* LeBlanc Decl. Ex. A; Felten Decl. Ex. A. | 14. Undisputed. |
| 15. Defendant Morse did not identify any cause or offer any explanation for the requested resignation or for the threatened termination of Mr. LeBlanc. *See* LeBlanc Decl. Ex. A. | 15. Undisputed. |
| 16. Defendant Morse did not identify any cause or offer any explanation for the requested resignation or for the threatened termination of Dr. Felten. *See* Felten Decl. Ex. A. | 16. Undisputed. |
| 17. Plaintiffs were not provided advance notice, a hearing, or any other process prior to the President's decision to terminate them. *See* LeBlanc Decl. ¶ 9; Felten Decl. ¶ 8. | 17. Plaintiffs received notice that the President was requesting their resignation on January 21, 2025, and that they would be terminated effective January 23, 2025, if they did not do so, which is what Plaintiffs state in ¶ 14 above. Otherwise, undisputed. |
| 18. Plaintiffs did not, and have not, resigned. *See* LeBlanc Decl. ¶ 10; Felten Decl. ¶ 9. | 18. Undisputed. |
| 19. On Thursday, January 23, 2025, Defendant Williams informed PCLOB staff that the three Democratic Board members would be terminated that evening.    *See* LeBlanc Decl. ¶ 11; Felten Decl. ¶ 10. | 19. Disputed, with Plaintiffs failing to support the allegations in  ¶ 19 with admissible evidence, as ¶ 10 of the Felten and ¶ 11 of the LeBlanc Declarations are both based solely on inadmissible hearsay ("[s]taff members at the PCLOB have advised me . . .).  *See* Fed. R. Civ. P. 56(c)(4) (requiring declarations to "be made on personal knowledge"); *see also* Fed. R. Civ. P. 56(c)(1)(a), (c)(2).   The parties' dispute is immaterial to the parties' motions. |

| | |
|---|---|
| 20. Defendant Williams ordered PCLOB staff to stay past the close of business on Thursday, January 23, 2025, for the purpose of effectuating Plaintiffs' anticipated removals from the Board. *See* LeBlanc Decl. ¶ 11; Felten Decl. ¶ 10. | 20. Disputed. Defendants incorporate their response to ¶ 19 in its entirety, as these same paragraphs in Plaintiffs' declarations cited in ¶ 20 are likewise not supported by personal knowledge, but rather by hearsay, and Plaintiffs cannot testify as to Defendant Williams's state of mind. This allegation is also immaterial to the parties' motions. No actions were taken to effectuate Plaintiffs' removals on Thursday, January 23, 2025. By their declarations, Plaintiffs continued their PCLOB work until Monday, January 27, 2025. *See* LeBlanc Decl. ¶¶ 12–14; Felten Decl. ¶¶ 11–13. |
| 21. Plaintiffs did not receive any notice of any termination by the President on Thursday, January 23; Friday, January 24; Saturday, January 25; or Sunday, January 26. *See* LeBlanc Decl. ¶ 12; Felten Decl. ¶ 11. | 21. Undisputed. |
| 22. Plaintiffs continued working on PCLOB matters through Monday, January 27. *See* LeBlanc Decl. ¶¶ 12-14; Felten Decl. ¶¶ 11-13. | 22. Undisputed. |
| 23. On Monday, January 27, 2025, Defendant Morse notified Defendant Williams to terminate Plaintiffs. *See* LeBlanc Decl. ¶ 13; Felten Decl. ¶ 12. | 23. Defendants incorporate their response to ¶ 19 in its entirety, as these paragraphs in Plaintiffs' declarations cited in ¶ 23 are likewise not supported by personal knowledge, but rather by hearsay ("PCLOB staff have advised me . . ."). As Plaintiffs acknowledge later in their statement of facts, it is President Trump, not Defendant Williams, who removed Plaintiffs from the Board. *See* ¶ 35 ("The President terminated all three Democratic members of the Board[.]"). |
| 24. Defendant Williams then directed PCLOB staff to cut off Plaintiffs' access to their PCLOB email accounts, revoke their access to the PCLOB's offices, remove them from the PCLOB website as active Board members, and terminate them from the agency. *See* LeBlanc Decl. ¶ 13; Felten Decl. ¶ 12. | 24. Defendants incorporate their response to ¶ 19 in its entirety, as these paragraphs in Plaintiffs' declarations cited in ¶ 24 are likewise not supported by personal knowledge, but rather by hearsay ("PCLOB staff have advised me . . ."). As Plaintiffs acknowledge later in their statement of facts, it is President Trump, not Defendant Williams, who removed Plaintiffs from the Board. *See* ¶ 35 ("The President terminated all three Democratic members of the Board[.]"). |

| | |
|---|---|
| 25. On Monday, January 27, Plaintiffs received notifications via Microsoft Outlook that they had been locked out of their PCLOB email accounts. *See* LeBlanc Decl. ¶ 14; Felten Decl. ¶ 13. | 25. Undisputed. |
| 26. Subsequently on Monday, January 27, Plaintiffs received, via their non-government email addresses, separate emails from Defendant Morse, with the subject line "Privacy and Civil Liberties Oversight Board." The emails stated: "Hello, This email confirms that your position on the Privacy and Civil Liberties Oversight Board was terminated on Thursday, January 23, 2025 at 17:01." *See* LeBlanc Decl. Ex. B; Felten Decl. Ex. B. | 26. Undisputed. |
| 27. Plaintiffs both requested a copy of the official Presidential action terminating them. LeBlanc Decl. ¶ 15; Felten Decl. ¶ 14; LeBlanc Decl. Ex. B; Felten Decl. Ex. B. | 27. Undisputed. |
| 28. Defendant Morse did not respond to Dr. Felten. Felten Decl. ¶ 14. | 28. Undisputed. |
| 29. He responded to Mr. LeBlanc: "This email serves as the Presidential action." LeBlanc Decl. Ex. B. | 29. Undisputed. |
| 30. Ms. Bradford Franklin was also purportedly terminated on Monday, January 27, 2025. *See* LeBlanc Decl. ¶ 18; Felten Decl. ¶ 17. | 30. Undisputed that Bradford Franklin's removal was confirmed on January 27, 2025, effective January 23, 2025. The four-day difference between the date of removal for an individual who is not a party to this action is not material to the parties' motions. |
| 31. Defendant Morse's January 27 email did not identify any cause or offer any explanation for Plaintiffs' purported terminations. *See* LeBlanc Decl. ¶ 16; Ex. B; Felten Decl. ¶ 15; Ex. B. | 31. Undisputed. |
| 32. The President has not informed Mr. LeBlanc in any other way that he believes that Mr. LeBlanc has committed neglect of duty or malfeasance or that there is any other cause for removal. *See* LeBlanc Decl. ¶ 17. | 32. Undisputed. |
| 33. The President has not informed Dr. Felten in any other way that he believes that Dr. Felten has committed neglect of duty or malfeasance or that there is any other cause for removal. *See* Felten Decl. ¶ 16. | 33. Undisputed. |

A66

| | |
|---|---|
| 34. The President did not identify any cause for the termination of Ms. Bradford Franklin. *See* LeBlanc Decl. ¶ 8; Felten Decl. ¶ 7; PCLOB, *Press Release*, [link omitted]. | 34. Undisputed. |
| 35. The President terminated all three Democratic members of the Board but did not terminate Ms. Williams, the sole Republican member of the Board. *See* LeBlanc Decl. ¶¶ 5, 18; Felten Decl. ¶¶ 4, 17. | 35. Undisputed. |
| 36. Promptly after Plaintiffs received emails from Defendant Morse on Monday, January 27, Defendant Williams directed the Board to issue a press release stating that "the White House terminated Chair Sharon Bradford Franklin and Members Ed Felten and Travis LeBlanc from their positions as of 5 p.m. last Thursday." *See* PCLOB, *Press Release*, [link omitted]. | 36. Undisputed that the press release was issued on January 27, 2025, several hours after Plaintiffs received emails from Defendant Morse, and undisputed that, with the exception of a capitalization change, Plaintiffs have correctly quoted that portion of the press release. Plaintiffs have failed to support the remaining allegations in ¶ 36 with admissible evidence. *See* Fed. R. Civ. P. 56(c)(1)(A), (c)(2). |
| 37. The PCLOB now lacks the quorum necessary to conduct its statutorily mandated functions. *See* 42 U.S.C. § 2000ee(h)(5). | 37. Undisputed that the Board lacks a quorum, although the legal conclusion that this quorum is necessary for the Board to continue to conduct its statutorily mandated functions is disputed, as described in Defendants' brief, which details the significant authority the Board has to operate in a sub-quorum status. *See, e.g.*, PCLOB, *Congressional Budget Justification: Fiscal Year 2023*, at 3.[2] For instance, the Board may continue to work on projects previously opened by a quorate Board, as well as issue staff reports and reports by individual members. *See id.* |
| 38. Prior to their purported terminations, Plaintiffs were working on PCLOB's mandatory semi-annual report to Congress, a report on the use of facial recognition technology in aviation security, and a forthcoming report to Congress on Section 702 of the Foreign Intelligence Surveillance Act. *See* LeBlanc Decl. ¶ 20; Felten Decl. ¶ 19. | 38. Undisputed that Plaintiffs were working on a report regarding the use of facial recognition technology in aviation security at or before the time of their removals. Plaintiffs' allegations in ¶ 38 are not material to the parties' motions and the Court may assume the truth thereof, notwithstanding Defendants' belief that the remaining allegations in ¶ 38 are inaccurate. |

---

[2]    *Available at* https://documents.pclob.gov/prod/Documents/FinancialReport/40/PCLOB%20FY%202023%20Congressional%20Budget%20Justification%20-%20508,%20Mar%2016,%202022%200940.pdf.

A67

| | |
|---|---|
| 39. The statutory authorization for Section 702 is set to expire in April 2026. *See* LeBlanc Decl. ¶ 20; Felten Decl. ¶ 19. | 39. Undisputed. |
| 40. Drafting the PCLOB's report on Section 702 will take many months and the report will need to clear an extensive accuracy and classification review. *See* LeBlanc Decl. ¶ 20; Felten Decl. ¶ 19. | 40. Disputed as to the characterizations of "many" and "extensive." Defendants aver that, because the Board issued an extensive report on Section 702 less than two years ago, the amount of time required to prepare this update, which will be far shorter, is substantially less. *See* PCLOB, *Report in the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act*, Sept. 28, 2023.[3] Otherwise, undisputed. |
| 41. If Plaintiffs are not reinstated, it is highly unlikely that the PCLOB's report on Section 702 will be completed before Congress is required to act on the Section 702 reauthorization. *See* LeBlanc Decl. ¶ 20; Felten Decl. ¶ 19. | 41. Disputed. The Board provided Congress with an extensive, 297-page report on Section 702 less than two years ago. *See* PCLOB, *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act*, (hyperlink at n.3). That report included the views of both Plaintiffs. *Id.* at iv. As such, only an update to that Report was approved as a project.[4] The Board has the authority to issue reports either as staff reports, or in the name of individual members while it operates in a sub-quorum status. PCLOB, *Congressional Budget Justification: Fiscal Year 2023*, at 3 (hyperlink at n.2). Plaintiffs' assertion as to what Congress is required to do is a legal conclusion to which no response is required, although Defendants aver that Congress may, as it has three times before, in 2012, 2017, and 2023, extend Section 702 following the expiration of the statute. Further, the phrase "highly unlikely" in ¶ 41 is unduly speculative. |

Pursuant to ¶ 13 of the General Order (ECF No. 5), Defendants' affirmative statement of

facts appears below:

---

[3]    *Available at* https://documents.pclob.gov/prod/Documents/OversightReport/054417e4-9d20-427a-9850-862a6f29ac42/2023%20PCLOB%20702%20Report%20(002).pdf.
[4]    https://www.pclob.gov/OversightProjects.

| **Defendants' Statement of Fact** | **Plaintiffs' Response** |
|---|---|
| 1.  Plaintiff Travis LeBlanc was nominated by President Trump in August 2018 to be a Board Member and confirmed by the Senate in July 2019, for a term expiring January 29, 2022. *See* LeBlanc Decl. (ECF No. 10-3) at 1, ¶ 2. | |
| 2.   Plaintiff LeBlanc was renominated by President Biden on March 29, 2022, and confirmed by the Senate on September 14, 2022, for a second term expiring on January 29, 2028.  *See* LeBlanc Decl. (ECF No. 10-3) at 1, ¶ 3. | |
| 3.  Plaintiff Edward Felten was nominated by President Trump in March 2018 to be a Board Member and confirmed by the Senate in October 2018, for a term expiring January 29, 2019.  *See* Felten Decl. (ECF No. 10-4) at 1, ¶ 2. | |
| 4.   Plaintiff Felten was renominated by President Trump on March 14, 2019, and confirmed by the Senate on June 27, 2019, for a second term expiring January 29, 2025. *See* Felten Decl. (ECF No. 10-4) at 1, ¶ 2. | |
| 5. No successor to Plaintiff Felten has been confirmed, and Plaintiff Felten, if not removed, would have been eligible at his election to serve until the earlier of January 29, 2026, or a successor was confirmed.  *See* Felten Decl. (ECF No. 10-4) at 1, ¶ 2. | |

A69

| **Defendants' Statement of Fact** | **Plaintiffs' Response** |
|---|---|
| 6.  On Tuesday, January 21, 2025, at 6:54 p.m., Plaintiffs each received separate emails from Defendant Morse, sent from a White House email address, with the subject line "Privacy and Civil Liberties Oversight Board."  The emails stated: "On behalf of President Donald J. Trump, I am writing to request your resignation as a Member of the Privacy and Civil Liberties Oversight Board.   Please submit your resignation to me by the close of business on Thursday, January 23, 2025.  If we have not received your resignation by that time, your position will be terminated.  Should the President determine your services are still needed, you will receive additional correspondence."  *See* LeBlanc Email (ECF No. 10-3) at 7; Felten Email (ECF No. 10-4) at 7. | |
| 7.    Plaintiffs did not comply with the President's request.  *See* LeBlanc Decl. (ECF No. 10-3) at 3, ¶ 10; Felten Decl. (ECF No. 10-4) at 3, ¶ 9. | |
| 8.  The President removed Plaintiffs from the Board effective January 23, 2025.    *See* LeBlanc Decl. (ECF No. 10-3) at 4, ¶ 15; Felten Decl. (ECF No. 10-4) at 4, ¶ 14. | |

A70

Dated: April 3, 2025                    Respectfully submitted,

                                        YAAKOV M. ROTH
                                        Acting Assistant Attorney General
                                        Civil Division

                                        EMILY HALL
                                        Counsel to the Assistant Attorney General
                                        Civil Division
                                        United States Department of Justice
                                        950 Pennsylvania Avenue NW
                                        Washington, DC 20530
                                        Tel: (202) 307-6482
                                        emily.hall@usdoj.gov

                                        EDWARD R. MARTIN, JR., D.C. Bar #481866
                                        United States Attorney


                                        By:  _____/s/ *Douglas C. Dreier*_____
                                             DOUGLAS C. DREIER, D.C. Bar #1020234
                                             Assistant United States Attorney
                                             601 D Street, NW
                                             Washington, DC 20530
                                             (202) 252-2551

                                             *Attorneys for the United States of America*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TRAVIS LEBLANC, *et al.*,

                *Plaintiffs*,

      v.

UNITED STATES PRIVACY AND CIVIL
LIBERTIES OVERSIGHT BOARD, *et al.*,

             *Defendants*.

Civil Action No. 25-542 (RBW)

## PLAINTIFFS' RESPONSE TO DEFENDANTS'
## STATEMENT OF UNDISPUTED MATERIAL FACTS

In support of their motion for expedited summary judgment and opposition to Defendants'
cross-motion for summary judgment, Plaintiffs Travis LeBlanc and Edward Felten submit the
following response to Defendants' statement of material facts as to which there is no genuine
dispute (ECF 12-1):

| **Defendants' Statement of Fact** | **Plaintiffs' Response** |
|---|---|
| 1. Plaintiff Travis LeBlanc was nominated by President Trump in August 2018 to be a Board Member and confirmed by the Senate in July 2019, for a term expiring January 29, 2022. *See* LeBlanc Decl. (ECF No. 10-3) at 1, ¶ 2. | 1. Plaintiffs' dispute with this paragraph is not material to the parties' motions. Although Plaintiff LeBlanc received his commission in July 2019, the Senate confirmed him to the Board the month before. *See* LeBlanc Decl., ECF 10-3, ¶ 2; https://www.congress.gov/nomination/116th-congress/195. |
| 2. Plaintiff LeBlanc was renominated by President Biden on March 29, 2022, and confirmed by the Senate on September 14, 2022, for a second term expiring on January 29, 2028. *See* LeBlanc Decl. (ECF No. 10-3) at 1, ¶ 3. | 2. Undisputed. |

A72

| **Defendants' Statement of Fact** | **Plaintiffs' Response** |
|---|---|
| 3. Plaintiff Edward Felten was nominated by President Trump in March 2018 to be a Board Member and confirmed by the Senate in October 2018, for a term expiring January 29, 2019. *See* Felten Decl. (ECF No. 10-4) at 1, ¶ 2. | 3. Undisputed. |
| 4. Plaintiff Felten was renominated by President Trump on March 14, 2019, and confirmed by the Senate on June 27, 2019, for a second term expiring January 29, 2025. *See* Felten Decl. (ECF No. 10-4) at 1, ¶ 2. | 4. Undisputed, but Plaintiff Felten had the right "at [his] election" to serve until January 29, 2026, or until a successor was confirmed. 42 U.S.C. § 2000ee(h)(4)(D). |
| 5. No successor to Plaintiff Felten has been confirmed, and Plaintiff Felten, if not removed, would have been eligible at his election to serve until the earlier of January 29, 2026, or a successor was confirmed. *See* Felten Decl. (ECF No. 10-4) at 1, ¶ 2. | 5. Undisputed that no successor has been confirmed. Undisputed that Plaintiff Felten had a statutory right to serve "at [his] election" until January 29, 2026, or until a successor was confirmed. 42 U.S.C. § 2000ee(h)(4)(D). Plaintiffs dispute any embedded legal conclusion that Plaintiff Felten's unlawful removal eliminated this statutory right. |
| 6. On Tuesday, January 21, 2025, at 6:54 p.m., Plaintiffs each received separate emails from Defendant Morse, sent from a White House email address, with the subject line "Privacy and Civil Liberties Oversight Board." The emails stated: "On behalf of President Donald J. Trump, I am writing to request your resignation as a Member of the Privacy and Civil Liberties Oversight Board. Please submit your resignation to me by the close of business on Thursday, January 23, 2025. If we have not received your resignation by that time, your position will be terminated. Should the President determine your services are still needed, you will receive additional correspondence." *See* LeBlanc Email (ECF No. 10-3) at 7; Felten Email (ECF No. 10-4) at 7. | 6. Undisputed. |
| 7. Plaintiffs did not comply with the President's request. *See* LeBlanc Decl. (ECF No. 10-3) at 3, ¶ 10; Felten Decl. (ECF No. 10-4) at 3, ¶ 9. | 7. Undisputed that Plaintiffs did not resign. |

| **Defendants' Statement of Fact** | **Plaintiffs' Response** |
|---|---|
| 8. The President removed Plaintiffs from the Board effective January 23, 2025.  *See* LeBlanc Decl. (ECF No. 10-3) at 4, ¶ 15; Felten Decl. (ECF No. 10-4) at 4, ¶ 14. | 8. Disputed both as to the timing of Plaintiffs' purported removals and as to the characterization of who effectuated those removals.  Plaintiffs "did not receive any notice of any termination by the President on Thursday, January 23; Friday, January 23; Saturday, January 25; or Sunday, January 26." LeBlanc Decl. ¶ 12; Felten Decl., ECF 10-4, ¶ 11.  Plaintiffs dispute that the President may make a removal retroactively effective.  On Monday, January 27, Defendant Morse notified Defendant Williams to terminate the three Democratic members of the Board, including Plaintiffs and then-Chair Bradford Franklin.  *See* LeBlanc Decl. ¶ 13; Felten Decl. ¶ 12.  Defendant Williams then directed agency officials to carry out the removals. *Id.* Plaintiffs' email access was revoked and they received notice of their purported terminations from Defendant Morse that day.  *See* LeBlanc Decl. ¶¶ 14, 15; Felten Decl. ¶¶ 13, 14.  Plaintiffs never received a termination notice signed by the President.  *See* LeBlanc Decl. ¶ 15; Felten Decl. ¶ 14. |

Dated: April 16, 2025

Respectfully submitted,

*/s/ Elisabeth S. Theodore*
Elisabeth S. Theodore (D.C. Bar No. 1021029)
Daniel Yablon (D.C. Bar. No. 90022490)
ARNOLD & PORTER
　KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
elisabeth.theodore@arnoldporter.com
daniel.yablon@arnoldporter.com

Caleb Thompson (D.C. Bar No. 90007438)
ARNOLD & PORTER
　KAYE SCHOLER LLP
250 West 55th St.
New York, NY 10019
Tel: (212) 836-8000
caleb.thompson@arnoldporter.com

*Counsel for Plaintiffs Travis LeBlanc and
Edward Felten*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

TRAVIS LEBLANC, et al.,

           *Plaintiffs*,

    v.

UNITED STATES PRIVACY AND CIVIL
LIBERTIES OVERSIGHT BOARD, et al.,

           *Defendants*.

Civil Action No. 25-542 (RBW)

## <u>SUPPLEMENTAL DECLARATION OF TRAVIS LEBLANC</u>

I, Travis LeBlanc, declare as follows:

1.      This declaration is based on my personal knowledge and belief.  I am over eighteen years of age and competent to testify to the matters set forth herein.  I submit this supplemental declaration in opposition to the defendants' motion for summary judgment in this matter and in further support of the plaintiffs' motion for summary judgment.

2.      The Privacy and Civil Liberties Oversight Board does not have significant authority to operate in a sub-quorum status. Absent a quorum, the Board will be unable to carry out its most important statutorily-mandated tasks, including commencing any new projects or investigations and issuing reports in the Board's name.   With or without a quorum, individual Board members may always seek to publish any document that they would like, but that would not be a Board document any more than one Senator issuing a report would make the report a document of the U.S. Senate.  Absent a quorum, individual Board members lack authority to take actions for the Board (other than addressing personnel matters).  In sub-quorum status, the Board also cannot produce its statutorily-required semi-annual reports.  Those reports are the method that Congress

prescribed for the Board to convey the results of its advice and oversight functions to Congress. Without them, the Board cannot fulfill its statutory mandate to communicate the Board's views to Congress on proposed legislation and policies.

3.      As a consequence of the President's purported terminations of me and my fellow Democratic Board members, the Board has not issued its report on facial recognition technology, a report that members of Congress have requested. That report was nearly finished at the time of our terminations and would have been issued by now if we had not been terminated, but it cannot be issued while the Board remains in sub-quorum status.

4.      The Board's sub-quorum status also threatens the integrity of the Trans-Atlantic Data Privacy Framework, which provides the key mechanism supporting more than $1 trillion in trade and investment by approximately 3,000 businesses operating in the United States that must transfer personal data of Europeans to the United States to conduct their business. Under Executive Order 14086, the Board reviews intelligence agency policies relating to collection of that data and conducts an annual review of complaints brought by individuals who believe that their data has been handled in violation of U.S. law, but now the Board cannot conduct these reviews. The European Parliament has now asked the European Commission to reconsider whether U.S. protections for personal information are adequate to permit EU-US data transfers or whether the framework would no longer be consistent with European law. A copy of this letter is attached as Exhibit A.

5.      In sub-quorum status, the Board also will not be able to report to Congress on the pending question of reauthorization of FISA § 702, a question of vital importance to national security and civil liberties. Nor will the Board be able to hold a public forum on Section 702, as it did in advance of issuing its report in 2023.

A77

6.      The Board's upcoming Section 702 report will take a substantial amount of time to complete, notwithstanding that it is an "update" of the 2023 report.  The 2023 report was also an "update" of a prior report on Section 702.  And as the Board's description of the 702 report on its "Current Oversight Projects" page indicates (attached as Exhibit B), the 2024 re-authorization statute, the Reforming Intelligence and Securing America Act of 2024 (RISAA), made a series of material changes to the Section 702 authority that the Board's 2023 report did not and could not address:

> Notably, RISAA imposed new requirements for and limitations on Section 702, including more stringent requirements for certain FBI queries, increased training and reporting requirements, new disciplinary rules for noncompliance, and mandatory use of FISA Court amici in Section 702 certifications. RISAA also expanded certain aspects of the program, including an expansion of the definition of "electronic communications service provider;" an expansion of the definition of "foreign intelligence information" to include the international production, distribution, and financing of certain drugs and precursors; and an expansion of the use of Section 702-acquired information for vetting non-US persons traveling to the country. The Board will evaluate Section 702 programmatic changes and compliance since 2023, including the impact on U.S. persons. In particular, the Board will evaluate how the Intelligence Community (IC) has implemented legislative changes as well as technical, policy, and procedural updates to the program that impact privacy and civil liberties.

7.      These are changes to some of the most significant aspects of Section 702, such as the definition of what constitutes "foreign intelligence information," and our prior report did not address the intelligence community's implementation of any of these changes because they had not happened at the time of our prior report.  The most critical part of our new report will be investigating and analyzing the implementation of these new requirements and authorities, whether they have had their intended effect, and whether they have had unintended effects on privacy and civil liberties, and making recommendations on whether Congress should walk back some of these changes or make additional changes.  The  report would also examine any intelligence community policy changes since the Board's 2023 report.  I personally expect that investigating and analyzing

and reporting on these changes would take at least 6 months. Based on my lengthy experience at PCLOB, I further anticipate that, once the report is completed, it will take at minimum 2 months for the intelligence community to complete its accuracy and classification review.

8.    As I explained in my original declaration, unless we are reinstated, it is highly unlikely that the 702 report will be completed in time to allow Congress to consider it in advance of April 2026, when the current Section 702 authorization expires. Our work on the Section 702 report in advance of the 2024 reauthorization began in the spring of 2022; we invited public comments in a Federal Register notice in September 2022; we held a public forum in January 2023 at which the director of the National Security Agency and the General Counsel of the Office of the Director of National Intelligence participated, among other officials; and we issued the declassified report on September 28, 2023, in advance of a December 2023 statutory sunset date. In other words, we began work at least 18 months before Section 702 authorities were set to expire in December 2023; and we are already behind that schedule because there is only a year before the April 2026 sunset. If Dr. Felten and I are not promptly reinstated, the report will not be complete sufficiently in advance of the reauthorization deadline to allow Congress to consider it, or would have to be significantly truncated or forego analysis of the implementation of some of the intelligence community's new and changed authorities under Section 702. Moreover, the Board cannot issue the Section 702 report without a quorum.

9.    Backpay or frontpay could not fully cure the harm to me from my illegal purported termination. First, under the statute, I am entitled to compensation only for "each day during which [I am] engaged in the actual performance of the duties of the Board," 42 U.S.C. § 2000ee(i)(1)(B), so a monetary award would not be available in the absence of reinstatement. Second, even if backpay or frontpay were available in the absence of reinstatement, it would not cure my injury.

A79

The President's purported terminations of my fellow Board members and me have left the Board without a quorum and unable to complete the tasks it is required to complete by law, and have prevented me from participating on the Board in any capacity.  As a rightful Board member with a duly executed commission entitling me to all the "powers, privileges and emoluments" of that office, I have a significant interest in ensuring that the Board continues to operate as intended, as a nonpartisan commission composed of multiple members with differing views, and I separately have a significant interest in continuing to serve in the position that I am legally entitled to hold and continuing to participate in the Board's work, including the forthcoming Section 702 report.  I brought this lawsuit to vindicate those rights and interests.  Moreover, my public service on the Board is of great importance to me: I have devoted much of my career to the study and practice of national security, cybersecurity, privacy, and civil liberties law.  I believe that the Board does critical work to ensure that privacy and civil liberties are respected and it is important to me personally, professionally, and as a citizen to continue to contribute to that work.  I do not serve on the Board because of the compensation.

I declare under penalty of perjury of the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: April 16, 2025

*Travis LeBlanc*
Travis LeBlanc

A80

# EXHIBIT A



Committee on Civil Liberties, Justice and Home Affairs
The Chairman

IUST-SEC/LIBE D (2025) 2901

Mr Michael McGrath
Commissioner for Democracy, Justice, the Rule of Law and Consumer Protection
European Commission
Rue de la Loi/Wetstraat 200          D 300788    06.02.2025
1049 Brussels

Dear Commissioner McGrath,

The Committee on Civil Liberties, Justice and Home Affairs (LIBE Committee) closely follows all matters linked to the European Commission's adequacy finding for the EU-US Data Privacy Framework mechanism. It was in view of the Commission's assessment that the European Parliament adopted its resolution of 11 May 2023 on the adequacy of the protection afforded by the EU-US Data Privacy Framework (2023/2501(RSP)). Furthermore, during a LIBE Committee mission to Washington in May 2023, LIBE Members had an opportunity to discuss EU-US data transfers with Members of the US Congress, representatives of the US Departments of Justice and Commerce, as well as the Chair of the Federal Trade Commission.

One of the issues considered in the above-mentioned resolution are the competences of the Privacy and Civil Liberties Oversight Board (PCLOB), an independent body responsible for ensuring that privacy and civil liberties are safeguarded. The EU-US Data Privacy Framework established a new review mechanism, allowing individuals in the EU whose personal data are transferred to the US to lodge a complaint before the US authorities. The PCLOB oversees the functioning of this mechanism. Among others, the PCLOB assesses whether surveillance activities carried out under legal provisions such as Section 702 of FISA are necessary, proportionate, and consistent with US privacy principles.

The LIBE Committee has learned that some members of the PCLOB were recently removed by the White House from their positions. As there is only one out of five Board members remaining, the PCLOB is no longer operational due to not reaching the minimum level of members required to have a *quorum*. Therefore, I would be grateful if you could provide me with the Commission's assessment of whether the above-mentioned changes affect the adequacy of the Data Privacy Framework, including whether the mechanism still meets the requirement of "essential equivalence" as established by the Court of Justice in case C-311/18 *Schrems II*.

Yours sincerely,

Javier ZARZALEJOS
Chair of the Committee on Civil Liberties, Justice and Home Affairs

B-1047 Brussels - Tel. +32 2 28 45634
F-67070 Strasbourg - Tel. +33 3 88 1 75634

A82

# EXHIBIT B



  

HOME    ABOUT ⌄    REPORTS ⌄    PROJECTS ⌄    EVENTS AND PRESS    SECTION 803

# Current Oversight Projects

Countering Domestic Terrorism and its Impacts on Privacy and Civil Liberties

In this Oversight Project ("Project"), the Board will examine Executive Branch ("Government") policies and activities to counter domestic terrorism. The Board will focus this project on two simultaneous and distinct workstreams: the impact on First Amendment rights; and the impact on privacy and civil liberties of particular groups, such as those with shared racial, religious, political, or ideological affiliations. Across both workstreams, the Board will examine how the Government collects, retains, analyzes, and disseminates information about domestic terrorism threats; and how it operationally responds to and seeks to prevent domestic terrorism. Through the Project, the Board seeks to increase transparency regarding the Government's activities to counter domestic terrorism, and to explore whether any changes to existing policies or activities should be made to better protect privacy and civil liberties.

First Amendment Workstream:

The Board will examine how the Government's activities to counter domestic terrorism intersect with First Amendment rights. This will focus on how the Government, in its efforts to counter domestic terrorism:

- Distinguishes First Amendment-protected speech and activity, including political, religious, and protest speech or activity, from domestic terrorism, and how that distinction is reflected in the Government's policy and training;
- Ensures that operational personnel comply with such policy and training as they execute mission activities, including and with respect to communities of color, religious communities, and political groups;
- Collects, retains, analyzes, and disseminates publicly accessible online activity;
- Defines, identifies, evaluates, seeks to counter, and seeks to suppress mis- and disinformation;
- Engages with and/or directs social media companies and other third parties regarding domestic terrorism and all the categories of speech and activities referenced above, and the resulting impact on individual users' or groups' speech; and
- Distinguishes the speech of foreign actors from that of U.S. persons.

Shared Affiliations Workstream:

The Board will examine whether and how the Government's efforts to counter domestic terrorism uniquely affect the privacy and civil liberties of particular groups, with an emphasis on rights under the Fourth, Fifth, and Fourteenth Amendments to the Constitution. Examples of such groups may include persons with shared racial, religious, political, or ideological affiliations. The Board's project will also cover those groups whose members are suspected of engaging in domestic terrorism, as well as those whose members are targets or victims of domestic terrorism. The project will focus on whether the policies, tools, and resources for counter-terrorism operations are appropriate relative to the threat presented or faced by members of these groups. The Board will examine how the Government, in its efforts to counter domestic terrorism:

- Defines and identifies distinct groups of people that may present or face a significant level of domestic terrorism threat meriting Government response, prevention, or protection activities;
- Assesses the domestic terrorism threat presented or faced by such groups, and prioritizes the Government response, including prevention and protection activities;
- Determines the type, amount, and allocation of resources considering the level of the domestic terrorism threat to and from such groups;
- Ensures that efforts to counter domestic terrorism do not disproportionately or otherwise inappropriately affect particular racial groups, historically underserved communities, religious groups, politically disfavored groups, and other individuals, relative to the threat, and how this is reflected in the Government's policy and training;
- Ensures that operational personnel comply with such policy and training as they execute mission activities, including and with respect to communities of color, religious communities, and political groups; and
- Limits use of racial, religious, political, or ideological affiliation as a predicate for investigation or surveillance.

Executive Order 14086

The Board will conduct oversight to carry out the two oversight roles envisioned for the PCLOB in Executive Order 14086 on Enhancing Safeguards for United States Signals Intelligence Activities. Specifically, the Board will review implementation of the updated policies and procedures adopted by the intelligence agencies pursuant to the executive order to ensure that they are consistent with the enhanced safeguards contained in the order, and will, to the extent feasible, conduct an annual review, as prescribed by Section 3(e) of the executive order, of the redress process established by the order.



FBI Collection of Open-Source Data

The Board is reviewing the FBI's acquisition and use of data from open-source or commercially available sources as part of its efforts to protect the nation against terrorism, as well as the legal, policy, and technological safeguards in place to protect privacy and civil liberties.



### Facial Recognition and Other Biometric Technologies in Aviation Security

The Board is reviewing how biometric technologies are used to verify identity at each phase of an air journey, considering both operational benefits and privacy and civil liberties concerns.



### Tactical Terrorism Response Teams

The Board will review the use of Tactical Terrorism Response Teams (TTRTs) by U.S. Customs and Border Protection. This review will examine TTRT authorities, activities, and encounters at ports of entry and within the border zone, with particular focus on interactions between TTRTs and U.S. persons; information sharing between TTRTs and other government agencies; the effectiveness of TTRTs in countering terrorism; and whether the program appropriately safeguards privacy and civil liberties.

### FISA Section 702

The Board released its updated Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act on September 28, 2023. Subsequently, FISA Section 702 was reauthorized for two years under the Reforming Intelligence and Securing America Act of 2024 (RISAA). In advance of Section 702's April 19, 2026 sunset date, the Board will provide an update to its 2023 report, focusing on recent changes to the program. Notably, RISAA imposed new requirements for and limitations on Section 702, including more stringent requirements for certain FBI queries, increased training and reporting requirements, new disciplinary rules for noncompliance, and mandatory use of FISA Court amici in Section 702 certifications. RISAA also expanded certain aspects of the program, including an expansion of the definition of "electronic communications service provider;" an expansion of the definition of "foreign intelligence information" to include the international production, distribution, and financing of certain drugs and precursors; and an expansion of the use of Section 702-acquired information for vetting non-US persons traveling to the country. The Board will evaluate Section 702 programmatic changes and compliance since 2023, including the impact on U.S. persons. In particular, the Board will evaluate how the Intelligence Community (IC) has implemented legislative changes as well as technical, policy, and procedural updates to the program that impact privacy and civil liberties.



### Reports by Privacy & Civil Liberty Officers

The Board receives and reviews reports from Civil Liberties and Privacy Officers under Section 803 of the Implementing Recommendations of the 9/11 Commission Act of 2007.

### Critical Infrastructure Cybersecurity

The Board receives and reviews reports under Executive Order 13636, Improving Critical Infrastructure Cybersecurity.



Return to Top

**U.S. PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD**

Contact PCLOB
(202) 296-4649
info@pclob.gov

Careers
FOIA
EEO/No Fear Act
Plain Writing Act
Privacy
Vulnerability Disclosure Policy
Non-Disclosure Agreement
USA.gov
OSC.gov
Agency Lapse Plan
Statement on the Use of Artificial Intelligence

A85

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TRAVIS LEBLANC, et al.,<br><br>        *Plaintiffs*,<br><br>   v.<br><br>UNITED STATES PRIVACY AND CIVIL<br>LIBERTIES OVERSIGHT BOARD, et al.,<br><br>        *Defendants*. | Civil Action No. 25-542 (RBW) |

## SUPPLEMENTAL DECLARATION OF EDWARD FELTEN

I, Edward Felten, declare as follows:

1.    This declaration is based on my personal knowledge and belief.  I am over eighteen years of age and competent to testify to the matters set forth herein.  I submit this supplemental declaration in opposition to the defendants' motion for summary judgment in this matter and in further support of the plaintiffs' motion for summary judgment.

2.    The Privacy and Civil Liberties Oversight Board does not have significant authority to operate in a sub-quorum status.  Absent a quorum, the Board will be unable to carry out its most important statutorily-mandated tasks, including commencing any new projects or investigations and issuing reports in the Board's name.   With or without a quorum, individual Board members may always seek to publish any document that they would like, but that would not be a Board document any more than one Senator issuing a report would make the report a document of the U.S. Senate.  Absent a quorum, individual Board members lack authority to take actions for the Board (other than addressing personnel matters).  In sub-quorum status, the Board also cannot produce its statutorily-required semi-annual reports.  Those reports are the method that Congress

A86

prescribed for the Board to convey the results of its advice and oversight functions to Congress. Without them, the Board cannot fulfill its statutory mandate to communicate the Board's views to Congress on proposed legislation and policies.

3.    As a consequence of the President's purported terminations of me and my fellow Democratic Board members, the Board has not issued its report on facial recognition technology, a report that members of Congress have requested. That report was nearly finished at the time of our terminations and would have been issued by now if we had not been terminated, but it cannot be issued while the Board remains in sub-quorum status.

4.    The Board's sub-quorum status also threatens the integrity of the Trans-Atlantic Data Privacy Framework, which provides the key mechanism supporting more than $1 trillion in trade and investment by approximately 3,000 businesses operating in the United States that must transfer personal data of Europeans to the United States to conduct their business. Under Executive Order 14086, the Board reviews intelligence agency policies relating to collection of that data and conducts an annual review of complaints brought by individuals who believe that their data has been handled in violation of U.S. law, but now the Board cannot conduct these reviews. The European Parliament has now asked the European Commission to reconsider whether U.S. protections for personal information are adequate to permit EU-US data transfers or whether the framework would no longer be consistent with European law. A copy of this letter is attached as Exhibit A.

5.    In sub-quorum status, the Board also will not be able to report to Congress on the pending question of reauthorization of FISA § 702, a question of vital importance to national security and civil liberties. Nor will the Board be able to hold a public forum on Section 702, as it did in advance of issuing its report in 2023.

6.    The Board's upcoming Section 702 report will take a substantial amount of time to complete, notwithstanding that it is an "update" of the 2023 report.   The 2023 report was also an "update" of a prior report on Section 702.   And as the Board's description of the 702 report on its "Current Oversight Projects" page indicates (attached as Exhibit B), the 2024 re-authorization statute, the Reforming Intelligence and Securing America Act of 2024 (RISAA), made a series of material changes to the Section 702 authority that the Board's 2023 report did not and could not address:

> Notably, RISAA imposed new requirements for and limitations on Section 702, including more stringent requirements for certain FBI queries, increased training and reporting requirements, new disciplinary rules for noncompliance, and mandatory use of FISA Court amici in Section 702 certifications. RISAA also expanded certain aspects of the program, including an expansion of the definition of "electronic communications service provider;" an expansion of the definition of "foreign intelligence information" to include the international production, distribution, and financing of certain drugs and precursors; and an expansion of the use of Section 702-acquired information for vetting non-US persons traveling to the country. The Board will evaluate Section 702 programmatic changes and compliance since 2023, including the impact on U.S. persons. In particular, the Board will evaluate how the Intelligence Community (IC) has implemented legislative changes as well as technical, policy, and procedural updates to the program that impact privacy and civil liberties.

7.    These are changes to some of the most significant aspects of Section 702, such as the definition of what constitutes "foreign intelligence information," and our prior report did not address the intelligence community's implementation of any of these changes because they had not happened at the time of our prior report.   The most critical part of our new report will be investigating and analyzing the implementation of these new requirements and authorities, whether they have had their intended effect, and whether they have had unintended effects on privacy and civil liberties, and making recommendations on whether Congress should walk back some of these changes or make additional changes.   The report would also examine any intelligence community policy changes since the Board's 2023 report.   I personally expect that investigating and analyzing

and reporting on these changes would take at least 6 months. Based on my lengthy experience at PCLOB, I further anticipate that, once the report is completed, it will take at minimum 2 months for the intelligence community to complete its accuracy and classification review.

8.    As I explained in my original declaration, unless we are reinstated, it is highly unlikely that the 702 report will be completed in time to allow Congress to consider it in advance of April 2026, when the current Section 702 authorization expires.   Our work on the Section 702 report in advance of the 2024 reauthorization began in the spring of 2022; we invited public comments in a Federal Register notice in September 2022; we held a public forum in January 2023 at which the director of the National Security Agency and the General Counsel of the Office of the Director of National Intelligence participated, among other officials; and we issued the declassified report on September 28, 2023, in advance of a December 2023 statutory sunset date.   In other words, we began work at least 18 months before Section 702 authorities were set to expire in December 2023; and we are already behind that schedule because there is only a year before the April 2026 sunset.  If Mr. LeBlanc and I are not promptly reinstated, the report will not be complete sufficiently in advance of the reauthorization deadline to allow Congress to consider it, or would have to be significantly truncated or forego analysis of the implementation of some of the intelligence community's new and changed authorities under Section 702.  Moreover, the Board cannot issue the Section 702 report without a quorum.

9.    Backpay or frontpay could not fully cure the harm to me from my illegal purported termination. First, under the statute, I am entitled to compensation only for "each day during which [I am] engaged in the actual performance of the duties of the Board," 42 U.S.C. § 2000ee(i)(1)(B), so a monetary award would not be available in the absence of reinstatement.  Second, even if backpay or frontpay were available in the absence of reinstatement, it would not cure my injury.

A89

The President's purported terminations of my fellow Board members and me have left the Board without a quorum and unable to complete the tasks it is required to complete by law, and have prevented me from participating on the Board in any capacity. As a rightful Board member with a duly executed commission entitling me to all the "powers, privileges and emoluments" of that office, I have a significant interest in ensuring that the Board continues to operate as intended, as a nonpartisan commission composed of multiple members with differing views, and I separately have a significant interest in continuing to serve in the position that I am legally entitled to hold and continuing to participate in the Board's work, including the forthcoming Section 702 report. I brought this lawsuit to vindicate those rights and interests. Moreover, my public service on the Board is of great importance to me: I have devoted much of my career to the study and practice of national security, cybersecurity, privacy, and technology policy. I believe that the Board does critical work to ensure that privacy and civil liberties are respected and it is important to me personally, professionally, and as a citizen to continue to contribute to that work. I do not serve on the Board because of the compensation.

I declare under penalty of perjury of the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: April 16, 2025

Edward Felten

A90

# EXHIBIT A

Committee on Civil Liberties, Justice and Home Affairs
The Chairman

European Parliament

IUST-SEC/LIBE D (2025) 2901

Mr Michael McGrath
Commissioner for Democracy, Justice, the Rule of Law and Consumer Protection
European Commission
Rue de la Loi/Wetstraat 200          D 300788    06.02.2025
1049 Brussels

Dear Commissioner McGrath,

The Committee on Civil Liberties, Justice and Home Affairs (LIBE Committee) closely follows all matters linked to the European Commission's adequacy finding for the EU-US Data Privacy Framework mechanism. It was in view of the Commission's assessment that the European Parliament adopted its resolution of 11 May 2023 on the adequacy of the protection afforded by the EU-US Data Privacy Framework (2023/2501(RSP)). Furthermore, during a LIBE Committee mission to Washington in May 2023, LIBE Members had an opportunity to discuss EU-US data transfers with Members of the US Congress, representatives of the US Departments of Justice and Commerce, as well as the Chair of the Federal Trade Commission.

One of the issues considered in the above-mentioned resolution are the competences of the Privacy and Civil Liberties Oversight Board (PCLOB), an independent body responsible for ensuring that privacy and civil liberties are safeguarded. The EU-US Data Privacy Framework established a new review mechanism, allowing individuals in the EU whose personal data are transferred to the US to lodge a complaint before the US authorities. The PCLOB oversees the functioning of this mechanism. Among others, the PCLOB assesses whether surveillance activities carried out under legal provisions such as Section 702 of FISA are necessary, proportionate, and consistent with US privacy principles.

The LIBE Committee has learned that some members of the PCLOB were recently removed by the White House from their positions. As there is only one out of five Board members remaining, the PCLOB is no longer operational due to not reaching the minimum level of members required to have a *quorum*. Therefore, I would be grateful if you could provide me with the Commission's assessment of whether the above-mentioned changes affect the adequacy of the Data Privacy Framework, including whether the mechanism still meets the requirement of "essential equivalence" as established by the Court of Justice in case C-311/18 *Schrems II*.

Yours sincerely,

Javier ZARZALEJOS
Chair of the Committee on Civil Liberties, Justice and Home Affairs

B-1047 Brussels - Tel. +32 2 28 45634
F-67070 Strasbourg - Tel. +33 3 88 1 75634

A92

# EXHIBIT B

A93



  

HOME    ABOUT⌄    REPORTS⌄    PROJECTS⌄    EVENTS AND PRESS    SECTION 803

# Current Oversight Projects

## Countering Domestic Terrorism and its Impacts on Privacy and Civil Liberties

In this Oversight Project ("Project"), the Board will examine Executive Branch ("Government") policies and activities to counter domestic terrorism. The Board will focus this project on two simultaneous and distinct workstreams: the impact on First Amendment rights; and the impact on privacy and civil liberties of particular groups, such as those with shared racial, religious, political, or ideological affiliations. Across both workstreams, the Board will examine how the Government collects, retains, analyzes, and disseminates information about domestic terrorism threats; and how it operationally responds to and seeks to prevent domestic terrorism. Through the Project, the Board seeks to increase transparency regarding the Government's activities to counter domestic terrorism, and to explore whether any changes to existing policies or activities should be made to better protect privacy and civil liberties.

First Amendment Workstream:

The Board will examine how the Government's activities to counter domestic terrorism intersect with First Amendment rights. This will focus on how the Government, in its efforts to counter domestic terrorism:

- Distinguishes First Amendment-protected speech and activity, including political, religious, and protest speech or activity, from domestic terrorism, and how that distinction is reflected in the Government's policy and training;
- Ensures that operational personnel comply with such policy and training as they execute mission activities, including and with respect to communities of color, religious communities, and political groups;
- Collects, retains, analyzes, and disseminates publicly accessible online activity;
- Defines, identifies, evaluates, seeks to counter, and seeks to suppress mis- and disinformation;
- Engages with and/or directs social media companies and other third parties regarding domestic terrorism and all the categories of speech and activities referenced above, and the resulting impact on individual users' or groups' speech; and
- Distinguishes the speech of foreign actors from that of U.S. persons.

Shared Affiliations Workstream:

The Board will examine whether and how the Government's efforts to counter domestic terrorism uniquely affect the privacy and civil liberties of particular groups, with an emphasis on rights under the Fourth, Fifth, and Fourteenth Amendments to the Constitution. Examples of such groups may include persons with shared racial, religious, political, or ideological affiliations. The Board's project will also cover those groups whose members are suspected of engaging in domestic terrorism, as well as those whose members are targets or victims of domestic terrorism. The project will focus on whether the policies, tools, and resources for counter-terrorism operations are appropriate relative to the threat presented or faced by members of these groups. The Board will examine how the Government, in its efforts to counter domestic terrorism:

- Defines and identifies distinct groups of people that may present or face a significant level of domestic terrorism threat meriting Government response, prevention, or protection activities;
- Assesses the domestic terrorism threat presented or faced by such groups, and prioritizes the Government response, including prevention and protection activities;
- Determines the type, amount, and allocation of resources considering the level of the domestic terrorism threat to and from such groups;
- Ensures that efforts to counter domestic terrorism do not disproportionately or otherwise inappropriately affect particular racial groups, historically underserved communities, religious groups, politically disfavored groups, and other individuals, relative to the threat, and how this is reflected in the Government's policy and training;
- Ensures that operational personnel comply with such policy and training as they execute mission activities, including and with respect to communities of color, religious communities, and political groups; and
- Limits use of racial, religious, political, or ideological affiliation as a predicate for investigation or surveillance.

## Executive Order 14086

The Board will conduct oversight to carry out the two oversight roles envisioned for the PCLOB in Executive Order 14086 on Enhancing Safeguards for United States Signals Intelligence Activities. Specifically, the Board will review implementation of the updated policies and procedures adopted by the intelligence agencies pursuant to the executive order to ensure that they are consistent with the enhanced safeguards contained in the order, and will, to the extent feasible, conduct an annual review, as prescribed by Section 3(e) of the executive order, of the redress process established by the order.

## FBI Collection of Open-Source Data



The Board is reviewing the FBI's acquisition and use of data from open-source or commercially available sources as part of its efforts to protect the nation against terrorism, as well as the legal, policy, and technological safeguards in place to protect privacy and civil liberties.



## Facial Recognition and Other Biometric Technologies in Aviation Security

The Board is reviewing how biometric technologies are used to verify identity at each phase of an air journey, considering both operational benefits and privacy and civil liberties concerns.



## Tactical Terrorism Response Teams

The Board will review the use of Tactical Terrorism Response Teams (TTRTs) by U.S. Customs and Border Protection. This review will examine TTRT authorities, activities, and encounters at ports of entry and within the border zone, with particular focus on interactions between TTRTs and U.S. persons; information sharing between TTRTs and other government agencies; the effectiveness of TTRTs in countering terrorism; and whether the program appropriately safeguards privacy and civil liberties.

## FISA Section 702

The Board released its updated Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act on September 28, 2023. Subsequently, FISA Section 702 was reauthorized for two years under the Reforming Intelligence and Securing America Act of 2024 (RISAA). In advance of Section 702's April 19, 2026 sunset date, the Board will provide an update to its 2023 report, focusing on recent changes to the program. Notably, RISAA imposed new requirements for and limitations on Section 702, including more stringent requirements for certain FBI queries, increased training and reporting requirements, new disciplinary rules for noncompliance, and mandatory use of FISA Court amici in Section 702 certifications. RISAA also expanded certain aspects of the program, including an expansion of the definition of "electronic communications service provider;" an expansion of the definition of "foreign intelligence information" to include the international production, distribution, and financing of certain drugs and precursors; and an expansion of the use of Section 702-acquired information for vetting non-US persons traveling to the country. The Board will evaluate Section 702 programmatic changes and compliance since 2023, including the impact on U.S. persons. In particular, the Board will evaluate how the Intelligence Community (IC) has implemented legislative changes as well as technical, policy, and procedural updates to the program that impact privacy and civil liberties.



## Reports by Privacy & Civil Liberty Officers

The Board receives and reviews reports from Civil Liberties and Privacy Officers under Section 803 of the Implementing Recommendations of the 9/11 Commission Act of 2007.

## Critical Infrastructure Cybersecurity

The Board receives and reviews reports under Executive Order 13636, Improving Critical Infrastructure Cybersecurity.



Return to Top

U.S. **PRIVACY AND CIVIL LIBERTIES** OVERSIGHT BOARD

Contact PCLOB
(202) 296-4649
info@pclob.gov

Careers
FOIA
EEO/No Fear Act
Plain Writing Act
Privacy
Vulnerability Disclosure Policy
Non-Disclosure Agreement
USA.gov
OSC.gov
Agency Lapse Plan
Statement on the Use of Artificial Intelligence

A95

SEC. ~~1061.~~801. MODIFICATION OF AUTHORITIES RELATING TO PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD.

~~(a)~~(a) MODIFICATION OF AUTHORITIES.—Section 1061 of the National Security Intelligence Reform Act of 2004 (5 U.S.C. 601 note) is amended to read as follows:

<< 5 USCA § 601 NOTE >>

"SEC. 1061. PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD.

"(a) IN GENERAL.—There is established as an independent agency within the executive branch a Privacy and Civil Liberties Oversight Board (referred to in this section as the 'Board').

"(b) FINDINGS.—Consistent with the report of the National Commission on Terrorist Attacks Upon the United States, Congress makes the following findings:

("(1) In conducting the war on terrorism, the ~~Federal~~ Government may need additional powers and may need to enhance the use of its existing powers.

("(2) This ~~potential~~ shift of power and authority to the ~~Federal~~ Government calls for an enhanced system of checks and balances to protect the precious liberties that are vital to our way of life and to ensure that the Government uses its powers for the purposes for which the powers were given.

~~(b) ESTABLISHMENT OF BOARD.   There is established within the Executive Office of the President a Privacy and Civil Liberties Oversight Board (referred to in this section as the "Board").~~

("(3) The National Commission on Terrorist Attacks Upon the United States correctly concluded that 'The choice between security and liberty is a false choice, as nothing is more likely to endanger America's liberties than the success of a terrorist attack at home. Our history has shown us that insecurity threatens liberty. Yet, if our liberties are curtailed, we lose the values that we are struggling to defend.'.

"(c) PURPOSE.—The Board shall—

"(1) analyze and review actions the executive branch takes to protect the Nation from terrorism, ensuring that the need for such actions is balanced with the need to protect privacy and civil liberties; and

"(2) ensure that liberty concerns are appropriately considered in the development and implementation of laws, regulations, and policies related to efforts to protect the Nation against terrorism.

"(d) FUNCTIONS.—

("(1) ADVICE AND COUNSEL ON POLICY DEVELOPMENT AND IMPLEMENTATION ~~OF POLICY.   For the purpose of providing advice to the President or to the head of any department or agency of the executive branch, the.—The~~ Board shall—



A96

~~("~~(A) review proposed legislation, regulations, and ~~executive branch~~ policies related to efforts to protect the Nation from terrorism, including the development and adoption of information sharing guidelines under subsections (d) and (f) of section 1016;

~~("~~(B) review the implementation of ~~laws~~new and existing legislation, regulations, and ~~executive branch~~ policies related to efforts to protect the Nation from terrorism, including the implementation of information sharing guidelines under subsections (d) and (f) of section 1016;

~~("~~(C) advise the President and the ~~head of any department or agency~~departments, agencies, and elements of the executive branch to ensure that privacy and civil liberties are appropriately considered in the development and implementation of such legislation, regulations ~~and executive branch,~~ policies~~;~~, and guidelines; and

~~("~~(D) in providing advice on proposals to retain or enhance a particular governmental power, consider whether the department, agency, or element of the executive branch ~~concerned~~ has ~~explained~~established—

~~(i~~"(i) that the need for the power is balanced with the need to protect privacy and civil liberties;

"(ii) that there is adequate supervision of the use by the executive branch of the power to ensure protection of privacy and civil liberties; and

~~(ii~~"(iii) that there are adequate guidelines and oversight to properly confine ~~the~~its use~~ of the power; and.~~

~~(iii) that the need for the power, including the risk presented to the national security if the Federal Government does not take certain actions, is balanced with the need to protect privacy and civil liberties.~~

~~("~~(2) OVERSIGHT.—The Board shall continually review—

~~("~~(A) the regulations, ~~executive branch~~ policies, and procedures ~~(including, and~~ the implementation of ~~such~~the regulations, policies, and procedures~~), related laws pertaining to efforts to protect,~~ of the ~~Nation from terrorism~~departments, agencies, and ~~other actions by~~elements of the executive branch ~~related~~relating to efforts to protect the Nation from terrorism to ensure that privacy and civil liberties are protected;~~ and~~

~~("~~(B) the information sharing practices of the departments, agencies, and elements of the executive branch relating to efforts to protect the Nation from terrorism to determine whether ~~or not such practices~~they appropriately protect privacy and civil liberties and adhere to the information sharing guidelines issued or developed under subsections (d) and (f) of section 1016 and to other ~~applicable~~governing laws, regulations, and ~~executive branch~~ policies regarding ~~the protection of~~ privacy and civil liberties.; and

~~(3) SCOPE.   The Board shall ensure that concerns with respect to privacy and civil liberties are appropriately considered in~~ "(C) other actions by the ~~implementation of laws, regulations, and~~ executive branch ~~policies related~~relating to efforts to protect the Nation ~~against~~from terrorism.~~ to determine whether such actions—~~

(4) REPORTS TO CONGRESS.—Not less frequently than annually,"(i) appropriately protect privacy and civil liberties; and

"(ii) are consistent with governing laws, regulations, and policies regarding privacy and civil liberties.

"(3) RELATIONSHIP WITH PRIVACY AND CIVIL LIBERTIES OFFICERS.—The Board shall—

"(A) receive and review reports and other information from privacy officers and civil liberties officers under section 1062;

"(B) when appropriate, make recommendations to such privacy officers and civil liberties officers regarding their activities; and

"(C) when appropriate, coordinate the activities of such privacy officers and civil liberties officers on relevant interagency matters.

"(4) TESTIMONY.—The members of the Board shall prepare a report to appear and testify before Congress, upon request.

"(e) REPORTS.—

"(1) IN GENERAL.—The Board shall—

"(A) receive and review reports from privacy officers and civil liberties officers under section 1062; and

"(B) periodically submit, not less than semiannually, reports—

"(i)(I) to the appropriate committees of Congress, including the Committee on the Judiciary of the Senate, the Committee on the Judiciary of the House of Representatives, the Committee on Homeland Security and Governmental Affairs of the Senate, the Committee on Homeland Security of the House of Representatives, the Committee on Oversight and Government Reform of the House of Representatives, the Select Committee on Intelligence of the Senate, and the Permanent Select Committee on Intelligence of the House of Representatives; and

"(II) to the President; and

"(ii) which shall be in unclassified form to the greatest extent possible (, with a classified annex, if where necessary), on.

"(2) CONTENTS.—Not less than 2 reports submitted each year under paragraph (1)(B) shall include—

"(A) a description of the Board's major activities of the Board during the preceding period.;

"(B) information on the findings, conclusions, and recommendations of the Board resulting from its advice and oversight functions under subsection (d);



A98

"(C) the minority views on any findings, conclusions, and recommendations of the Board resulting from its advice and oversight functions under subsection (d);

"(D) each proposal reviewed by the Board under subsection (d)(1) that—

"(i) the Board advised against implementation; and

"(ii) notwithstanding such advice, actions were taken to implement; and

"(E) for the preceding period, any requests submitted under subsection (g)(1)(D) for the issuance of subpoenas that were modified or denied by the Attorney General.

"(f) INFORMING THE PUBLIC.—The Board shall—

"(1) make its reports, including its reports to Congress, available to the public to the greatest extent that is consistent with the protection of classified information and applicable law; and

"(2) hold public hearings and otherwise inform the public of its activities, as appropriate and in a manner consistent with the protection of classified information and applicable law.

"(g) ACCESS TO INFORMATION.—

("(1) AUTHORIZATION.—If determined by the Board to be necessary to carry out its responsibilities under this section, the Board is authorized, to the extent permitted by law, to—

("(A) have access from any department or, agency, or element of the executive branch, or any Federal officer or employee of any such department or, agency, or element, to all relevant records, reports, audits, reviews, documents, papers, recommendations, or other relevant material, including classified information consistent with applicable law;

("(B) interview or, take statements from officers, or take public testimony from personnel of any department or, agency, or element of the executive branch, or any Federal officer or employee of any such department, agency, or element;

("(C) request information or assistance from any State, tribal, or local government; and

("(D)(i) at the direction of a majority of the members of the Board, submit a written request thatto the Attorney General of the United States that the Attorney General require, by subpoena, persons (other than departments, agencies, and elements of the executive branch) to produce for the Boardany relevant information, documents, reports, answers, records, accounts, papers, and other documentary andor testimonial evidence; and.

(ii) if the person to whom such a request is directed does not comply with the request within 45"(2) REVIEW OF SUBPOENA REQUEST.—

"(A) IN GENERAL.—Not later than 30 days after the date of receipt of such request, notify the Attorney General of such person's failure to comply with such request, which notice shall include all relevant information.

(2) PRODUCTION OF INFORMATION AND EVIDENCE.—



A99

~~(A) EXPLANATION OF NONCOMPLIANCE.—Upon receiving notification~~a request by the Board under paragraph (1)(D)~~(ii) regarding a request,~~). the Attorney General shall ~~provide an opportunity for the person subject to the request to explain the reasons for not complying with the request.~~

~~(B) ACTION BY ATTORNEY GENERAL.—Upon receiving notification under paragraph (1)(D)~~("(i) issue the subpoena as requested; or

"(ii) ~~regarding a request,~~provide the Board, in writing, with an explanation of the grounds on which the subpoena request has been modified or denied.

"(B) NOTIFICATION.—If a subpoena request is modified or denied under subparagraph (A)(ii), the Attorney General shall ~~review the request~~, not later than 30 days after the date of that modification or denial, notify the Committee on the Judiciary of the Senate and ~~may take such steps as appropriate~~the Committee on the Judiciary of the House of Representatives.

"(3) ENFORCEMENT OF SUBPOENA.—In the case of contumacy or failure to ~~ensure compliance with the request~~obey a subpoena issued pursuant to paragraph (1)(D), the United States district court for the ~~information, documents, reports, answers, records, accounts, papers, and other documentary and testimonial~~judicial district in which the subpoenaed person resides, is served, or may be found may issue an order requiring such person to produce the evidence ~~covered~~required by ~~the request~~such subpoena.

~~(3~~"(4) AGENCY COOPERATION.—Whenever information or assistance requested under subparagraph (A) or (B) of paragraph (1) is, in the judgment of the Board, unreasonably refused or not provided, the Board shall report the circumstances to the head of the department ~~or,~~ agency, or element concerned without delay. ~~If the requested information or assistance may be provided to the Board in accordance with applicable law, the~~The head of the department ~~or,~~ agency, or element concerned shall ensure ~~compliance with such request~~that the Board is given access to the information, assistance, material, or personnel the Board determines to be necessary to carry out its functions.

~~(4) EXCEPTIONS FOR NATIONAL SECURITY.—~~

~~(A) IN GENERAL.—If the National Intelligence Director, in consultation with the Attorney General, determines that it is necessary to withhold information requested under paragraph (3) to protect the national security interests of the United States, the head of the department or agency concerned shall not furnish such information to the Board.~~

~~(B) CERTAIN INFORMATION.—If the Attorney General determines that it is necessary to withhold information requested under paragraph (3) from disclosure to protect sensitive law enforcement or counterterrorism information or ongoing operations, the head of the department or agency concerned shall not furnish such information to the Board.~~

~~(e~~"(h) MEMBERSHIP.—

~~("~~(1) MEMBERS.—

(A) IN GENERAL.—The Board shall be composed of a full-time chairman, a vice chairman, and three4 additional members appointed by the President.

(B) CHAIRMAN AND VICE CHAIRMAN.—The chairman and vice chairman shall each, who shall be appointed by the President, by and with the advice and consent of the Senate.

(C) APPOINTMENT REQUIREMENTS.—Any individual appointed to "(2) QUALIFICATIONS.—Members of the Board shall be appointed from among trustworthy and distinguished citizens outside the Federal Government who are qualifiedselected solely on the basis of achievement,their professional qualifications, achievements, public stature, expertise in civil liberties and privacy, and relevant experience, and independence.

(D) FULL-TIME SERVICE OF CHAIRMAN.—The chairman may serve on a full-time basis.

(E) SERVICE AT PLEASURE OF PRESIDENT.—The chairman, vice chairman, and otherwithout regard to political affiliation, but in no event shall more than 3 members of the Board shall each serve atbe members of the same political party. The President shall, before appointing an individual who is not a member of the pleasure ofsame political party as the President, consult with the leadership of that party, if any, in the Senate and House of Representatives.

(2"(3) INCOMPATIBLE OFFICE.—An individual appointed to the Board may not, while serving on the Board, be an elected official, officer, or employee of the Federal Government, other than in the capacity as a member of the Board.

(3"(4) TERM.—Each member of the Board shall serve a term of 6 years, except that—

"(A) a member appointed to a term of office after the commencement of such term may serve under such appointment only for the remainder of such term; and

"(B) upon the expiration of the term of office of a member, the member shall continue to serve until the member's successor has been appointed and qualified, except that no member may serve under this subparagraph—

"(i) for more than 60 days when Congress is in session unless a nomination to fill the vacancy shall have been submitted to the Senate; or

"(ii) after the adjournment sine die of the session of the Senate in which such nomination is submitted.

"(5) QUORUM AND MEETINGS.—The Board shall meet upon the call of the chairman or a majority of its members. Three members of the Board shall constitute a quorum.

(f"(i) COMPENSATION AND TRAVEL EXPENSES.—

("(1) COMPENSATION.—

("(A) CHAIRMAN ON FULL-TIME BASIS.—If the.—The chairman serves on a full-time basis,of the Board shall be compensated at the rate of pay for the chairman shall be the annual

A101

rate of basic pay in effectpayable for a position at level III of the Executive Schedule under section 5314 of title 5, United States Code.

(B) CHAIRMAN AND VICE CHAIRMAN ON PART-TIME BASIS.—The chairman, if serving on a part-time basis, and the vice chairman shall be compensated at a rate equal to the daily equivalent of the annual rate of basic pay in effect for a position at level III of the Executive Schedule under section 5314 of title 5, United States Code, for each day during which such official is engaged in the actual performance of the duties of the Board.

(C"(B) MEMBERS.—Each member of the Board shall be compensated at a rate equal to the daily equivalent of the annual rate of basic pay in effectof pay payable for a position at level IV of the Executive Schedule under section 5315 of title 5, United States Code, for each day during which that member is engaged in the actual performance of the duties of the Board.

("(2) TRAVEL EXPENSES.—Members of the Board shall be allowed travel expenses, including per diem in lieu of subsistence, at rates authorized for persons employed intermittently by the Federal Government under section 5703(b) of title 5, United States Code, while away from their homes or regular places of business in the performance of services for the Board.

(g"(j) STAFF.—

("(1) APPOINTMENT AND COMPENSATION.—The chairman of the Board, in accordance with rules agreed upon by the Board, shall appoint and fix the compensation of ana full-time executive director and such other personnel as may be necessary to enable the Board to carry out its functions, without regard to the provisions of title 5, United States Code, governing appointments in the competitive service, and without regard to the provisions of chapter 51 and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates, except that no rate of pay fixed under this subsection may exceed the equivalent of that payable for a position at level V of the Executive Schedule under section 5316 of title 5, United States Code.

("(2) DETAILEES.—Any Federal employeesemployee may be detailed to the Board without reimbursement from the Board, and such detailee shall retain the rights, status, and privileges of the detailee's regular employment without interruption.

("(3) CONSULTANT SERVICES.—The Board may procure the temporary or intermittent services of experts and consultants in accordance with section 3109 of title 5, United States Code, at rates that do not exceed the daily rate paid a person occupying a position at level IV of the Executive Schedule under section 5315 of such title.

(h"(k) SECURITY CLEARANCES.—

"(1) IN GENERAL.—The appropriate departments and, agencies, and elements of the executive branch shall cooperate with the Board to expeditiously provide the Board members and staff with appropriate security clearances to the extent possible under applicableexisting procedures and requirements. Promptly upon commencing its work, the Board shall adopt, after

"(2) RULES AND PROCEDURES.—After consultation with the Secretary of Defense, the Attorney General, and the Director of National Intelligence Director,, the Board shall adopt rules and procedures of the Board for physical, communications, computer, document, personnel, and other security in relationrelating to carrying out the workfunctions of the Board.

(i) APPLICABILITY OF CERTAIN LAWS.—

(1) FEDERAL "(l) TREATMENT AS AGENCY, NOT AS ADVISORY COMMITTEE ACT.— The Federal Advisory Committee Act (5 U.S.C. App.) shall not apply with respect to the Board and its activities.—

(2) FREEDOM OF INFORMATION ACT.—For purposes of the Freedom of Information Act, the Board shall be treated as "(1) is an agency (as that term is defined in section 551(1) of title 5, United States Code).); and

(j) CONSTRUCTION.—Except as otherwise provided in this section, nothing in this section shall be construed to require any consultation with the Board by any department or agency of the executive branch or any Federal officer or employee, or any waiting period that must be observed by any department or agency of the executive branch or any Federal officer or employee, before developing, proposing, or implementing any legislation, law, regulation, policy, or guideline related to efforts to protect the Nation from terrorism.

(k) PRESIDENTIAL RESPONSIBILITY.—The Board shall perform its functions within the executive branch and under the general supervision of the President.

(l "(2) is not an advisory committee (as defined in section 3(2) of the Federal Advisory Committee Act (5 U.S.C. App.)).

"(m) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this section amounts as follows:

"(1) For fiscal year 2008, $5,000,000.

"(2) For fiscal year 2009, $6,650,000.

"(3) For fiscal year 2010, $8,300,000.

"(4) For fiscal year 2011, $10,000,000.

"(5) For fiscal year 2012 and each subsequent fiscal year, such sums as may be necessary.".

<< 42 USCA § 2000ee NOTE >>

(b) SECURITY RULES AND PROCEDURES.—The Privacy and Civil Liberties Oversight Board shall promptly adopt the security rules and procedures required under section 1061(k)(2) of the National Security Intelligence Reform Act of 2004 (as added by subsection (a) of this section).

(c) TRANSITION PROVISIONS.—

<< 42 USCA § 2000ee NOTE >>

(1) TREATMENT OF INCUMBENT MEMBERS OF THE PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD.—

(A) CONTINUATION OF SERVICE.—Any individual who is a member of the Privacy and Civil Liberties Oversight Board on the date of enactment of this Act may continue to serve on the Board until 180 days after the date of enactment of this Act.

(B) TERMINATION OF TERMS.—The term of any individual who is a member of the Privacy and Civil Liberties Oversight Board on the date of enactment of this Act shall terminate 180 days after the date of enactment of this Act.

(2) APPOINTMENTS.—

(A) IN GENERAL.—The President and the Senate shall take such actions as necessary for the President, by and with the advice and consent of the Senate, to appoint members to the Privacy and Civil Liberties Oversight Board as constituted under the amendments made by subsection (a) in a timely manner to carry out provide for the continuing operation of the Board and orderly implementation of this section.

(B) DESIGNATIONS.—In making the appointments described under subparagraph (A) of the first members of the Privacy and Civil Liberties Oversight Board as constituted under the amendments made by subsection (a), the President shall provide for the members to serve terms of 2, 3, 4, 5, and 6 years beginning on the effective date described under subsection (d)(1), with the term of each such member to be designated by the President.

<< 42 USCA § 2000ee NOTE >>

(d) EFFECTIVE DATE.—

(1) IN GENERAL.—The amendments made by subsection (a) and subsection (b) shall take effect 180 days after the date of enactment of this Act.

(2) TRANSITION PROVISIONS.—Subsection (c) shall take effect on the date of enactment of this Act.



# PRIVACY & CIVIL LIBERTIES OVERSIGHT BOARD

**Sub-Quorum Authorities and Operations When the Position of Chair is Vacant
Policy 102-01**

**October 23, 2024**

A105

**Section 1. Summary of Changes**

This document updates, consolidates, and revises:

I.      Memorandum, Guidance for Sub-Quorum Periods, dated January 17, 2017;

II.     General Counsel Memorandum for Record, dated July 12, 2018; and,

III.    Memorandum, Sub-Quorum Titles and Functions, dated October 20, 2017.

**Section 2. Purpose**

I.      The intent of this policy is to clarify and further delegate and delineate authority for the PCLOB to engage in its various mission-related activities and administrative support functions, as well as outline limitations on its authorities when the PCLOB lacks the statutory quorum of three Members, and for when the position of Chair is vacant even though there is a quorum of Members.

**Section 3. Applicability**

I.      This policy shall be effective on the date below and shall not be retroactive.

II.     This document is an internal agency procedure. Nothing herein creates any legal or enforceable rights, benefits, obligations, or liabilities, whether substantive or procedural, for any parties over and above those that already exist in applicable law.

III.    A majority of a quorate Board may waive, change, or grant exceptions to this policy, consistent with controlling law and regulations.

**Section 4. Definitions**

All definitions contained in 42 U.S.C. §§ 2000ee, et seq, and 6 C.F.R. §§ 1000, et seq, are hereby incorporated unless otherwise specified.

I.      *Acting Director* means the Executive Director, or another designated staff member in the absence of an Executive Director, who in the event of all Board Member positions becoming vacant, is delegated authority of the Board as head of agency to conduct internal activities and management, other than those expressly proscribed or limited by law.

II.     *PCLOB* or *Board* means the Privacy and Civil Liberties Oversight Board created pursuant to 42 U.S.C. § 2000ee.

III.    *Board Member* or *Member* means any of the individual Members of the Board, including the Chair.

Case 1:25-cv-00542-RBW     Document 18-2     Filed 04/23/25     Page 4 of 16
USCA Case #25-5197     Document #2130419     Filed: 08/15/2025     Page 109 of 208

Policy 102-01

IV.     *Chair* means the Chair of the Board as described by 42 U.S.C. §§ 2000ee.

V.      *Executive Director* means the individual appointed by the Chair, or the Board in the absence of a Chair, to act as the Executive Director with the authority outlined in 6 C.F.R. § 1000.5(c) and pursuant to 42 U.S.C. § 2000ee.

VI.     *General Counsel* means the individual appointed by the Chair, or the Board in the absence of a Chair, to act as the chief legal officer of the Board with the authority outlined in 6 C.F.R. § 1000.5(d).

VII.    *Head of Agency* means Members of the Board collectively.

VIII.   *Staff Member* or *Staff* means any employee, including an intern or an employee of another Executive Branch department or agency detailed to the Board, except where these procedures specify a particular position.

## Section 5. Individual Member Authorities

I.     <u>Members during Sub-Quorum</u>.

    A. Individual Board Members continue to possess all authority to act in their individual official capacity, including the authority to provide individual advice to the President, Executive Branch, and Congress, and to provide testimony to Congress when requested.

    B. Notwithstanding Sections 6-8, in all respects, Staff, including the Executive Director and the General Counsel, remain subject to the supervision of the remaining Board Members. If the Executive Director or General Counsel position is vacant, the remaining Board Members may assign to one or more Staff Members those responsibilities formerly assigned to such positions.

    C. All authorities of the Chair pursuant to 6 C.F.R. 1000.5, shall revert to the remaining Members unless otherwise delegated by the remaining Members pursuant to Section 8. III.

II.    <u>Members' Authorities When the Position of Chair is Vacant</u>.

    A. The Board retains its statutory authority, in the absence of a Chair, to hire staff upon the unanimous agreement of all remaining Members, even if only one Member remains.

## Section 6. Sub-Quorum Staff Authorities

Policy 102-01

Unless otherwise restricted by a quorum of the Board prior to a sub-quorum period, or the unanimous action of the remaining Board Member(s) during a sub-quorum period, PCLOB Staff may continue to perform the following functions during a sub-quorum period:

I.  <u>Advice and Oversight</u>.

A.  Request documents from, and work with, Executive Branch departments and agencies on projects initiated before the loss of a quorum, so long as within the scope of that authorization. However, requests for agency cooperation to the head of a department or agency is not authorized. Any disputes should be handled through the General Counsel to the appropriate counterparts.

B.  Interview, take statements, receive briefings, and obtain public testimony for projects initiated before the loss of quorum.

C.  Issue advice and oversight reports as a "Staff Report" based on projects initiated before the loss of a quorum under the following conditions:

1.  The project was properly initiated by a Board with quorum;

2.  The remaining Board Members unanimously approve; and

3.  The project report shall make it clear that a quorum of the Board did not vote or approve the report.

D.  If no Board Members remain, PCLOB Staff may not issue advice or oversight reports.

II.  <u>Congressional Support</u>.

A.  Brief congressional committees, Members, and staff on any past or ongoing projects or other PCLOB activities.

B.  Complete other congressional and interagency reports (e.g., responses to Government Accountability Office or Congressional Budget Office), if practicable, but must include a notation that there is no quorum, and the report is being issued by Board Members in their official, individual capacities, or at the Staff-level, if the remaining Members unanimously approve Staff-level guidance or no Board Members remain.

III.  <u>Staff Roles</u>. All designations, responsibilities, and authorities otherwise provided for in PLCOB-D-2022-10 (Board Delegations) remain in effect. This includes such actions as preparing budget estimates and justifications, handling and settlement of litigation, security clearance processing, and the publishing of Systems of Record Notices in the Federal Register. Development of new internal guidelines by Staff is authorized, but official policies may not be finalized until approved by a quorate Board.

**Section 7. Sub-Quorum Prohibitions.**

Although individual Board Members may take actions in their individual official capacity, including providing their individual advice to other elements of the Executive Branch, the General Counsel has determined that the following actions may not be taken on behalf of the Board as a whole:

I.     <u>Advice</u>.

    A. Issue Board advice on proposed legislation, regulations, and policies.

    B. Issue Board advice on the implementation of new and existing legislation, regulations, and policies.

    C. Provide Board advice to the Executive Branch on the development and implementation of such legislation, regulations, policies, and guidelines.

    D. Issue Board advice related to implementation of an Executive Order.

II.    <u>Oversight</u>.

    A. Issue Board reports on regulations, policies, and procedures, or the implementation thereof, by elements of the Executive Branch, relating to efforts to protect the nation against terrorism.

    B. Issue Board reports on information sharing practices of the Executive Branch, relating to efforts to protect the Nation against terrorism.

    C. Issue Board reports on other actions of the Executive Branch related to counterterrorism activities.

    D. Issue Board reports related to implementation of an Executive Order.

III.   <u>Other Reports</u>.

    A. Issue comments on Section 803 Reports from privacy and civil liberties officers.

    B. Submit the Semi-Annual Report and Strategic Plan to Congress. In lieu of the Semi-Annual Report to Congress, Staff shall submit a short statement that the Board does not have a quorum and cannot file the report until such time as the Board regains a quorum.

IV.    <u>Subpoena</u>. Request a subpoena from the Attorney General.

**Section 8. Additional Provisions**

Policy 102-01

I.  During a sub-quorum period, all Board Members and Staff receive the same compensation to which they are entitled when the Board had a quorum, subject to statute, and direction from the Office of Personnel Management (OPM).

II.  <u>Acting Director</u>.

   A.  Should all Members' terms expire, prior to departure, the final Member shall designate the Executive Director or any other Staff Member as "Acting Director."[1]

   B.  The Acting Director shall have all delegable authority of the Board to conduct internal activities and management necessary to ensure the continuity of operations of the agency, other than those expressly proscribed or limited by law. Such delegated authority includes the ability to:

      1.  supervise and provide evaluations for any other personnel in the PCLOB, including those that would otherwise report to the Board;

      2.  procure such services as are necessary to maintain operations, including consultants, so long as under $500,000;

      3.  provide for appropriate changes to human resources documents, including changes in title, granting awards, and other appropriate actions;

      4.  coordinate with agencies providing management or support to PCLOB, such as OPM, the Office of Management and Budget, Office of Special Counsel, Merit Systems Protection Board, Equal Employment Opportunity Commission, etc.; and

      5.  accept detailees to the Board from other federal agencies, and approve the detail of Board employees to other agencies.

   C.  Nothing in this policy purports to give the Acting Director the authority of a Member, or to speak as head of agency for any mission-related purposes.

   D.  Upon the swearing-in of a new Member, the Acting Director's authorities shall be automatically terminated. No ratification of prior actions shall be necessary by the new Member.

III.  <u>Authorities of Executive Director in Absence of the Chair.</u> Should the position of Chair become vacant, the following authorities shall be redelegated to the Executive Director, who remains subject to the supervision of the remaining Board Members.  By unanimous vote of the remaining Board Members (in an inquorate Board), or by majority vote of a quorate Board, any of these authorities may revert to the Board.  Thereafter the remaining

---

[1] In the absence of a designated Acting Director, the order of succession shall be: (1) Executive Director; (2) General Counsel; (3) Deputy Executive Director for Mission; (4) Deputy Executive Director for Operations; (5) the individual serving in an acting capacity in positions (1)-(4), in that order.

Board Members may redelegate the authority by unanimous vote of an inquorate Board, or majority vote of a quorate Board.

A.  All delegations to the Chair pursuant to 6 C.F.R. § 1000.5(b). If a quorum remains, the Executive Director shall set the agenda for Board meetings, in consultation with the remaining Board Members. Any Board Member may add an item to the agenda. At the direction, or with the approval of a majority of the remaining Board Members, the Executive Director shall schedule votes, and shall circulate all materials and proposals to Board Members in advance of Board meetings. The most senior Board Member by date of appointment shall convene Board meetings in the absence of the Chair. The Executive Director shall ensure that every vote and official act of the Board required by law to be recorded is accurately and promptly recorded by the General Counsel

B.  Appointing Authority. The Executive Director shall be delegated the role of Appointing Authority under the Board's Hiring and Compensation Policy (July 18, 2022), except that the Board must give its statutory, unanimous approval prior to extending an offer of employment to any applicant. The Executive Director shall submit to remaining Board Members the application materials of individuals being recommended for employment. Board Members shall have ten (10) business days to interview the candidate and review application materials; thereafter, the General Counsel shall circulate the application for notational vote, or with the unanimous agreement of the remaining Board Members, the Executive Director shall add it to the agenda for a Board meeting. Board Members who did not have the opportunity to interview the candidate during the initial ten business days may do so during the ten (10) calendar days allotted for notational voting.

   1.  This delegation of Appointing Authority authorities does not extend to the discretion, under section IV.B.3 of the Hiring and Compensation Policy, to appoint an Executive Director or General Counsel in the event of a split decision by the Board Members.

   2.  The Executive Director shall obtain the approval of a majority of the remaining Board Members before accepting any detailees to the Board (at any level), and prior to approving detailees of Board employees to other agencies (at any level).

C.  Other Delegations. The Executive Director shall also be delegated the authorities of the Chair under PCLOB-D-2022-10 (Board Delegations); PCLOB Policy on Awards (2019-09); PCLOB Policy 307-01 (Recruitment and Retention); PCLOB Policy 2019-04 (Policy on Credit Hours and Compensatory Time); PCLOB Policy 2019-05 (Transportation Subsidy Program); PCLOB Telework Policy (2013-008); PCLOB Policy on Compensation and Promotion (2016-004); PCLOB Policy on Continuity of Operations (2019-01); PCLOB Insider Threat Policy (2019-02); PCLOB Absence and Leave Policy (2019-08); and PCLOB Policy 301-01 Managing Employee Conduct and Performance (except Sections 7.II.2.C(5); 8.VI.F). See Appendix A.

Policy 102-01

    D.  Under no circumstance shall the Executive Director have the authority to amend or reverse a policy, decision, or action that was previously approved by a quorate Board.

    E.  If, following absence of the Chair, the terms of the remaining Members expire, the authorities delegated to the Executive Director in this subsection shall be assigned to the Acting Director, consistent with subsection 8.II.

**Section 9. Legal Notes.**

I.      In accordance with 5 U.S.C. § 3349c, the Federal Vacancies Reform Act of 1998 does not apply to the PCLOB.

II.    Executive Order 13472, Executive Branch Responsibilities with Respect to Orders of Succession, 2008)

**APPENDIX A**[2]

Authorities Delegated to the Executive Director in the Absence of a Chair Subject to the Terms of this Policy.

| Policy | Section | Authority |
|---|---|---|
| 6 C.F.R. §1000.5(b) ("Delegations of Authority") | §1000.5(b)(1) | "Exercise control over the Board's management and functioning" |
| | §1000.5(b)(2) | "Implement and execute the Board's budget" |
| | §1000.5(b)(3) | "Develop and effectively use staff support to carry out the functions of the Board, including, but not limited to, the supervision and removal of Board employees and the assignment and distribution of work among staff" |
| | §1000.5(b)(4) | "Convene and preside at all meetings of the Board and ensure that every vote and official act of the Board required by law to be recorded is accurately and promptly recorded by the General Counsel" except as provided in Section 8.III.A of this policy. |
| | §1000.5(b)(5) | "Redelegate to one or more Board staff persons those responsibilities of the Executive Director or General Counsel under this part, in the event that either position is unfilled" |
| | §1000.5(b)(6) | "Authorize any officer or employee of the Board to perform a function vested in, delegated, or otherwise designated to the Chair" |
| PCLOB Policy on Awards (2019-09) | III.B | "Serve as the Granting Official for any monetary award, non-monetary award, or award for cost-saving disclosures" to staff subject to any limitations as may be established by the remaining Board Members. |
| Hiring and Compensation Policy (July 18, 2022) | IV.A | "Pursuant to 42 U.S.C. 2000ee(j)(l), the Chair, in accordance with the rules described in this policy and any other rules that may be adopted by the Board in its discretion, shall appoint and fix the |

[2] In this document, all references to "Chairman" in existing PCLOB policies have been changed to "Chair." This appendix is intended only to document the authorities delegated to the Executive Director under this policy.

| | | compensation of Board personnel as may be necessary to enable the Board to carry out its functions" except that the Board must give its statutory, unanimous approval prior to extending an offer of employment to any applicant. |
|---|---|---|
| | IV.B | As Appointing Authority, "propose Executive Director and General Counsel candidates to the Board for approval prior to such appointment." Such authority does not extend to subsection IV.B.3. |
| | IV.C | As Appointing Authority, "appoint and fix the compensation of … Counselor[s]," upon notice of selection by the Member for whom the Counselor will work. |
| | V.A. | Serve as the Appointing Authority, except that the Board must give its statutory, unanimous approval prior to extending an offer of employment to any applicant. |
| | VII.A. | "Subject to this policy and any other rules that may be adopted by the Board in its discretion, may set position classifications and compensation for Board employees." |
| | VII.C. | "in consultation with the [detailee's] employing agency, may determine that reimbursement is appropriate under the circumstances of the detail assignment and shall enter into an agreement providing for the terms of such reimbursement with the employing agency." |
| PCLOB-D-2022-10 (Board Delegations) | Organization Chart | "Authority to develop, revise, and restructure the [PCLOB] organizational chart, with stipulated conditions, provided Chair shall: (1) Ensure that the organizational chart maintains all Board Members collectively as the head of agency and assigns each Board Member a Counselor; (2) Retain the Executive Director, General Counsel, and EEO Director as a direct report to the Board; |

| | | |
|---|---|---|
| | | (3) Consult with Board Members regularly on changes or updates to the organizational chart, circulating copies for review and comment as needed and briefing Board Members on organizational needs;<br>(4) Provide changes or updates of the organizational chart to the Board for approval; and<br>(5) Make the chart public in Board administrative filings where appropriate and practicable." |
| | Policies/Procedures | "(1) Supervise staff in preparing, drafting, and revising the Board's policies and procedures, ensuring that they move quickly and in priority order;<br>(2) Prior to Board vote, circulate near-final drafts of new or revised policies and procedures to the Board for review and comment, as well as any policies or procedures that the Chair believes should be rescinded;<br>(3) Update Board Members regularly on the progress of policies and procedures, including at Board meetings or otherwise as appropriate, and coordinate staff briefings requested by Board Members or deemed necessary for them;<br>(4) Ensure, in consultation with the General Counsel, that other guidance memoranda or documents prepared by staff are consistent with Board policies and procedures, including determining whether such guidance memoranda or documents should instead be policies or procedures themselves;<br>(5) Direct the General Counsel, with the assistance of other senior staff as necessary, to review the Board's policies and procedures annually to determine whether any updates are necessary; and<br>(6) Seek staff input on policies and procedures as deemed necessary." |
| | CUI Senior Agency Official | Duties under 32 C.F.R. §2002.4 ("[R]esponsible…for implementation of the CUI Program within that agency".) |

| | Contracts | "Handle all contracts, procurements, acquisitions, intergovernmental agreements, and other related purchase or service orders, and:<br><br>• Ensure that all contracts with an annual obligation of $250,000 or less be reviewed by the Senior Acquisitions Officer and the General Counsel, as well as any other relevant subject matter experts;<br>• Review all contracts with an annual obligation above $250,000;<br>• Inform the Board of all contracts with an annual obligation above $500,000;<br>• Direct the Senior Procurement Executive to provide the Board with a list of all PCLOB contracts on a semiannual basis; and<br>• Raise any contract-related issues with the Board that the Chair determines may have a significant impact on the operations of the Board." |
|---|---|---|
| | 42 U.S.C. §2000ee(j); 6 C.F.R. § 1000.5(b)(3); PCLOB Hiring policy. | "Authority to Approve and Sign Personnel Actions" |
| PCLOB Policy 307-01 (Recruitment and Retention) | 6.II | "May approve incentive requests for all positions; or [d]etermines whether to approve any incentive requests for employees whose salary is or would be at the equivalent of GS-15 or higher or any incentive requests initiated by the Executive Director." |
| | 12.III | Receive semi-annual reports from the CHCO "on the use and value of the incentive programs, and "recommendations for their current use". |
| PCLOB Policy 2019-04 (Policy on Credit Hours and Compensatory Time) | IV.D | "The Chair, in consultation with the HR Specialist, shall set the core hours." |

| | IV.E | "If the employee's direct supervisor denies a request to work under a flexible work schedule, the employee may request a review of the denial by the Chair (or, if the Chair position is vacant, then the Board, or if there is less than a quorum of Members without a Chair, then the remaining Board Members), who will consult with the HR Specialist in rendering a decision." |
|---|---|---|
| | VI.B | "If the employee's supervisor denies a request to earn compensatory time the employee may request a review of the denial by the Chair (or, if the Chair position is vacant, then the Board, or if there is less than a quorum of Members without a Chair, then the remaining Board Members), who will consult with the HR Specialist in rendering a decision." |
| | VI.E | "Compensatory time off may only be paid out only [sic] if failure to use the compensatory time off was due to an exigency of service beyond the employee's control. An exigency of service must be established prior by the Chair." |
| PCLOB Policy 2019-05 (Transportation Subsidy Program) | XII.A. | "to implement other transportation, parking, or travel benefits that are authorized by federal laws and regulations, such as pre-tax benefits generally available to federal employees." |
| PCLOB Telework Policy (2013-008) | IV.B | "If a participant has been officially disciplined for being absent without permission or other workplace infractions, the TMO can exclude him/her from eligibility to telework based upon his/her discretion as to what is in the best interest of the Board. The participant can appeal the eligibility exclusion determination to the Chair within 30 days of the TMO's determination. The Chair's decision is final." |

# A117
<sup>13</sup>

| PCLOB Policy on Compensation and Promotion (2016-004) | IV.A. | "The Chair (or, in the event the Chair position is vacant, then the Board) may, consistent with this policy, increase an employee's base compensation based upon a Within Grade Increase, Quality Step Increase, or Promotion." |
|---|---|---|
| PCLOB Policy on Continuity of Operations (2019-01) | III.2 | "The Chair is the Board's Continuity Coordinator.  The Chair will assign personnel to the COOP Team." |
| PCLOB Insider Threat Policy (2019-02) | IV.A. | "The Chair (or, in the absence of a Chair, the remaining Board Members) will serve as the senior official ("Senior Agency Official") responsible for establishing an insider threat detection and prevention program and a process to gather, integrate, analyze, and respond to information indicative of potential insider threats." |
| PCLOB Absence and Leave Policy (2019-08) | I.C. | "The Chair may prudentially adopt absence and leave rules to supplement those imposed by statute." |
| PCLOB Policy 301-01 Managing Employee Conduct and Performance | 7.II.2.C(2) | "The supervisor's immediate superior shall generally be the Deciding Official. However, given the small size of the PCLOB, the second-line supervisor may be a Member of the Board. Two alternatives are acceptable with OGC consultation: i. The Chair shall designate the immediate supervisor who shall act as both Proposing and Deciding Officials. ii. The Chair shall designate a different management official as the Deciding Official." |
|  | 7.II.2.C(3) | "If the Chair (or a majority of the Board in the absence of a Chair) determines it is inappropriate for the employee's supervisor to be the Proposing Official, the Chair may designate a separate management official to act as Proposing Official." |
|  | 9.I.F. | "If an employee's security clearance is suspended or revoked, the CSO shall notify the Chair. Any specific information regarding the underlying reasons for the action shall be limited to |

A118

Policy 102-01

| | | the Chair, though the Board as a whole should be notified about the overall action. If it pertains to a particular Counselor, the specific Board Member may also be read-in. If the Chair's Counselor's security clearance is suspended or revoked, the CSO shall notify the Chair and the next most senior Board Member. A majority vote of the Board may expand the provision of information to the entire Board." |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRAVIS LEBLANC, et al.,

                 *Plaintiffs*,

    v.

UNITED STATES PRIVACY AND CIVIL
LIBERTIES OVERSIGHT BOARD, et al.,

                 *Defendants*.

Civil Action No. 25-542 (RBW)

## SECOND SUPPLEMENTAL DECLARATION OF TRAVIS LEBLANC

I, Travis LeBlanc, declare as follows:

    1.     This declaration is based on my personal knowledge and belief. I am over eighteen years of age and competent to testify to the matters set forth herein. I submit this supplemental declaration pursuant to the Court's Order of May 9, 2025, and in opposition to the defendants' motion for summary judgment in this matter and in further support of the plaintiffs' motion for summary judgment.

    2.     PCLOB members (other than the chair) are compensated "at a rate of pay payable for a position at level IV of the Executive Schedule under section 5315 of title 5 for each day during which that member is engaged in the actual performance of duties of the Board." 42 U.S.C. § 2000ee(i)(1)(B). In 2025, the annual rate of basic pay for positions at level IV of the Executive Schedule is $195,200. *See* Office of Personnel Management, 2025 Executive & Senior Level Employee Pay Tables, https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/2025/executive-senior-level.

# A120

3.      Thus, my monthly compensation as a Board member by law could not exceed $16,267 per month even if I had worked full time as a Board member.  Prior to my purported termination from the Board, I typically performed duties of the Board between 5 and 15 days per month, and my monthly compensation from Board duties was in fact significantly less than $16,267 per month.

4.      Since January 2019, I have been privately employed as a partner at Cooley LLP, a position I have held concurrently with my part-time employment as a member of the Privacy and Civil Liberties Oversight Board.  In my private employment at Cooley, I am paid monthly, but my compensation is not fixed and varies each quarter.  My compensation from Cooley exceeded $16,267 in each month of 2024 and has exceeded $16,267 in each month of 2025 thus far.  I anticipate that my monthly earnings in private employment will continue to exceed $16,267 per month for the foreseeable future.  In addition, my earnings from private employment since my purported termination from the Board on January 27, 2025, have exceeded $195,200.  Thus, my earnings in private employment significantly exceed the compensation I received as a part-time Board member.

5.      Under the Back Pay Act, a wrongfully terminated federal employee is entitled, "on correction of the personnel action," to backpay in "an amount equal to all or part of the pay, allowances, or differentials, as applicable which the employee normally would have earned … less any amounts earned by the employee through other employment during that period."  5 U.S.C. § 5596(b)(1).  Because the amounts I earned "through other employment" since my purported termination from the Board exceed "the pay … [I] normally would have earned" as a Board member, my understanding is that I would not be entitled to any monetary remedy under the Back Pay Act.

I declare under penalty of perjury of the laws of the United States of America, pursuant to

28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: May 11, 2025


*Travis LeBlanc*
_____
Travis LeBlanc

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TRAVIS LEBLANC, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, et al.,<br><br>*Defendants*. | Civil Action No. 25-542 (RBW) |

### REDACTED SECOND SUPPLEMENTAL DECLARATION OF EDWARD FELTEN

I, Edward Felten, declare as follows:

1.      This declaration is based on my personal knowledge and belief.  I am over eighteen years of age and competent to testify to the matters set forth herein.  I submit this supplemental declaration pursuant to the Court's Order of May 9, 2025, and in opposition to the defendants' motion for summary judgment in this matter and in further support of the plaintiffs' motion for summary judgment.

2.      PCLOB members (other than the chair) are compensated "at a rate of pay payable for a position at level IV of the Executive Schedule under section 5315 of title 5 for each day during which that member is engaged in the actual performance of duties of the Board." 42 U.S.C. § 2000ee(i)(1)(B).  In 2025, the annual rate of basic pay for positions at level IV of the Executive Schedule is $195,200.  *See* Office of Personnel Management, 2025 Executive & Senior Level Employee Pay Tables, https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/2025/executive-senior-level.

A123

3.     Thus, my monthly compensation as a Board member by law could not exceed $16,267 per month even if I had worked full time as a Board member.  Prior to my purported termination from the Board, I typically performed duties of the Board between 5 and 15 days per month, and my monthly compensation from Board duties was in fact significantly less than $16,267 per month.

4.     Since January 11, 2019, I have been privately employed as Co-Founder and Chief Scientist at Offchain Labs, Inc., a position I have held concurrently with my part-time employment as a member of the Privacy and Civil Liberties Oversight Board.  In my private employment at Offchain Labs, I earn an annual base salary of ███████, which equates to ███████ per month, or ███████ every two weeks.  My base salary at Offchain Labs is paid biweekly; I have received my biweekly pay from Offchain Labs for every pay period thus far in 2025; and I expect to continue to do so for the foreseeable future.  Thus, my earnings in private employment significantly exceed the compensation I received as a part-time Board member.

5.     Under the Back Pay Act, a wrongfully terminated federal employee is entitled, "on correction of the personnel action," to backpay in "an amount equal to all or part of the pay, allowances, or differentials, as applicable which the employee normally would have earned … less any amounts earned by the employee through other employment during that period."  5 U.S.C. § 5596(b)(1).  Because the amounts I earned "through other employment" since my purported termination from the Board exceed "the pay … [I] normally would have earned" as a Board member, my understanding is that I would not be entitled to any monetary remedy under the Back Pay Act.

I declare under penalty of perjury of the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: May 11, 2025

_Edward Felten_
_____
Edward Felten

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

TRAVIS LEBLANC, et al.,         )
                            )
           Plaintiffs,        )
                            )
       v.                     )     Civil Action No. 25-542 (RBW)
                            )
UNITED STATES              )
PRIVACY AND CIVIL LIBERTIES     )
OVERSIGHT BOARD, et al.,       )
                            )
           Defendants.      )
                            )

## MEMORANDUM OPINION

      This case concerns the authority of the President of the United States to remove without cause members of the United States Privacy and Civil Liberties Oversight Board (the "PCLOB" or the "Board"), an independent, nonpartisan board of experts tasked with analyzing and reporting on the Executive Branch's counterterrorism actions—as well as the development and implementation of counterterrorism-related laws, regulations, and policies by Congress and the Executive Branch—to ensure that privacy and civil liberties are adequately considered and protected. See generally 42 U.S.C. § 2000ee.

      The plaintiffs, Travis LeBlanc and Edward Felten, bring this civil action against the defendants—the PCLOB; Beth Williams, in her official capacity as a Board member of the PCLOB; Jenny Fitzpatrick, in her official capacity as Executive Director of the PCLOB; Trent Morse, in his official capacity as Deputy Director of Presidential Personnel; and Donald J. Trump, in his official capacity as President of the United States of America—challenging the President's termination of the plaintiffs' positions on the Board, which they argue violates federal law and the Due Process Clause of the Fifth Amendment to the United States

A126

Constitution.  See First Amended Complaint ("Am. Compl.") at 1, ECF No. 8.  Currently

pending before the Court are the Plaintiffs' Motion for Summary Judgment ("Pls.' Mot."), ECF

No. 10, and the defendants' cross-motion for summary judgment, see Defendants' Cross-Motion

for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment

("Defs.' Mot."), ECF No. 12.

Upon careful consideration of the parties' submissions,[1] their arguments during the

hearing on the motions, and the plaintiffs' supplemental declarations, the Court concludes the

following: (1) the plaintiffs' removals were unlawful because although the plain text of the

PCLOB's organic statute does not include an express textual removal restriction, the Board's

structure and function clearly indicate that Congress intended to create such a restriction on the

President's removal power; (2) the restriction as it applies to the plaintiffs is constitutional; and

(3) the plaintiffs' requested declaratory and injunctive relief is both available and appropriate

under the circumstances presented to the Court in this case.  Accordingly, the Court must grant

the plaintiffs' motion for summary judgment and deny the defendants' cross-motion for

summary judgment.

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment ("Pls.' Mem."), ECF No. 10-1; (2) the Plaintiffs' Statement of Undisputed Material Facts ("Pls.' Facts"), ECF No. 10-2; (3) the Declaration of Travis LeBlanc ("LeBlanc Decl."), ECF No. 10-3; (4) the Declaration of Edward Felten ("Felten Decl."), ECF No. 10-4; (5) the defendants' Memorandum of Points and Authorities in Support of Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("Defs.' Mem."), ECF No. 12-1; (6) the Defendants' Statement of Material Facts as to Which There Is No Genuine Dispute ("Defs.' Facts"), ECF No. 12-2; (7) the Plaintiffs' Opposition to Defendants' Cross-Motion for Summary Judgment and Reply in Support of Motion for Summary Judgment ("Pls.' Opp'n"), ECF No. 15; (8) the Plaintiffs' Response to Defendants' Statement of Undisputed Facts ("Pls.' Resp."), ECF No. 15-1; (9) the Supplemental Declaration of Travis LeBlanc ("LeBlanc Suppl. Decl."), ECF No. 15-2; (10) the Supplemental Declaration of Edward Felten ("Felten Suppl. Decl."), ECF No. 15-3; (11) the Defendants' Reply in Further Support of Cross-Motion for Summary Judgment ("Defs.' Reply"), ECF No. 18; (12) the Second Supplemental Declaration of Travis LeBlanc ("LeBlanc 2d Suppl. Decl."), ECF No. 20-1; and (13) the Redacted Second Supplemental Declaration of Edward Felten ("Felten 2d Suppl. Decl."), ECF No. 20-2.

# I.    BACKGROUND

**A.    Legislative History and Statutory Background**

**1.  The Creation of the PCLOB**

In the aftermath of the terrorist attacks on the United States on September 11, 2001, Congress and then-President George W. Bush established the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission"), and they tasked the 9/11 Commission with investigating the "facts and circumstances" relating to those attacks and providing recommendations for how to protect the country from future such attacks.  The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States xv (2004).  And, on July 22, 2004, the 9/11 Commission released its final report, in which it made a number of recommendations relating to the United States' government's protection against and response to the continued threat of terrorism.  See id. at 395.

In making its terrorism prevention recommendations, the 9/11 Commission recognized that "the American public has vested enormous authority in the U[nited ]S[tates] government[]" in its fight against terrorism.  Id. at 394.  The 9/11 Commission emphasized that this "shift of power and authority to the government calls for an enhanced system of checks and balances to protect the precious liberties that are vital to our way of life."  Id.  Acknowledging the difficulty of balancing the protection of the nation on one hand and on the other hand the need to simultaneously prevent the government from violating privacy and civil liberties interests, which are the hallmark of our nation's ethos, the 9/11 Commission made several recommendations to enhance the protection of civil liberties and privacy rights.  See id. at 395.  Specifically, the 9/11 Commission recommended that "[a]t this time of increased and consolidated government authority, there should be a board within the [E]xecutive [B]ranch to oversee adherence to the

guidelines we recommend and the commitment the government makes to defend our civil

liberties." Id.

In response to the 9/11 Commission Report, Congress enacted the Intelligence Reform

and Terrorism Prevention Act of 2004 (the "IRTPA"), Pub L. No. 108-458, 118 Stat. 3638,

which established the PCLOB to engage in the oversight function recommended by the 9/11

Commission Report, see id. § 1061, 118 Stat. at 3684–88.  Although Congress echoed the 9/11

Commission Report's call for "an enhanced system of checks and balances" to protect civil

liberties, id. § 1061(a)(2), 118 Stat. at 3684, it chose to initially constitute the PCLOB within the

Executive Office of the President (the "EOP"), see id. § 1061(b), 118 Stat. at 3684, and

specifically directed that the Board "shall perform its functions within the [E]xecutive [B]ranch

and under the general supervision of the President[,]" id. § 1061(k), 118 Stat. at 3688.

The PCLOB was initially composed of a chairman and vice chairman, each of whom

were to "be appointed by the President, by and with the advice and consent of the Senate[,]" id.

§ 1061(e)(1)(B), 118 Stat. at 3686, as well as "three additional members appointed by the

President[,]" without the advice and consent of the Senate, id. § 1061(e)(1)(A), 118 Stat. at 3686.

And rather than delineating a term of service, Congress prescribed that all members of the

PCLOB, including the chairman and vice chairman, "shall each serve at the pleasure of the

President."  Id. § 1061(e)(1)(E), 118 Stat. at 3687.  Pursuant to the IRTPA—and as it remains

today—the PCLOB requires a quorum of three members to carry out many of its statutorily-

mandated tasks.  See id. § 1061(e)(3), 118 Stat. at 3687.

Congress delineated two minimum qualifications for members of the Board: (1) that they

"be appointed from among trustworthy and distinguished citizens outside the Federal

Government who are qualified on the basis of achievement, experience, and independence[,]" id.

§ 1061(e)(1)(A), 118 Stat. at 3687; and (2) that, once appointed, no member could "while

serving on the Board, be an elected official, officer, or employee of the Federal Government,

other than in the capacity as a member of the Board[,]" id. § 1061(e)(1)(E), 118 Stat. at 3687.

Pursuant to the IRTPA, the PCLOB's mandate was "to ensure that concerns with respect

to privacy and civil liberties are appropriately considered in the implementation of laws,

regulations, and [E]xecutive [B]ranch policies related to efforts to protect the Nation against

terrorism." Id. § 1061(c)(3), 118 Stat. at 3685. To carry out its mandate, Congress prescribed

the PCLOB's core functions. First, the PCLOB was to advise the President and Executive

Branch agencies and departments on "the development and implementation of such regulations

and [E]xecutive [B]ranch policies[,]" id. § 1061(c)(1)(C), 118 Stat. at 3685, and "on proposals to

retain or enhance a particular governmental power," id. § 1061(c)(1)(D), 118 Stat. at 3685.

Second, the PCLOB was to "continually review[,]" inter alia, Executive Branch

"regulations, . . . policies, and procedures[,]" and their implementation, as well as "related laws

pertaining to efforts to protect the Nation from terrorism, and other actions by the [E]xecutive

[B]ranch related to efforts to protect the Nation from terrorism to ensure that privacy and civil

liberties are protected[,]" id. § 1061(c)(2), 118 Stat. at 3685. And third, the PCLOB was to issue

a report to Congress, at least annually, apprising it of the Board's activities. See id. § 1061(c)(4),

118 Stat. at 3685.

Although the PCLOB was authorized to request information and have access to all

relevant records, including classified information, see id. § 1061(d)(1), 118 Stat. at 3685–86,

Congress did not provide the PCLOB with subpoena power, see generally id. § 1061, 118 Stat. at

3684–88. Instead, Congress established a process by which the PCLOB could request assistance

from the Attorney General. Specifically, Congress directed that, if an individual failed to

comply with the PCLOB's request within forty-five days of receiving such a request for information, the PCLOB was to notify the Attorney General.  See id. § 1061(d)(1)(D)(ii), 118 Stat. at 3686.  Congress further directed that, upon receiving such a notification from the PCLOB, the Attorney General: (1) "shall provide an opportunity for the person subject to the request to explain the reasons for not complying with the request[,]" id. § 1061(d)(2)(A), 118 Stat. at 3686; and (2) "shall review the request and may take such steps as appropriate to ensure compliance with the request[,]" id. § 1061(d)(2)(B), 118 Stat. at 3686 (emphasis added).  Similarly, in the event that information or assistance from any agency "is, in the judgment of the Board, unreasonably refused or not provided," id. § 1061(d)(3), 118 Stat. at 3686, the Board was to "report the circumstances to the head of the department or agency concerned[,]" id., 118 Stat. at 3686, who—subject to two exceptions,[2] see id. § 1061(d)(4), 118 Stat. at 3686—was to ensure compliance with the request "[i]f the requested information or assistance may be provided to the Board in accordance with applicable law," id. § 1061(d)(3), 118 Stat. at 3686.

## 2. Reconstitution of the PCLOB as an Independent Agency

However, within several years following the PCLOB's establishment, Congress began debating whether there should be significant changes to the PCLOB as it became clear that the Board—as then constituted—was too closely tied to the President, and the Executive Branch more broadly, to be meaningfully independent, thus failing to satisfy Congress's objective of establishing an "enhanced system of checks and balances[,]" The 9/11 Commission Report at 394, regarding the federal government's counterterrorism powers.  One original member of the

---

[2] The IRTPA provided that agencies were not to furnish information under two broad national security exceptions: (1) where the Director of National Intelligence, in consultation with the Attorney General, determined it was "necessary to withhold information requested [by the Board] . . . to protect the national security interests of the United States[,]" id. § 1061(d)(4), 118 Stat. at 3686; or (2) where the Attorney General determines such withholding was necessary "to protect sensitive law enforcement or counterterrorism information or ongoing operations[,]" id., 118 Stat. at 3686.

Board, Lanny J. Davis, who resigned in response to White House edits to the PCLOB's first annual report to Congress, later testified before Congress on July 24, 2007, that "it simply was not possible to have independent oversight while being treated as if [the Board members] were part of the White House staff." Privacy in the Hands of Government: The Privacy and Civil Liberties Oversight Board and the Privacy Officer of the U.S. Department of Homeland Security, Hearing Before the Subcomm. on Com. & Admin. L. of the H. Comm. on the Judiciary, 110 Cong. 33 (July 24, 2007) (testimony of Lanny J. Davis). Mr. Davis testified that, although the Board members "saw a contradiction and even a tension[]" in the Board's construction as both an oversight board and as a board within the White House, id., these tensions came to a head when the White House provided "extensive redlining" to the Board's first annual report, without the Board's prior knowledge, including "significant deletions of substantive parts of [the Board's] report[,]" id.; see John Solomon & Ellen Nakashima, White House Edits to Privacy Board's Report Spur Resignation, Wash. Post. (May 15, 2007) (reporting that "[t]he Bush administration made more than 200 revisions to the [PCLOB's] report . . . , including the deletion of a passage on anti-terrorism programs that intelligence officials deemed 'potentially problematic' intrusions on civil liberties[]").[3]

The following month, in light of these concerns regarding the PCLOB's authority and independence, Congress enacted legislation removing the Board from the EOP and reconstituted it as an independent agency—still within the Executive Branch—pursuant to the Implementing Recommendations of the 9/11 Commission Act (the "9/11 Commission Act") § 801(a), Pub. L. 110-53, 121 Stat. 266 (codified as amended at 42 U.S.C. § 2000ee). In doing so, the 9/11

---

[3] Available at https://www.washingtonpost.com/archive/national/2007/05/15/white-house-edits-to-privacy-boards-report-spur-resignation/c7967467-c99f-4bb5-aa8a-261c6b6273ed/.

Commission Act made a number of fundamental changes to the PCLOB's structure and functions, the vast majority of which remain in effect today.

The 9/11 Commission Act's structural reforms to the PCLOB included revisions to the Board's membership qualifications and selection process that were consistent with Congress's desire for greater independent expertise.  First, the 9/11 Commission Act directed that all members of the Board, not just the chairman and vice chairman, were to be "appointed by the President, by and with the advice and consent of the Senate."  Compare id. § 801(a) (codified as amended at 42 U.S.C. § 2000ee(h)(1)), with IRTPA § 1061(e)(1)(A), (B), 118 Stat. at 3686. Second, the 9/11 Commission Act revised the qualifications for membership on the PCLOB, emphasizing that Board members "shall be selected solely on the basis of their professional qualifications, achievements, public stature, expertise in civil liberties and privacy, and relevant experience, and without regard to political affiliation[,]" and further promoted the Board's nonpartisan nature by directing that "in no event shall more than [three] members of the Board be members of the same political party."  Compare 9/11 Commission Act § 801(a) (codified as amended at 42 U.S.C. § 2000ee(h)(2)), with IRTPA § 1061(e)(1), 118 Stat. at 3686.  Third, Congress excised the provision stating that the members "shall each serve at the pleasure of the President[,]" IRTPA § 1061(e)(1)(E), 118 Stat. at 3687, and added a provision directing that "[e]ach member of the Board shall serve a term of six years[,]"[4] see 9/11 Commission Act § 801(a) (codified as amended at 42 U.S.C. § 2000ee(h)(4)).

Along with these changes to the PCLOB's structure and membership, Congress reoriented the PCLOB's purpose and core functions.  Whereas, in its prior iteration, the

---

[4] Under the current version of the PCLOB's organic statute, a member "may be reappointed to one or more additional terms[,]" 42 U.S.C. § 2000ee(h)(4)(B), and "may continue to serve for up to one year after the date of expiration[ of his or her term], at the election of the member[]" preceding their reappointment or "until the member's successor has been appointed and qualified[,]" id. § 2000ee(h)(4)(D).

PCLOB's scope of responsibility was limited to "ensur[ing] that concerns with respect to privacy and civil liberties are appropriately considered in the <u>implementation</u> of laws, regulations, and [E]xecutive [B]ranch policies related to efforts to protect the Nation against terrorism[,]" IRTPA § 601(c)(3), 118 Stat. at 3684 (emphasis added), pursuant to the 9/11 Commission Act, and as currently constituted, the PCLOB's purpose is now two-fold, namely:

> (1) analyz[ing] and review[ing] actions the [E]xecutive [B]ranch takes to protect the Nation from terrorism, ensuring that the need for such actions is balanced with the need to protect privacy and civil liberties; and

> (2) ensur[ing] that liberty concerns are appropriately considered in the <u>development and implementation</u> of laws, regulations, and <u>policies</u> related to efforts to protect the Nation against terrorism.

9/11 Commission Act § 801(a) (codified as amended at 42 U.S.C. § 2000ee(c)) (emphasis added).

Consistent with these revised objectives, Congress expanded and clarified the PCLOB's core functions in several ways. First, the PCLOB advises Congress and the Executive Branch on the consideration of privacy and civil liberties concerns in the proposal and implementation of legislation, regulations, and policies relating to counterterrorism, as well as on proposals "to retain or enhance" certain government powers. <u>See</u> <u>id.</u> (codified as amended at 42 U.S.C. § 2000ee(d)(1)). Second, the Board performs an oversight function by "continually review[ing]" Executive Branch regulations, policies, and procedures, information-sharing practices, and other actions relating to counterterrorism, in order to determine whether such actions "appropriately protect privacy and civil liberties" and "are consistent with governing laws, regulations, and policies regarding privacy and civil liberties." <u>Id.</u> (codified as amended at 42 U.S.C. § 2000ee(d)(2)). Third, the PCLOB "receive[s] and review[s] reports and other information" from privacy and civil liberties officers within the Executive Branch and, when appropriate,

makes recommendations to, or coordinates the activities of, those officers.  Id. (codified as

amended at 42 U.S.C. 2000ee(d)(3)).  Fourth, members of the PCLOB "appear and testify before

Congress upon request."  Id. (codified as amended at 42 U.S.C. § 2000ee(d)(4)).

As part of its statutory obligations, the PCLOB must "periodically submit, not less than

semiannually, reports[]" to Congress and the President, id. (codified as amended at 42 U.S.C.

§ 2000ee(e)(1)), which are required to include, inter alia, a description of the PCLOB's "major

activities" during the relevant period, "information on the findings, conclusions, and

recommendations of the Board resulting from its advice and oversight functions[,]" and "the

minority views" as to any of these findings, conclusions, and recommendations.  Id. (codified as

amended at 42 U.S.C. §§ 2000ee(e)(2)(A)–(C)).

In addition to providing advice to Congress, the PCLOB is now required to play a role in

educating the public regarding its work.  Accordingly, Congress directed the PCLOB to "make

its reports, including its reports to Congress, available to the public to the greatest extent that is

consistent with the protection of classified information and applicable law," id. (codified as

amended at 42 U.S.C. § 2000ee(f)(1)), and "hold hearings and otherwise inform the public of its

activities," consistent with these same protections,[5] id. (codified as amended at 42 U.S.C.

§ 2000ee(f)(2)).

---

[5] Courts have routinely referenced and relied upon the PCLOB's public representations and conclusions in reviewing legal challenges to certain government surveillance programs.  See Am. C.L. Union v. Clapper, 785 F.3d 787, 798–99 (2d Cir. 2015) (agreeing with the PCLOB's conclusion that the government's statutory interpretation underpinning a bulk telephone records program was at odds with the text of the statute); United States v. Muhtorov, 20 F.4th 558, 588 (10th Cir. 2021); United States v. Hasbajrami, 945 F.3d 641, 649 n.4 (2d Cir. 2019) (noting that "many Section 702 procedures remain highly classified," and that "[o]ur discussion here is drawn from declassified public sources and in large part from the report on Section 702 surveillance produced by the Privacy and Civil Liberties Oversight Board"); United States v. Mohamud, 843 F.3d 420, 440 (9th Cir. 2016); Wikimedia Found. v. Nat'l Sec. Agency, 14 F.4th 276, 280–81 (4th Cir. 2021).

Consistent with Congress's reconstitution and reorientation of the Board as an independent agency, Congress removed language in the prior version of the PCLOB's organic statute directing that "[t]he Board shall perform its functions within the [E]xecutive [B]ranch and under the general supervision of the President." Compare generally id. (codified as amended at 42 U.S.C. § 2000ee)), with IRTPA § 1061(k), 118 Stat. at 3688.

At the same time, Congress again decided not to grant the PCLOB subpoena authority, despite proposals that it do so. See H.R. Rep. No. 110-259, at 321 (2007) (Conf. Rep.). Instead, the PCLOB's organic statute, as amended via the 9/11 Commission Act, merely authorizes the Board to, "at the direction of a majority of the members of the Board, submit a written request to the Attorney General" that he or she issue a subpoena to a person outside the Executive Branch, 9/11 Commission Act § 801(a) (codified as amended at 42 U.S.C. § 2000ee(g)(1)(D)), and that, upon receipt of that request, the Attorney General shall either "issue the subpoena as requested" or "provide the Board, in writing, with an explanation of the grounds on which the subpoena request has been modified or denied[,]"[6] id. (codified as amended at 42 U.S.C. § 2000ee(g)(2)(A)). Therefore, while Congress reoriented the Board's structure, the nature and scope of its functions, and its relationship to the President, Congress stopped short of vesting the reconstituted Board with power to compel compliance with its investigations.

## B.    Factual Background

The plaintiffs are two members of the PCLOB who allege that they were removed from the Board by the President without any expressed reason for their removals. "Plaintiff Travis LeBlanc was nominated [to the PCLOB] by President [Donald J.] Trump in August

---

[6] In the event that the Attorney General denies a request from the Board, the Attorney General must notify the House and Senate Judiciary Committees. See id. (codified as amended at 42 U.S.C. § 2000ee(g)(2)(B)).

2018[,] . . . and confirmed unanimously by the Senate in July 2019, for a term expiring January

29, 2022." Pls.' Facts ¶ 1 (citing LeBlanc Decl. ¶ 2); see Defs.' Facts ¶ 1.[7]  "Mr. LeBlanc was

renominated by [then-]President [Joseph R.] Biden on March 29, 2022, and confirmed

unanimously by the Senate on September 14, 2022, for a second term expiring on January 29,

2028." Pls.' Facts ¶ 2 (citing LeBlanc Decl. ¶ 3); see Defs.' Facts ¶ 2.  "Plaintiff Edward Felten

was nominated [to the PCLOB] by President Trump in March 2018[,] . . . and confirmed

unanimously by the Senate in October 2018, for a term expiring January 29, 2019."  Pls.' Facts

¶ 3 (citing Felten Decl. ¶ 2); see Defs.' Facts ¶ 3.  "Dr. Felten was renominated by President

Trump on March 14, 2019[,] and reconfirmed unanimously by the Senate on June 27, 2019, for a

second term that [ ] ran through January 29, 2025."  Pls.' Facts ¶ 4 (citing Felten Decl. ¶ 2); see

Defs.' Facts ¶ 4.  However, under the PCLOB's organic statute, Dr. Felten was eligible to

continue serving at his discretion until either his successor was confirmed or one year after the

date of the expiration of his first term, i.e., January 29, 2026, whichever occurred first.  See Pls.'

Facts ¶ 5 (citing Felten Decl. ¶ 2); Defs.' Facts ¶ 5; see also 42 U.S.C. § 2000ee(h)(4)(D).  Both

plaintiffs "have expertise in civil liberties and privacy and experience relevant to their service on

the PCLOB."  Pls.' Facts ¶ 7; Defs.' Facts ¶ 7; see LeBlanc Decl. ¶ 4 (detailing Mr. LeBlanc's

credentials); Felten Decl. ¶ 3 (detailing Dr. Felten's credentials).  And, both plaintiffs are

Democrats.  See Pls.' Facts ¶ 13; Defs.' Facts ¶ 13.

On "January 21, 2025, . . . [the p]laintiffs each received separate emails from [d]efendant

Morse, sent from a White House email address," stating:

> On behalf of President Donald J. Trump, I am writing to request your resignation
> as a Member of the Privacy and Civil Liberties Oversight Board.  Please submit

---

[7] The defendants take issue with the plaintiffs' representation that the plaintiffs were "confirmed unanimously"
because, according to the defendants, they were "confirmed by a voice vote, which is not necessarily unanimous and
where the tally of votes is not recorded."  Defs.' Facts ¶ 1; see id. ¶¶ 3, 4 (incorporating the same objection).

> your resignation to me by close of business on Thursday, January 23, 2025. If we
> have not received your resignation by that time, your position will be terminated.
> Should the President determine your services are still needed, you will receive
> additional correspondence.[8]

Pls.' Facts ¶ 14 (citations omitted); Defs.' Facts ¶ 14. "Defendant Morse did not identify any

cause or offer any explanation for the requested resignation or for the threatened termination of"

either plaintiff, Pls.' Facts ¶¶ 15–16; Defs.' Facts ¶¶ 15–16, and neither of the plaintiffs was

"provided advanced notice, a hearing, or any other process prior to the President's decision to

terminate them[,]" Pls.' Facts ¶ 17; see Defs.' Facts ¶ 17 (indicating that the plaintiffs "received

notice that the President was requesting their resignation on January 21, 2025, and that they

would be terminated effective January 23, 2025, if they did not do so"). Despite receiving these

emails, the plaintiffs did not—and to date, have not—resigned from their positions as members

of the PCLOB, see Pls.' Facts ¶ 18; Defs.' Facts ¶ 18, and "continued working on PCLOB

matters through Monday, January 27[, 2025,]" Pls.' Facts ¶ 22; see Defs.' Facts ¶ 22.

　　　The plaintiffs represent that defendant Williams, a Republican and the sole remaining

member of the PCLOB, see Pls.' Facts ¶ 13; Defs.' Facts ¶ 13, along with defendant Fitzpatrick,

the Executive Director of the PCLOB, effectuated the plaintiffs' challenged terminations, see

Pls.' Facts ¶ 19. Specifically, the plaintiffs represent that on "January 23, 2025, [d]efendant

Williams informed PCLOB staff that the three Democratic Board members would be terminated

that evening[,]" id., and "ordered PCLOB staff to stay past the close of business . . . for the

purpose of effectuating [the p]laintiffs' anticipated removals from the Board[,]"[9] id. ¶ 20. The

---

[8] The third Democratic member and then-Chair of the Board, Sharon Bradford Franklin, whose extended term was set to expire on January 29, 2025, also received such an email. See Pls.' Facts ¶¶ 12–13; Defs.' Facts ¶¶ 12–13.

[9] The defendants argue that the plaintiffs "fail[ed] to support the allegations" regarding defendant Williams' involvement in their termination because the allegations in the LeBlanc and Felten declarations "are both based solely on inadmissible hearsay" due to the fact that they represent that the plaintiffs were told by PCLOB staff members about what they had been told. Defs.' Facts ¶ 19; see id. ¶¶ 20, 23, 24. The defendants further argue that

(continued . . .)

plaintiffs further represent that, on January 27, 2025, after "[d]efendant Morse notified

[d]efendant Williams to terminate [the p]laintiffs[,]" id. ¶ 23, defendant Williams "directed

PCLOB staff to cut off [the p]laintiffs' access to their PCLOB email accounts, revoke their

access to the PCLOB's offices, remove them from the PCLOB website as active Board members,

and terminate them from the agency[,]" id. ¶ 24.  That same day, the plaintiffs received

notifications "that they had been locked out of their PCLOB email accounts."  Id. ¶ 25; Defs.'

Facts ¶ 25.

Later on January 27, 2025, the "[p]laintiffs received, via their non-government email

addresses, separate emails from [d]efendant Morse," stating: "This email confirms that your

position on the Privacy and Civil Liberties Oversight Board was terminated on Thursday,

January 23, 2025, at 17:01."  Pls.' Facts ¶ 26; Defs.' Facts ¶ 26.  After both plaintiffs "requested

a copy of the official Presidential action terminating them[,]" Pls.' Facts ¶ 27; Defs.' Facts ¶ 27,

---

(. . . continued)
the plaintiffs "cannot testify to [d]efendant Williams's state of mind[]" in regards to their allegation that she ordered
PCLOB staff to stay late for the purpose of effectuating the plaintiffs' removals.  Id. ¶ 20.  However, as the plaintiffs
note, Federal Rule of Evidence 801(d)(2)(D) directs that a statement is not hearsay when it is "offered against an
opposing party and[] . . . was made by the party's agent or employee on a matter within the scope of that relationship
and while it existed . . ."  Fed. R. Evid. 801(d)(2)(D).

Here, the PCLOB itself is a party, and the challenged statements were made by PCLOB staff members to the
plaintiffs—themselves PCLOB employees until their challenged terminations—about directions they allegedly
received from defendant Williams as part of their duties as PCLOB staff members.  Further, these staff members
were allegedly told by defendant Williams that they were expected to remove the plaintiffs from the PCLOB
website.  See Pls.' Facts ¶ 20.  And, counter to the defendants' position, the mere fact that the staff members are at
this point unidentified does not preclude these statements from being converted into admissible evidence in light of
the circumstantial evidence that they were speaking on a matter within the scope of their employment.  See, e.g.,
Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 134 (3d Cir. 1997) (concluding that statements made by
unidentified meeting participants were admissible because "the sources of the statements are identified sufficiently
to establish that they were made by agents of [the defendant corporation] acting within the scope of their
existence of their employment relationship") (citation omitted).  Therefore, based on this record, the Court
concludes that the plaintiffs' evidence is "capable of being converted into admissible evidence," Greer v. Paulson,
505 F.3d 1306, 1315 (D.C. Cir. 2007), and, thus, its consideration is permissible at the summary judgment stage.
And, because the defendants do not otherwise dispute these facts, the Court will consider them as undisputed for the
purposes of this Memorandum Opinion.  See Fed. R. Civ. P. 56(e)(2).

defendant Morse responded to Mr. LeBlanc: "This email serves as the Presidential action[,]"[10]

Pls.' Facts ¶ 29; Defs.' Facts ¶ 29.  "Defendant Morse's January 27[, 2025,] email did not

identify any cause or offer any explanation for [the p]laintiffs' termination[,]" Pls.' Facts ¶ 31

(citations omitted); see Defs.' Facts ¶ 31, and the plaintiffs represent that President Trump has

not otherwise informed them that they were terminated for cause,[11] see Pls.' Facts ¶¶ 32–33

(citations omitted); Defs.' Facts ¶¶ 32–33.

     The plaintiffs emphasize that "[t]he President terminated all three Democratic members

of the Board but did not terminate Ms. Williams, the sole Republican member of the Board."

Pls.' Facts ¶ 35; Defs.' Facts ¶ 35.  And, because the PCLOB already had two vacant Board

positions, the plaintiffs represent that the President's decision to terminate the three Democratic

members means that "[t]he PCLOB now lacks the quorum necessary to conduct its statutorily

mandated functions."[12]  Pls.' Facts ¶ 37; see also 42 U.S.C. § 2000ee(h)(5).  Specifically, the

plaintiffs note that prior to their challenged terminations, they "were working on PCLOB's

mandatory semi-annual report to Congress, a report on the use of facial recognition in aviation

security, and a forthcoming report to Congress on Section 702 of the Foreign Intelligence

Surveillance Act[ ('Section 702'),]" ahead of the expiration of its statutory authorization in April

2026.  Pls.' Facts ¶¶ 38–39; see generally 50 U.S.C. § 1551(a).  The plaintiffs further indicate

that because "[d]rafting the PCLOB's report on Section 702 will take many months and the

---

[10] According to the plaintiffs, "[d]efendant Morse did not respond to Dr. Felten['s request for a copy of the official Presidential action terminating his position]."  Pls.' Facts ¶ 28; see Defs.' Facts ¶ 28.

[11] As with the plaintiffs, then-Chair Bradford Franklin, was terminated on January 27, 2025, with no indication of cause for her termination.  See Pls.' Facts ¶¶ 13, 30, 34; Defs.' Facts ¶¶ 13, 30, 34.

[12] The defendants do not dispute that the PCLOB now lacks a quorum, but they do challenge the plaintiffs' assertion "that this quorum is necessary for the Board to continue to conduct its statutorily mandated functions[,]" Defs.' Facts ¶ 37, representing instead that the Board has "significant authority . . . to operate in a sub-quorum status[,]" id., including "continu[ing] to work on projects previously opened by a quorate Board, as well as issu[ing] staff reports and reports by individual members[,]" id. (citation omitted).  The Court discusses this dispute in the context of the plaintiffs' entitlement to a permanent injunction.  See infra Sec. III.B.2.

report will need to clear an extensive accuracy and classification review[,]" Pls.' Facts ¶ 40

(citations omitted); see Defs.' Facts ¶ 40, "[i]f [they] are not reinstated, it is highly unlikely that

the PCLOB's report on Section 702 will be completed before Congress is required to act on the

Section 702 reauthorization[,]"[13] Pls.' Facts ¶ 41.

## C.     Procedural History

The plaintiffs filed their original Complaint in this case on February 24, 2025, see

Complaint ("Compl.") at 1, ECF No. 1, and they subsequently filed their Amended Complaint on

March 12, 2025, see Am. Compl. at 1.  On that same date, the plaintiffs filed their motion for an

expedited summary judgment decision.  See Pls.' Mot. at 1.  On April 3, 2025, the defendants

filed their combined opposition to the plaintiffs' motion and cross-motion for an expedited

summary judgment ruling.  See Defs.' Mot. at 1.  On April 16, 2025, the plaintiffs filed their

combined opposition to the defendants' cross-motion and reply in support of their motion for

summary judgment.  See Pls.' Opp'n at 1.  And, on April 23, 2025, the defendants filed their

reply in support of their cross-motion for summary judgment.  See Defs.' Reply at 1.  Upon the

parties' completion of their summary judgment briefing, and considering the parties' requests for

expedited resolution of this matter, the Court held a hearing on the parties' motions on April 30,

2025.  See Minute ("Min.") Entry (Apr. 30, 2025).  And, following the hearing, the Court

ordered the plaintiffs to submit supplemental declarations in support of their arguments regarding

the availability of backpay.  See Order at 1 (May 9, 2025), ECF No. 19; see LeBlanc 2d Suppl.

Decl.; Felten 2d Suppl. Decl.

---

[13] The defendants dispute the plaintiffs' representations, indicating instead "that, because the Board issued an extensive report on Section 702 less than two years ago, the amount of time required to prepare this update, which will be far shorter, is substantially less[,]" Defs.' Facts ¶ 40, and therefore, they contend that it is "unduly speculative" to represent that the Board will be unable to complete an update to its report before Congress is required to act on the Section 702 reauthorization, id. ¶ 41.

## II.    STANDARD OF REVIEW

**A.    Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56**

A court may grant a Rule 56 motion for summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Steele v. Schafer, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment[.]" Id. The movant has the burden of demonstrating the absence of a genuine issue of material fact and that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Accordingly, unsupported allegations or conclusory statements are not sufficient to defeat summary judgment, see Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp., 564 F.3d 462, 465–66 (D.C. Cir. 2009); Pub. Citizen Health Rsch. Grp. v. Food & Drug Admin., 185 F.3d 898, 908 (D.C. Cir. 1999) ("[C]onclusory allegations unsupported by factual data will not create a triable issue of fact."

(citations and internal quotation marks omitted)).  And, the non-moving party "must set forth

specific facts showing that there [are] genuine issue[s] for trial," <u>Anderson</u>, 477 U.S. at 256.

Therefore, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's]

position [is] insufficient" to withstand a summary judgment motion; rather, "there must be

[some] evidence on which the jury could reasonably find for the [non-movant]."  <u>Id.</u> at 252.

When a non-moving party supports its position via affidavit or declaration, "[it] must set

forth . . . specific facts[,]" <u>Ass'n of Flight Attendants-CWA</u>, 564 F.3d at 465 (internal quotation

marks omitted), pursuant to Rule 56(e), "that is, it 'must be made on personal knowledge, set out

facts that would be admissible in evidence, and show that the affiant is competent to testify on

the matters stated,'" <u>id.</u> (quoting Fed. R. Civ. P. 56(e)(1)).  "Although, as a rule, statements made

by the party opposing a motion for summary judgment must be accepted as true for the purpose

of ruling on that motion, some statements are so conclusory as to come within an exception to

that rule." <u>Greene v. Dalton</u>, 164 F.3d 671, 675 (D.C. Cir. 1999); <u>see also</u> <u>Dist. Intown Props.</u>

<u>Ltd. P'ship v. District of Columbia</u>, 198 F.3d 874, 878 (D.C. Cir. 1999) ("[T]he court must

assume the truth of all statements proffered by the non-movant <u>except</u> for conclusory allegations

lacking any factual basis in the record." (emphasis added)).  Moreover, the non-moving party

"must support his allegations . . . with facts in the record; a mere unsubstantiated allegation . . .

creates no genuine issue of fact and will not withstand summary judgment[.]"  <u>Harding v. Gray</u>,

9 F.3d 150, 154 (D.C. Cir. 1993).

### III.    ANALYSIS

The plaintiffs argue that they are entitled to summary judgment on their claims because

"the PCLOB's organic statute prohibits the President from removing Board members without

cause[,]" Pls.' Mem. at 17, and that, under Supreme Court precedent, "the PCLOB is precisely

the kind of nonpartisan, multi-member, expert agency that Congress can constitutionally insulate

from at-will removal[,]" rendering the President's removal of the plaintiffs unlawful,[14] id. at 2.

Accordingly, the plaintiffs request that the Court "declare the[ir] purported terminations . . . to be

unlawful," id. at 34, as well as issue an injunction or writ of mandamus "requiring the immediate

reinstatement of [the] plaintiffs to their position as Board members and forbidding any actions

that would deprive the plaintiffs of their ability to carry out their duties as Board members[,]" id.

    In response, the defendants argue that they are entitled to summary judgment because,

"[u]nlike in other cases presenting seemingly similar issues, the Board's organic statute does not

impose any restrictions on the President's authority to remove Board [m]embers[,]" Defs.' Mem.

at 1 (citation omitted), and, even if the Court could construe the statute to include such a

restriction, it should refrain from doing so pursuant to the canon of constitutional avoidance, see

id. at 16.  Further, the defendants argue that "even if any removal protections could be divined,

[the p]laintiffs would not be entitled to reinstatement[,]" id. at 2, because the Court lacks the

authority to order reinstatement and the plaintiffs "have not demonstrated that mandamus is

warranted[,]" id. at 20.

    The Court will first address whether the PCLOB's organic statute protects Board

members from at-will removal by the President, either by its plain text or based on the Board's

structure and function.  Because it ultimately concludes that it does, and that such protections are

consistent with the separation of powers, the Court will then address whether the plaintiffs are

entitled to any of their requested relief.

---

[14] Because the Court ultimately concludes that the plaintiffs' removals were unlawful under federal law, the Court
need not reach the question of whether their removals violate the Due Process Clause.  See Pls.' Mem. at 33–34.

A.      **Whether the President's Removal of the Plaintiffs Was Unlawful**

1.    **Whether the PCLOB's Organic Statute Restricts the Authority of the President to Remove Members of the PCLOB at Will**

As indicated above, the plaintiffs argue that they are entitled to summary judgment on their claims because "the PCLOB's organic statute prohibits the President from removing Board members without cause."  Pls.' Mem. at 17.  The defendants do not contend that the plaintiffs' removals were for cause, but rather that their removals were lawful because "the Board's organic statute does not impose any restrictions on the President's authority to remove Board [m]embers."  Defs.' Mem. at 1 (citing 42 U.S.C. § 2000ee).  The Court will address each of these arguments in turn.

Under Supreme Court precedent, "absent a 'specific provision to the contrary, the power of removal from office is incident to the power of appointment.'"  Carlucci v. Doe, 488 U.S. 93, 99 (1988) (quoting Keim v. United States, 177 U.S. 290, 293 (1900)).  Therefore, "[b]ecause of the background presumption that the President may remove anyone he appoints, Congress must make it clear in a statute if it wishes to restrict the President's removal power."  Severino v. Biden, 71 F.4th 1038, 1044 (D.C. Cir. 2023) (citing Carlucci, 488 U.S. at 99).  Congress can make such a restriction clear in one of two ways: (1) through "the plain text of [the] statute[,]"  Severino, 71 F.4th at 1044 (first citing Seila L. LLC v. Consumer Fin. Prot. Bureau, 591 U.S. 197, 230–31 (2020); then citing Carlucci, 488 U.S. at 99); or (2) "through the statutory structure and function of an office[,]"  id. (first citing Seila L., 591 U.S. at 230; then citing Wiener v. United States, 357 U.S. 349, 353 (1958)).

"These two tests ask only whether a statute should be read as limiting the President's removal power."  Id. at 1044 n.2.  "If a statute does so, the question of the constitutionality of that restriction would still need to be decided."  Id. (citing Free Enter. Fund v. Pub. Co. Acct.

20

Oversight Bd., 561 U.S. 477, 486–87 (2010)).  However, because "[c]ourts will not assume

Congress legislated a potential separation of powers problem unless the statutory text makes

Congress's intent to test constitutional lines apparent[,]" id. at 1044 (citing, inter alia, Jennings v.

Rodriguez, 583 U.S. 281, 296 (2018) (noting that "[w]hen a 'serious doubt' is raised about the

constitutionality of an Act of Congress," courts, pursuant to the canon of constitutional

avoidance, will seek to avoid such constitutional questions so long as "after the application of

ordinary textual analysis, the statute is found to be susceptible of more than one construction")

(citations omitted)), once a Court has concluded under Severino that Congress clearly indicated

such a removal restriction, the canon of constitutional avoidance does not apply and the Court

must proceed to determine the constitutionality of that restriction.

The Court will address each of these tests in turn, before proceeding to the constitutional

analysis, if necessary.

### a. Whether the Plain Text of the PCLOB's Organic Statute Restricts the President's Removal Power

The plaintiffs rely on the legislative history of the PCLOB's organic statute, as well as

collateral provisions in its current text, for the proposition that Congress—although it did not

include an express textual removal restriction—nonetheless clearly intended to protect Board

members from removal by the President, at least without cause.  See Pls.' Mem. at 19.

Specifically, the plaintiffs argue that, in response to the above-discussed concerns relating to the

PCLOB's independence as initially constituted, Congress "substantially amended the Board's

organic statute[]" to ensure the Board's independence.  Id.  In support of their position, the

plaintiffs emphasize that, in amending the PCLOB's organic statute:

> Congress removed the Board from the Executive Office of the President, deleted
> language stating that Board members "serve[d] at the pleasure of the President,"
> deleted language stating that the "Board shall perform its functions within the

> [E]xecutive [B]ranch and under the general supervision of the President," added a
> requirement of partisan balance, and gave Board members fixed terms of office.

Id.  Thus, according to the plaintiffs, "[t]he[] [amended] textual provisions, along with the text

Congress deleted when it amended the statute in 2007, make it unambiguously clear that

Congress intended to impose removal restrictions." Id. at 20.  And, according to the plaintiffs,

because the PCLOB's organic stature directs that "[e]ach member of the Board shall serve a term

of [six] years[,]" 42 U.S.C. § 2000ee(h)(4) (emphasis added), with no caveats, the statute clearly

"mandates that members will hold office for a fixed six-year term, not only so long as the

President chooses to keep them[,]" Pls.' Mem. at 20.

    The defendants respond that the absence of an explicit restriction on removal in the

PCLOB's organic statute is fatal to the plaintiffs' claims because "[w]here Congress intends to

protect principal officers from removal, it does so clearly."  Defs.' Mem. at 3 (citations omitted).

Thus, according to the defendants, the plaintiffs' reliance on the statute's legislative history and

these collateral provisions are futile.  See id. at 4.  Moreover, the defendants contend that the

plaintiffs' reading of the PCLOB's organic statute would insulate the plaintiffs from any removal

by the President, including for significant misconduct and wrongdoing, "mean[ing] that

congressional silence as to removal offers stronger removal protections than [other] statutes

invalidated" by the Supreme Court in prior cases.  Id.  Finally, the defendants argue that the

plaintiffs' reliance on the changes Congress made in the 9/11 Commission Act is misplaced

because "Congress replaced [IRTPA] Section 1061 wholesale, remodeling the Board and

replacing its original organic statute with what was, in effect, an entirely new statutory

provision[,]" and thus, "[t]his is not an instance in which a reader may draft inferences from

Congress's choice to line-item remove certain provisions from the statute."  Id. at 7.

In construing whether the PCLOB's organic statute provides restrictions on the removal of Board members, several well-settled principles of statutory interpretation must guide the Court's analysis. First, as with any issue of statutory interpretation, the Court must "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." United States v. Albertini, 472 U.S. 675, 680 (1985) (quoting Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985)). Thus, where the statute of the language is "plain, 'the sole function of the courts is to enforce it according to its terms.'" United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989) (quoting Caminetti v. United States, 242 U.S. 470, 485 (1917)). Moreover, the Court must also interpret the statute so as "to give effect, if possible, to every clause and word of a statute." Duncan v. Walker, 533 U.S. 167, 174 (2001) (quoting United States v. Menasche, 348 U.S. 528, 538–39 (1955)). In doing so, the Court is mindful that "[s]tatutory construction . . . is a holistic endeavor." United Savings Ass'n v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 371 (1988). Therefore, the Court must consider "the object and policy of the entire statutory scheme in interpreting a provision within that scheme."[15] United States v. Fahnbulleh, 742 F. Supp. 2d 137, 146 (D.D.C. 2010) (Walton, J.) (citing Richards v. United States, 369 U.S. 1, 11 (1962)) (holding that courts must not construe statutory provisions "in isolation from the context of the whole Act," but rather courts "must look to the provisions of the whole law, and to its object and policy").

---

[15] The Court is unpersuaded by the defendants' argument that because Congress engaged in a "complete overhaul" of the PCLOB's organic statute and did not include an explicit removal provision, the Court should essentially discount the import of any individual change to the statute. Defs.' Reply at 8. The defendants provide no legal authority that supports their position, and, as the plaintiffs note, courts—including the Supreme Court—regularly engage in statutory interpretation under similar circumstances. See Pls.' Opp'n at 6 (citing Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241 (2004)).

However, in conducting its analysis, the Court must also adhere to the Supreme Court's admonition that "absent a 'specific provision to the contrary, the power of removal from office is incident to the power of appointment.'" Carlucci, 488 U.S. at 99 (quoting Keim, 177 U.S. at 293) (emphasis added). As another member of this Court has noted, because "Congress knows how to codify an explicit removal protection[,]" Stirrup v. Biden, 662 F. Supp. 3d 12, 24 (D.D.C. 2023), "it is doubtful that anything [other] than an explicit removal protection would constitute a 'specific provision' under Carlucci," id. at 25 (citing Carlucci, 488 U.S. at 99).

And, in Severino, the District of Columbia Circuit implicitly incorporated Carlucci's requirement for a "specific provision" in concluding that Congress may clearly indicate its intent to impose a removal restriction in the "plain text of a statute." 71 F.4th at 1044 (citing Carlucci, 488 U.S. at 99). This comports with the Supreme Court's decision in Seila Law, which Severino also cited for that same proposition, in which the Supreme Court focused on the specific provision in the Dodd-Frank Act that provided for-cause removal protections. See Seila L., 591 U.S. at 229 (interpreting the Act's provision that the Director of the Consumer Financial Protection Bureau (the "CFPB") "may be removed for 'inefficiency, neglect of duty, or malfeasance in office[]'" (quoting 12 U.S.C. § 5491(c)(3)). Thus, the most natural reading of Severino is that the first test, i.e., the "plain text" test, is a narrow inquiry focused on whether there is a "specific provision" expressly restricting removal, as opposed to the second test's broader inquiry as to an agency or board's "structure and function," which is derived from the statutory text as a whole. See Severino, 71 F.4th at 1047 (noting that when an agency's structure and function is "operationally incompatible with at-will Presidential removal, that can be a relevant signal that Congress meant for members of that agency to be shielded from Presidential

removal, even without an <u>explicit textual statement</u> to that effect") (emphasis added) (citations
omitted).

Here, as indicated above, the plaintiffs rely on several collateral provisions contained in
the statute—along with the statute's legislative history—in support of their position that
Congress made it clear through the "plain text" of the statute that PCLOB members are entitled
to removal protection.  Specifically, the plaintiffs argue that (1) the removal of the PCLOB from
the Executive Office of the President; (2) the deletion of statutory language stating that Board
members "serve[d] at the pleasure of the President[;]" (3) the deletion of language stating that
the Board was to perform its work "under the general supervision of the President[;]" (4) the
addition of a requirement of partisan balance; and (5) the addition of a fixed term-of-office
provision amount to such a clear indication of Congress's intent to limit the President's removal
power, despite the lack of any express textual removal restriction in the statutory language.  Pls.'
Mem. at 19.

For the following reasons, the Court concludes that these provisions, even when
considered collectively, do not satisfy <u>Carlucci</u>'s "specific provision" requirement, as
incorporated by <u>Severino</u>.  First, the plaintiffs argue that the requirement that "[e]ach member of
the Board <u>shall serve</u> a term of [six] years[,]" 42 U.S.C. § 2000ee(h)(4), "is inconsistent with
removal at will[,]" Pls.' Mem. at 20, because "[t]he plain statutory text mandates that members
will hold office for a fixed six-year term, not so long as the President chooses to keep them[,]"
<u>id.</u>  However, the D.C. Circuit in <u>Severino</u> concluded that Supreme Court precedent counsels that
"a defined term of office [acts] as a cap rather than an entitlement."  71 F.4th at 1075.  In
reaching this conclusion, the Circuit relied on the Supreme Court's decision in <u>Parsons v. United
States</u>, in which the Supreme Court upheld the President's removal of U.S. Attorneys from office

despite a term-of-office provision directing that they "shall be appointed for a term of four years." 167 U.S. 324, 338 (1897). And, as the Circuit noted in <u>Severino</u>, "[t]he Supreme Court subsequently reaffirmed <u>Parsons</u>' understanding of a defined term of office as a cap rather than entitlement." 71 F.4th at 1045 (citing <u>Myers v. United States</u>, 272 U.S. 52, 146–47 (1926)). Thus, as another member of this Court has noted, "the most natural reading of <u>Parsons</u>[ is] that such provisions are not standalone restrictions on the President's removal power." <u>Spicer v. Biden</u>, 575 F. Supp. 3d 93, 99 (D.D.C. 2021).

The plaintiffs argue that <u>Parsons</u> and <u>Severino</u> are distinguishable for two reasons. First, they argue that the language in the PCLOB's organic statute mandating that members "shall serve" their fixed terms is distinct from the statutory language in <u>Parsons</u>, which provided that officers "shall be appointed for a term of four years[,]" 167 U.S. at 327–28. However, another member of this Court has rejected term-of-office provisions as express textual removal restrictions under similar circumstances where members "serve for three years each" "except that any member whose term of office has expired <u>shall continue to serve</u> until his successor is appointed." <u>Spicer</u>, 575 F. Supp. 3d at 95; <u>see also</u> <u>id.</u> at 99 (concluding that <u>Parsons</u> and its progeny foreclosed that plaintiff's efforts to distinguish <u>Parsons</u> based on the same legislative history here). The plaintiffs' argument in this case appears to indicate that where, as in <u>Spicer</u>, members "serve" fixed terms, but "shall continue to serve" thereafter until their successor assumes the position, they are removable at will during their designated terms but are only removable for cause after that term expires. The Court doubts that Congress would intentionally create such an outcome based on the statutory text. Thus, the Court cannot conclude that, despite binding precedent and the untenable practical implications of the plaintiffs' argument, the PCLOB members' term-of-office provision constitutes an express textual removal restriction.

In further support of their position, the plaintiffs emphasize that other courts, including the D.C. Circuit, have upheld implied removal protections relating to other agencies with "shall serve" statutory language.  See Pls.' Opp'n at 12–13.  However, those courts' assumptions that members of the agencies at issue were protected from at-will removal were based on the structure and function of the agencies in those cases, rather than on the particular statutory language governing those agencies.[16]  See Federal Election Comm'n v. NRA Pol. Victory Fund, 6 F.3d 821, 826 (D.C. Cir. 1993) (noting that the Federal Election Commission "is patterned on the classic independent regulatory agency sanctioned . . . in Humphrey's Executor[v. United States, 295 U.S. 602 (1935),]" and concluding that the limitation on the President's removal power could likely be implied "by the Commission's structure and mission as well as the commissioners' terms"); Secs. & Exch. Comm'n v. Blinder, Robinson & Co., 855 F.2d 677, 682 (10th Cir. 1988) (drawing parallels between the Securities and Exchange Commission's function and that of the Federal Trade Commission in Humphrey's Executor). Therefore, to the extent these cases have any bearing on the plaintiffs' claims, they provide guidance as to whether the structure and function of the PCLOB prescribes the outcome in this case, not whether the plain text of the statute does so.

Second, the plaintiffs argue that, unlike in Severino, the term-of-service provision does not stand alone, because Congress clearly indicated a textual removal protection by its removal of the PCLOB from the EOP, as well as its deletion of statutory language stating that Board members "serve[d] at the pleasure of the President" and operated under the "general supervision

---

[16] Nor is the Court persuaded by the plaintiffs' argument that because Congress has "repeatedly paired 'shall serve' language with explicit removal carveouts in other appointment statutes, . . . Congress understands the phrase standing alone to confer tenure protections[,]" Pls.' Opp'n at 13 (listing statutes), because adopting such an interpretation would be directly at odds with Parsons, which remains binding on this Court, and would run counter to the presumption that "Congress legislates against the backdrop of existing law[,]" Parker Drilling Mgmt. Servs., Ltd. v. Newton, 587 U.S. 601, 611 (2019) (quoting McQuiggin v. Perkins, 569 U.S. 383, 398 n.3 (2013)).

of the President[.]"  Pls.' Mem. at 21.  To be sure, this legislative history provides support for

Congress's intent to make the PCLOB more independent, and it is relevant to the Court's

analysis of the PCLOB's structure and function set forth below.  However, the plain text of the

statute does not allow the Court to read into the statute a "specific provision"—i.e., an express

textual removal restriction—where there is not one.[17]  Carlucci, 488 U.S. at 99.

      The plaintiffs also emphasize that the 2007 amendments indicated that the PCLOB was to

be an "independent" agency in light of Congress's other revisions to the PCLOB's organic

statute because the Board would not be able to operate independently if the President could

remove members at will over policy disagreements.  See Pls.' Mem. at 23.  However, the

Supreme Court has noted that the term "independent" alone "does not necessarily mean that [an]

[a]gency is 'independent' of the President[,]" rather than merely indicating that it "is not part of

and is therefore independent of any other unit of the Federal Government."  Collins v. Yellen,

594 U.S. 220, 248–49 (2021).  Again, Congress's revisions to the PCLOB's organic statute may

indeed indicate that the Board's "structure and function" is incompatible with at-will removal,

Severino, 71 F.4th at 1044, but regarding the plain text of the statute alone, Congress's

characterization of the PCLOB as "independent" in its organic statute does not convert any of the

collateral provisions in the statute into an express textual removal restriction, see Collins, 594

U.S. at 249.

      Finally, and most importantly, the fact that Congress revised the statutory text and still

failed to include an express protection against removal further cuts against the plaintiffs'

argument that the plain text of the statute provides a removal restriction.  Accordingly, the Court

---

[17] Similarly, although the plaintiffs argue that such a reading of the plain text of the statute would nullify many of the other provisions Congress changed in 2007, see Pls.' Mem. at 22–23, those changes are relevant to the revisions of the PCLOB's structure and function, not to the existence of any "specific provision" regarding removal, Carlucci, 488 U.S. at 99.

concludes that the "plain text" of the PCLOB's organic statute does not clearly indicate

Congress's intent to impose a removal restriction.  Severino, 71 F.4th at 1044.  The Court will

therefore next address whether the structure and function of the PCLOB clearly indicates

Congress's intent to impose such a removal restriction, even absent an explicit textual removal

limitation provision in the statute.

### b.    Whether the Structure and Function of the PCLOB Indicates Congress's Intent to Restrict the President's Removal Power

The plaintiffs argue that Congress "'clearly indicate[d] its intent to restrict removals

through the statutory structure and function' of the PCLOB[,]" Pls.' Mem. at 23 (quoting

Severino, 71 F.4th at 1044), because: (1) "[t]he Board's composition, requirements for the

appointment of members, and the structure of members' terms each reflect Congress's design to

insulate members from presidential control and removal[,]" id.; and (2) its "functions make clear

that independence from presidential influence is critical and that Congress thus could not have

sought to allow removal at will[,]" id. at 26.  The defendants respond that the plaintiffs have

"fail[ed] to demonstrate that the structure and function of the Board are 'operationally

incompatible with at-will presidential removal[,]'" Defs.' Mem. at 11 (quoting Severino, 71

F.4th at 1047), in light of the omission of any explicit removal restriction, and because the Board

"serves primarily advisory functions[]" directed at the Executive Branch, see id. at 13.  The

defendants further argue that, had Congress included removal restrictions, such restrictions

"would present constitutional questions about the applicability of Humphrey's Executor to" the

PCLOB based on those functions, id. at 15, and thus, the canon of constitutional avoidance

counsels in favor of their narrower interpretation of the statute, see id. at 16.

As indicated above, the Circuit in Severino noted that Congress can make a removal

restriction clear based on the "structure and function" of the agency in question.  71 F.4th at

1044 (first citing <u>Seila L.</u>, 591 U.S. at 230; then citing <u>Wiener</u>, 357 U.S. at 353).  According to

the Circuit, "under <u>Humphrey's Executor</u>'s and <u>Wiener</u>'s binding precedent, when Congress

assigns to an agency quasi-judicial or quasi-legislative functions that are deemed to be

operationally incompatible with at-will Presidential removal, that can be a relevant signal that

Congress meant for members of that agency to be shielded from Presidential removal, even

without an explicit textual statement to that effect."  <u>Id.</u> at 1047.  And, as previously indicated,

courts, including the D.C. Circuit, have indicated precisely that regarding two other independent

agencies, namely the Federal Election Commission (the "FEC") and the Securities and Exchange

Commission (the "SEC").  <u>See</u> <u>Federal Election Comm'n</u>, 6 F.3d at 826 (noting that it was

"likely correct" that, even in the absence of an express removal provision, the President could

only remove members of the FEC for cause); <u>Blinder, Robinson & Co.</u>, 855 F.2d at 681

(assuming, in the absence of an express removal provision, that the President had the authority to

remove SEC members only for cause).

In <u>Severino</u>, the D.C. Circuit concluded that the structure and function of the

Administrative Conference of the United States ("ACUS" or "the Conference") were not

"operationally incompatible with at-will Presidential removal[,]" 71 F.4th at 1047, because "[f]ar

from the 'absolute freedom from Executive interference' deemed so mission-critical in

<u>Humphrey's Executor</u> and <u>Wiener</u>, the Council's design and function reflect the opposite:

Integration and cooperation with the Executive Branch is vital to the successful accomplishment

of the Conference's consultative role[,]" <u>id.</u> at 1049 (internal citation omitted).

In doing so, the D.C. Circuit made clear that the ACUS's structure had none of the

qualities of a classic independent agency or board in <u>Humphrey's Executor</u> or <u>Wiener</u>.  The

ACUS was made up of between "75 and 101 members who reflect a mix of governmental and

30

outside experts[,]" far from the classic five-member board structure.  See Severino, 71 F.4th at

1040 (citing 5 U.S.C. § 593(a)).  And, roughly half of the ACUS members were subject to

removal at will because their positions on the ACUS were a byproduct of their other positions in

the Executive Branch, underscored by the fact that they were to act as representatives of those

agencies as part of the ACUS.  See 71 F.4th at 1049 (noting that Congress "made roughly half of

the Conference's membership, and up to half of the Members of the Council, employees of the

Executive Branch").  Congress also gave ACUS members three-year terms, "ensuring that no

member could outlast a President."  Id. (citing 5 U.S.C. § 595(b)).  And, although the members

of the ACUS served staggered terms, the Circuit noted that the staggered nature of the ACUS

members' terms was not designed to last because half of the members were Executive Branch

members and would change with the administration.[18]  See id.  Finally, the Circuit noted that

although the fact that non-governmental ACUS members were unpaid "gives them a certain

independence from the President and Congress[,]" their "volunteer service[] . . . only

underscores how diametrically opposed their role is to the weighty quasi-judicial jobs at issue in

Wiener and Humphrey's Executor."  Id.

 Apart from its structure, the D.C. Circuit also emphasized the clear distinctions between

the ACUS's wholly advisory function and the functions of the independent agencies at issue in

Humphrey's Executor and Wiener.  The Circuit concluded that "[p]roducing advice for the

Executive Branch is the Conference's raison d'etre[,]" id. at 1048, and that it was "created

specifically for the purpose of helping '[f]ederal agencies, assisted by outside experts' to 'study

---

[18] Although not discussed by the Circuit, other ACUS member selection requirements underscore the sharp contrast between the ACUS and classic independent agencies and boards.  Specifically, while the ACUS Chairman was to select certain members "in a manner which will provide broad representation of the views of private citizens and utilize diverse experience[,]" see 5 U.S.C. § 593(b)(6), and was to select among individuals with expertise in federal administrative procedure, see id., there was no requirement of partisan balance, see generally id. § 593.

mutual problems, exchange information, and develop recommendations[,]'" id. (quoting 5

U.S.C. § 591(1)); see also id. (emphasizing that "[t]he Executive Branch is the planet around

which all of the [ACUS]'s responsibilities revolve").  And, although the ACUS had a few

statutory obligations to "submit informational reports to Congress[,]" id., and it was "permitted

to inform the legislative and judicial branches about aspects of administrative procedure[,]" id.

(emphasis added) (citing 5 U.S.C. § 594(1)), the Circuit emphasized that "the overwhelming

majority of the Conference's work focuses on and contributes to the internal workings of the

Executive Branch[,]" id.  Accordingly, the Circuit found that "[t]he occasional assistance [the

ACUS] provides to the other Branches is a byproduct of that mission."  Id.  Thus, at bottom, the

Circuit concluded that "Congress designed the [ACUS] to be a forum inside the Executive

Branch for shop talk and collaboration with external experts[,]" id., rather than a genuinely

independent agency.

  To the contrary, the PCLOB's structure, unlike that of the ACUS, is clearly "patterned on

the classic" multimember expert board at issue in Humphrey's Executor.  Federal Election

Comm'n, 6 F.3d at 826.  The PCLOB has five members, each of whom are appointed by the

President and confirmed by the Senate, see 42 U.S.C. § 2000ee(h)(1), and each of whom are

selected "solely on the basis of" their expertise regarding civil liberties and privacy, see id.

§ 2000ee(h)(2).  And, unlike the ACUS members, the plaintiffs are not otherwise employees of

the Executive Branch, and, by law, cannot be.  See 42 U.S.C. § 2000ee(h)(3).  In that sense,

PCLOB members resemble the Federal Trade Commissioners at issue in Humphrey's Executor,

who held their positions independent of any other position in the Executive Branch.

  The PCLOB is also designed to be nonpartisan, as members are required to be selected

"without regard to political affiliation, but in no event shall more than [three] members of the

Board be members of the same political party[,]" id.; and the members serve staggered,[19] six-year terms, see id. § 2000ee(h)(4).  Although the defendants argue that some PCLOB members' terms overlap and thus are not perfectly staggered, see Defs.' Reply at 10, the terms of the members nonetheless appear designed to promote "the independence, autonomy, and non-partisan nature" of the PCLOB, Severino, 71 F.4th at 1049 (quoting United States v. Wilson, 290 F.3d 347, 359 (D.C. Cir. 2002)).  Finally, members of the PCLOB are paid for performing their services as members of the Board, unlike the ACUS members' volunteer service.  See 42 U.S.C. § 2000ee(i)(B); see also Severino, 71 F.4th at 1049.

Second, the PCLOB's function is squarely in line with those of the multimember expert boards recognized by Humphrey's Executor and its progeny.  Although the defendants seek to draw parallels between the quintessentially executive advice function of the ACUS and the PCLOB's function, while part of the PCLOB's function is to provide advice to the Executive Branch, Congress made clear in the 2007 amendments that many of the PCLOB's responsibilities are also to Congress.  See, e.g., 42 U.S.C. § 2000ee(d), (e) (detailing the PCLOB's functions and reporting requirements).  Thus, unlike the ACUS, the PCLOB's responsibilities to Congress are not merely a "byproduct" of its responsibilities to provide advice to the Executive Branch.  Severino, 71 F.4th at 1048.

In contrast to the ACUS's function as a "forum inside the Executive Branch for shop talk and collaboration with external experts[,]" id. at 1049, the PCLOB's function, first and foremost,

---

[19] Although the parties do not dispute that the Board members serve staggered terms, the Court notes that such a stagger is not expressly required by the PCLOB's organic statute.  See generally 42 U.S.C. § 2000ee.  However, it does appear to the Court that members' terms have largely been staggered as a matter of practice, and the PCLOB's own characterizations support a finding that the terms of the members are in fact staggered.  See Privacy & C.L. Oversight Bd., History and Mission, https://www.pclob.gov/About/HistoryMission (last visited May 21, 2025) ("Under the 9/11 Commission Act, the Board is comprised of a full-time Chairman and four part-time Members, each appointed by the President, with the advice and consent of the Senate, to staggered[,] six-year terms.") (emphasis added).

—and consistent with the very name of the Board—is to conduct <u>oversight</u>.[20]  Although the

defendants argue that the PCLOB's function, like that of the ACUS, is to "review" Executive

Branch regulations and actions, the PCLOB's mandate extends far beyond that function.  As

indicated above, Congress, in enacting the changes it did in 2007, reoriented the PCLOB's

function away from exclusively advising the President and other Executive Branch officials, and

toward also advising Congress in support of its legislative function in the counterterrorism

context.  That reorientation was made clear by Congress's removal of language included in the

initial iteration of the PCLOB's organic statute that the Board's work was "for the purpose of

providing advice to the President" or to the heads of Executive Branch agencies.  <u>Compare</u> 42

U.S.C. § 2000ee(d)(1), <u>with</u> IRTPA § 1061(c)(1), 118 Stat. at 3684.  To the contrary, in the

amended statute, that role includes informing Congress of any recommendations made to the

Executive Branch that were not adopted, in order to ensure that Congress is aware of any areas

for further oversight or legislation in the absence of Executive Branch action.  <u>See</u> 42 U.S.C.

§ 2000ee(e)(2)(D).

　　　Congress appears to have weighed the PCLOB's recommendations and testimony heavily

in its consideration of the reauthorization and reform of certain surveillance authorities within

the PCLOB's designated domain, in light of its requests that Board members testify as to

whether and to what extent reforms are necessary, <u>see, e.g.</u>, <u>Fixing FISA: How a Law Designed</u>

<u>to Protect Americans Has Been Weaponized Against Them</u>, <u>Hearing Before the Subcomm. on</u>

<u>Fed. Gov't Surveillance of the H. Comm. on the Judiciary</u>, 118 Cong. 9 (April 27, 2023)

---

[20] The defendants argue that the plaintiffs' emphasis on oversight is misplaced because "Inspectors General, who likewise perform oversight functions within the Executive Branch, 'may be removed from office by the President.'" Defs.' Reply at 12 (quoting 5 U.S.C. § 403(b)(1)(A)).  However, as the plaintiffs noted at the April 30, 2025, motion hearing, the structure and function of Inspectors General differs greatly from the PCLOB.  Specifically, Inspectors General "shall report to and be under the general supervision of" the relevant agency head, 5 U.S.C. § 403(a), which clearly distinguishes it from the PCLOB and other independent boards. Therefore, the defendants' argument on this point is misplaced.

(featuring testimony from two PCLOB members), and its track record of seriously debating—or

adopting—many of the PCLOB's recommendations, see, e.g., U.S. Privacy & C.L. Oversight

Bd., Recommendations Assessment Report at 1–2 (Feb. 5, 2016) (reporting that Congress's

enactment of the USA FREEDOM Act "addressed most of the recommendations in [the]

PCLOB's" report on a particular surveillance program).[21]  Thus, the PCLOB's purpose and

function is far closer to the Federal Trade Commission's (the "FTC") "specified duties as a

legislative . . . aid" in Humphrey's Executor, 295 U.S. at 628, as it is tasked with investigating

and providing recommendations to Congress to ensure that new and existing laws adequately

protect privacy and civil liberties, and providing oversight of the government's implementation

of those laws to ensure that the Executive Branch is acting in conformity with Congress's will.

    Beyond these differences, there are significant indicia that the "'absolute freedom from

Executive interference' deemed so mission-critical in Humphrey's Executor and Wiener[,]"

Severino, 71 F.4th at 1049, is just as mission-critical for the PCLOB's operation.  One such

indicia is that "[w]hen performing its fact-finding, investigatory, and monitoring

functions, . . . the [PCLOB] is often required to criticize the policies of the Executive that are

contrary to" privacy and civil liberties.  Berry v. Reagan, Civil Action No. 83-3182, 1983 WL

538, at *4 (D.D.C. Nov. 14, 1983), vacated as moot, 732 F.2d 949 (D.C. Cir. 1983) (per curiam).

    For example, in 2013, a bipartisan group of United States Senators requested that the

PCLOB investigate and report publicly on two National Security Agency ("NSA") surveillance

programs following the publication of a series of media reports "based on unauthorized

disclosures of classified documents by Edward Snowden, a contractor for the [NSA]." Privacy &

---

[21] Available at https://documents.pclob.gov/prod/Documents/OversightReport/8ab510df-738f-44b5-a73a-08d1336d544d/Recommendations_Assessment_Report_20160205%20-%20Completed%20508%20-%2010252022.pdf.

C.L. Oversight Bd., <u>Report on the Telephone Records Program Conducted under Section 215 of the USA PATRIOT Act and on the Operations of the Foreign Intelligence Surveillance Court</u> 1 (Jan. 23, 2014).[22]  In response, the PCLOB issued two reports—its first report on Section 702, as well as a second report on the telephone records program conducted pursuant to Section 215 of the USA PATRIOT Act.  <u>See id.</u>  And, in the PCLOB's report on Section 215, the majority of the PCLOB concluded that the Section 215 program "d[id] not provide an adequate legal basis to support the program," <u>id.</u> at 10, and that "the program violate[d] the Electronic Communications Privacy Act[,]" <u>id.</u>  The PCLOB majority reached this conclusion after its "independent[] examin[ation]" of the statutory scheme, noting that it "disagreed with the conclusions of the government and the [Foreign Intelligence Surveillance] Court[]" that the program was statutorily authorized.  <u>Id.</u> at 57.  Therefore, the PCLOB recommended that the government terminate the program.[23]  <u>See id.</u> at 168.

The PCLOB's report on Section 215 is far from the only time the PCLOB has been at odds with the Executive Branch over its counterterrorism programs.  Indeed, in its most recent report on Section 702, the PCLOB recommended, <u>inter alia</u>, that Congress require "individualized and particularized judicial review" by the Foreign Intelligence Surveillance Court (the "FISC") for all U.S. person queries of communications obtained through the use of Section 702.  <u>See</u> Privacy & C.L. Oversight Bd., <u>Report on the Surveillance Program Operated</u>

---

[22] Available at https://documents.pclob.gov/prod/Documents/OversightReport/ec542143-1079-424a-84b3-acc354698560/215-Report_on_the_Telephone_Records_Program.pdf.

[23] In making its recommendations, the PCLOB conducted its own independent policy analysis of the value of the Section 215 program, scrutinizing publicly available examples that "members of the intelligence community ha[d] cited as demonstrating successful use of the program."  <u>Id.</u> at 148.  Ultimately, the PCLOB determined that these "success stories" did not withstand close scrutiny, <u>id.</u>, and that Executive Branch officials' "suggestions to [the Board] that the program should be preserved because it might [have value] in the future" provided "little reasons to expect that it is likely to provide significant value, much less essential value, in safeguarding the nation in the future[,]" <u>id.</u> at 155.

<u>Pursuant to Section 702 of the Foreign Intelligence Surveillance Act</u> 12 (Sept. 28, 2023).[24] <u>But</u> <u>see</u> <u>id.</u> at B-44 (Separate Statement of Board Members Beth A. Williams and Richard E. DiZinno) (disagreeing with the Board majority's recommendation for such a requirement). Therefore, it is clear to the Court that the PCLOB's function, contrary to the defendants' assertions at the April 30, 2025, motion hearing, is not only to provide information and advice that the President desires to receive, but is rather to act as an independent, objective check on the exercise of the government's counterterrorism authorities. And, at times, that might demand the delivery of information critical of the Executive Branch's actions or contrary to its positions.

Based on the above factors, the Court concludes that the PCLOB's structure and function as a multimember, nonpartisan, expert oversight board is "operationally incompatible with at-will Presidential removal[,]" <u>Severino</u>, 71 F.4th at 1047, and thus, it is obvious that Congress intended for the Board to perform its statutory duties without "the Damocles' sword of removal by the President" over members' heads,[25] <u>Wiener</u>, 357 U.S. at 356. Accordingly, the Court

---

[24] Available at https://documents.pclob.gov/prod/Documents/OversightReport/054417e4-9d20-427a-9850-862a6f29ac42/2023%20PCLOB%20702%20Report%20(002).pdf.

[25] At the April 30, 2025, motion hearing, the defendants argued that the Supreme Court in <u>Collins</u> cast doubt on the availability of removal protections for other boards with a structure similar to that of the PCLOB. However, the Supreme Court's dicta in <u>Collins</u>—<u>i.e.</u>, whether Congress had "impos[ed] any restriction on the President's power to remove the agency's leadership[,]" 594 U.S. at 249—indicates that the Court was focusing solely on when the word "independent" is used in a statute, whether courts may infer removal protections based solely on such usage, <u>see id.</u> (noting that the interplay between express removal protections and the use of the word "independent" "shows that the term 'independent' does not necessarily connote independence from Presidential control, and we refuse to read that connotation into the [ ] Act"). The Court does not draw from that dicta anything to suggest that members of those boards are—or are not—entitled to removal protection based on the structure and function of the boards. And, the defendants have provided no other case law establishing that members of these boards are not entitled to removal protections. Indeed, at least one of the agencies referenced by the defendants is subject to litigation before another member of this Court over purportedly unlawful removals of agency officials. <u>See</u> <u>Harper v. Bessent</u>, No. 25-cv-1294 (AHA) (D.D.C. filed Apr. 28, 2025) (challenging the President's removal of members of the National Credit Union Administration Board without cause). Therefore, the defendants' reference to these boards in the context of the PCLOB's structure and function is inapposite.

concludes that the Board's structure and function clearly indicates Congress's intent to protect its members from removal, at least without cause.[26]

The defendants, in an apparent effort to preclude a constitutional analysis by the Court, argue that the canon of constitutional avoidance weighs in favor of the Court adopting their narrower interpretation of the statute, in order to avoid "'serious doubts' about the constitutionality of [the p]laintiffs' interpretation of the statute[.]" Defs.' Mem. at 17. However, because "[c]ourts will not assume Congress legislated a potential separation of powers problem unless the statutory text makes Congress's intent to test constitutional lines apparent[,]" Severino, 71 F.4th at 1044 (citing, inter alia, Jennings, 583 at 296)—either by virtue of the "plain text" of the statute or through the structure and function of the agency, as indicated by the language of the statute as a whole, id.—the canon of constitutional avoidance is inapplicable here. Thus, having concluded that the structure and function of the PCLOB, as set forth in the statutory text as a whole, makes clear that Congress intended to restrict the President's removal authority regarding members of the PCLOB, the Court must proceed to determine whether those restrictions violate the separation of powers.[27] See id. at 1044 n.2.

---

[26] Nor does reading the statute as including a removal protection produce "absurd" results by insulating Board Members from any removal, even under extraordinary circumstances such as malfeasance. Defs.' Mem. at 4. As the plaintiffs concede, the Court's interpretation of the President's removal authority under the PCLOB's organic statute "does not require the [C]ourt to conclude that PCLOB members are protected from for-cause termination." Pls.' Opp'n at 13 n.2. Rather, the plaintiffs admit that the Court "could reasonably interpret the PCLOB removal protection to extend only to removals without cause, because Congress legislated against a background understanding that, when it confers tenure protection, that protection usually permits removal for cause." Id. And, there is good reason for adopting such a position because it would ensure that PCLOB members are provided the same protection as other multimember expert boards—but no more, and no less. However, because the defendants concede that the plaintiffs' removals were without cause, the Court need not conclusively determine this issue.

[27] The plaintiffs argue that the defendants have "intentionally decline[d]" to argue that the PCLOB's removal restriction is unconstitutional, Pls.' Opp'n at 21, and therefore the Court should treat its constitutional argument as waived, see id. at 22. However, Severino counsels that, upon the Court concluding that the PCLOB's organic "statute should be read as limiting the President's removal power[,]" 71 F.4th at 1044 n.2, "the question of the constitutionality of that restriction would still need to be decided[,]" id. Therefore, the Court must proceed to determine whether the restriction in this case is constitutional.

2.  **Whether Congress's Restriction of the President's Removal Power Regarding Members of the PCLOB Runs Afoul of the Separation of Powers**

The plaintiffs argue that the PCLOB fits squarely within those multimember expert agencies at issue in Humphrey's Executor and its progeny, and therefore the restriction on the President's removal power in this case comports with the separation of powers. See Pls.' Mem. at 32. The defendants do not—and, indeed, could not—argue that Humphrey's Executor is not still good law and binding on the Court, see generally Defs.' Mem.; Defs.' Reply, because the Supreme Court has repeatedly upheld Congress's constitutional prerogative to restrict the President's removal powers for multimember expert boards, see, e.g., Seila L., 591 U.S. at 228 (declining to revisit Humphrey's Executor). Although couched in constitutional avoidance language, the defendants essentially make a more limited argument—that these restrictions are unconstitutional because the PCLOB does not fit within Congress's judicially-recognized authority under Humphrey's Executor and its progeny. See Defs.' Mem. at 19. The Court will canvas the relevant Supreme Court precedent before addressing the PCLOB's fit within this exception to the President's removal power.

a.  **The President's Removal Power**

Because Article II of the Constitution vests the President with executive power and requires that the President "take Care that the Laws be faithfully executed[,]" U.S. Const. Art. II, § 3, cl. 1, the Supreme Court has held that the President has a general power to remove executive officers, see Myers, 272 U.S. at 163–64. Indeed, the Supreme Court has emphasized that "the President's removal power is the rule, not the exception." Seila L., 591 U.S. at 228.

However, the Supreme Court has also recognized two exceptions to that rule, "represent[ing] what up to now have been the outermost constitutional limits of permissible congressional restriction on the President's removal power." Id. (quoting PHH Corp. v.

A164

<u>Consumer Fin. Prot. Bureau</u>, 881 F.3d 75, 196 (D.C. Cir. 2018) (Kavanaugh, J., dissenting) (internal quotation marks omitted)).  First, the Supreme Court has repeatedly recognized that Congress, pursuant to its own constitutional authority, has the power to protect from removal "multimember expert agencies that do not wield substantial executive power," <u>id.</u> at 217—<u>i.e.</u>, multimember bodies with "quasi-judicial" or "quasi-legislative" functions, <u>see id.</u>; <u>see also</u> <u>Humphrey's Ex'r</u>, 295 U.S. at 629.  Second, the Supreme Court has recognized an exception for "inferior officers with limited duties and no policymaking or administrative authority[.]"  <u>Seila L.</u>, 591 U.S. at 228; <u>see</u> <u>Morrison v. Olson</u>, 587 U.S. 654, 691–92 (1988) (upholding the constitutionality of Title VI of the Ethics in Government Act, which provided for-cause removal protections for independent counsel appointed by a specialized court to investigate federal government officials).  Because the PCLOB members are appointed by the President with the advice and consent of the Senate, they are not inferior officers, and therefore, the inferior officer exception under <u>Morrison</u> is inapplicable here.  Thus, the Court will only assess whether the PCLOB fits within the exception recognized by the Supreme Court in <u>Humphrey's Executor</u>.

**b.  The <u>Humphrey's Executor</u> Exception**

In <u>Humphrey's Executor</u>, the Supreme Court upheld statutory removal protections afforded to members of the FTC, a five-member board of experts, balanced based on political party affiliation, whose members were appointed by the President with the advice and consent of the Senate to serve staggered, seven-year terms, and were protected by an express for-cause removal restriction.  295 U.S. at 619–20.  Since the issuance of that opinion in 1935, the Supreme Court has reaffirmed <u>Humphrey's Executor</u>'s protections for multimember independent agencies that share the same characteristics as the 1935 FTC.  <u>See, e.g.</u>, <u>Wiener</u>, 357 U.S. at 350 (upholding removal restrictions regarding members of the War Claims Commission).

More recently, the Supreme Court has concluded that it could not "extend" Humphrey's Executor to certain independent agencies with a single director.  Seila L., 591 U.S. at 205; see Collins, 594 U.S. at 251 (concluding the same).  In Seila Law, the Supreme Court distinguished the CFPB from Humphrey's Executor in several ways.  First, the Court observed that the CFPB's structure was "almost wholly unprecedented[,]" 591 U.S. at 220, because the CFPB was an "independent agency led by a single Director and vested with significant executive power[,]" id. (citing Free Enter. Fund, 561 U.S. at 483), rather than an agency led by a multimember board. Second, the Court noted that "[b]ecause the CFPB is headed by a single Director with a five-year term, some Presidents may not have an opportunity to shape its leadership and thereby influence its activities." Id. at 225.  And third, the Court emphasized that "[t]he CFPB's receipt of funds outside the appropriations process further aggravates the agency's threat to Presidential control." Id. at 226.  Accordingly, the Seila Law Court concluded that Congress's for-cause removal restrictions regarding the CFPB's single director violated the separation of powers.[28]  See id. at 213.

In declining to "extend" the exception, the Seila Law Court reiterated its application to "multimember expert agencies that do not wield substantial executive power[.]" Id. at 218. And, in doing so, that Court noted that "[r]ightly or wrongly, the [Humphrey's Executor] Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.'"  Id. at 215 (quoting Humphrey's Ex'r, 295 U.S. at 628), because "it was 'an administrative body' that performed 'specific duties as a legislative or as a judicial aid[,]'" id. (quoting Humphrey's Ex'r, 295 U.S. at 628).  The Seila Law Court noted that the Humphrey's Executor Court had

_____

[28] Subsequently, the Supreme Court in Collins concluded that "[a] straightforward application of [the Court's] reasoning in Seila Law dictate[d] the result" that the statutory removal protection afforded to the single Director of the Federal Housing Finance Agency was unconstitutional.  594 U.S. at 251.

"identified several organizational features that helped explain its characterization of the FTC as non-executive": (1) that because it was "[c]omposed of five members—no more than three from the same political party—the Board was designed to be 'non-partisan' and to 'act with entire impartiality[,]" id. at 216 (quoting Humphrey's Ex'r, 295 U.S. at 624); (2) its "duties were 'neither political nor executive,' but instead called for 'the trained judgment of a body of experts' 'informed by experience[,]'" id. (quoting Humphrey's Ex'r, 295 U.S. at 624); and (3) "the Commissioners' staggered, seven-year terms enabled the agency to accumulate technical expertise and avoid a 'complete change' in leadership 'at any one time[,]'" id. (quoting Humphrey's Ex'r, 295 U.S. at 624). And, although the FTC had certain "powers of investigation," Humphrey's Ex'r, 295 U.S. at 621, the Supreme Court in Seila Law recognized that the Humphrey's Executor Court characterized these investigative powers as part of the FTC's functions "as a legislative agency" in "making investigations and reports" to Congress, 591 U.S. at 215 (quoting Humphrey's Ex'r, 295 U.S. at 628).

Here, as an initial matter, the PCLOB's structure—a five-member board of experts, balanced along partisan lines, whose members are appointed by the President with the advice and consent of the Senate to serve staggered terms—fits well within the historical tradition of independent agencies. Therefore, it does not appear to the Court that Seila Law's additional factors—i.e., whether an agency's structure and terms of office impede the President's ability to influence that agency; and whether the agency receives funding outside the normal appropriations process—apply. See Consumers' Rsch. v. Consumer Prod. Safety Comm'n, 91 F.4th 342, 355 (5th Cir. 2024) (concluding that Seila Law did not apply to the Consumer Product Safety Commission because the Commission "fits squarely within" the Humphrey's Executor exception for multimember expert boards). However, even assuming arguendo that the Seila

Law factors did apply in this case, the Board members' staggered, six-year terms, see 42 U.S.C.

§ 2000ee(h)(4), and the Board's reliance on the appropriations process, see generally, U.S.

Privacy & C.L. Oversight Bd., Congressional Budget Justification: Fiscal Year 2025 (2024)[29]

both provide each President with "an opportunity to shape [the Board]'s leadership and

[otherwise] influence its activities[,]"[30] see Seila L., 591 U.S. at 225–26, and thus these

additional factors present no issue in this case.  The question, then, is whether the PCLOB

members "closely resemble[] the FTC Commissioners" as described by the Supreme Court in

Humphrey's Executor.  Seila L., 591 U.S. at 217.  For the following reasons, the Court concludes

that they do, and accordingly, Congress may constitutionally protect PCLOB members from

removal.

    First, the PCLOB mirrors the 1935 FTC in that it is composed of five members, with no

more than three from the same political party; the selection criteria emphasize the substantive

expertise and qualifications for these members; and the Board is nonpartisan in nature.  See 42

U.S.C. § 2000ee(h)(2) ("Members of the Board shall be selected solely on the basis of their

professional qualifications, achievements, public stature, expertise in civil liberties and privacy,

and relevant experience, and without regard to political affiliation, but in no event shall more

than [three] members of the Board be members of the same political party.").  These features all

clearly indicate that the Board was designed to be nonpartisan and act impartially.  And, as with

the FTC in Humphrey's Executor, the Board's duties are "neither political nor executive," but

---

[29] Available at
https://documents.pclob.gov/prod/Documents/FinancialReport/1068/FY25%20%20PCLOB%20CBJ%20-
%20508%20Complete%20-%20Mar%2025,%202024.pdf.

[30] Indeed, President Trump appointed both plaintiffs to their positions with the advice and consent of the Senate
during his first term in office, and upon returning to office, two positions on the Board—including the position of
Chair upon the expiration of Ms. Bradford Franklin's holdover term—are currently vacant, independent of the
plaintiffs' positions.



rather the product of "the trained judgment of a body of experts" "informed by [their] expertise." 295 U.S. at 629. Finally, members serve staggered, six-year terms, allowing members—and the Board as a whole—to avoid wholesale changes and to accumulate technical expertise. See id.

Moreover, the PCLOB's structure—consistent with other multimember expert boards—ensures a greater level of accountability, both between members of the Board, and between the Board majority and the President and public. See PHH Corp., 881 F.3d at 148 (Henderson, J., dissenting) (noting that "a minority party of a multimember agency is a 'built-in monitoring system,' dissenting when appropriate and serving as a 'fire alarm' for the President and the public" (quoting Rachel E. Barkow, Insulating Agencies: Avoiding Capture Through Institutional Design, 89 Tex. L. Rev. 15, 41 (2010)); see id. at 166 (Kavanaugh, J., dissenting) ("In lieu of Presidential control, the multi-member structure of independent agencies operates as a critical substitute check on the excesses of any individual independent agency head."). This ventilation of disparate views is of particular importance in the context of the government's counterterrorism authorities given their significant implications for privacy and civil liberties interests.

Nor does the PCLOB exercise substantial executive power, or for that matter, any executive power beyond that of the FTC in 1935. Although the defendants argue that the Humphrey's Executor exception applies only to multimember bodies that are "said not to exercise any executive power[,]" Defs.' Mem. at 18 (quoting Seila L., 591 U.S. at 216), as indicated above, the Seila Law Court explained its reasoning as to why the 1935 FTC was viewed as non-executive in nature, and the PCLOB shares these same characteristics. Moreover, adopting the defendants' argument would appear to indicate that all executive agencies,

regardless of their structure and function, exercise executive power, directly contradicting binding Supreme Court precedent.

The defendants further argue that the PCLOB, far from being a "mere legislative or judicial aid," id. at 19 (quoting Seila L., 591 U.S. at 218), is a freestanding executive agency that performs executive functions such as (1) advising the President on national security matters; (2) "possess[ing] the authority to enforce subpoenas it requests from the Attorney General in federal court[,]" and being otherwise authorized to access certain information as part of its oversight and reporting missions; and (3) "coordinat[ing] the activities of [ ] privacy officers and civil liberties officers on relevant interagency matters[,]" id. (citations omitted).

However, upon review of the record and the relevant case law, the Court is not persuaded by the defendants' position. First, the PCLOB does not have any authority to compel or otherwise bind the Executive Branch to do or cease doing anything, nor does it have such authority over any other governmental or private entities. See generally 42 U.S.C. § 2000ee. For example, the PCLOB cannot enforce subpoenas—or even issue them—despite the defendants' representations to the contrary. See id. § 2000ee(g)(1)(D) (noting that "at the direction of a majority of the members of the Board, [the PCLOB may] submit a written request to the Attorney General of the United States that the Attorney General require, by subpoena[,]" certain information); id. § 2000ee(g)(2) (noting that the Attorney General shall either "issue the subpoena as requested[]" or explain its decision to modify or deny the PCLOB's request) (emphasis added). Nor does the PCLOB adjudicate claims, engage in rulemaking, or have the power to impose any form of punishment. See generally 42 U.S.C. § 2000ee.

Second, as discussed above regarding the PCLOB's structure and function, the defendants' characterization of the PCLOB's function as being primarily advisory in nature is

clearly inconsistent with the statutory text, which makes clear that the PCLOB's oversight and reporting requirements are to act as an independent check in aid of Congress's legislative activity, rather than merely in support of advising the Executive Branch. See supra Sec. III.A.1.b. Therefore, although the PCLOB may have access to certain information and otherwise interact with members of the Executive Branch, its "powers of investigation" clearly enable its responsibilities not just to the Executive Branch, but also to make recommendations to Congress, which "have serve[d] as the basis of congressional legislation." Humphrey's Ex'r, 295 U.S. at 621. Accordingly, to the extent that the PCLOB's powers constitute the exercise of any executive power—and the Court doubts that is the case—these investigative powers are clearly in support of the Board's "specified duties as a legislative . . . aid." Seila L., 591 U.S. at 215 (quoting Humphrey's Ex'r, 295 U.S. at 628). At bottom, the PCLOB does not legally or otherwise "hold enormous power over" anyone, whether through rulemaking, regulation, or the adjudication of disputes. PHH Corp., 881 at 165 (Kavanaugh, J., dissenting). Nor does the PCLOB "pose a significant threat to individual liberty and the constitutional system of separation of powers and checks and balances." Id.

Therefore, for all of the above reasons, the Court concludes that Congress's restriction of the President's removal authority regarding members of the PCLOB comport with the separation of powers. Accordingly, because such a restriction is constitutional, and because the defendants do not dispute that the plaintiffs' removals were without cause, the Court concludes that the plaintiffs' removals were unlawful.

**B. Remedies**

Having concluded that the plaintiffs' removals were unlawful, the Court must now determine what remedies are warranted. The plaintiffs request that the Court declare that (1) the President lacks the authority to remove them from their positions as members of the PCLOB

"without cause or on the basis of their party affiliation," or "take actions that would deprive the plaintiffs of their ability to exercise the functions of their office," and (2) "the purported terminations of the plaintiffs from their office are void and without legal effect."  Am. Compl., Exhibit ("Ex.") 5 (Proposed Order) at 1, ECF No. 10-5.  The plaintiffs also request that the Court permanently enjoin all defendants—except the President—to restore the plaintiffs to their positions as Board members and to "take no action that would deprive the plaintiffs of their ability to exercise the functions of their office or deprive the plaintiffs of any right or benefit of that office."  Id.  The defendants respond that, even if the Court concludes that the President's removal of the plaintiffs from their positions was unlawful—as it now has—reinstatement is inappropriate here because "[r]einstatement exceeds the equitable powers of an Article III court and would intrude on the President's Article II authority to appoint officers of the United States, and [the p]laintiffs have not demonstrated that mandamus is warranted."  Defs.' Mem. at 20.

For the reasons set forth below, the Court concludes that (1) because the President's removal of the plaintiffs from their positions as Board members was unlawful, the plaintiffs are entitled to the declaratory relief they seek; (2) the plaintiffs have carried their burden of showing that they are entitled to the permanent injunction they seek; and (3) because injunctive relief is available, a writ of mandamus is not appropriate, but that issuance of the writ would be appropriate, should injunctive relief be unavailable for any reason.

**1.  Declaratory Judgment**

The plaintiffs first seek a judgment declaring that their terminations from the PCLOB were unlawful and therefore are null and void.  See Am. Compl., Ex. 5 (Proposed Order) at 1. The defendants, other than arguing that the plaintiffs' claims should be denied on the merits, do not appear to contend that declaratory judgment would be unavailable should the Court conclude that the plaintiffs' removals were unlawful.  See generally Defs.' Mem.; Defs.' Reply.

Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  The Declaratory Judgment Act "provides neither jurisdiction nor a cause of action, but rather a form of relief when the case is already properly before the Court." Harris v. Bessent, ___ F. Supp. 3d ___, ___, No. 25-cv-412 (RC), 2025 WL 679303, at *8 (D.D.C. Mar. 4, 2025), (citing C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth., 310 F.3d 197, 201 (D.C. Cir. 2002)), stay lifted, No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025).  Because the Act does not provide an independent basis for jurisdiction or a distinct cause of action, "just like suits for every other type of remedy, declaratory-judgment actions must satisfy Article III's case-or-controversy requirement." California v. Texas, 593 U.S. 659, 672 (2021) (citing MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 126–27 (2007)).  As the Supreme Court has noted, in order to satisfy Article III, a dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests[,]" and it must also be "'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" MedImmune, 549 U.S. at 127 (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240–41 (1937)).  To constitute a live controversy, the dispute must be "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Preiser v. Newkirk, 422 U.S. 395, 402 (1975) (emphasis omitted) (quoting Md. Cas. Co. v. Pac. Co., 312 U.S. 270, 273 (1941)).

"[I]t is well settled that a declaratory judgment always rests within the sound discretion of the court." President v. Vance, 627 F.2d 353, 365 n.76 (D.C. Cir. 1980) (citing Brillhart v. Excess Ins. Co. of Am., 316 U.S. 491, 494 (1942)).  While there are no dispositive factors in

determining whether to grant declaratory relief, such relief will "ordinarily be granted only when it will either 'serve a useful purpose in clarifying the legal relations in issue' or 'terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" Id. (quoting E. Borchard, Declaratory Judgments 299 (2d ed. 1941)).

Other members of this Court have uniformly concluded that declaratory relief is available under similar circumstances in recent cases challenging the removal of independent agency members, concluding that where a case relates to the unlawful removal of such a member, a declaratory judgment would serve a useful purpose to clarify the legal relations between the parties and afford relief from the underlying challenged actions. See Harris, ___ F. Supp. 3d at ___, 2025 WL 679303, at *8; Wilcox v. Trump, ___ F. Supp. 3d ___, ___, No. 25-cv-334 (BAH), 2025 WL 720914, at *15 (D.D.C. Mar. 6, 2025), stay lifted, No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025); Grundmann v. Trump, ___ F. Supp. 3d ___, ___, No. 25-cv-425 (SLS), 2025 WL 782665, at *11 (D.D.C. Mar. 12, 2025). So too here. The plaintiffs have challenged their removals from the PCLOB and seek to clarify whether they may resume their work as members of the Board. The defendants, on the other hand, contend that their removals were lawful and that Congress did not—and cannot—restrict the President's removal authority in this case. And, as indicated above, the defendants have not disputed the availability of declaratory judgment if otherwise warranted. Consistent with the position of its colleagues, the Court concludes that, for the reasons set forth above, it must grant the plaintiffs' request for declaratory relief and enter a declaratory judgment in favor of the plaintiffs.

## 2. Reinstatement Through Injunctive Relief

The plaintiffs also request that the Court reinstate them to their positions on the Board by issuing a permanent injunction against all defendants except the President. See Pls.' Mem. at 37. The defendants, make two arguments against injunctive relief consistent with arguments the

government has made in similar cases concerning the challenged removals of independent

agency members.  First, the defendants argue that historically courts of equity could not restrain

by injunction the removal of a public officer, and that because the plaintiffs here are principal

officers—rather than inferior officers or employees—the Court does not have the authority to

grant the requested injunctive relief.  See Defs.' Mem. at 21.  And second, the defendants

contend that, even if the Court has the authority to grant injunctive relief, the plaintiffs have

failed to show that they are entitled to such relief in this case.  See id. at 24.

Plaintiffs seeking to show that they are entitled to a permanent injunction must satisfy a

four-factor test in order to obtain such "drastic and extraordinary" relief.  Monsanto Co. v.

Geertson Seed Farms, 561 U.S. 139, 165 (2010).  Specifically, the plaintiffs must establish:

> (1) that [they] ha[ve] suffered an irreparable injury; (2) that remedies available at
> law, such as monetary damages, are inadequate to compensate for that injury;
> (3) that, considering the balance of hardships between the plaintiff[s] and [the]
> defendant[s], a remedy in equity is warranted; and (4) that the public interest
> would not be disserved by a permanent injunction.

Id. at 156–57 (quoting eBay Inc. v. MercExchange L.L.C., 547 U.S. 388, 391 (2006)).  "The

decision to grant or deny permanent injunctive relief is an act of equitable discretion by the

district court[.]"  eBay, 547 U.S. at 391 (citing Weinberger v. Romero-Barcelo, 456 U.S. 305,

311–13 (1982)).  The Court will first address the defendants' argument that the Court does not

have the legal authority under Article III to provide such relief, before addressing each of these

factors in turn.

### a.  Whether the Court May Provide Injunctive Relief

As indicated above, the defendants argue that reinstatement is not a proper equitable

remedy because a court sitting in equity "has no jurisdiction over the appointment and removal

of public officers[,]" Defs.' Mem. at 21 (quoting In re Sawyer, 124 U.S. 200, 212 (1888)), and

A175

"reinstatement is beyond the equitable authority of the [C]ourt to impose because it 'impinges on the "conclusive and preclusive" power through which the President controls the Executive Branch that he is responsible for supervising[,]'" id. (quoting Dellinger v. Bessent, No. 25-5028, 2025 WL 559669, at *16 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting)).  The plaintiffs counter that "the Supreme Court has repeatedly reaffirmed the authority of federal courts to order reinstatement, whether via mandamus, quo warranto, or equitable remedies."  Pls.' Mem. at 34 (listing cases).  The plaintiffs further argue that, apart from formal reinstatement, binding D.C. Circuit precedent counsels that the Court has the authority to de facto reinstate officers who have been wrongfully removed by the President by enjoining subordinate officers—but not the President—to restore the plaintiffs to their positions as members of the Board.  See id. (citing Severino, 71 F.4th at 1042–43).

The Court is unpersuaded by the defendants' arguments in light of relevant D.C. Circuit precedent and the consistent practice of other members of this Court in applying the Circuit's precedent.  Specifically, the D.C. Circuit has made clear that courts may "reinstate a wrongly terminated official 'de facto,' even without a formal presidential reappointment."  Severino, 71 F.4th at 1042–43 (citing Swan v. Clinton, 100 F.3d 973, 980 (D.C. Cir. 1996)).  Although the defendants argue that these cases addressed standing, rather than the availability of a particular remedy and the scope of courts' authority to provide a remedy, these arguments are unavailing in light of applicable precedent from the Circuit.  Indeed, in Swan, the Circuit concluded that it could order the subordinate agency officials there to "treat[] [the plaintiff] as a member of the [ ] Board and allow[] him to exercise the privileges of that office."[31]  100 F.3d at 980.

---

[31] Because the Court ultimately concludes that it has the authority to grant the plaintiffs relief in the form of de facto reinstatement under Severino, it need not wade into the broader debate over the historical boundaries between legal and equitable relief, although other members of this Court have recently concluded that reinstatement is appropriate

(continued . . .)

The defendants argue that de facto reinstatement through an injunction of subordinate officials—but not the President—nonetheless effectively targets the President because it is the President alone who has the power to appoint Board members.  See Defs.' Mem. at 21–22.  However, Swan and Severino are binding precedent on this Court, and the defendants have offered no legal authority in support of their position that the Court cannot enjoin the subordinate officials in this case.  Nor could they offer such legal authority "because, as a general matter, courts undoubtedly have authority to constrain unlawful presidential action by enjoining the President's subordinates."  Wilcox, ___ F. Supp. 3d at ___, 2025 WL 720914, at *16 (citing, e.g., Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 582, 589 (1952) (affirming the district court's judgment restraining the Secretary of Commerce from carrying out unconstitutional presidential action)).

Therefore, based on binding D.C. Circuit precedent, and absent compelling argument for why this case should be treated differently, the Court concludes that it is within its authority to provide the plaintiffs with their requested injunctive relief, should the Court determine that doing so is appropriate in this case.  Accordingly, the Court will next assess whether the plaintiffs have established that they are entitled to injunctive relief against all defendants except the President.

_____

(. . . continued)
equitable relief in these circumstances because the Supreme Court "ha[s] recognized that federal courts are generally empowered to review the claims of discharged federal employees."  Harris, ___ F. Supp. 3d at ___, 2025 WL 679303, at *10 (citing Sampson v. Murray, 415 U.S. 61, 71–62 (1974)); see Wilcox, ___ F. Supp. 3d at ___, 2025 WL 720914, at *16 n.22 (concluding the same).

Further, as the D.C. Circuit has noted, a request for injunctive relief is "essentially a request for a writ of mandamus in this context," Swan, 100 F.3d at 973 n.1, and, as discussed below, see infra Sec. III.B.3, the Court concludes that mandamus would be appropriate if injunctive relief were not available.  Similarly, because the Court concludes that these remedies are available, it need not address the plaintiffs' request for administrative mandamus under the Administrative Procedure Act (the "APA").  See Pls.' Mem. at 36.

### b.  Irreparable Harm and Inadequate Remedy at Law

The first two factors of the Court's permanent injunction analysis, i.e., whether there is irreparable harm and an inadequate remedy at law, "are often considered together."  Wilcox, ___ F. Supp. 3d at ___, 2025 WL 720914, at *15 n.20 (listing cases).

To establish irreparable harm for the purposes of seeking injunctive relief, plaintiffs challenging their terminations must sufficiently show "harm [that is] certain and great . . .  and so imminent that there is a clear and present need for equitable relief to prevent [such] irreparable harm."  League of Women Voters of U.S. v. Newby, 838 F.3d 1, 7 (D.C. Cir. 2016) (citation, internal quotation marks, and alterations omitted).  "[P]roving 'irreparable' injury is a considerable burden," Power Mobility Coal. v. Leavitt, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (Walton, J.) (quoting Wis. Gas Co. v. Fed. Energy Regul. Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985)), and establishing the mere "possibility of irreparable harm" is not sufficient to satisfy this burden, Winter, 555 U.S. at 22.

Additionally, the injury "must be beyond remediation," Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006), and, generally, "economic loss does not, in and of itself, constitute irreparable harm," Wis. Gas. Co., 758 F.2d at 674.  More specifically, "the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury."  Davenport v. Int'l Bhd. of Teamsters, AFL-CIO, 166 F.3d 356, 367 (D.C. Cir. 1999) (quoting Sampson v. Murray, 415 U.S. 61, 90 (1974)).

"Economic harm may qualify as irreparable, however, 'where a plaintiff's alleged damages are unrecoverable.'"  Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Rsrv. Sys., 773 F. Supp. 2d 151, 180 (D.D.C. 2011) (quoting Sterling Com. Credit—Michigan, LLC v. Phoenix Indus. I, LLC, 762 F. Supp. 2d 8, 16 (D.D.C. 2011)); see Nat'l Mining Ass'n v. Jackson,

768 F. Supp. 2d 34, 53 (D.D.C. 2011) (Walton, J.) (noting that while "the mere fact that

economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable

harm," the "recoverability of monetary losses can, and should, have some influence on the

irreparable harm calculus"). But, even where economic loss is unrecoverable, "the loss 'must . . .

be serious in terms of its effect on the plaintiff.'" Cal. Ass'n of Priv. Postsecondary Schs. v.

DeVos, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) (quoting Gulf Oil Corp. v. Dep't of Energy, 514

F. Supp. 1019, 1026 (D.D.C. 1981)).

  Here, the plaintiffs argue that they have suffered irreparable harm without another

adequate legal remedy available to them because (1) they are not entitled to money damages in

light of their part-time status as Board members and the PCLOB's compensation provisions, see

Pls.' Opp'n at 30–31; and (2) they have been "'depriv[ed] of [their] statutory right to function' as

[ ] member[s] of the [PCLOB],' which carries profound consequences for the Board[,]" id. at 31

(quoting Harris, ___ F. Supp. 3d at ___, 2025 WL 679303, at *13). In response, the defendants

argue that the plaintiffs have not established that they have suffered irreparable harm because

(1) they would be entitled to backpay, evinced by their inclusion of a request for backpay in the

original Complaint in this case, see Defs.' Reply at 19; and (2) the deprivation of their positions

as Board members does not constitute irreparable harm, see Defs.' Mem. at 25. The Court will

address these alleged harms in turn.

  In support for the plaintiffs' first argument, they contend that unlike in some other cases

arising out of challenged terminations of independent agency officials, they would not be entitled

to money damages, had they retained that request in their Amended Complaint, which they have

not done.[32]  The plaintiffs note that "[u]nlike federal career employees, PCLOB members earn

no salary[,]" Pls.' Opp'n at 30 (citing 42 U.S.C. § 2000ee(i)(1)(B)); rather, as part-time PCLOB

members, they "receive compensation only 'for each day during which that member is engaged

in the actual performance of the duties of the Board[,]" id. (citing 42 U.S.C. § 2000ee(i)(1)(B)).

Therefore, according to the plaintiffs, because they did not actually perform any work following

their challenged terminations, they are not entitled to backpay, nor would they be entitled to front

pay because they could not actually perform their Board duties following their terminations.  See

id.  The defendants respond that (1) the plaintiffs' request for an award of backpay in their

original Complaint indicates that backpay would be available in this case, see Defs.' Reply at 19;

and (2) such backpay is available and able to be calculated because "an award of backpay

assumes that a terminated employee would have been working when the employee would

normally have worked[,]" id. (citation omitted).

However, at the April 30, 2025, hearing on the pending motions, the plaintiffs

represented that they had removed their backpay request upon recognizing that they are not

entitled to money damages in the form of either backpay or front pay under the PCLOB's

organic statute, and the defendants do not dispute the plaintiffs' characterization of the statute in

this regard, nor do they cite any other statute that would make backpay available to the plaintiffs

under the circumstances in this case.[33]

---

[32] The plaintiffs initially included backpay as part of their requested relief but removed that request as part of their Amended Complaint.  Compare Compl. at 26, with Am. Compl. at 26.

[33] The plaintiffs also argued at the motion hearing that they would not be eligible for backpay pursuant to the Back Pay Act.  Specifically, the Back Pay Act provides that a wrongfully terminated federal employee "on correction of the personnel action," is entitled to "an amount equal to all or part of the pay, allowances, or differentials, as applicable which the employee normally would have earned . . . less any amounts earned by the employee through other employment during that period."  5 U.S.C. § 5596(b)(1).  However, the plaintiffs argue that they are not entitled to any backpay because they each earn more money through their other, private-sector employment, than they do through their part-time employment with the PCLOB, see LeBlanc 2d Suppl. Decl. ¶ 4; Felten 2d Suppl.

(continued . . .)

Even assuming <u>arguendo</u> that backpay was unavailable, and thus, the plaintiffs' economic losses are irretrievable, the Court concludes that they have not shown that such irretrievable loss is sufficiently "serious in terms of its effect on" the plaintiffs.  <u>Cal. Ass'n of Priv. Postsecondary Schs.</u>, 344 F. Supp. 3d at 170 (quoting <u>Gulf Oil Corp.</u>, 514 F. Supp. at 1026).  Although the Court does not discount that the plaintiffs have suffered some economic harm by not being permitted to perform their PCLOB duties, and will continue to suffer additional harms if not reinstated, by their own admission, their PCLOB compensation is "modest" and not the reason they serve as members of the Board.  Pls.' Opp'n at 31.  Nor do the plaintiffs provide "specific details regarding the extent to which [they] will suffer [from their economic losses]."  <u>Nat'l Ass'n of Mortg. Brokers</u>, 773 F. Supp. 2d at 181.  Therefore, despite these unrecoverable economic losses, the Court cannot conclude that such harm is irreparable.

The plaintiffs next argue that they have established that they have suffered irreparable harm because they have been deprived of their "statutory right to function" as members of the Board, which also carries profound consequences for the Board itself.  Pls.' Mem. at 31 (quoting <u>Harris</u>, ___ F. Supp. 3d, at ___, 2025 WL 679303, at *13).  Specifically, the plaintiffs argue that because the Board no longer has its statutorily-mandated quorum, it cannot perform certain statutory requirements, such as initiating new oversight projects, formally finalizing existing projects, or retaining staff.  <u>See id.</u> at 32.  The plaintiffs argue that these requirements are "highly time sensitive" in light of the upcoming statutory sunset of Section 702, which is set to expire in April 2026.  <u>Id.</u> at 32–33.

---

(. . . continued)

Decl. ¶ 4, and they declare that they have earned more money through those positions since their challenged terminations than they would have made from their positions on the PCLOB, <u>see</u> LeBlanc 2d Suppl Decl. ¶ 5; Felten 2d Suppl. Decl. ¶ 5.  However, the Court need not conclusively determine whether backpay is available under this theory because, as the Court explains below, it concludes that the plaintiffs have failed to show irreparable economic harm, assuming <u>arguendo</u> that backpay is unavailable.

The defendants argue that the plaintiffs have failed to establish irreparable harm in this regard because loss of employment is not an irreparable harm, even where an individual has been deprived of a "unique, singular, or high-level position[.]" Defs.' Mem. at 24. The defendants further argue that the cases upon which the plaintiffs rely in support of their irreparable harm position are distinguishable for several reasons. According to the defendants, unlike in other recent cases before other members of this Court, there is no statutory restriction here on the President's removal power. See id. at 26. Further, the defendants argue that the plaintiffs would be entitled to backpay, which is the traditional remedy for unlawful termination. See id. at 27. Finally, the defendants contend that unlike the agencies at issue in other cases, the PCLOB "can continue to fulfill its mandate without [the p]laintiffs[']" participation in light of its sub-quorum authority, id. at 29, and therefore, there is no irreparable disruptive effect to the Board itself, see id. at 26–29.

In cases arising out of the purportedly unlawful termination of government employees, plaintiffs challenging their terminations "must make a showing of irreparable injury sufficient in kind and degree to override[,]" Sampson, 415 U.S. at 84, (1) the "disruptive effect" to the "administrative process" resulting from injunctive relief, id. at 83; (2) the Court's general deference to the government "in the 'dispatch of its own affairs,'" id. at 83 (quoting Cafeteria & Rest. Workers Union, Loc. 473, AFL-CIO v. McElroy, 367 U.S. 886, 896 (1961)); and (3) "the traditional unwillingness of courts of equity to enforce contracts for personal service either at the behest of the employer or of the employee[,]" id. (citation omitted).

In Sampson, the Supreme Court concluded that the plaintiff—a probationary employee within the General Services Administration—had failed to establish irreparable harm beyond mere economic loss or reputational harm, and thus her harm was insufficient to entitle her to

injunctive relief.  Id. at 91–92.  However, in reaching this conclusion, the Supreme Court

acknowledged that "cases may arise in which the circumstances surrounding an employee's

discharge, together with the resultant effect on the employee, may so far depart from the normal

situation that irreparable injury might be found[,]" and that district courts have authority to grant

injunctive relief to terminated government employees "in [that] genuinely extraordinary

situation." Id. at 92 n.68.

      Several other members of this Court have recognized such irreparable harm in cases

involving the removal of individuals appointed to independent, multimember boards based on

"the[ir] 'unlawful removal from office by the President' and 'the obviously disruptive effect' that

such removal has on the organization's functioning." Wilcox, ___ F. Supp. 3d, at ___, 2025 WL

720914, at *15 (quoting Berry, 1983 WL 538, at *5); see Harris v. Bessent, ___ F. Supp. 3d ___,

___, 2025 WL 521027, at *6–9 (D.D.C. Feb. 18, 2025) (finding that the plaintiff had established

irreparable harm from being removed as a member of the Merit Systems Protection Board in

granting a temporary restraining order); Grundmann, ___ F. Supp. 3d, at ___, 2025 WL 782665,

at *17 (concluding the removed chair of the Federal Labor Relations Authority had established

irreparable harm); Berry, 1983 WL 538, at *5 (concluding the same regarding the removal of

members of the United States Commission on Civil Rights).

      For example, in Berry, the district court recognized such irreparable harm where the

President's removal of members of the United States Commission on Civil Rights deprived the

Commission of a quorum, thus disrupting the Commission's "ability to fulfil its [statutory]

mandate" to draft its final report.  1983 WL 538, at *5.  In making its finding, the district court—

relying on Sampson—found the plaintiffs' injury was sufficient to entitle them to injunctive

relief for several reasons.  First, the district court found that because it was "not clear that the

President ha[d] the power to remove Commissioners at his discretion[,]" there was no indication that the court was required to give the government the usual latitude it is given to conduct its affairs.  Id.  Second, the district court found that because the Commissioners served in a quasi-legislative capacity, "in the furtherance of civil rights in this country[,]" rather than a federal employee who serves in a personal service capacity, the courts' general aversion to enforcing personal service contracts was not applicable.  Id.  And third, the plaintiffs—by virtue of their positions on an independent commission, rather than within a department of government—"d[id] not have administrative, statutory, or other relief that is readily available to many federal employees."  Id.

　　　Here too, the Court concludes that the plaintiffs' removals by the President constitute a "genuinely extraordinary situation."  Id.  To reiterate, the plaintiffs are appointed by the President, with the advice and consent of the Senate, to a nonpartisan, multimember board of experts, and they have been tasked—based on their expertise relating to privacy and civil liberties—with the weighty responsibility of ensuring that the federal government's counterterrorism actions adequately protect these interests.  See, e.g., Wilcox, ___ F. Supp. 3d at ___, 2025 WL 720914, at *15 (noting that the plaintiff had been "deprived of a presidentially appointed and congressionally confirmed position of high importance").  Although the defendants argue that "the deprivation of a unique, singular, or high-level position is . . . [not] an irreparable injury[,]" Defs.' Mem. at 24, all of the legal authority they cite for that proposition involved lower-level or state officials, and is therefore inapposite, see id., especially in light of the recent persuasive authority from other members of this Court.[34]

_____

[34] The defendants also cite the Supreme Court's decision in Raines v. Byrd for the proposition that "public officials have no individual right to the powers of their offices."  Id. at 27 (citing 521 U.S. 811, 820–21 (1997)).  However, the issue in Raines was whether six members of Congress could establish legislative standing to challenge the

(continued . . .)

The plaintiffs' removals also implicate core separation of powers issues, which is strikingly different from the "routine" employment circumstances of the probationary employee at issue in Sampson. As the Court has concluded, Congress clearly indicated its intent to insulate the plaintiffs as PCLOB members from executive branch interference based on the Board's structure and function, which is incompatible with at-will removal. See infra Sec. III.A.2; see also Harris v. Bessent, ___ F. Supp. 3d at ___, 2025 WL 679303, at *13 (emphasizing that the Merit Systems Protection Board's "independence would evaporate if the President could terminate its members without cause"). Although the defendants attempt to distinguish these cases based on the absence of an explicit "statutory restriction on the President's removal power[,]" Defs.' Mem. at 26, the Court has nonetheless concluded that the PCLOB's organic statute restricts the President's removal power, see supra Sec. III.A.2, and thus the Court rejects the defendants' attempt to distinguish these other cases based on whether that removal protection

---

(. . . continued)

passage of the Line Item Veto Act, which these members voted against and which gave the President "the authority to 'cancel' certain spending and tax benefit measures after he [ ] signed them into law." Id. at 814. The plaintiffs claimed that they suffered an injury for the purposes of Article III standing because the bill diminished "the legal and practical effect of all votes they may cast on bills" subject to the President's line item veto power, divested them "of their constitutional role in the repeal of legislation[,]" and expanded Executive power at the expense of their power as legislators. 521 U.S. at 816. The Supreme Court concluded that the plaintiffs could not establish standing because their purported injury was based on "the abstract dilution of institutional legislative power[,]" id. at 826, rather than "hav[ing] been deprived of something to which they personally are entitled—such as their seats as Members of Congress after their constituents had elected them[,]" id. at 821. Here, by contrast, although the plaintiffs have not been elected to their positions as Board members, they were appointed by the President, with the advice and consent of the Senate, to positions that the Court has found are protected by constitutional removal restrictions. Thus, they "have been deprived of something to which they personally are entitled[.]" Id.

Further, although Raines references the Tenure of Office Act—which restricted the President's removal power without the consent of Congress, and was "passed by Congress over the veto of President Andrew Johnson[,]" id. at 826—the Supreme Court was clearly focused on whether the President would have had Article III standing to challenge the constitutionality of that statute even "before he ever thought about firing a cabinet member," id. at 827, which it said would have "improperly and unnecessarily plunged [the federal courts] into the bitter political battle being waged between the President and Congress[,]" id. Contrary to the constitutional dilemma such an encounter would create for the judiciary, the Supreme Court went on to note that the federal courts did properly hear a case regarding the constitutionality of that statute after an official who was removed by the President despite those protections brought suit challenging his removal, see id. at 827 (citing Myers, 272 U.S. at 52). Therefore, Raines' reference to cases involving removal does nothing to undermine the plaintiffs' claims here.

arises out of the "plain text" of the statute as compared to arising from the "statutory structure and function" of an agency.

Finally, upon review of the PCLOB's organic statute and the PCLOB Sub-Quorum Policy, the Court concludes that the plaintiffs' removals give rise to irreparable harm by depriving them of their "statutory rights to function as [PCLOB members]" and thereby impeding the ability of the PCLOB to function as envisioned by Congress.  Berry, 1983 WL 538, at *5.  The defendants contend that, unlike the plaintiffs in Berry, the plaintiffs' removals in this case do not create irreparable harm because the Board "will not cease to exist and may resume full functioning" upon the resumption of a quorum, Defs.' Mem. at 28–29, and "the Board is quite capable of fulfilling its missions when in a sub-quorum status[,]" Defs.' Reply at 18, especially in light of the fact that "the Board has operated in a sub-quorum status for large portions of its history[,]" id.  Further, in regards to the pending reauthorization of Section 702, the defendants counter that the plaintiffs have failed to establish that this factor constitutes irreparable harm because the PCLOB prepared a "thorough report of approximately 300 pages regarding Section 702[]" less than two years ago, which included the plaintiffs' views, Defs.' Mem. at 29, and thus any update to the report will be "far shorter" and require "substantially less[]" time to prepare, Defs.' Facts. ¶ 40, due to the recency and thoroughness of its prior report on the same authority.

The Court is unpersuaded by any of the defendants' arguments.  Pursuant to the PCLOB Sub-Quorum Policy, without a quorum the PCLOB may not, inter alia: issue advice in the name of the Board, issue any Board reports, submit its statutorily-required Semi-Annual Report, or request a subpoena from the Attorney General.  See Defs.' Reply, Ex. 1 (Privacy & C.L. Oversight Bd., Sub-Quorum Authorities and Operations When the Position of Chair is Vacant:

Policy 102-01 5 (Oct. 23, 2024) ("PCLOB Sub-Quorum Policy")), ECF No. 18-2.  Nor, clearly,

can the PCLOB comply with its statutory mandate to apprise Congress of any minority views

regarding its oversight of Executive Branch counterterrorism actions and the authorities under

which these actions are taken if the President has removed all but one member of the Board.  See

42 U.S.C. § 2000ee(e)(2)(C).

These constraints clearly apply to the PCLOB's contribution to Congress's assessment

regarding whether and how to reauthorize Section 702.  The defendants do not dispute that the

Board cannot issue its Section 702 report without a quorum or that the Board—as opposed to the

sole remaining individual member—can provide advice to Congress as it debates whether and

how to reauthorize the authority, which grants the government important and broad surveillance

powers, but also has the potential to significantly intrude on privacy and civil liberties interests.

Moreover, the plaintiffs represent, and the defendants do not dispute, that the plaintiffs'

representations that, in its prior reauthorization of Section 702, Congress imposed new

restrictions on the authority, but also expanded certain aspects of the authority, including the

definition of which entities constitute an "electronic communications service provider[]" and the

definition of what amounts to "foreign intelligence information[,]" as well as "an expansion of

the use of Section 702-acquired information for vetting non-U[.]S[.] persons traveling to the

[United States]."  Pls.' Opp'n at 33.  Therefore, the Court is unpersuaded by the defendants'

representations that the PCLOB's anticipated report on Section 702 will amount to a mere update

of its last report, rather than an extensive substantive report, thereby obviating the need for the

Board as a whole—or any of the members not affiliated with the President's political party—to

offer new and possibly contrary advice relating to the recent expansions of the authority.  See

Defs.' Mem. at 29.

And, although PCLOB staff may conduct certain activities and issue certain advice and oversight reports in the form of a "Staff Report" if those projects were initiated by a quorum of the Board, such activities may be restricted by the "unanimous action of the remaining Board [m]ember(s) during a sub-quorum period." Id. at 4. Therefore, as now composed, the single remaining member unilaterally controls any staff activities and reports issued by the staff. Admittedly, the PCLOB only had one member between March 2017 and September 2018 due to the failure to fill the vacant seats, see U.S. Privacy & C.L. Oversight Bd., Board Members, https://www.pclob.gov/Board/Index (last visited May 21, 2025); however, it is the Court's view that the President's removal of the plaintiffs, resulting in the Board consisting of a single member of the President's political party, deprives the Board of the very structure and function that Congress constructed in making it an independent and nonpartisan entity, thus undermining its ability to be a truly independent watchdog that would provide candid, bipartisan oversight based on the members' expertise and collective wisdom.[35]

Thus, the Court concludes that the plaintiffs' removals have caused irreparable harm because their removals deprive the plaintiffs of their "statutory rights to function" as members of the PCLOB and impedes the ability of the PCLOB to function as an independent watchdog in furtherance of protecting civil liberties and privacy interests, as envisioned by Congress, Berry, 1983 WL 538, at *5, and that other "remedies available at law, such as monetary damages, are inadequate to compensate for that injury[,]" Monsanto Co., 561 U.S. at 165 (quoting eBay, 547

---

[35] Although the Commission in Berry—unlike the PCLOB—was set to expire, the Court concludes these harms resulting from the plaintiffs' removals are nonetheless irreparable. Further, the length of the previous period in which the PCLOB was without a quorum between 2017 and 2018, as well as the lack of any indication in the record that the President has sought to replace the plaintiffs on the Board, leaves open the possibility that the Board may be disabled for an extended period of time due to the President's actions.

U.S. at 391).  Accordingly, the Court concludes that the first two injunctive factors weigh in favor of granting the plaintiffs' request for injunctive relief.

### c.  The Balance of the Equities and the Public Interest

Finally, the Court must weigh the balance of equities and the public interest.  As the Supreme Court has noted, "these factors merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009).  Relevant here, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'"  League of Women Voters of U.S., 838 F.3d at 12 (quoting Washington v. Reno, 35 F.3d 1093, 1103 (6th Cir. 1994)).  And, as a corollary, the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required."  R.I.L-R v. Johnson, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting Rodriguez v. Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013)).

Here, the plaintiffs argue that these final two factors weigh in favor of granting injunctive relief because their removals by the President have rendered the PCLOB without a quorum, resulting in the PCLOB's inability to fulfill its statutory responsibilities.  See Pls.' Mem. at 39. Specifically, the plaintiffs again point to the upcoming reauthorization of Section 702, which, as indicated above, is set to expire in April 2026, and they argue that the Board has limited time in which to fulfill its statutory duty to "provid[e] advice on proposals to retain or enhance a particular government power."  See id. (quoting 42 U.S.C. § 2000ee(d)(1)(D)).  The defendants, rather than directly confronting the plaintiffs' arguments, counter that these final two factors weigh against awarding injunctive relief "[b]ecause the Board is an executive agency exercising executive power, [and thus] an injunction functionally reinstating one of its principal officers

would raise grave separation-of-powers concerns and work a great and irreparable harm to the Executive."  Defs.' Mem. at 30.

    For the following reasons, the Court agrees with the plaintiffs.  First, although the parties disagree on the effects of the PCLOB's sub-quorum status, the Court concludes that the PCLOB's statutory obligations are significantly impeded by the loss of a quorum due to the plaintiffs' challenged removals.  Consistent with that conclusion, the Court is thus persuaded that the final two injunctive factors weigh in favor of the plaintiffs because of the general but "substantial public interest in the for-cause removal protections Congress has given to certain members of independent agencies[,]" Harris, ___ F. Supp. 3d at ___, 2025 WL 679303, at *14, and specifically, the substantial public interest in these protections as they relate to the PCLOB and its statutory mandate.  There is a substantial public interest in the effective oversight of the government's counterterrorism actions and authorities, which is furthered by independent, candid, and expert advice being provided to the President, as well as to Congress as it debates reauthorizing important—yet controversial—authorities that have significant potential impact on privacy and civil liberties.

    The D.C. Circuit made clear in its en banc decision to lift the stay on the district courts' orders in Harris and Wilcox that the defendants, on the other hand, cannot demonstrate irreparable harm under the circumstances presented in this case and others like it "because the claimed intrusion on presidential power only exists if Humphrey's Executor and Wiener are overturned."  Harris v. Bessent, No. 25-5037, 2025 WL 1021435, at *2 (D.C. Cir. Apr. 7, 2025).[36]  Thus, consistent with the Circuit's recent decision in Harris and Wilcox, as well as

---

[36] At the April 30, 2025, motion hearing, the defendants argued that any reliance on the D.C. Circuit's en banc decision lifting the stay in the consolidated appeal in Harris and Wilcox "would be inappropriate because that decision has been administratively stayed by the U.S. Supreme Court and a decision there is forthcoming."

(continued . . .)

those by other members of this Court, the Court concludes that the balance of equities and the

public interest weigh in favor of granting the plaintiffs the injunctive relief they seek.

Accordingly, having determined that all four of these factors weigh in favor of granting

the plaintiffs' motion, the Court concludes that issuance of a permanent injunction against all

defendants except the President is warranted in this case.

### 3. Reinstatement Through Writ of Mandamus

Finally, the plaintiffs ask the Court to issue a writ of mandamus if it ultimately concludes

that no other relief is available. See Am. Compl. ¶ 87. Specifically, the plaintiffs argue that they

are entitled to mandamus because "[s]ince the advent of federal judicial review, the Supreme

Court has recognized the federal courts' authority to order the instatement of federal officials to

positions they lawfully hold[,]" including via mandamus. See Pls.' Mem. at 34 (quoting

Marbury v. Madison, 5 U.S. 137, 172–73 (1803)). The defendants argue that, even if the Court

concludes—as it now has—that the PCLOB's organic statute protects members from removal

without cause, there is still no "clear and indisputable" right to relief due to the purported

separation of powers concerns raised by the defendants in their constitutional avoidance

argument, as well as the parties' disagreement over the proper interpretation of the PCLOB's

organic statute. See Defs.' Mem. at 31. The defendants further argue that, in any event, "the

President's determination of who should be entrusted with the authorities of a principal executive

officer is anything but ministerial[,]" and thus, there is no "clear nondiscretionary duty" to

reinstate the plaintiffs. Id.

---

(. . . continued)
However, neither party has requested that the Court defer ruling on these expedited motions for summary judgment based on the pending decision in that case, and the defendants have provided no legal authority for their position that the Court may simply ignore recent Circuit authority that is directly applicable here while the authority is pending review by the Supreme Court.

Under 28 U.S.C. § 1361, mandamus relief is proper only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to [the] plaintiff." In re Nat'l Nurses United, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022) (quoting Muthana v. Pompeo, 985 F.3d 893, 910 (D.C. Cir. 2021)). And, "mandamus jurisdiction under § 1361 merges with the merits." Muthana, 985 F.3d at 910 (quoting Lovitky v. Trump, 949 F.3d 753, 759 (D.C. Cir. 2020)).

The party seeking mandamus has the "burden of showing that [his or her] right to issuance of the writ is 'clear and indisputable.'" Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 289 (1988) (citing Bankers Life & Cas. Co. v. Holland, 346 U.S. 379, 384 (1953)). And, even upon such a showing by the plaintiff, the issuance of a writ of mandamus is within the Court's discretion, In re Cheney, 406 F.3d 723, 729 (D.C. Cir. 2005), after consideration of "whether judicial intervention would be appropriate" in light of the Circuit's admonishment that mandamus is a "drastic remedy reserved for extraordinary circumstances[,]" In re Nat'l Nurses United, 47 F.4th at 752–53 (first citing Cheney v. U.S. Dist. Ct., 542 U.S. 367, 380 (2004); then citing In re Pub. Emps. for Env't Resp., 957 F.3d 267, 273 (D.C. Cir. 2020)).

Based on the Court's conclusion that the PCLOB's organic statute limits the President's authority to remove the plaintiffs, at least without cause, the Court finds that the first two mandamus factors are satisfied because it is "clear and undisputable" that the President was not permitted to terminate the plaintiffs under the circumstances in this case. Gulfstream Aerospace Corp., 485 U.S. at 289 (quoting Bankers Life & Cas. Co., 346 U.S. at 384). And, as the D.C. Circuit "ha[s] often stated in the mandamus context, a ministerial duty can exist even 'where the interpretation of the controlling statute is in doubt,' provided that 'the statute, once interpreted, creates a peremptory obligation for the officer to act.'" Swan, 100 F.3d at 978 (quoting 13th

Reg'l Corp. v. U.S. Dep't of Interior, 654 F.2d 758, 760 (D.C. Cir. 1980)).  Therefore, the

defendants' argument that there is no "clear and indisputable" right to relief in this case must be

rejected.

Second, the Court concludes that mandamus would be appropriate in this case because,

by removing the plaintiffs without cause in violation of the PCLOB's organic statute, the

defendants violated a nondiscretionary duty.  The defendants argue that mandamus cannot issue

for the reinstatement of principal executive officers, and that, in any event, because the

"[p]laintiffs have been removed from their office, [ ] the only way to return them is to reappoint

them to the Board[,]" and "[m]andamus cannot accomplish that weighty task."  Defs.' Reply

at 20.  However, this is precisely what the Supreme Court indicated would be appropriate in

Marbury.  Specifically, the Marbury Court concluded that Marbury—who was a principal

executive officer, having been appointed as a justice of the peace in Washington, D.C., see 5

U.S.C. at 155—would have been entitled to a writ of mandamus compelling the delivery of his

commission, had the Court properly possessed jurisdiction, see id. at 173.  And, contrary to the

defendants' position, binding D.C. Circuit precedent counsels that the Court has the authority to

de facto reinstate the plaintiffs to their positions by granting relief against subordinate officials—

i.e., all defendants except the President—and mandamus in this context would constitute

essentially the same relief.[37]  See, e.g., Swan, 100 F.3d at 976 n.1.  Therefore, the Court joins

other members of this Court who have concluded that, absent an adequate alternative remedy,

mandamus relief would be available based on "the voluminous precedent demonstrating that

---

[37] The defendants also argue, as they did regarding the plaintiffs' requested injunctive relief, that the plaintiffs are entitled to backpay, and thus, they have an adequate remedy available to them.  See Defs.' Mem. at 32.  However, as the Court concluded above, see supra Sec. III.B.2, backpay is not in fact available to the plaintiffs.  And, in any event, the Supreme Court in Marbury made clear in the mandamus context that "[t]he value of a public office not to be sold, is incapable of being ascertained; and the applicant has a right to the office itself, or to nothing."  5 U.S.C. at 173.  Therefore, this argument fails.

courts of law issued mandamus relief in similar situations at the time Congress passed the All Writs Act in 1789 and over the ensuing centuries." Harris, ___ F. Supp. 3d at ___, 2025 WL 679303, at *15; see Wilcox, ___ F. Supp. 3d at ___, 2025 WL 720914, at *16 n.22.

However, because the Court has concluded that a preliminary injunction is warranted in this case, the plaintiffs have an adequate alternative remedy, and mandamus is therefore not appropriate. See In re Nat'l Nurses United, 47 F.4th at 752 n.4 (quoting Muthana, 985 F.3d at 910). Nonetheless, if injunctive relief were found to be unavailable to the plaintiffs, this third prong would be satisfied and, thus, the Court would have to conclude that mandamus would be appropriate here, especially in light of the fact that it provides essentially the same relief as their requested injunctive relief.

## IV.    CONCLUSION

In our founders' astute and perceptive wisdom, "[c]hecks and balances were established in order that this should be a 'government of laws and not of men.'" Myers, 272 U.S. at 84 (Brandeis, J., dissenting). And, our constitutional system, based on the separation of powers, was adopted "not to promote efficiency but to preclude the exercise of arbitrary power." Id. at 85. At times, our elected officials "often confus[e] the issue of a power's validity with the cause it is invoked to promote, [and] confound the permanent executive office with its temporary occupant." Youngstown Sheet & Tube Co., 343 U.S. at 634 (Jackson, J., concurring). "The tendency is strong to emphasize transient results upon policies[ . . . ]and lose sight of enduring consequences upon the balanced power structure of our Republic." Id.

Our system of checks and balances is of the utmost urgency and necessity today in the realm of national security and counterterrorism, where Congress has authorized an aggressive response to the attacks on September 11, 2001, but was also mindful of the significant risks these

enhanced powers posed to the privacy and civil liberties of the American citizenry. Indeed, as

the 9/11 Commission found, and Congress enshrined in the PCLOB's organic statute:

> The choice between security and liberty is a false choice, as nothing is more likely
> to endanger America's liberties than the success of a terrorist attack at home. Our
> history has shown us that insecurity threatens liberty. Yet, if our liberties are
> curtailed, we lose the values that we are struggling to defend.

42 U.S.C. § 2000ee(b)(3) (quoting The 9/11 Commission Report at 395).

In response to the 9/11 Commission Report, Congress created an independent,

multimember board of experts and tasked its members with the weighty job of overseeing the

government's counterterrorism actions and policies, and recommending changes to ensure that

those actions and policies adequately protect privacy and civil liberties interests. And, as the

Court has now concluded, that responsibility is incompatible with at-will removal by the

President, because such unfettered authority would make the Board and its members beholden to

the very authority it is supposed to oversee on behalf of Congress and the American people. To

hold otherwise would be to bless the President's obvious attempt to exercise power beyond that

granted to him by the Constitution and shield the Executive Branch's counterterrorism actions

from independent oversight, public scrutiny, and bipartisan congressional insight regarding those

actions. And, when the President contravenes a statutory scheme designed by Congress to

ensure that these interests are adequately protected, it is specifically the "province and duty" of

the independent Judiciary to "say what the law is." Marbury, 5 U.S. at 177. Fulfilling that

obligation, the Court concludes for the foregoing reasons that it must grant the plaintiffs' motion

for summary judgment and deny the defendants' cross-motion for summary judgment.

**SO ORDERED** this 21st day of May, 2025.[38]

REGGIE B. WALTON
United States District Judge

---

[38] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| _____ | ) | |
| TRAVIS LEBLANC, <u>et al.</u>, | ) | |
|  | ) | |
| Plaintiffs, | ) | |
|  | ) | |
| v. | ) | Civil Action No. 25-542 (RBW) |
|  | ) | |
| UNITED STATES | ) | |
| PRIVACY AND CIVIL LIBERTIES | ) | |
| OVERSIGHT BOARD, <u>et al.</u>, | ) | |
|  | ) | |
| Defendants. | ) | |
| _____ | ) | |

<u>**ORDER**</u>

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the Plaintiffs' Motion for Summary Judgment, ECF No. 10, is

**GRANTED**.  It is further

**ORDERED** that the Defendants' Cross-Motion for Summary Judgment and Opposition

to Plaintiffs' Motion for Summary Judgment, ECF No. 12, is **DENIED**.  It is therefore

**DECLARED** that the terminations of the plaintiffs, Travis LeBlanc and Edward Felten,

were unlawful, in violation of 42 U.S.C. § 2000ee, and therefore null and void.  It is further

**ORDERED** that the plaintiff Travis LeBlanc remains a member of the Privacy and Civil

Liberties Oversight Board ("PCLOB" or "the Board"), having been appointed by the President

and confirmed by the Senate to a term expiring on January 29, 2028, and he may be removed by

the President prior to expiration of his term only for cause.  It is further

**ORDERED** that the plaintiff Edward Felten remains a member of the PCLOB, having

been appointed by the President and confirmed by the Senate to a term expiring on January 29,

2025, and being eligible to serve at his discretion until either his successor is confirmed or one

A197

year after the date of the expiration of his current term, i.e., January 29, 2026, whichever occurs

first, and he may be removed by the President prior to expiration of his holdover term only for

cause or upon the confirmation of a successor to his position on the Board.  It is further

       **ORDERED** that the Privacy and Civil Liberties Oversight Board, defendant Beth A.

Williams, defendant Jenny Fitzpatrick, and defendant Trent Morse, as well as their subordinates,

agents, and employees, are **ENJOINED** from treating the plaintiffs as having been removed

from their positions as Board members of the Privacy and Civil Liberties Oversight Board during

their terms as members of the Board, and from taking any action that would deprive the plaintiffs

of their ability to exercise the functions of their office during their terms as members of the

PCLOB or deprive the plaintiffs of any right or benefit of that office during their terms as

members of the PCLOB.  It is further

       **ORDERED** that this case is **CLOSED**.

       **SO ORDERED** this 21st day of May, 2025.

REGGIE B. WALTON
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TRAVIS LEBLANC; EDWARD FELTEN,

        *Plaintiffs*,

*v*.

U.S. PRIVACY AND CIVIL LIBERTIES
OVERSIGHT BOARD, et al.,

        *Defendants*.

Civil Action No. 1:25-cv-542-RBW

## DEFENDANTS' NOTICE OF APPEAL

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit the Court's May 21, 2025 Order, *see* ECF No. 25, and Memorandum Opinion, *see* ECF No. 24.

Dated: May 27, 2025                          Respectfully submitted,


                                             YAAKOV M. ROTH
                                             *Acting Assistant Attorney General*

                                             /s/ *Emily Hall*
                                             EMILY HALL, D.C. Bar No. 1780317
                                             *Counsel to the Assistant Attorney General*
                                             Civil Division
                                             United States Department of Justice
                                             950 Pennsylvania Avenue NW
                                             Washington, DC 20530
                                             Tel:  (202) 307-6482
                                             emily.hall@usdoj.gov


                                             JEANINE FERRIS PIRRO
                                             United States Attorney

                                             DOUGLAS C. DREIER
                                             Assistant United States Attorney
                                             601 D Street NW
                                             Washington, DC 20530
                                             Tel:  (202) 252-2551


                                             *Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                    )
TRAVIS LEBLANC, <u>et al.</u>,        )
                                    )
         Plaintiffs,                )
                                    )
         v.                         )        Civil Action No. 25-542 (RBW)
                                    )
UNITED STATES                       )
PRIVACY AND CIVIL LIBERTIES         )
OVERSIGHT BOARD, <u>et al.</u>,       )
                                    )
         Defendants.                )
_____)

**<u>ORDER</u>**

On May 21, 2025, the Court granted the plaintiffs' motion for summary judgment after concluding that the President had unlawfully removed them from their positions as members of the Privacy and Civil Liberties Oversight Board (the "PCLOB" or "Board"). <u>See</u> Order at 1 (May 21, 2025), ECF No. 25; <u>see generally</u> <u>LeBlanc v. U.S. Privacy & C.L. Oversight Bd.</u>, ___ F. Supp. 3d ___, 2025 WL 1454010 (D.D.C. May 21, 2025) (Walton, J.). Because the Court concluded that the plaintiffs' removal was unlawful, the Court granted them their requested declaratory judgment and permanent injunction, having found such relief to be both available and appropriate under the circumstances. <u>See</u> Order at 1 (May 21, 2025); <u>see</u> <u>LeBlanc</u>, ___ F. Supp. 3d at ___, 2025 WL 1454010, at *1. Currently pending before the Court is the Defendants' Motion to Stay the Court's Order Pending Appeal ("Defs.' Mot."), ECF No. 28, which the plaintiffs oppose, <u>see</u> Plaintiffs' Opposition to Defendants' Motion for Stay Pending Appeal at 1, ECF No. 29. For the following reasons, the Court concludes it must deny the defendants' motion.

A201

"A stay is not a matter of right, even if irreparable injury might otherwise result." Nken v. Holder, 556 U.S. 418, 433 (2009) (quoting Virginian Ry. Co. v. United States, 272 U.S. 658, 672 (1926)). Rather, the decision to grant a stay is "an exercise of judicial discretion," id. (quoting Virginian Ry. Co., 272 U.S. at 672–73), based on "the circumstances of the particular case[,]" id. (quoting Virginian Ry Co., 272 U.S. at 672–73). Thus, "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." Id. at 433–34 (citations omitted). Specifically, in assessing whether to grant a stay, the Court must consider:

> (1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Id. at 434 (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)). "The first two factors . . . are the most critical." Id. "Irreparable harm must be 'both certain and great[,]' and 'actual and not theoretical.'" Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (quoting Wis. Gas Co. v. Fed. Energy Regul. Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985)).

The defendants first argue that they are likely to succeed on the merits because although the District of Columbia Circuit has held that an agency's "structure and function" may indicate removal protections absent an express textual removal protection, the PCLOB is "not an adjudicatory body[,]" Defs.' Mot. at 3 (quoting Collins v. Yellen, 594 U.S. 220, 250 n.18 (2021)), and thus, under a different line of precedent, PCLOB members may be removed at will absent "plain language" to the contrary, id. Moreover, the defendants also argue that the PCLOB's structure and function resembles that of the Council of the Administrative Conference

of the United States, rather than the War Claims Commission or the Federal Trade Commission.
See id. at 4.

    The defendants further argue that the Court "erred in holding that the PCLOB does not
exercise 'any executive power beyond that of the [Federal Trade Commission] in 1935[,]'" id.
at 3 (quoting Leblanc, ___ F. Supp. 3d at ___, 2025 WL 1454010, at *22), because the PCLOB:
(1) "has 'access' to records and personnel from 'any department, agency, or element of the
executive branch[,]'" id. (quoting 42 U.S.C. § 2000ee(g)(1)(A)–(B)); and (2) "'produc[es] advice
for the President and to his delegees,' which is 'a quintessential example of a purely executive
function[,]'" id. (quoting Severino v. Biden, 71 F.4th 1038, 1048 (D.C. Cir. 2023)) (citation
omitted).

    Neither of these arguments is persuasive. First, as the Court explained in its
Memorandum Opinion, despite the lack of an express removal provision in the PCLOB's organic
statute, the Board's "structure and function clearly" indicated Congress's intent to protect
members of the Board from at-will removal. See Leblanc, ___ F. Supp. 3d at ___, 2025 WL
1454010, at *19. In reaching this conclusion, the Court distinguished at length the Council of
the Administrative Conference of the United States, see id. at ___–___, 2025 WL 1454010, at
*15–18, and thus, the defendants' attempts to rehash their arguments on this point must be
rejected.

    And, to the extent that the defendants seek to rely on Shurtleff v. United States, 189 U.S.
311 (1903), for the proposition that such "structure and function" does not apply to non-
adjudicatory bodies—an argument the defendants did not raise anywhere in their summary
judgment briefing, see generally Memorandum of Points and Authorities in Support of
Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for

Summary Judgment, ECF No. 12-1; Defendants' Reply in Further Support of Cross-Motion for

Summary Judgment, ECF No. 18—this case is not on point.  In Shurtleff, the Supreme Court was

confronted with the removal of a "general appraiser[] of merchandise[,]" 189 U.S. at 312, not a

member of a nonpartisan, multi-member, expert board modeled after the 1935 Federal Trade

Commission.  And, although the Supreme Court in Collins noted that Shurtleff appeared to be

the "more applicable precedent[]" regarding the Federal Housing Finance Agency ("FHFA"),

594 U.S. at 250 n.18, the FHFA was an agency managed by a single Director, not a traditional,

multi-member board as here, see id. at 248 ("When a statute does not limit the President's power

to remove an agency head, we generally presume that the officer serves at the President's

pleasure.") (emphasis added) (citing Shurtleff, 189 U.S. at 316).

    Second, although the defendants take issue with the Court's conclusions regarding the

PCLOB's lack of executive power, and cite the Supreme Court's decision staying two district

court orders reinstating officers of other independent agencies, see Trump v. Wilcox, ___ S. Ct.

___, 2025 WL 1464804, at *1 (May 22, 2025), the Supreme Court in that case emphasized that

its decision was based on its conclusion that the government was likely to succeed in arguing that

the two agencies at issue—the National Labor Relations Board and the Merit Systems Protection

Board—"exercise considerable executive power[,]" id. (emphasis added).  However, as the Court

concluded in its Memorandum Opinion, the PCLOB has no "authority to compel or otherwise

bind the Executive Branch to do or cease doing anything, nor does it have any such authority

over any other governmental or private entities[,]" Leblanc, ___ F. Supp. 3d at ___, 2025 WL

1454010, at *23, and it does not "adjudicate claims, engage in rulemaking, or have the  power to

impose any form of punishment[,]" id. (citation omitted).  And, although the defendants argue

that the PCLOB's access to records and personnel in the Executive Branch, and its advice to

Executive Branch officials, collectively amount to exercises of executive power, the Court already dispatched these arguments in its Memorandum Opinion, concluding that any "investigative powers" it may have "are clearly in support of the Board's 'specified duties as a legislative . . . aid."[1] Id. (quoting Seila L. LLC v. Consumer Fin. Prot. Bureau, 591 U.S. 197, 215 (2020)).

Nor have the defendants shown that they will be irreparably harmed absent a stay in this case, or that the balance of equities weighs in favor of granting a stay pending appeal. The defendants argue, citing the Supreme Court's order in Wilcox, that "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being able to perform her statutory duty." Defs.' Mot. at 4 (quoting Wilcox, ___ S. Ct. at ___, 2025 WL 1464804, at *1). However, although the defendants argue that the "same analysis controls here[,]" id., that is not so. As indicated above, the Supreme Court's decision in Wilcox involved agencies that were said to exercise "considerable executive power[,]" Wilcox, ___ S. Ct. at ___, 2025 WL 1464804, at *1, which is not the case with the PCLOB. Indeed, because the PCLOB may only make recommendations, which Congress and the Executive Branch are free to adopt or ignore, allowing the PCLOB members to continue to serve their terms pending appeal will not have a disruptive impact on the Executive Branch, nor will it require—should the plaintiffs be removed upon the final disposition of this matter—for example, "unwinding or disgorging hundreds of millions of dollars that have already changed hands[,]" Collins, 594 U.S. at 283 (Gorsuch, J., concurring), or any other actions of that magnitude. And, to the contrary, as the Court concluded in its Memorandum Opinion, the plaintiffs would suffer irreparable harm absent being granted

---

[1] Indeed, it is telling that the defendants no longer argue that the PCLOB can enforce or issue subpoenas, as they did at summary judgment. See id.

injunctive relief due to the deprivation of their statutorily-mandated right to function as members

of the Board, and the related harms arising out of the Board's inability to function absent a

quorum.  See Leblanc, ___ F. Supp. 3d at ___, 2025 WL 1454010, at *32.

   Finally, the defendants have failed to establish that the balance of equities and the public

interest counsel in favor of a stay, especially in light of the Court's conclusion that there is a

> substantial public interest in the effective oversight of the government's
> counterterrorism actions and authorities, which is furthered by independent, candid,
> and expert advice being provided to the President, as well as to Congress as it
> debates reauthorizing important—yet controversial—authorities that have
> significant potential impact on privacy and civil liberties.

Id.  Indeed, this is a subject the defendants do not address, as it is irrefutable that the PCLOB

cannot function as envisioned by Congress without a quorum.  Rather, as now staffed, it cannot

be expected that objective and non-partisan insight will be provided to the President, Congress,

and the American public that Executive Branch actions are not compromising privacy and civil

liberties interests, which is the core mandate given to the PCLOB by Congress.

   Based on the above factors, the Court concludes that the defendants have not established

that they are entitled to a stay of the Court's order pending appeal.  Accordingly, it is hereby

   **ORDERED** that the Defendants' Motion to Stay the Court's Order Pending Appeal, ECF

No. 28, is **DENIED**.

   **SO ORDERED** this 29th day of May, 2025.

REGGIE B. WALTON
United States District Judge
