**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 25-5197**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

––––––––––––––––––

TRAVIS LEBLANC; EDWARD FELTEN,

Plaintiffs-Appellees,

v.

U.S. PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, et al.

Defendants-Appellants.

––––––––––––––––––

On Appeal from the United States District Court
for the District of Columbia

––––––––––––––––––

**BRIEF FOR APPELLANTS**

––––––––––––––––––

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
ADAM C. JED
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7243*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *202-514-8280*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A.      Parties and Amici**

Plaintiffs-appellees are Travis LeBlanc and Edward Felten.

Defendants-appellants are the United States Privacy and Civil Liberties Oversight Board; Beth A. Williams, in her official capacity as a Board Member of the United States Privacy and Civil Liberties Oversight Board; Jenny Fitzpatrick, in her official capacity as Executive Director of the United States Privacy and Civil Liberties Oversight Board; Trent Morse, in his official capacity as Deputy Director of Presidential Personnel; and Donald J. Trump, in his official capacity as President of the United States of America.

The following participated as amici curiae in district court: the State of Alabama, State of Alaska, Arizona Legislature, State of Florida, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of North Dakota, State of Oklahoma, State of South Carolina, State of South Dakota, State of Tennessee, State of Texas, and State of West Virginia.

### B.    Rulings Under Review

Defendants-appellants are appealing from the May 21, 2025, final judgment and permanent injunction issued by the Honorable Reggie B. Walton, United States District Court for the District of Columbia, in Case No. 25-cv-542, Dkt. Nos. 24, 25. The district court's order and opinion are reproduced in the Appendix at A126 and A197 respectively.  No citation is yet available in the Federal Supplement.  The district court's opinion and order can be found at 2025 WL 1454010.

### C.    Related Cases

This case has not previously been before this Court.  Some overlapping issues related to the removal of officials from other government agencies are presented in a number of other cases pending within this Circuit.  *See Harris v. Bessent*, No. 25-5037 (D.C. Cir.), No. 25-cv-412 (D.D.C.); *Wilcox v. Trump*, No. 25-5057 (D.C. Cir.), No. 25-cv-334 (D.D.C.); *Aviel v. Gor*, No. 25-5105 (D.C. Cir.), No. 25-cv-778 (D.D.C.); *Grundmann v. Trump*, No. 25-5165 (D.C. Cir.), No. 25-cv-425 (D.D.C.); *U.S. Inst. of Peace v. Jackson*, No. 25-5185 (D.C. Cir.), No. 25-cv-804 (D.D.C.); *Slaughter v. Trump*, No. 25-5261 (D.C. Cir.), No. 25-cv-909 (D.D.C.); *Harper v. Bessent*, No. 25-5268 (D.C. Cir.), No. 25-cv-1294 (D.D.C.); *Storch v. Hegseth*, No. 25-cv-415 (D.D.C.); *Brehm v. Marocco*, No. 25-cv-660 (D.D.C.); *Cristosal Hum. Rts. v. Marocco*, No. 25-cv-857 (D.D.C); *Abramowitz v. Lake*, No. 25-cv-887 (D.D.C.); *Samuels v. Trump*, No. 25-cv-1069 (D.D.C.); *Pippenger v. U.S. DOGE*

*Serv.*, No. 25-cv-1090 (D.D.C.); *Corporation for Pub. Broad. v. Trump*, No. 25-cv-1305 (D.D.C.); *Rural Dev. Innovations Ltd. v. Marocco*, No. 25-cv-1631 (D.D.C); *Perlmutter v. Blanche*, No. 25-cv-1659 (D.D.C.); *Brown v. Trump*, No. 25-cv-1764 (D.D.C.).

/s/ *Adam Jed*
Adam C. Jed
*Attorney, Appellate Staff*
*Civil Division, Room 7243*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-8280*

## TABLE OF CONTENTS

**Page**

GLOSSARY

STATEMENT OF JURISDICTION ................................................................. 1

STATEMENT OF THE ISSUES ................................................................. 1

PERTINENT STATUTES AND REGULATIONS ..................................... 2

STATEMENT OF THE CASE ................................................................. 2

    A.    Legal Background ............................................................. 2

    B.    Factual Background and Prior Proceedings ......................... 7

SUMMARY OF ARGUMENT ................................................................. 14

STANDARD OF REVIEW ................................................................. 17

ARGUMENT ................................................................. 17

I.    The Privacy And Civil Liberties Oversight Board Statute Does Not Restrict The President's Removal Power .................................................. 17

    A.    Under Established Law, the President's Power to Appoint Board Members Includes the Power to Remove Them ................................. 18

    B.    The Absence of a Statutory Removal Restriction Is Dispositive ........ 22

    C.    The Board's Structure and Function Are Not Operationally Incompatible With Presidential Removal ............................................. 31

II.    Plaintiffs Cannot Show Entitlement To Reinstatement ............................... 48

CONCLUSION ................................................................. 58

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                                   **Page(s)**

*Aiken County, In re*,
   645 F.3d 428 (D.C. Cir. 2011) ..........................................................................22

*Al Bahlul v. United States*,
   967 F.3d 858 (D.C. Cir. 2020) ..................................................................19, 26

*al-Nashiri, In re*,
   791 F.3d 71 (D.C. Cir. 2015) ..............................................................................53

*Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*,
   64 F.4th 1354 (D.C. Cir. 2023) .................................................................. 17, 54

*Baker v. Carr*,
   369 U.S. 186 (1962) ............................................................................................49

*Bessent v. Dellinger*,
   145 S. Ct. 515 (2025) .............................................................................. 48, 49, 50

*Cafeteria & Rest. Workers Union, Loc. 473 v. McElroy*,
   367 U.S. 886 (1961) ....................................................................................19, 20

*Carlucci v. Doe*,
   488 U.S. 93 (1988) ..........................................................................8, 14, 19, 20

*Clevinger v. Advocacy Holdings, Inc.*,
   134 F.4th 1230 (D.C. Cir. 2025) .......................................................................55

*Collins v. Yellen*,
   594 U.S. 220 (2021) ................................................. 9, 11, 14, 15, 16, 19, 21, 22,
                                         23, 24, 27, 31, 36, 46, 47

*Dellinger v. Bessent*,
   No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ....................12, 50, 56

*Department of the Navy v. Egan*,
   484 U.S. 518 (1988) ............................................................................................35

*eBay Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006) ............................................................................................53

*Federal Election Comm'n v. NRA Pol. Victory Fund*,
   6 F.3d 821 (D.C. Cir. 1993), *cert. dismissed*, 513 U.S. 88 (1994) ....................25

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ................................................................ 47, 50

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*:
  537 F.3d 667 (D.C. Cir. 2008), *aff'd in part, rev'd in part, and remanded*,
    561 U.S. 477 (2010) ...........................................................25, 30
  561 U.S. 477 (2010) .............................................................19

*Great Lakes Dredge & Dock Co. v. Huffman*,
  319 U.S. 293 (1943) ............................................................ 48-49, 49

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
  527 U.S. 308 (1999) .............................................................. 48

*Harris v. Bessent*:
  No. 25-5037, 2025 WL 980278 (D.C. Cir. Mar. 28, 2025),
  *vacated en banc and per curiam*,
    2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) ................................ 46
  No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025),
    *overruled by Trump v. Wilcox*, 145 S. Ct. 1415 (2025) ..................13, 48, 57

*Hennen, Ex parte*,
  38 U.S. 230 (1839) ..............................................................20, 21

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935) ................................. 10, 11, 27, 35, 36, 37, 41, 48

*Illinois v. Ferriero*,
  60 F.4th 704 (D.C. Cir. 2023) ..................................................53

*Kalaris v. Donovan*,
  697 F.2d 376 (D.C. Cir. 1983) .......................................19, 20, 23, 26

*Kansas v. Nebraska*,
  574 U.S. 445 (2015) ..............................................................20

*Keim v. United States*,
  177 U.S. 290 (1900) ........................................................ 8, 14-15, 19, 20

*Kennedy v. Braidwood Mgmt., Inc.*,
  145 S. Ct. 2427 (2025) ........................... 13, 15, 18, 20, 21, 22, 24, 28

iii

*LeBlanc v. PCLOB*,
   No. 25-5197, 2025 WL 1840591 (D.C. Cir. July 1, 2025),
   *reh'g en banc denied* (July 18, 2025) ........................................ 13-14, 14, 15, 21,
                                      22, 24, 27-28, 28

*Lee v. Garland*,
   120 F.4th 880 (D.C. Cir. 2024) ......................................................... 35

*Medicare Reimbursement Litig., In re*,
   414 F.3d 7 (D.C. Cir. 2005) .............................................................54

*Mississippi v. Johnson*,
   71 U.S. (4 Wall.) 475 (1867) ...........................................................50

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ........................................................................54

*Myers v. United States*,
   272 U.S. 52 (1926) ...................................................................19, 44

*National Nurses United, In re*,
   47 F.4th 746 (D.C. Cir. 2022) .........................................................52

*National Treasury Emps. Union v. Trump*,
   No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) .............35

*Natural Res. Def. Council, Inc. v. Hodel*,
   865 F.2d 288 (D.C. Cir. 1988) ........................................................38

*Nevada Comm'n on Ethics v. Carrigan*,
   564 U.S. 117 (2011) ........................................................................54

*Newdow v. Roberts*,
   603 F.3d 1002 (D.C. Cir. 2010) ......................................................50

*Parsons v. United States*,
   167 U.S. 324 (1897) .........................................9, 14, 19, 25, 44, 48

*Pievsky v. Ridge*,
   98 F.3d 730 (3d Cir. 1996) ..............................................................20

*Raines v. Byrd*,
   521 U.S. 811 (1997) ........................................................................54

*Reichelderfer v. Johnson*,
   72 F.2d 552 (D.C. Cir. 1934) ...............................................................53

*Sale v. Haitian Ctrs. Council, Inc.*,
   509 U.S. 155 (1993) ...........................................................................35

*Sampson v. Murray*,
   415 U.S. 61 (1974) .......................................................................12, 20

*Samuels v. Mackell*,
   401 U.S. 66 (1971) .............................................................................49

*Sanchez-Espinoza v. Reagan*,
   770 F.2d 202 (D.C. Cir. 1985) ...........................................................52

*Sawyer, In re*,
   124 U.S. 200 (1888) ................................................................12, 49, 52

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
   591 U.S. 197 (2020) ...............................................21, 23, 27, 50, 56

*Severino v. Biden*,
   71 F.4th 1038 (D.C. Cir. 2023) ....................................... 8, 9, 12, 14, 16, 19, 21,
                                               23, 24, 26, 27, 31, 32, 33, 36, 37,
                                               38, 41, 42, 43, 45, 46, 50, 51, 52, 53, 56

*Shurtleff v. United States*,
   189 U.S. 311 (1903) ...............................13-14, 14, 15, 19, 21, 22, 24, 24-25, 48

*Spicer v. Biden*,
   575 F. Supp. 3d 93 (D.D.C. 2021) ......................................................9

*Stanley v. Department of Just.*,
   423 F.3d 1271 (Fed. Cir. 2005) ..........................................................20

*Stirrup v. Biden*,
   662 F. Supp. 3d 12 (D.D.C. 2023), *aff'd in part and vacated in part as moot sub nom.*, *Stirrup v. U.S. Dep't of Def.*,
   No. 23-5094, 2024 WL 2873780 (D.C. Cir. June 7, 2024) ................................33

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) ....................................... 12, 19, 25, 30, 50, 51, 52

*Trump v. CASA, Inc.*,
   145 S. Ct. 2540 (2025) ........................................................48

*Trump v. United States*,
   603 U.S. 593 (2024) .....................................................12, 50

*Trump v. Wilcox*,
   145 S. Ct. 1415 (2025) ................................... 13, 48, 56, 57

*United States v. Wilson*,
   290 F.3d 347 (D.C. Cir. 2002) ...........................................30

*United States ex rel. Bernardin v. Duell*,
   172 U.S. 576 (1899) ...........................................................52

*Vanda Pharm., Inc. v. FDA*,
   123 F.4th 513 (D.C. Cir. 2024) .........................................17

*White v. Berry*,
   171 U.S. 366 (1898) ...........................................................49

*Whitehouse v. Illinois Cent. R.R. Co.*,
   349 U.S. 366 (1955) ...........................................................53

*Wiener v. United States*,
   357 U.S. 349 (1958) .............................. 11, 14, 22, 23, 24, 25, 26, 27, 35, 37, 48

*Wilton v. Seven Falls Co.*,
   515 U.S. 277 (1995) ...........................................................53

**U.S. Constitution:**

Art. II § 1, cl. 1 ....................................................................46

Art. II § 3 ..............................................................................46

**Statutes:**

Dodd-Frank Wall Street Reform and Consumer Protection Act,
   Pub. L. No. 111-203, § 1011(c)(3), 124 Stat. 1376, 1964 (2010) ......................29

Housing and Economic Recovery Act of 2008,
   Pub. L. No. 110-289, § 1101, 122 Stat. 2654, 2662 ...................................... 28-29

Implementing Recommendations of the 9/11 Commission Act of 2007,
  Pub. L. No. 110-53, 121 Stat. 266 ...................................................... 3-4
    § 504(6), 121 Stat. at 316-317
      (codified as amended at 6 U.S.C. § 485(i)(1)(C)).......................6, 34
    § 511(a), 121 Stat. at 317-318
      (codified as amended at 6 U.S.C. § 124h(a)) ......................... 7, 34
    § 801 (codified at 42 U.S.C. § 2000ee(e)) .................................39, 40
    § 801(a), 121 Stat. at 352-357
      (codified as amended at 42 U.S.C. § 2000ee) .......................... 3-4
    § 801(c)(2)(B) ....................................................................................32
    § 802, 121 Stat. at 358-360 (codified at 6 U.S.C. § 142)...........................29, 39
    § 803 (codified at 42 U.S.C. § 2000ee-1) ......................................39

Intelligence Reform and Terrorism Prevention Act of 2004,
  Pub. L. No. 108-458, 118 Stat. 3638 ...................................................3
    § 1011(a), 118 Stat. at 3643-3644 ...................................................3
    § 1061(b), 118 Stat. at 3684 ............................................................. 3
    § 1061(b)-(c), 118 Stat. at 3684-3685 ...........................................43
    § 1061(c), 118 Stat. at 3684-3685 ...................................................3
    § 1016(d), 118 Stat. at 3666 .............................................................3
    § 1061(e), 118 Stat. at 3686-3687 ...................................................3

Postal Accountability and Enhancement Act,
  Pub. L. No. 109-435, 120 Stat. 3198 (2006)......................................28
    § 501(a)(1), 120 Stat. at 3232 ..........................................................28
    § 601(a)(1), 120 Stat. at 3238 ..........................................................28

Travel Promotion Act of 2009,
  Pub. L. No. 111-145, § 9(b)(2)(D), 124 Stat. 49, 57 (2010)................29

5 U.S.C. § 404 ...........................................................................................41
5 U.S.C. § 405 ...........................................................................................41
5 U.S.C. § 405(b)-(c) ............................................................................... 38
5 U.S.C. § 594(a)(1) ................................................................................. 39
5 U.S.C. § 595 ........................................................................................... 39
6 U.S.C. § 142(d) ...................................................................................... 39
6 U.S.C. § 142(e)(1)................................................................................. 39

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................1

28 U.S.C. § 1361 .................................................................................52

42 U.S.C. § 2000ee(a) ...........................................14, 18, 32, 46

42 U.S.C. § 2000ee(c) ....................................................................4, 33

42 U.S.C. § 2000ee(d) .........................................................14, 33, 38

42 U.S.C. § 2000ee(d)(1) ..............................................................4

42 U.S.C. § 2000ee(d)(2) ..............................................................5

42 U.S.C. § 2000ee(d)(3) .......................................................5, 6, 34, 37

42 U.S.C. § 2000ee(d)(3)(C) .......................................................37

42 U.S.C. § 2000ee(d)(4) .......................................................5, 38

42 U.S.C. § 2000ee(e)-(f) ......................................................5, 38

42 U.S.C. § 2000ee(g) ......................................................................33

42 U.S.C. § 2000ee(g)(1)(A)-(B) ...............................5, 33, 47

42 U.S.C. § 2000ee(g)(1)(C) .......................................................5

42 U.S.C. § 2000ee(g)(1)(D) ...............................................6, 34, 37

42 U.S.C. § 2000ee(g)(2) .......................................................6, 34, 37

42 U.S.C. § 2000ee(h) ......................................................4, 14, 32

42 U.S.C. § 2000ee(h)(1) ..............................................................18

42 U.S.C. § 2000ee(h)(2)-(3) .......................................................4

42 U.S.C. § 2000ee(h)(4) ..............................................................8

42 U.S.C. § 2000ee(h)(5) .............................................................55

42 U.S.C. § 2000ee(k)(1) ..............................................................5

42 U.S.C. § 2000ee(k)(2) ..............................................................5

42 U.S.C. § 2000ee-1 ......................................................................5

42 U.S.C. § 2000ee-1(a) ........................................................6, 34, 37

42 U.S.C. § 2000ee-1(b)(1) .......................................................37

42 U.S.C. § 2000ee-1(f) .............................................................39

**Regulations:**

6 C.F.R. § 1000.5(a) ...............................................................55

6 C.F.R. § 1000.5(c) ...............................................................55

Exec. Order No. 13,353,
    69 Fed. Reg. 53,585 (Sep. 1, 2004) ......................................2

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ......................................................1

**Legislative Materials:**

H.R. Rep. No. 110-259 (2007) (Conf. Rep.) ...........................4

S. 4, 110th Cong. (2007) ..........................................................45

**Other Authorities:**

*Constitutional Separation of Powers Between the President and Congress*,
    20 Op. O.L.C. 124 (1996) ....................................................30

Kirti Datla & Richard L. Revesz, *Deconstructing Independent*
    *Agencies (and Executive Agencies)*, 98 Corn. L. Rev. 769 (2013) ............... 18-19

Nat'l Comm'n on Terrorist Attacks Upon the U.S.,
    *The 9/11 Commission Report* (2004) ...................................2

Neomi Rao, *Removal: Necessary and Sufficient for*
    *Presidential Control*, 65 Ala. L. Rev. 1205 (2014) ............................45

PCLOB, *Board Members*, https://perma.cc/AX9T-HJ83 .......................................55

PCLOB, Policy 102-01, *Sub-Quorum Authorities and Operations When the*
    *Position of Chair is Vacant* (Oct. 23, 2024) ......................................55

PCLOB, *Use of Facial Recognition Technology by the Transportation Security*
    *Administration* (May 9, 2025) ................................................55

# GLOSSARY

| | |
|---|---|
| A | Appendix |
| PCLOB or Board | U.S. Privacy and Civil Liberties Oversight Board |

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. A10. The district court entered final judgment on May 21, 2025. A197-198 (order); *see* A126-196 (opinion). The government filed a timely notice of appeal on May 27, 2025. A199-200; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The U.S. Privacy and Civil Liberties Oversight Board (PCLOB or Board) is a freestanding Executive Branch entity that advises on various national security programs and policies to ensure that privacy and civil liberties are taken into account. The PCLOB is also integrated into other agencies' similar functions. Board members are appointed by the President. No statutory provision purports to restrict the President's power to remove Board members. The district court held that Board members nonetheless have some unspecified form of implicit removal protection. And the court entered a permanent injunction requiring the reinstatement of two Board members who had been removed by the President. This appeal presents the following questions:

1. Whether PCLOB members have a removal protection not found in the statutory text.

2. Whether the district court properly ordered plaintiffs' reinstatement.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this Brief.

## STATEMENT OF THE CASE

### A.    Legal Background

In the wake of September 11, 2001, the National Commission on Terrorist Attacks Upon the United States, known as the 9/11 Commission, recommended "substantial change in the way we collect and share intelligence," including more intelligence sharing and integration among the "far-flung entities constituting the intelligence community." *See* Nat'l Comm'n on Terrorist Attacks Upon the U.S., *The 9/11 Commission Report* 361-428 (2004). The Commission also noted that there was "no office within the government whose job it is to look across the government at the actions we are taking to protect ourselves to ensure that liberty concerns are appropriately considered." *Id.* at 395. To fill that gap, the Commission called for "a board within the executive branch" to perform that function. *Id.*

President George W. Bush initially established a 20-member board within the Department of Justice, made up of senior law enforcement and intelligence officials and chaired by the Deputy Attorney General. Exec. Order No. 13,353, 69 Fed. Reg. 53,585 (Sep. 1, 2004). Congress subsequently created a Privacy and Civil Liberties Oversight Board (PCLOB) "within the Executive Office of the President,"

2

comprising five members chosen by the President with only the Chair and Vice-Chair subject to Senate confirmation and all members "serv[ing] at the pleasure of the President."  Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, § 1061(b), (e), 118 Stat. 3638, 3684, 3686-3687.[1]  The Board was required to "provid[e] advice to the President" and other agency "head[s]" on a range of matters related to national security and civil liberties, to engage in "[o]versight" by continually reviewing various policies and practices, and to submit an annual report to Congress "on the Board's major activities."  *Id.* § 1061(c), 118 Stat. at 3684-3685 (formatting altered).  The President was required to issue guidelines "in consultation with" the Board to protect privacy and civil liberties while sharing terrorism information.  *Id.* § 1016(d), 118 Stat. at 3666.

In response to concerns about the PCLOB's location within the Executive Office of the President and its limited information-gathering powers, Congress in 2007 reconstituted the PCLOB as an independent entity "within the executive branch," but outside of the Executive Office of the President, and with certain subpoena authority.  Implementing Recommendations of the 9/11 Commission Act

---

[1]  The same statute also reorganized the intelligence community and established a Director of National Intelligence that "shall not be located within the Executive Office of the President."  Pub. L. No. 108-458, § 1011(a), 118 Stat. at 3643-3644.

of 2007, Pub. L. No. 110-53, § 801(a), 121 Stat. 266, 352-357 (9/11 Act) (codified as amended at 42 U.S.C. § 2000ee); *see* H.R. Rep. No. 110-259, at 321 (2007) (Conf. Rep.); *see also* A131-132 (describing criticisms about the prior Board "being treated as … part of the White House staff" (quotation marks omitted)).  The Board now comprises a full-time Chair and four additional members, all appointed by the President for six-year terms subject to Senate confirmation.  42 U.S.C. § 2000ee(h).  No statutory provision addresses removal.  Board members are to be chosen based on their qualifications; no more than three should be members of the same political party; and they cannot otherwise serve in the federal government.  *Id.* § 2000ee(h)(2)-(3).

The PCLOB's stated purpose is to "analyze and review actions the executive branch takes to protect the Nation from terrorism," as well as "the development and implementation of laws, regulations, and policies" related to such efforts to ensure that privacy and civil liberties are taken into account.  42 U.S.C. § 2000ee(c).  The PCLOB is to provide "[a]dvice and counsel on policy development and implementation" by reviewing proposed and existing policies and practices and "advis[ing] the President" and "departments, agencies, and elements of the executive branch."  *Id.* § 2000ee(d)(1).  The PCLOB is to "continually review" various "regulations, policies, and procedures" related to counterterrorism efforts, including

4

"information sharing practices" and a range of "other actions." *Id.* § 2000ee(d)(2). And the PCLOB is to "receive and review" reports from other agencies' internal "privacy and civil liberties officers" (which are also sent to Congress and agency heads), work with those privacy and civil liberties officers, and "coordinate" their "activities" on "interagency matters." *Id.* § 2000ee(d)(3); *see id.* § 2000ee-1. Board members are to be available to "testify before Congress." *Id.* § 2000ee(d)(4). The PCLOB is to "periodically submit, not less than semiannually," reports to "the appropriate committees of Congress" and "the President" describing its "major activities" and findings and recommendations, including minority views; to make those reports "available to the public" to the extent possible; and to "hold public hearings and otherwise inform the public of its activities." *Id.* § 2000ee(e)-(f).

To carry out its functions, the PCLOB is generally to have access to "all" relevant "records," "personnel," and information throughout the Executive Branch, "including classified information." 42 U.S.C. § 2000ee(g)(1)(A)-(B). Relevant agencies should "provide the Board members and staff with appropriate security clearances." *Id.* § 2000ee(k)(1). The PCLOB must establish security rules and procedures after "consultation with the Secretary of Defense, the Attorney General, and the Director of National Intelligence." *Id.* § 2000ee(k)(2). The PCLOB may request information from state, tribal, or local governments. *Id.* § 2000ee(g)(1)(C).

5

And the Board, acting with the Attorney General, may also issue subpoenas to persons outside of the Executive Branch. To do so, the Board submits a formal request to the Attorney General, who must either "issue the subpoena as requested" or provide a written explanation and notify the Senate and House Judiciary Committees. *Id.* § 2000ee(g)(1)(D), (2).

The PCLOB also assists with other functions related to privacy and national security. As noted, it works with and "coordinate[s]" the activities of individual agencies' privacy and civil liberties officers. 42 U.S.C. § 2000ee(d)(3). These are "senior officer[s]" at various agencies who are "designate[d]" by agency heads to provide agency-specific review. *Id.* § 2000ee-1(a). The PCLOB is also empowered to "designate[]" additional agencies and thereby require those agencies' heads to designate their own privacy and civil liberties officers. *Id.* The statute establishing the PCLOB also required "the President" to study and report on creating new standards for accessing and sharing various sensitive information, "including homeland security information, terrorism information, and weapons of mass destruction information," that would be "established in consultation with the [PCLOB]." 9/11 Act § 504(6), 121 Stat. at 316-317 (codified as amended at 6 U.S.C. § 485(i)(1)(C)). That statute also required the Secretary of Homeland Security to establish a "Fusion Center Initiative" "in consultation with" the Attorney General

6

and, among others, "the [PCLOB]," to coordinate counterterrorism efforts with state and local governments. *Id.* § 511(a), 121 Stat. at 317-318 (codified as amended at 6 U.S.C. § 124h(a)).

### B.    Factual Background and Prior Proceedings

**1.** Plaintiffs are two former PCLOB members who were removed from office without specified cause by the President. A135-136. One plaintiff was appointed by President Trump and reappointed by President Biden. A136-137. The other plaintiff was appointed and then reappointed by President Trump. A137. On January 21, 2025, the White House Deputy Director of Presidential Personnel emailed plaintiffs on behalf of the President asking for their resignations. A137-138. When plaintiffs did not resign, they were removed from office without specified cause by the President. A138-140.[2]

**2.** On February 24, 2025, plaintiffs filed suit to challenge their dismissal. Dkt. No. 1. Plaintiffs filed an amended complaint on March 12 that, among other things, removed a request for back pay. A7-34. Their operative complaint named as defendants the President, the PCLOB, the remaining Board member, the PCLOB's

---

[2] The district court mistakenly described as "undisputed" certain facts about the roles played by the agency's Executive Director and another Board member (both defendants here). A139-139, 138 n.9. While immaterial to the disposition of this appeal, the government notes that these allegations were disputed in district court. *See* A64-65.

Executive Director, and the White House official who requested plaintiffs'
resignations and communicated that they had been removed. A11. As relevant here,
plaintiffs alleged that while the PCLOB's organic statute does not expressly limit
the President's power to remove Board members, the "text, structure, and history"
nonetheless provide some unspecified form of for-cause removal protections. A29.

**3.** The district court granted summary judgment to plaintiffs. The court
explained that "absent a 'specific provision to the contrary, the power of removal
from office is incident to the power of appointment.'" A145 (quoting *Carlucci v.
Doe*, 488 U.S. 93, 99 (1988) (quoting *Keim v. United States*, 177 U.S. 290, 293
(1900))). And the court acknowledged that particularly to find such a restriction on
the President's removal power, the restriction must be "clear." A145 (quoting
*Severino v. Biden*, 71 F.4th 1038, 1044 (D.C. Cir. 2023)).

The district court recognized that the statutory text provides no express
removal restrictions. A146-154. And the court declined plaintiffs' invitation to infer
a removal restriction from "collateral provisions" and the "history" of amending the
statute in 2007. A150-154. The court found unpersuasive plaintiffs' argument that
because members "shall serve a term of [six] years," the President cannot remove
members without cause before the expiration of a term. A150-152 (alteration in
original) (emphasis omitted) (quoting 42 U.S.C. § 2000ee(h)(4)). A "term of office,"

8

the court explained, is a "cap," not "an entitlement."  A150-151 (quoting *Severino*, 71 F.4th at 1045) (first citing *Parsons v. United States*, 167 U.S. 324, 338 (1897); and then citing *Spicer v. Biden*, 575 F. Supp. 3d 93, 95 (D.D.C. 2021)).  The court added that the phrase "shall serve" does not alter that conclusion and is materially indistinguishable from similar provisions that have been held not to create a removal restriction.  A151-152 (first citing *Parsons*, 167 U.S. at 327-328; and then citing *Spicer*, 575 F. Supp. 3d at 95).

The district court also rejected plaintiffs' reliance on the fact that the 2004 PCLOB was placed in the Executive Office of the President and expressly "serve[d] at the pleasure of the President" and under the "general supervision of the President." A152-153 (alteration in original) (alteration omitted) (quoting plaintiffs' filing).  The court explained that while Congress in 2007 may well have wanted to make the reestablished Board "more independent" than its predecessor, those changes do not amount to "an express textual removal restriction."  A153.  The court similarly rejected plaintiffs' reliance on the Board's reestablishment as an "'independent' agency" within the Executive Branch, explaining that such language often means that an entity "'is not part of and is therefore independent of any other unit of the Federal Government.'"  A153 (quoting *Collins v. Yellen*, 594 U.S. 220, 248 (2021)). "Finally, and most importantly," the court added, "the fact that Congress revised the

statutory text and still failed to include an express protection" from removal "cuts against the plaintiffs' argument."  A153.

The district court, however, held that the PCLOB's "structure and function" "indicate[]" Congress's "intent" to restrict the President's removal power.  A154-163.  The court stated that "the PCLOB's structure" is similar to the "multimember expert board at issue in *Humphrey's Executor* [*v. United States*, 295 U.S. 602 (1935)]."  A157.  And the court concluded that selection of Board members "without regard to political affiliation," political balance, and terms that "have largely been staggered as a matter of practice" "appear designed to promote the independence, autonomy, and non-partisan nature of the PCLOB."  A157-158, 158 n.19 (quotation marks omitted).  The court observed that "part of the PCLOB's function is to provide advice to the Executive Branch"—a "quintessentially executive" function.  A158.  But the court stated that "many of the PCLOB's responsibilities are also to Congress," A158, and cited two instances (in 2016 and 2023) where Congress "appears to have weighed the PCLOB's recommendations and testimony heavily," A159-160.  And the court believed that "absolute freedom from Executive interference" is "mission-critical for the PCLOB's operation" because the PCLOB's role can include "criticiz[ing]" Executive Branch "policies."  A160.  The court acknowledged that other officers and entities in the Executive Branch, such as

10

inspectors general, serve similar functions and are not insulated from removal.  A159 n.20.  But the court stated that inspectors general report to "agency head[s]."  A159 n.20.  The court also dismissed as "dicta" the Supreme Court's statement in *Collins* that a range of multi-member boards exist throughout the government that do not have removal protections.  A162 n.25 (citing *Collins*, 594 U.S. at 249).

The district court accordingly found it "obvious that Congress intended for the Board" to have some implicit removal protection.  A162 (citing *Wiener v. United States*, 357 U.S. 349, 356 (1958)).  The court stated that it could likely devise some form of for-cause removal restriction, but it declined to "conclusively determine" whether Board members are removable under any circumstances.  A163 n.26.  The court added that because "the structure and function of the PCLOB, as set forth in the statutory text as a whole, makes clear that Congress intended to restrict the President's removal authority," there was no reason to consider "constitutional avoidance."  A163.  And the court held that a removal restriction for the PCLOB is not unconstitutional because it falls within the "exception to the President's removal power" created in *Humphrey's Executor.*  A164-171.

Finally, the district court stated that it would enter a declaratory judgment and a permanent injunction.  A171-191.  The court noted the government's argument that under Supreme Court precedent, "a court sitting in equity" cannot order the

11

reinstatement of "'public officers'" and that doing so would, in any event, "'impinge[] on the "conclusive and preclusive" power through which the President controls the Executive Branch.'"    A175-176 (quoting government's filing (first quoting *In re Sawyer*, 124 U.S. 200, 212 (1888); and then quoting *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *16 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting) (quoting *Trump v. United States*, 603 U.S. 593, 608-609 (2024)))).    But the court held that under this Court's precedent, it could enjoin Board members and staff to "treat" plaintiffs as "*de facto*" Board members.    A176-177 (alteration omitted) (first quoting *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996); and then quoting *Severino*, 71 F.4th at 1043).[3]

The district court concluded that such an injunction is appropriate here.    A178-191.    The court recognized that even as to employees, reinstatement would require a particularly extraordinary showing of harm to a plaintiff.    A182-183 (citing *Sampson v. Murray*, 415 U.S. 61, 83-84, 91-92 (1974)).    But the court stressed that "Congress clearly indicated its intent to insulate the plaintiffs" and concluded that plaintiffs could rest on the "irreparable harm" of being deprived of their "statutory

---

[3] The district court stated that "because injunctive relief is available, a writ of mandamus is not appropriate."    A172.    But the court added that "issuance of the writ would be appropriate, should injunctive relief be unavailable for any reason."    A172; *see* A191-194.

rights to function" as PCLOB members.  A185-186, 188.  The court also cited the risk that if the Board continues to lack a quorum, the PCLOB might not issue reports or would issue reports as "Staff Reports" rather than "Board Reports" and, if there is only one member, would not have "minority views" to include in reports.  A186-188, 190.  In balancing the equities, the district court cited (A190) this Court's en banc stay decision in *Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *2 (D.C. Cir. Apr. 7, 2025) (en banc) (per curiam), *overruled by Trump v. Wilcox*, 145 S. Ct. 1415 (2025).

The district court's order "DECLARED" that plaintiffs' terminations are "null and void," "ORDERED" that they could be "removed by the President" "only for cause," and enjoined the PCLOB and its staff from "treating" plaintiffs "as having been removed" or otherwise "depriv[ing]" plaintiffs of "the functions" or "any right or benefit" of "office."  A197-198.

**4.**  The district court denied a motion for a stay pending appeal, A201-206, and this Court then stayed the district court's order.  This Court explained that under governing precedent, "a statute 'must use "very clear and explicit language"' to restrict the President's removal power."  *LeBlanc v. PCLOB*, No. 25-5197, 2025 WL 1840591, at *1 (D.C. Cir. July 1, 2025) (per curiam) (quoting *Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427, 2448 (2025) (quoting *Shurtleff v. United States*, 189

13

U.S. 311, 315 (1903))) (citing *Severino*, 71 F.4th at 1044), *reh'g en banc denied* (July 18, 2025). The Court observed that the "PCLOB's organic statute contains no language restricting the President's removal power." *Id.* Because the PCLOB does not adjudicate, the Court held that its "members do not have implied protection" from removal. *Id.* (citing *Collins*, 594 U.S. at 247-250, 250 n.18; *Wiener*, 357 U.S. at 353-356; *Severino*, 71 F.4th at 1049; *Shurtleff*, 189 U.S. at 315-319; and *Parsons*, 167 U.S. at 327-328, 338-339).

**5.** Plaintiffs filed a petition for hearing en banc. On July 18, the Court denied that request without noted dissent. Order, July 18, 2025.

## SUMMARY OF ARGUMENT

**I.** The PCLOB is an entity "within the executive branch" that reviews and advises on various national security programs and policies to ensure that privacy and liberties are taken into account. 42 U.S.C. § 2000ee(a), (d). The PCLOB is also integrated into other agencies' similar functions. The PCLOB's organic statute authorizes the President to appoint a full-time Chair and four additional Board members for six-year terms, subject to Senate confirmation. 42 U.S.C. § 2000ee(h). The statute makes no mention of removal. It is black-letter law that absent a "specific provision to the contrary, the power of removal from office is incident to the power of appointment." *Carlucci v. Doe*, 488 U.S. 93, 99 (1988) (quoting *Keim*

14

*v. United States*, 177 U.S. 290, 293 (1900)).  Accordingly, the President may remove PCLOB members at will.

The district court nonetheless found that PCLOB members have removal protections that appear nowhere in the statutory text.  That was an error several times over.  As an initial matter, the Supreme Court recently reiterated that "to 'take away' the power of at-will removal from an appointing officer, Congress must use 'very clear and explicit language.'"  *Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427, 2448 (2025) (quoting *Shurtleff v. United States*, 189 U.S. 311, 315 (1903)); *see Collins v. Yellen*, 594 U.S. 220, 248, 250 & n.18 (2021).  "[M]ere inference or implication does not suffice."  *Braidwood*, 145 S. Ct. at 2448 (alteration in original) (quotation marks omitted).  As the motions panel recognized in this case, that should be dispositive here.  *LeBlanc v. PCLOB*, No. 25-5197, 2025 WL 1840591, at *1 (D.C. Cir. July 1, 2025) (per curiam), *reh'g en banc denied* (July 18, 2025).  It is also particularly implausible that when Congress reconstituted the PCLOB in 2007 and significantly rewrote the statute, it would have established a removal restriction through inferences rather than through statutory text.

The district court further erred by concluding that the PCLOB's structure and function "indicate" any "clear" congressional "intent" to restrict the President's removal power.  Like the Council of the Administrative Conference, whose

15

members this Court has held to be removable at will, the PCLOB "is structurally housed squarely within the Executive Branch and serves to advise personnel in and components of the Executive Branch." *Severino v. Biden*, 71 F.4th 1038, 1048 (D.C. Cir. 2023). If anything, the PCLOB's integration into the Executive Branch and its national security roles weigh even more strongly against inferring a non-textual removal protection. Multi-member boards exist throughout the government that are not generally understood to have removal protections and that share various combinations of the structural features that plaintiffs rely on here. *See Collins*, 594 U.S. at 249. And the PCLOB's functions of reviewing (and sometimes criticizing) programs operated by the Executive Branch, providing advice to the Executive Branch, and generating reports for both Congress and the President are not "operationally incompatible with at-will Presidential removal." *Severino*, 71 F.4th at 1048. Like inspectors general, the Administrative Conference, and myriad other entities, the PCLOB is part of the Executive Branch and serves to provide candid and expert analysis on important subjects while ultimately remaining accountable to the President.

**II.** The district court compounded its errors by ordering plaintiffs' reinstatement. A court's equitable powers do not extend to ordering the reinstatement of public officials. The error is even greater here because plaintiffs

16

were appointed and removed by the President.  The district court purported to rely on two cases from this Court referencing the possibility of "*de facto*" reinstatement.  But the district court's actual order went much further by effectively ordering actual reinstatement.  This Court has also never permitted a "*de facto*" reinstatement.  The Court has held only that plaintiffs had standing to challenge their removals where it would be possible to grant at least some of the relief being sought by providing some of the privileges of office.  And, in all events, even if a court has the power to order some form of reinstatement in truly extraordinary cases, this is not such a case.

## STANDARD OF REVIEW

The district court's entry of summary judgment is reviewed de novo.  *Vanda Pharm., Inc. v. FDA*, 123 F.4th 513, 520 (D.C. Cir. 2024).  The order granting a permanent injunction is reviewed for abuse of discretion.  *Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1361 (D.C. Cir. 2023).

## ARGUMENT

## I.    The Privacy And Civil Liberties Oversight Board Statute Does Not Restrict The President's Removal Power

The PCLOB is an entity in the Executive Branch that advises on various national security programs and policies to ensure that privacy and civil liberties are taken into account.  The PCLOB also works with and coordinates other executive agencies on such matters.  Its organic statute provides for five Board members who

17

are appointed by the President. The district court correctly recognized that under governing precedent, the power to remove inheres in the right to appoint unless specifically limited by statute. Because the statute establishing the PCLOB contains no language addressing how Board members can be removed, the President may remove Board members at will. The district court nonetheless found a removal protection based on its view that the PCLOB's "structure and function" "indicate" Congress's "intent" to restrict the President's removal power. That was an error several times over.

### A.    Under Established Law, the President's Power to Appoint Board Members Includes the Power to Remove Them

The PCLOB is an agency "within the executive branch." 42 U.S.C. § 2000ee(a). The Board comprises a full-time Chair and four additional members who are "appointed by the President, by and with the advice and consent of the Senate." *Id.* § 2000ee(h)(1). The statute is silent as to how a Board member, who is appointed by the President, may be removed. In contrast to many other statutes, including some establishing agencies that are structured like the PCLOB, the PCLOB statute contains no language addressing or limiting the circumstances under which Board members can be removed. *See Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427, 2448 (2025) (noting that Congress "knows how" to establish removal restrictions and citing examples); *see also* Kirti Datla & Richard L. Revesz,

18

*Deconstructing Independent Agencies (and Executive Agencies)*, 98 Corn. L. Rev. 769, 786 (2013) (listing agencies with removal protections).

As the district court noted, the well-established rule is that "absent a 'specific provision to the contrary, the power of removal from office is incident to the power of appointment.'" A145 (quoting *Carlucci v. Doe*, 488 U.S. 93, 99 (1988) (quoting *Keim v. United States*, 177 U.S. 290, 293 (1900))). The Supreme Court has made clear that the power to remove "inheres in the right to appoint, unless limited by Constitution or statute." *Shurtleff v. United States*, 189 U.S. 311, 316 (1903); *see, e.g.*, *Collins v. Yellen*, 594 U.S. 220, 248, 250 & n.18 (2021); *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 509 (2010); *Cafeteria & Rest. Workers Union, Loc. 473 v. McElroy*, 367 U.S. 886, 896 (1961); *Myers v. United States*, 272 U.S. 52, 119, 161 (1926); *Parsons v. United States*, 167 U.S. 324, 343 (1897). This Court has similarly explained that "the long-standing rule relating to the removal power is that, in the face of congressional silence, the power of removal is incident to the power of appointment." *Al Bahlul v. United States*, 967 F.3d 858, 872 (D.C. Cir. 2020) (alteration omitted); *see, e.g.*, *Severino v. Biden*, 71 F.4th 1038, 1043-1044 (D.C. Cir. 2023); *Swan v. Clinton*, 100 F.3d 973, 979, 981-982 (D.C. Cir. 1996); *Kalaris v. Donovan*, 697 F.2d 376, 389 & n.54, 401 (D.C. Cir. 1983).

The rule that "the power of removal from office is incident to the power of appointment" is not just a constitutional presumption governing the President's removal of executive officers.  It is also "a matter of statutory interpretation" and applies in other contexts.  *Carlucci*, 488 U.S. at 99 (National Security Agency removal of employee); *see, e.g.*, *Braidwood*, 145 S. Ct. at 2444, 2448-2449 (Secretary of Health and Human Service's removal of task force member); *Ex parte Hennen*, 38 U.S. 230, 259-260 (1839) (district judge's removal of clerk of court); *see also, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 70 n.17 (1974) (discussing removal of a probationary program analyst by Acting Commissioner of Public Buildings); *Cafeteria & Rest. Workers*, 367 U.S. at 896 (discussing security officer's constructive discharge of cook); *Keim*, 177 U.S. at 293 (discussing Secretary of Interior's discharge of clerical employee); *Stanley v. Department of Just.*, 423 F.3d 1271, 1272-1274 (Fed. Cir. 2005) (Attorney General's removal of bankruptcy trustee); *Pievsky v. Ridge*, 98 F.3d 730, 734 (3d Cir. 1996) (governor's removal of interstate compact commissioner)[4]; *Kalaris*, 697 F.2d at 389 (Secretary of Labor's removal of review board members).

---

[4] *Pievsky* applied the "long-standing rule" for interpreting federal statutes because interstate compacts are approved by Congress, and their interpretation is a question of federal law.  98 F.3d at 733-734; *see Kansas v. Nebraska*, 574 U.S. 445, 455-456 (2015).

But this interpretative rule applies with particular force where the President's removal powers are at issue. Constitutional "text," "first principles," history, and precedent all establish that "the President's removal power is the rule, not the exception." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 228 (2020). "Because of the background presumption that the President may remove anyone he appoints, Congress must make it *clear* in a statute if it wishes to restrict the President's removal power." *Severino*, 71 F.4th at 1044 (emphasis added); *see Collins*, 594 U.S. at 248, 250 & n.18; *Shurtleff*, 189 U.S. at 315-317.

These principles confirm that PCLOB members are not insulated from removal. The "PCLOB's organic statute contains no language restricting the President's removal power." *LeBlanc v. PCLOB*, No. 25-5197, 2025 WL 1840591, at *1 (D.C. Cir. July 1, 2025) (per curiam), *reh'g en banc denied* (July 18, 2025). No provision purports to address the President's authority to remove Board members. Where "no statute restricts removal," "'there can be no doubt'" that the appointing authority—here, the President—may remove appointees "at will." *Braidwood*, 145 S. Ct. at 2444 (quoting *Hennen*, 38 U.S. at 259); *see id.* at 2448. Accordingly, the President may remove Board members at will.

21

**B.      The Absence of a Statutory Removal Restriction Is Dispositive**

**1.** The district court erred by finding that PCLOB members have removal protections that appear nowhere in the statutory text.  The Supreme Court just recently reiterated that "to 'take away' the power of at-will removal from an appointing officer, Congress must use 'very clear and explicit language.'" *Braidwood*, 145 S. Ct. at 2448 (quoting *Shurtleff*, 189 U.S. at 315); *see Collins*, 594 U.S. at 247-250, 250 n.18; *Shurtleff*, 189 U.S. at 315-318. "[M]ere inference or implication does not suffice."  *Braidwood*, 145 S. Ct. at 2448 (alteration in original) (quotation marks omitted).  That rule should be dispositive here.

Once in recent history, the Supreme Court "'read a removal restriction'" into a statute, and that was "only for officials serving on an 'adjudicatory body' with 'a unique need for "absolute freedom from Executive interference."'"  *LeBlanc*, 2025 WL 1840591, at *1 (quoting *Collins*, 594 U.S. at 250 n.18 (quoting *Wiener v. United States*, 357 U.S. 349, 353 (1958))).  In particular, in *Wiener*, the Supreme Court inferred removal protections for the adjudicatory War Claims Commission that was set up to have "finality of determination 'not subject to review by any other official,'" stressing "the intrinsic judicial character of the task."  357 U.S. at 354-355; *see In re Aiken County*, 645 F.3d 428, 447 n.7 (D.C. Cir. 2011) (Kavanaugh, J.,

22

concurring) (describing *Wiener* as the "one post-*Humphrey's* case in which the Court suggested that there could be such a thing as an implied independent agency").

As the Supreme Court later summarized, *Wiener* found a removal restriction "on the rationale that the War Claims Commission was an adjudicatory body" with "a unique need for 'absolute freedom from Executive interference.'" *Collins*, 594 U.S. at 250 n.18 (quoting *Wiener*, 357 U.S. at 353); *see Severino*, 71 F.4th at 1047 (explaining that *Wiener* rested on the Commission's "judicial functions"); *see also Kalaris*, 697 F.2d at 394 (stating that Congress had placed the War Claims Commission in *Wiener* "outside the Executive Branch" and provided that its decisions "were not 'subject to review by any other official of the United States'"); *cf. Seila Law*, 591 U.S. at 217 (describing *Wiener* as having "uph[e]ld" removal protections for "a three-member 'adjudicatory body' tasked with resolving claims for compensation arising from World War II"). The PCLOB plainly is not an adjudicatory body, bears no resemblance to the tribunal at issue in *Wiener*, and performs "quintessential" "'purely executive' function[s]," *see Severino*, 71 F.th at 1048.

In *Collins*, the Supreme Court clarified the limits of *Wiener* and resolved any possible tension between that case and the ordinary rule governing removal restrictions. The Court made clear that for an agency like the PCLOB that "is not

23

an adjudicatory body," "*Shurtleff*, not *W*[*ie*]*ner*, is the more applicable precedent." *Collins*, 594 U.S. at 250 n.18.  Under *Shurtleff* (and *Collins*), "the President holds the power to remove at will executive officers" and "a statute must contain 'plain language to take [that power] away.'"  *Id.* at 250 (alteration in original) (quoting *Shurtleff*, 189 U.S. at 316); *see also Shurtleff*, 189 U.S. at 315 ("very clear and explicit language"); *id.* ("explicit language to that effect"); *id.* at 316 ("plain language"); *id.* ("plain and explicit language"); *id.* at 318 ("plain and unambiguous language").  The district court's inferences of "intent" based on "structure and function" (A154-163) do not come close to meeting that governing standard.  *See Shurtleff*, 189 U.S. at 315 (confirming that "mere inference or implication" is insufficient).  Because the PCLOB statute does not "contain 'plain language'" restricting the President's removal power, the President may remove Board members "at will."  *Collins*, 594 U.S. at 250; *see Braidwood*, 145 S. Ct. at 2448.

In sum, the "PCLOB's organic statute contains no language restricting the President's removal power."  *LeBlanc*, 2025 WL 1840591, at *1.  And given that the PCLOB does not have "adjudicatory functions" like those in *Wiener*, its "members do not have [an] implied removal protection."  *Id.* (citing *Collins*, 594 U.S. at 247-250, 250 n.18; *Wiener*, 357 U.S. at 353-356; *Severino*, 71 F.4th at 1049; *Shurtleff*,

189 U.S. at 315-319; and *Parsons*, 167 U.S. at 327-328, 338-339).  The Court need go no further to decide this case.

**2.**  Contrary to the district court's assumption, this Court's cases do not permit the sort of freewheeling inquiry that the district court undertook here.  In a handful of cases before *Collins*, this Court cited *Wiener* and suggested that an agency's "function, statutory language and legislative history may demonstrate that Congress nonetheless intended such removal protection to exist."  *Swan*, 100 F.3d at 981 (primarily citing *Wiener*, 357 U.S. at 353-356); *see Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 537 F.3d 667, 680, 682 (D.C. Cir. 2008) (stating, in passing, that the President can remove members of the Securities and Exchange Commission "for cause" (citing, *inter alia*, *Wiener*)), *aff'd in part, rev'd in part, and remanded*, 561 U.S. 477 (2010); *see also Federal Election Comm'n v. NRA Pol. Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993) (stating, in passing, that the President "likely" can only remove members of the Federal Election Commission for cause but declining to rule on the issue), *cert. dismissed*, 513 U.S. 88 (1994); *cf. Swan*, 100 F.3d at 990 (Silberman, J., concurring) ("We have never *held* … that an appointee to a multi-member regulatory agency with a term appointment enjoys tenure equivalent to the term appointee who, according to the explicit terms of the statute, may not be removed except for good cause.").  But, to the best of the government's knowledge,

25

even in those pre-*Collins* cases, this Court never squarely found a removal protection on the basis of a freewheeling inquiry into structure and function and certainly not for an agency that lacks any adjudicatory authority.  And in 2020, the Court applied modern standards of statutory interpretation and focused on the absence of a plain-text removal restriction.  *See Al Bahlul*, 967 F.3d at 872.  The Court reiterated "[t]he long-standing rule relating to the removal power" that "in the face of congressional silence, the power of removal is incident to the power of appointment."  *Id.* (alteration in original) (quoting *Kalaris*, 697 F.2d at 401).  And without "explicit tenure provisions," the Court held the official there to be "removable at will."  *Id.*

In this case, the district court relied on language in *Severino*, a post-*Collins* decision holding that members of the Council of the Administrative Conference are removable at will.  71 F.4th at 1040.  The Court in *Severino* stated that "Congress may clearly indicate its intent to restrict removals through the statutory structure and function of an office."  *Id.* at 1044.  But the district court misunderstood the significance of that language.  *Severino* cited for that proposition *Wiener* and a page of *Seila Law* that, in turn, cited *Humphrey's Executor*.  *Id.*  *Severino* itself recognized that *Wiener* rested on the War Claims Commission's "judicial functions."  *Id.* at 1047 (also citing the statement in *Collins* that "*Wiener* was decided 'on the rationale that the War Claims Commission was an adjudicatory body'" (quoting

26

*Collins*, 594 U.S. at 250 n.18)). It is undisputed that the PCLOB does not adjudicate any matters. And the cited page of *Seila Law* made clear that "the President's removal power is the rule, not the exception" and declined to rewrite an explicit removal restriction, stressing the absence of a "workable standard derived from the statutory language." 591 U.S. at 228-230; *see also id.* at 230 (rejecting a proposed removal restriction that, among other things, was not "root[ed] … in the statutory text"). That is what the district court did here: it created some unspecified restriction on the President's removal power found nowhere in the statutory text. *See also* A163 n.26 (stating that the court could likely devise some form of for-cause removal protection but declining to "conclusively determine" whether Board members are removable under any circumstances).

*Severino* also went on to describe "quasi-judicial functions" as having been "determinative" in both *Wiener* and *Humphrey's Executor*, cited the relevant passage from *Collins* about the governing standard, and stressed that the Administrative Conference at issue in *Severino* "does not … adjudicate." 71 F.4th at 1048-1049. Thus, however one slices it, if an agency does not perform "quasi-judicial functions" and the governing statute imposes no plain-language removal restriction, then no removal restriction exists. *See LeBlanc*, 2025 WL 1840591,

27

at *1.  That is enough to resolve this case, since there is no argument that PCLOB engages in any adjudications.  *Id.*

**3.**  In any event, it is particularly implausible that when Congress reconstituted the PCLOB in 2007, it would have established a removal restriction through inferences rather than through statutory text.  It is uncontroverted that the original PCLOB, as constituted in 2004, had no removal protections.  Plaintiffs' theory is that in 2007, when Congress reconstituted the PCLOB outside of the Executive Office of President with six-year terms and deleted certain language expressly referencing presidential control, Congress implicitly established some form of unspecified removal protections.  *See* A146-147, 152-153.

But by 2007, it was well understood that statutory interpretation, if nothing else, begins with the text.  And certainly by 2007, "[w]hen Congress want[ed] to depart from the default of at-will removability and instead furnish for-cause protection," it knew "how to do so."  *Braidwood*, 145 S. Ct. at 2448 (listing examples); *see also, e.g.*, Postal Accountability and Enhancement Act, Pub. L. No. 109-435, § 501(a)(1), 120 Stat. 3198, 3232 (2006) (reestablishing a U.S. Postal Service Board of Governors that "may be removed only for cause"); *id.* § 601(a), 120 Stat. at 3238 (establishing a Postal Regulatory Commission that "may be removed by the President only for cause"); Housing and Economic Recovery Act of

28

2008, Pub. L. No. 110-289, § 1101, 122 Stat. 2654, 2662 (establishing the Federal Housing Finance Agency led by a Director removable by the President "for cause"); Travel Promotion Act of 2009, Pub. L. No. 111-145, § 9(b)(2)(D), 124 Stat. 49, 57 (2010) (establishing the Corporation for Travel Promotion with a board that may be removed by the Secretary of Commerce "for good cause"); Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1011(c)(3), 124 Stat. 1376, 1964 (2010) (establishing the Bureau of Consumer Financial Protection led by a Director who was removable "for inefficiency, neglect of duty, or malfeasance in office").

Additionally, in the very next section of the 2007 statute reconstituting the PCLOB, Congress amended the provisions governing the Department of Homeland Security's Privacy Officer and provided that if the Secretary "removes" or transfers that official, the Secretary must formally notify Congress. 9/11 Act § 802, 121 Stat. at 358-360 (codified at 6 U.S.C. § 142). That amendment confirms Congress's understanding that officials charged with monitoring privacy concerns might be removed from their positions and that there are a range of ways to address that possibility. That Congress did not do so in the accompanying section establishing the PCLOB shows that Congress did not intend to create a PCLOB removal restriction.

At the same time, when Congress reconstituted the PCLOB in 2007, multi-member boards existed throughout the government that were not understood as having removal protections. Judges had questioned whether and when courts should impose removal restrictions that appear nowhere in the statutory text. *See, e.g.*, *Free Enter. Fund*, 537 F.3d at 695 (Kavanaugh, J., dissenting); *see also Swan*, 100 F.3d at 990 (Silberman, J., concurring). And the Executive Branch had also questioned the idea that "*Congress* must have implied a for-cause removal restriction when *the Court* believes that the functions of the agency demand such tenure protection," stating that the government "should resist any further application" of that logic "under which a court may infer the existence of a for-cause limit on presidential removal, except with respect to officers whose only functions are adjudicatory." *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 168 n.115, 170 (1996); *cf. United States v. Wilson*, 290 F.3d 347, 357 (D.C. Cir. 2002) ("Congress is presumed to be aware of established practices and authoritative interpretations of the coordinate branches."). No sound reason existed in 2007 for Congress simply to assume that some particular combination of structural features and agency functions would be understood as implicitly imposing a removal restriction.

That Congress did not simply provide for a removal restriction is strong evidence that Congress did not intend one. As even the district court recognized, "the fact that Congress revised the statutory text and still failed to include an express protection against removal further cuts against" plaintiffs' position. A153. If nothing else, the absence of a textual removal restriction in these circumstances means that Congress's intent to impose one is not "clear," *Severino*, 71 F.4th at 1044.

## C. The Board's Structure and Function Are Not Operationally Incompatible With Presidential Removal

**1.** In all events, the district court was wrong to conclude that the PCLOB's "structure and function" "indicate" Congress's "intent" to restrict the President's removal power, A154-163, let alone that it was "clear," as the court recognized would be necessary, A145, 154, 163; *see Severino*, 71 F.4th at 1044 ("Congress must make it clear in a statute if it wishes to restrict the President's removal power"); *id.* (Congress would have to "clearly indicate its intent); *id.* at 1046 (Congress must make that intent "crystal clear"); *id.* at 1050 ("Congress, at the outset, must clearly express its intent to do so"). Multi-member boards exist throughout the government that are not generally understood to have removal protections and that share various combinations of the structural features that plaintiffs rely on here. *See Collins*, 594 U.S. at 249 (listing agencies where Congress did not "impos[e] any restriction on the President's power to remove the agency's leadership"). And the PCLOB's

31

functions of reviewing (and sometimes criticizing) programs operated by the Executive Branch, providing advice to the Executive Branch, and generating reports for both Congress and the President are not "operationally incompatible with at-will Presidential removal," *Severino*, 71 F.4th at 1047.  Indeed, those functions do not materially distinguish the PCLOB from inspectors general, who may be removed at will, or the Administrative Conference, which was at issue in *Severino.*

Like the Council of the Administrative Conference, which this Court has held to be removable at will, the PCLOB "is structurally housed squarely within the Executive Branch and serves to advise personnel in and components of the Executive Branch."  *Severino*, 71 F.4th at 1048.  The PCLOB is undisputedly "within the executive branch."  42 U.S.C. § 2000ee(a).  Like the Council in *Severino*, it has a small, fixed number of members appointed to serve limited terms.  *Compare id.* § 2000ee(h) (five members for six-year terms), *with Severino*, 71 F.4th at 1041 (11 members (other than the Chair) for three-year terms).[5]  Like the Council in *Severino*, the terms were initially staggered but early departures may alter staggering.  *Compare* 9/11 Act § 801(c)(2)(B) (establishing initial terms), *with*

---

[5] The district court appears to have mistakenly looked to the number of people in the full Administrative Conference—75 to 101—rather than to that Conference's Council, which was at issue in *Severino*.  A155-156; *see Severino*, 71 F.4th at 1040-1041.

*Severino*, 71 F.4th at 1049.  And like the Council in *Severino*, the PCLOB's primary role is to review programs and policies operated within the Executive Branch and provide advice.  *Compare* 42 U.S.C. § 2000ee(c), (d), (g), *with Severino*, 71 F.4th at 1048-1049.  "Producing advice for the President and to his delegees," as the PCLOB does, "is a quintessential example of a 'purely executive' function" subject to the President's control.  *Id.* at 1048.  And that "advice is only as useful as its recipient believes it to be."  *Stirrup v. Biden*, 662 F. Supp. 3d 12, 26 (D.D.C. 2023) (discussing Boards of Visitors to the military academies), *aff'd in part and vacated in part as moot sub nom.*, *Stirrup v. U.S. Dep't of Def.*, No. 23-5094, 2024 WL 2873780 (D.C. Cir. June 7, 2024); *see Severino*, 71 F.4th at 1048-1049 (recognizing that "[p]residential influence is completely consistent with [a] wholly advisory and consultatory mission" and can be "vital to the successful accomplishment of [a] consultative role").

If anything, the PCLOB's functions weigh even more strongly against inferring removal protections.  The statute provides that the PCLOB is generally to have "access from any department, agency, or element of the executive branch" to "all" relevant "records" and "personnel," including to "classified information." 42 U.S.C. § 2000ee(g)(1)(A)-(B).  And the Board, acting with the Attorney General, may also issue subpoenas to persons outside of the Executive Branch by submitting

33

formal requests that require the Attorney General to "issue the subpoena as requested" or provide a written explanation and notify Congress. *Id.* § 2000ee(g)(1)(D), (2). The PCLOB also receives reports from, works with, and "coordinate[s] the activities of" individual agencies' privacy and civil liberties officers. *Id.* § 2000ee(d)(3). These are the agencies' "senior officer[s]" who are "designate[d]" by agency heads to provide agency-specific review. *Id.* § 2000ee-1(a). The Board is also empowered to "designate" additional agencies and thereby require those agencies' heads to designate their own privacy and civil liberties officers. *Id.* The statute establishing the PCLOB also required the President to study and report on creating new standards for accessing or sharing various sensitive information that would be "established in consultation with the [PCLOB]," 9/11 Act § 504(6), and required the Secretary of Homeland Security to establish a "Fusion Center Initiative" "in consultation with" the Attorney General and, among others, "the [PCLOB]," to coordinate counterterrorism efforts with state and local governments, *id.* § 511(a). This work is plainly "meant to be integrated within the Executive Branch, not isolated from it." *Severino*, 71 F.4th at 1049.

Contrary to the district court's apparent suggestion, the PCLOB's role in "the realm of national security and counterterrorism," A194; *see* A159-162, further weighs against inferring a removal restriction. In "the national security context,"

34

"the President generally enjoys unique responsibility."  *National Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at \*2 (D.C. Cir. May 16, 2025) (per curiam) (quotation marks omitted); *see, e.g.*, *Department of the Navy v. Egan*, 484 U.S. 518, 526-530 (1988); *Lee v. Garland*, 120 F.4th 880, 886, 888, 891-894 (D.C. Cir. 2024).  Courts should be especially cautious about inferring a restriction on the President's removal power when dealing with presidential appointees to a Board that reviews and advises on national security matters.  *See Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993) (applying a statutory presumption with "special force" when construing a statute "that may involve … military affairs for which the President has unique responsibility").  And it is particularly doubtful that Congress intended to establish such a restriction here, where the PCLOB's ability to function depends on its access to some of the most sensitive, classified information over which the President maintains significant control and discretion.  *See Egan*, 484 U.S. at 526-530; *Lee*, 120 F.4th at 886, 888, 891-894.

**2.  a.**  The district court's repeated comparisons (A155-162) of the PCLOB to the Federal Trade Commission, as understood in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and to the War Claims Commission at issue in *Wiener* only underscore the error of the court's conclusion.  As noted, multi-member boards exist throughout the government that serve a variety of functions and that are not

generally understood to have removal protections.  *See Collins*, 594 U.S. at 249.

*Humphrey's Executor* involved an express removal protection that was "definite and unambiguous," 295 U.S. at 620, 623, and involved a "quasi-judicial" role, *Severino*, 71 F.4th at 1047-1049; *see Humphrey's Ex'r*, 295 U.S. at 621, 628-629 (explaining that the 1935 FTC "act[ed] as a master of chancery" that recommended decisions to Article III courts).  The Court in *Humphrey's Executor* also stressed that the agency there could not "in any proper sense be characterized as an arm or an eye of the executive." 295 U.S. at 628.  And, as noted, *Wiener* concerned an adjudicatory body set up to have "finality of determination 'not subject to review by any other official.'"  357 U.S. at 354-355; *see Severino*, 71 F.4th at 1047.

The PCLOB does not adjudicate or otherwise act in a quasi-judicial role, and its function of analyzing and advising executive agencies "only underscores how diametrically opposed" its role is "to the weighty quasi-judicial jobs at issue in *Wiener* and *Humphrey's Executor*."  *Severino*, 71 F.4th at 1049.  "Those cases are of no help" to plaintiffs here because "[p]roducing advice for the President and to his delegees," as the PCLOB does, "is a quintessential example of a 'purely executive' function" subject to the President's control.  *Id.* at 1048 (quoting *Wiener*, 357 U.S. at 352 (quoting *Humphrey's Ex'r*, 295 U.S. at 628)).  The PCLOB is

therefore, if nothing else, "an eye of the executive." *Humphrey's Ex'r*, 295 U.S. at 628.

The PCLOB is also "an arm … of the executive." *Humphrey's Ex'r*, 295 U.S. at 628. As discussed, the PCLOB works with each agency's internal privacy and liberties officers, who are "senior officer[s]" designated "as the principal advisor[s]" on a range of privacy and civil liberties matters. 42 U.S.C. §§ 2000ee(d)(3), 2000ee-1(a). The PCLOB, among other things, "coordinate[s]" their "activities" on "interagency matters." *Id.* § 2000ee(d)(3)(C). The PCLOB can impose legal obligations on other agency heads, requiring them to designate their own internal privacy and civil liberties officers and thus require those senior officers to take on a host of responsibilities. *See id.* §2000ee-1(a), (b)(1). And the PCLOB (along with the Attorney General) holds one of the two keys necessary to issue subpoenas under the statute. *See id.* § 2000ee(g)(1)(D), (2). These functions are far from those discussed in *Wiener* or in *Humphrey's Executor* (where there was also an "express textual" removal restriction, *Severino*, 71 F.4th at 1047).

**b.** The apparent linchpin of the district court's conclusion was its mistaken view that "many of the PCLOB's responsibilities are also to Congress," A158, and that a removal restriction is "mission-critical for the PCLOB's operation," A160. While a few provisions require the PCLOB "to submit informational reports to

Congress," the PCLOB's "*raison d'être*" is to produce "advice for the Executive Branch." *Severino*, 71 F.4th at 1048. The Board's organic statute lays out its "Functions" in over 10 detailed parts. *See* 42 U.S.C. § 2000ee(d). The only specific mention of Congress there is a single sentence stating that "members of the Board shall appear and testify before Congress upon request." *Id.* § 2000ee(d)(4). That does little to distinguish Board members from other senior Executive Branch officials, who testify before Congress.

In separate subsections, the statute directs the Board to submit semi-annual reports to both Congress *and* the President describing its "major activities" and findings and recommendations, to make those reports "available to the public" to the extent possible, and to "hold public hearings and otherwise inform the public of its activities." 42 U.S.C. § 2000ee(e)-(f). That reporting requirement is hardly the PCLOB's primary focus and is comparable to many "[c]ongressional reporting requirements" that "are, of course, legion in federal law," *Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 317 & n.30 (D.C. Cir. 1988). Indeed, the PCLOB's reporting requirement is similar to the reporting requirement for inspectors general. *See, e.g.*, 5 U.S.C. § 405(b)-(c) (requiring inspectors general to submit semi-annual reports to Congress and agency heads). It is also comparable to the Administrative Conference's mandate to "make recommendations to … Congress" (among others)

38

and "transmit to … Congress" (as well as the President) its various reports.  *Id.*
§§ 594(a)(1), 595.

The PCLOB's reporting requirement also mirrors others established in the
very same statute that plainly do not signal a removal restriction.  Title VIII of the
9/11 Act, called "Privacy and Civil Liberties," not only established the current
PCLOB, 9/11 Act § 801, but (as referenced before) also expanded the role of the
Department of Homeland Security's Privacy Officer, *id.* § 802 (codified at 6 U.S.C.
§ 142), and established a framework for privacy and civil liberties officers, *id.* § 803
(codified at 42 U.S.C. § 2000ee-1).  The provision governing the DHS Privacy
Officer required that official to "submit reports directly to the Congress."  6 U.S.C.
§ 142(e)(1).  As illustrated by the fact that the statute just requires the Secretary to
notify Congress if removing or transferring that official, there is no restriction on
that official's removal.  *See id.* § 142(d).

Even more pertinent, the provision governing privacy and civil liberties
officers requires those officials to submit reports "periodically, but not less than
quarterly" "to the appropriate committees of Congress," the relevant agency head,
and the PCLOB.  9/11 Act § 803.[6]  That mirrors the PCLOB's mandate, established

---

[6] The reporting requirement was later amended to require reports "not less
than annually."  42 U.S.C. § 2000ee-1(f).

39

just a few pages earlier in the same statute, to "receive and review reports" from those privacy and civil liberties officers and to "periodically submit, not less than semiannually" the PCLOB's own reports "to the appropriate committees of Congress" and the President. *Id.* § 801 (codified at 42 U.S.C. § 2000ee(e)). Agencies' internal privacy and liberties officers are not shielded from removal by virtue of their designations to that role. The fact that their congressional reporting requirement mirrors the PCLOB's very similar congressional reporting requirement, established just pages away in the same statute, is further evidence that the PCLOB's reporting requirement does not imply a removal restriction. And the fact that the PCLOB also receives the reports prepared by privacy and civil liberties officers and submits its own reports illustrates the integrated nature of the reports in this field. All of this underscores that the PCLOB's reporting requirements do not clearly indicate an intent to restrict the removal of PCLOB members.

The district court also erred by concluding that "'absolute freedom from Executive interference'" is "mission-critical for the PCLOB's operation" because the PCLOB's role can include "'criticiz[ing]'" Executive Branch "policies." A160 (some quotation marks omitted). There is nothing fundamentally incompatible between the President's power to remove an official and that official's providing candid assessments and even criticisms of policies and activities carried out within

the Executive Branch.  The PCLOB's structural insulation from the officials and agencies that it oversees, *e.g.*, intelligence agencies, enables a significant degree of independence.  And as is the case with inspectors general, for example, Executive Branch officials may serve an oversight function even when they can be removed by the President.  *See, e.g.*, 5 U.S.C. §§ 404, 405.  Senate confirmation and other political checks can be effective in staffing the PCLOB with members who provide their own, candid assessments.  No sound reason exists to conclude that these functions are so "operationally incompatible with at-will Presidential removal" that Congress must have "meant" to restrict the President's removal power without saying so.  *Severino*, 71 F.4th at 1047.  And any such intent is most certainly not "clear."  *Id.* at 1044.

The district court's inferences about what Congress intended when it passed the statute rested heavily on a handful of examples that postdate the statute.  The court discussed two instances (in 2016 and 2023) where it believed that Congress "appears to have weighed the PCLOB's recommendations and testimony heavily." A159-160.  The court "[t]hus" concluded that "the PCLOB's purpose and function" are analogous to the quasi-legislative duties discussed in *Humphrey's Executor*, A159-160, where, again, there was an express removal restriction.  The court also described two instances (in 2014 and 2023) where the PCLOB criticized surveillance

41

programs.  A160-162.  Those examples are not "*statutory* structure and function," *Severino*, 71 F.4th at 1044 (emphasis added), and they shed little light on whether Congress in 2007 clearly intended to restrict the President's default removal authority.  Those examples also fail to distinguish the PCLOB from inspectors general, the Administrative Conference, privacy and civil liberties officers, and other government officials who make recommendations to Congress and sometimes criticize actions or programs carried on somewhere in the Executive Branch.

**3.**  Although the district court declined plaintiffs' invitation to infer a removal restriction from "collateral provisions" and the "history" of amending the statute in 2007, A150-154, the court stated in passing that the 2007 history "provides support for Congress's intent to make the PCLOB more independent" and was "relevant" to the court's views of "the PCLOB's structure and function," A152-153; *see also* A159.  The court provided little further explanation, but plaintiffs' opposition to a stay and their petition for rehearing en banc of this Court's stay decision primarily led with those arguments.

Far from helping plaintiffs, however, the history on which they seek to rely undermines their position.  Plaintiffs' theory is that in 2007, when Congress reconstituted the PCLOB outside of the Executive Office of the President with six-year terms, deleted language expressly referencing presidential control, and slightly

42

revised the PCLOB's functions, Congress implicitly established some unspecified removal protection. But while the linchpin of plaintiffs' position is that removal protections were necessary for the 2007 PCLOB to provide "oversight" and "report to Congress" (*e.g.*, Stay Opp'n 14-16), the 2004 PCLOB had substantially the same role, as reflected in its name (the Privacy and Civil Liberties *Oversight* Board), express "Oversight" functions, and required "report[ing] to Congress," Pub. L. No. 108-458, § 1061(b)-(c), 118 Stat. at 3684-3685 (formatting altered). Indeed, Congress's decision in 2004 to vest those functions in a Board with significant dependence on the President—including its placement in the Executive Office of the President—undermines plaintiffs' contention that the Board's 2007 oversight functions necessarily require "absolute freedom from Executive interference." A160 (quoting *Severino*, 71 F.4th at 1049).

Congress's 2007 deletion of language stating that Board members "serve at the pleasure of the President" and operate "under the general supervision of the President" (without the addition of any removal restriction) does not alter that conclusion. *See* A146-147, 152-153 (describing plaintiffs' argument). Of course, the absence of text is not "plain text." *Severino*, 41 F.4th at 1044. And it provides no sound reason to believe that Congress clearly (albeit implicitly) established an unspecified removal restriction without addressing removal. When Congress stated

43

in 2004 that Board members "serve at the pleasure of the President," it is likely that "Congress thought it wiser to make express what would have been understood." *Myers*, 272 U.S. at 145. But that reference was "not necessary" because the President was "regarded as being clothed with such power in any event." *Parsons*, 167 U.S. at 339. When Congress amended the statute in 2007, it significantly rewrote the language and made various non-substantive changes, such as changing "Federal Government" to "Government" even where the federal government was clearly at issue. *See* A96-104 (redline showing changes from the prior version).

When Congress in 2007 removed the PCLOB from the Executive Office of the President and established six-year terms, it was also reasonable no longer to state that Board members "serve at the pleasure of the President" and operate "under the general supervision of the President." For one thing, when Congress replaced indefinite service with a term that lasts for six years (even if it could be renewed), that established a default period of service for PCLOB members. Given the practical expectation that members would serve during that period, it makes sense that Congress would not specifically emphasize that Board members "serve at the pleasure of the President." *See* A129 (explaining that in the 2004 statute, "rather than delineating a term of service, Congress prescribed that all members of the PCLOB, including the chairman and vice chairman, 'shall each serve at the pleasure

44

of the President.'"); *Severino*, 71 F.4th at 1046 (a term "mark[s] the point in time when a fresh presidential appointment is due"); *see also* Neomi Rao, *Removal: Necessary and Sufficient for Presidential Control*, 65 Ala. L. Rev. 1205, 1253 (2014) (suggesting that while terms "do not impose a legal restriction on removal at will," they "may … imply a sort of presumption against removal during the term").  And, of course, when Congress removed the PCLOB from the Executive Office of the President, it was sensible no longer to emphasize that the Board operates "under the general supervision of the President."  Far less sensible is plaintiffs' view that Congress went about revising the text to establish a removal restriction but did not bother to put that restriction in the text.

The 2007 history weighs further against plaintiffs.  The bill initially passed by the Senate made virtually all the changes plaintiffs treat as significant: it omitted language about serving at the pleasure of the President and under the President's supervision; established a five-member, nonpartisan expert board with a political-balance requirement whose members "shall serve" initially-staggered six-year terms; and directed the PCLOB to engage in "oversight" and submit semi-annual reports to Congress and the President that include, among other things, "minority views."  S. 4, 110th Cong. § 601(a), at 161-175 (2007).  But it placed this reconstituted PCLOB "within the Executive Office of the President." *Id.* at 161.  It

45

is implausible that the Senate understood the various changes that plaintiffs emphasize here as restricting the President's power to remove officials expressly placed in the Executive Office of the President. And it is doubly implausible that the Senate thought that intent was so clear that there was no need to say so in the statute.

**4.** The district court was also wrong to dismiss constitutional concerns. *See* A163; *see also* A164-171. Article II of the Constitution vests "[t]he executive Power" in the President, U.S. Const. art. II § 1, cl. 1, and directs the President to "take Care that the Laws be faithfully executed," *id.* § 3; *see Collins*, 594 U.S. at 251-254. The PCLOB is undisputedly an "agency within the executive branch." 42 U.S.C. § 2000ee(a). That itself raises serious constitutional questions that would arise from imposing a removal restriction. *See, e.g.*, *Harris v. Bessent*, No. 25-5037, 2025 WL 980278, at *12 & n.142 (D.C. Cir. Mar. 28, 2025) (Walker, J., concurring), *vacated en banc and per curiam*, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025). The PCLOB "[p]roduc[es] advice for the President and to his delegees," which is "a quintessential example of a 'purely executive' function." *Severino*, 71 F.4th at 1048. That advice serves to inform how others in the Executive Branch, all of whom ultimately answer to the President, execute the law and wield their other powers, specifically in the national security realm. The PCLOB is also to have "access" to

46

records and personnel from "any department, agency, or element of the executive branch." 42 U.S.C. § 2000ee(g)(1)(A)-(B). And, as discussed, the PCLOB has legal powers beyond producing advice. *See supra* pp. 5-7, 33-35.

The district court did not articulate the precise contours of the removal protection it recognized. *See* A163 n.26 (declining to "conclusively determine" whether Board members are removable under *any* circumstances). But whatever the boundaries, its approach raises serious constitutional concerns. The district court viewed those concerns as "inapplicable" because it had concluded that "Congress intended to restrict the President's removal authority." A163. But if this Court believed it to be a close question (which it is not), the Court should decline to infer a removal restriction that would raise novel constitutional questions and that is plainly not compelled by the statute's text or any principle of construction. And, if nothing else, these concerns further underscore the high bar for finding a removal restriction and that, in particular, "the President holds the power to remove at will executive officers" and "a statute must contain 'plain language to take [that power] away.'" *Collins,* 594 U.S. at 250 (alteration in original); *see also Franklin v. Massachusetts*, 505 U.S. 788, 800-801 (1992) (requiring an "express statement" before a statute is read to restrict the President).

47

## II.    Plaintiffs Cannot Show Entitlement To Reinstatement

The district court erred in finding a removal restriction, and the judgment should be reversed on that basis.  But the court compounded its errors by ordering plaintiffs' reinstatement.

**A.  1.**  Because the appointment and removal of PCLOB members is specifically entrusted to the President, a court may not order plaintiffs' reinstatement once removed.  *See Bessent v. Dellinger*, 145 S. Ct. 515, 516-518 (2025) (Gorsuch, J., dissenting from the order holding the application in abeyance); *Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *4 (D.C. Cir. Apr. 7, 2025) (en banc) (Rao, J., dissenting), *overruled by Trump v. Wilcox*, 145 S. Ct. 1415 (2025). Traditionally, removed officials (or their executors) have challenged removals by seeking back pay—not injunctions or declaratory judgments restoring them to office. *See, e.g.*, *Wiener*, 357 U.S. at 350; *Humphrey's Ex'r*, 295 U.S. at 618; *Shurtleff*, 189 U.S. at 318; *Parsons*, 167 U.S. at 327.

Even as a general matter, a court's equitable powers do not extend to remedies regarding the reinstatement of public officials.  A court's equitable powers are limited to remedies that were "traditionally accorded by courts of equity."  *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2551 (2025) (quoting *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)); *see Great Lakes Dredge*

48

*& Dock Co. v. Huffman*, 319 U.S. 293, 300 (1943). Reinstatement of a public official is not such a remedy. "It is … well settled that a court of equity has no jurisdiction over the appointment and removal of public officers … ." *In re Sawyer*, 124 U.S. 200, 212 (1888); *see, e.g.*, *Baker v. Carr*, 369 U.S. 186, 231 (1962) (decisions that "held that federal equity power could not be exercised to enjoin a state proceeding to remove a public officer" or that "withheld federal equity from staying removal of a federal officer" reflect "a traditional limit upon equity jurisdiction"); *White v. Berry*, 171 U.S. 366, 377 (1898) ("[A] court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of another."); *see also Dellinger*, 145 S. Ct. at 517 (Gorsuch, J., dissenting from the order holding the application in abeyance) (observing that "courts of equity at the time of the founding were apparently powerless" to stop the removal of executive officers). And because a declaratory-judgment suit is "'essentially an equitable cause of action,'" "the same equitable principles" apply. *Samuels v. Mackell*, 401 U.S. 66, 70, 73 (1971); *see Great Lakes Dredge & Dock Co.*, 319 U.S. at 300. The remedies issued here flout those longstanding remedial principles.

The error is even greater here because plaintiffs were appointed and removed by the President. Courts cannot enjoin the President's performance of official duties.

*Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867); *see Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him and have never submitted the President to declaratory relief." (citation omitted)).  And absent "an express statement by Congress," courts must be hesitant about concluding that a general grant of equitable power authorizes judicial remedies that could burden the President' exercise of Article II powers.  *See Franklin*, 505 U.S. at 801.  These include the President's removal power.  *See Trump v. United States*, 603 U.S. 593, 620-621 (2024); *Seila Law*, 591 U.S. at 213.  Since only the President has the authority to appoint, remove, and supervise agency heads, any relief preventing PCLOB members' removal "necessarily targets the President." *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *13 n.2 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting), and "effectively command[s] the President … to recognize and work with someone whom the President sought to remove from office," *Dellinger*, 145 S. Ct. at 516 (Gorsuch, J., dissenting from the order holding the application in abeyance).

The district court relied on statements in *Severino* and *Swan* suggesting that the court can "*de facto*" reinstate officials who have been removed by enjoining other officials to treat them as if they had been returned to office.  A176-177 (first citing *Severino*, 71 F.4th at 1042-1043; and then citing *Swan*, 100 F.3d at 980).  But, as an

50

initial matter, the district court's actual order went much further. Despite apparently recognizing that the court could not enjoin the President, *see* A177, the court appears to have enjoined the President when it "ORDERED" that plaintiffs "may" presently be "removed by the President" "only for cause." A197-198. And despite purporting to limit itself to some form of *de facto* reinstatement, the court "DECLARED" that plaintiffs' removal was "null and void" and "ORDERED" that plaintiffs "remain[]" "member[s] of the [PCLOB]." A197. This amounts to *de jure* reinstatement and goes beyond what this Court has even suggested, let alone held, may be available, *i.e.*, reinstating plaintiffs "*de facto*" by having subordinates "treat[]" plaintiffs as if they were Board members. *See Severino*, 71 F.4th at 1042-1043 (confirming that the President "is the only person with the power to reappoint" an official who has been removed and "[i]nferior officials could not 'officially' reinstate a member of [a] board" (quoting *Swan*, 100 F.3d at 980)).

The district court also overread *Severino* and *Swan*. Those cases did not address a number of the remedial issues just discussed. And because the Court upheld the challenged removals in those cases, it had no occasion to impose a remedy. The Court has thus never, in fact, permitted a "*de facto*" reinstatement. Rather, in the context of finding that the plaintiffs in those cases had standing to challenge removal by the President, the Court stated that it would be possible to

51

grant "at least some of the relief" being sought by ordering some form of "*de facto*" reinstatement, such as, "at least in principle," "access" to a plaintiff's "former office," "includ[ing]" a plaintiff in "meetings," and "permit[ting] him to cast votes." *Severino*, 71 F.4th at 1042-1043 (quoting *Swan*, 100 F.3d at 980). It is unclear what that could or would actually entail. *See id.* All that was necessary for finding standing was the possibility of providing "some of the privileges of [an] office." *Id.* at 1043. To the extent that the Court has suggested that an injunction could require full reinstatement, that was dicta. And that dicta would conflict with, among other things, the established principle that equitable power may not be used to "restrain by injunction the removal of a [public] officer," *Sawyer*, 124 U.S. at 212.

**2.** The district court also erred when it suggested that if "injunctive relief be unavailable," the court would issue mandamus. A172; *see* A191-194.[7] A court may award mandamus only if the applicant has a "clear and indisputable" right to relief. *United States ex rel. Bernardin v. Duell*, 172 U.S. 576, 582 (1899). Mandamus is thus available only where there is "a crystal-clear legal duty to act," *In re National Nurses United*, 47 F.4th 746, 752 (D.C. Cir. 2022), and cannot be used "to compel

---

[7] "Federal Rule of Civil Procedure 81(b) abolished the writ of mandamus in the district courts, but relief 'in the nature of mandamus' may still be obtained through an appropriate action … ." *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207 n.7 (D.C. Cir. 1985) (Scalia, J.) (quoting 28 U.S.C. § 1361).

an official to perform an act unless the official's interpretation of her statutory duties is '*clearly wrong*,'" *Illinois v. Ferriero*, 60 F.4th 704, 715 (D.C. Cir. 2023) (emphasis added).  Debatable questions, like those plaintiffs claim to exist here, "are the antithesis of the 'clear and indisputable' right needed for mandamus."  *In re al-Nashiri*, 791 F.3d 71, 85-86 (D.C. Cir. 2015) (adding that "mandamus would not lie because the answer was hardly 'clear' *ex ante*"); *see Reichelderfer v. Johnson*, 72 F.2d 552, 554 (D.C. Cir. 1934) ("[M]andamus will not lie if the construction of the officer is a possible one, and there is room for an honest difference of opinion.").  To obtain mandamus based on the violation of an assertedly implied removal restriction, plaintiffs would have to show that it was "clear," *e.g.*, *al-Nashiri*, 791 F.3d at 85-86, that Congress "clearly indicate[d] its intent to restrict" the President's removal power, *Severino*, 71 F.4th at 1044.  That double burden is one that plaintiffs cannot possibly meet.

**B.**  In all events, even if a court has the power to order some form of reinstatement in truly extraordinary cases—whether actual or "*de facto*" and whether by injunction or mandamus—this is not such a case.  A court's decision to grant such a remedy is an "act of equitable discretion."  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (injunction); *see Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) (declaratory judgment); *Whitehouse v. Illinois Cent. R.R. Co.*, 349 U.S. 366,

373 (1955) (mandamus).  Particularly relevant here, "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), and even when a party "has suffered an injury sufficient to confer standing to seek injunctive relief, that does not necessarily make injunctive relief appropriate," *Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1363 (D.C. Cir. 2023); *see also In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005) ("Even when the legal requirements for mandamus jurisdiction have been satisfied, however, a court may grant relief only when it finds 'compelling equitable grounds.'" (alteration omitted)).

The district court's injunction departs from these principles in all respects. The court stressed that "Congress clearly indicated its intent to insulate the plaintiffs" and concluded that the plaintiffs could therefore rest on the "irreparable harm" of being deprived of their "statutory rights to function" as PCLOB members. A185-186, 188.  But public officials have no individual right to the powers of their offices; the "loss" of formal authority is not a judicially cognizable harm.  *See Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125-126 (2011); *Raines v. Byrd*, 521 U.S. 811, 820-821 (1997).  By conflating an implicit removal restriction

with an irreparable harm that warrants an injunction, the district court mistakenly collapsed the court's merits and remedial decisions.

The district court also cited the risk that if the Board continues to lack a quorum, the PCLOB might not issue reports or would issue reports as "Staff Reports" rather than "Board Reports" and, if there is only one member, would not have "minority views" to include in reports.  A186-188, 190.  That is not a harm to plaintiffs.  Nor is it sufficiently "certain and great" as to constitute an "irreparable injury."  *See Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2025).  The Board will only lack a quorum until the President fills two of the now-four vacant seats.  *See* 42 U.S.C. § 2000ee(h)(5).  The PCLOB can "[i]ssue advice and oversight reports as a 'Staff Report' based on projects initiated before the loss of a quorum."  PCLOB, Policy 102-01, *Sub-Quorum Authorities and Operations When the Position of Chair is Vacant* § 6(I)(C), at 4 (Oct. 23, 2024); *see* 6 C.F.R. § 1000.5(a), (c); *see, e.g.*, PCLOB, *Use of Facial Recognition Technology by the Transportation Security Administration* (May 9, 2025).  The Board has not had a quorum for more than a third of the time it has existed in its current form.  *See* PCLOB, *Board Members*, https://perma.cc/AX9T-HJ83 (identifying terms of all former Board Members).  And plaintiffs may well be able to share their views with Congress, the public, or others even when not serving on the Board.

Plaintiffs' operation of the PCLOB, especially if it is in a "*de facto*" status, could also call into question the validity of actions taken by the PCLOB. The President "is the only person with the power to reappoint" a removed official, and any form of "*de facto*" reinstatement could not "'officially' reinstate a member of [a] board." *Severino*, 71 F.4th at 1042-1043. It is thus unclear whether a report issued while plaintiffs were "*de facto*" reinstated would be issued pursuant to a quorum and thus be a "Board Report" rather than a "Staff Report" and whether any actions taken by such a Board would have legal effect.

In any event, any ordinary and speculative delay in the PCLOB's work cannot overcome the far greater harms imposed by the district court's injunction. The government and the public suffer a clear and obvious harm when an official is granted power to run an Executive Branch entity over the President's objection. *See Wilcox*, 145 S. Ct. at 1415; *Dellinger*, 2025 WL 559669, at *16 (Katsas, J., dissenting). The district court's order subverts the President's authority to exercise "all of" "the 'executive Power'" and "take Care that the Laws be faithfully executed" through and with the assistance of others all subject to an accountable chain of command. *See Seila Law*, 591 U.S. at 203. The PCLOB's national security role and its significant access to sensitive information and integration with other agencies further compound that injury.

In balancing the equities, the district court cited (A190) this Court's en banc stay decision in *Harris*, 2025 WL 1021435, at *2.  But the Supreme Court subsequently made clear that "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." *Wilcox*, 145 S. Ct. at 1415.  The district court's order requires Executive Branch officials (who report to the President) to treat plaintiffs (who were removed by the President) as if they were still on the PCLOB (even though they could only be reinstated by the President), to share national security information with them (that is ultimately controlled by the President), and to let plaintiffs coordinate others in the Executive Branch (who work for the President) and formulate recommendations (to be sent to the President and his delegees).  That remedy was improper.

57

# CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
 */s/ Adam Jed*
ADAM C. JED
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7243*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-8280*

AUGUST 2025

58

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,927 words according to the count of Microsoft Word. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 365 in Times New Roman 14-point font, a proportionally spaced typeface.


*/s/ Adam Jed*
ADAM C. JED

**ADDENDUM**

# TABLE OF CONTENTS

42 U.S.C. § 2000ee ............................................................Add.1

42 U.S.C § 2000ee-1 .........................................................Add.11

**42 U.S.C. § 2000ee.  Privacy and Civil Liberties Oversight Board**

**(a) In general**

There is established as an independent agency within the executive branch a Privacy and Civil Liberties Oversight Board (referred to in this section as the "Board").

**(b) Findings**

Consistent with the report of the National Commission on Terrorist Attacks Upon the United States, Congress makes the following findings:

**(1)** In conducting the war on terrorism, the Government may need additional powers and may need to enhance the use of its existing powers.

**(2)** This shift of power and authority to the Government calls for an enhanced system of checks and balances to protect the precious liberties that are vital to our way of life and to ensure that the Government uses its powers for the purposes for which the powers were given.

**(3)** The National Commission on Terrorist Attacks Upon the United States correctly concluded that "The choice between security and liberty is a false choice, as nothing is more likely to endanger America's liberties than the success of a terrorist attack at home. Our history has shown us that insecurity threatens liberty. Yet, if our liberties are curtailed, we lose the values that we are struggling to defend.".

**(c) Purpose**

The Board shall--

**(1)** analyze and review actions the executive branch takes to protect the Nation from terrorism, ensuring that the need for such actions is balanced with the need to protect privacy and civil liberties; and

**(2)** ensure that liberty concerns are appropriately considered in the development and implementation of laws, regulations, and policies related to efforts to protect the Nation against terrorism.

**(d) Functions**

**(1) Advice and counsel on policy development and implementation**

The Board shall--

**(A)** review proposed legislation, regulations, and policies related to efforts to protect the Nation from terrorism, including the development and adoption of information sharing guidelines under subsections (d) and (f) of section 485 of Title 6;

**(B)** review the implementation of new and existing legislation, regulations, and policies related to efforts to protect the Nation from terrorism, including the implementation of information sharing guidelines under subsections (d) and (f) of section 485 of Title 6;

**(C)** advise the President and the departments, agencies, and elements of the executive branch to ensure that privacy and civil liberties are appropriately considered in the development and implementation of such legislation, regulations, policies, and guidelines; and

**(D)** in providing advice on proposals to retain or enhance a particular governmental power, consider whether the department, agency, or element of the executive branch has established--

**(i)** that the need for the power is balanced with the need to protect privacy and civil liberties;

**(ii)** that there is adequate supervision of the use by the executive branch of the power to ensure protection of privacy and civil liberties; and

**(iii)** that there are adequate guidelines and oversight to properly confine its use.

**(2) Oversight**

The Board shall continually review--

**(A)** the regulations, policies, and procedures, and the implementation of the regulations, policies, and procedures, of the departments, agencies, and elements of the executive branch relating to efforts to protect the Nation from terrorism to ensure that privacy and civil liberties are protected;

**(B)** the information sharing practices of the departments, agencies, and elements of the executive branch relating to efforts to protect the Nation from terrorism to determine whether they appropriately protect privacy and civil liberties and adhere to the information sharing guidelines issued or developed under subsections (d) and (f) of section 485 of Title 6 and to other governing laws, regulations, and policies regarding privacy and civil liberties; and

**(C)** other actions by the executive branch relating to efforts to protect the Nation from terrorism to determine whether such actions--

> **(i)** appropriately protect privacy and civil liberties; and

> **(ii)** are consistent with governing laws, regulations, and policies regarding privacy and civil liberties.

**(3) Relationship with privacy and civil liberties officers**

The Board shall--

**(A)** receive and review reports and other information from privacy officers and civil liberties officers under section 2000ee-1 of this title;

**(B)** when appropriate, make recommendations to such privacy officers and civil liberties officers regarding their activities; and

**(C)** when appropriate, coordinate the activities of such privacy officers and civil liberties officers on relevant interagency matters.

**(4) Testimony**

The members of the Board shall appear and testify before Congress upon request.

**(e) Reports**

**(1) In general**

The Board shall--

**(A)** receive and review reports from privacy officers and civil liberties officers under section 2000ee-1 of this title; and

**(B)** periodically submit, not less than semiannually, reports--

> **(i)**

**(I)** to the appropriate committees of Congress, including the Committee on the Judiciary of the Senate, the Committee on the Judiciary of the House of Representatives, the Committee on Homeland Security and Governmental Affairs of the Senate, the Committee on Homeland Security of the House of Representatives, the Committee on Oversight and Government Reform of the House of Representatives, the Select Committee on Intelligence of the Senate, and the Permanent Select Committee on Intelligence of the House of Representatives; and

**(II)** to the President; and

**(ii)** which shall be in unclassified form to the greatest extent possible, with a classified annex where necessary.

## (2) Contents

Not less than 2 reports submitted each year under paragraph (1)(B) shall include--

**(A)** a description of the major activities of the Board during the preceding period;

**(B)** information on the findings, conclusions, and recommendations of the Board resulting from its advice and oversight functions under subsection (d);

**(C)** the minority views on any findings, conclusions, and recommendations of the Board resulting from its advice and oversight functions under subsection (d);

**(D)** each proposal reviewed by the Board under subsection (d)(1) that--

**(i)** the Board advised against implementation; and

**(ii)** notwithstanding such advice, actions were taken to implement; and

**(E)** for the preceding period, any requests submitted under subsection (g)(1)(D) for the issuance of subpoenas that were modified or denied by the Attorney General.

**(f) Informing the public**

The Board--

> **(1)** shall make its reports, including its reports to Congress, available to the public to the greatest extent that is consistent with the protection of classified information and applicable law; and

> **(2)** shall hold public hearings and otherwise inform the public of its activities, as appropriate and in a manner consistent with the protection of classified information and applicable law, but may, notwithstanding section 552b of Title 5, meet or otherwise communicate in any number to confer or deliberate in a manner that is closed to the public.

**(g) Access to information**

**(1) Authorization**

If determined by the Board to be necessary to carry out its responsibilities under this section, the Board is authorized to--

> **(A)** have access from any department, agency, or element of the executive branch, or any Federal officer or employee of any such department, agency, or element, to all relevant records, reports, audits, reviews, documents, papers, recommendations, or other relevant material, including classified information consistent with applicable law;

> **(B)** interview, take statements from, or take public testimony from personnel of any department, agency, or element of the executive branch, or any Federal officer or employee of any such department, agency, or element;

> **(C)** request information or assistance from any State, tribal, or local government; and

> **(D)** at the direction of a majority of the members of the Board, submit a written request to the Attorney General of the United States that the Attorney General require, by subpoena, persons (other than departments, agencies, and elements of the executive branch) to produce any relevant information, documents, reports, answers, records, accounts, papers, and other documentary or testimonial evidence.

**(2) Review of subpoena request**

**(A) In general**

Not later than 30 days after the date of receipt of a request by the Board under paragraph (1)(D), the Attorney General shall--

**(i)** issue the subpoena as requested; or

**(ii)** provide the Board, in writing, with an explanation of the grounds on which the subpoena request has been modified or denied.

**(B) Notification**

If a subpoena request is modified or denied under subparagraph (A)(ii), the Attorney General shall, not later than 30 days after the date of that modification or denial, notify the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives.

**(3) Enforcement of subpoena**

In the case of contumacy or failure to obey a subpoena issued pursuant to paragraph (1)(D), the United States district court for the judicial district in which the subpoenaed person resides, is served, or may be found may issue an order requiring such person to produce the evidence required by such subpoena.

**(4) Agency cooperation**

Whenever information or assistance requested under subparagraph (A) or (B) of paragraph (1) is, in the judgment of the Board, unreasonably refused or not provided, the Board shall report the circumstances to the head of the department, agency, or element concerned without delay. The head of the department, agency, or element concerned shall ensure that the Board is given access to the information, assistance, material, or personnel the Board determines to be necessary to carry out its functions.

**(5) Access**

Nothing in this section shall be construed to authorize the Board, or any agent thereof, to gain access to information regarding an activity covered by section 3093(a) of Title 50.

**(h) Membership**

**(1) Members**

The Board shall be composed of a full-time chairman and 4 additional members, who shall be appointed by the President, by and with the advice and consent of the Senate.

**(2) Qualifications**

Members of the Board shall be selected solely on the basis of their professional qualifications, achievements, public stature, expertise in civil liberties and privacy, and relevant experience, and without regard to political affiliation, but in no event shall more than 3 members of the Board be members of the same political party. The President shall, before appointing an individual who is not a member of the same political party as the President, consult with the leadership of that party, if any, in the Senate and House of Representatives.

**(3) Incompatible office**

An individual appointed to the Board may not, while serving on the Board, be an elected official, officer, or employee of the Federal Government, other than in the capacity as a member of the Board.

**(4) Term**

**(A) Commencement**

Each member of the Board shall serve a term of 6 years, commencing on the date of the appointment of the member to the Board.

**(B) Reappointment**

A member may be reappointed to one or more additional terms.

**(C) Vacancy**

A vacancy on the Board shall be filled in the manner in which the original appointment was made.

**(D) Extension**

Upon the expiration of the term of office of a member, the member may continue to serve for up to one year after the date of expiration, at the election of the member--

Add.7

**(i)** during the period preceding the reappointment of the member pursuant to subparagraph (B); or

**(ii)** until the member's successor has been appointed and qualified.

**(5) Quorum and meetings**

The Board shall meet upon the call of the chairman or a majority of its members. Three members of the Board shall constitute a quorum.

**(i) Compensation and travel expenses**

**(1) Compensation**

**(A) Chairman**

The chairman of the Board shall be compensated at the rate of pay payable for a position at level III of the Executive Schedule under section 5314 of Title 5.

**(B) Members**

Each member of the Board shall be compensated at a rate of pay payable for a position at level IV of the Executive Schedule under section 5315 of Title 5 for each day during which that member is engaged in the actual performance of the duties of the Board.

**(2) Travel expenses**

Members of the Board shall be allowed travel expenses, including per diem in lieu of subsistence, at rates authorized for persons employed intermittently by the Government under section 5703(b) of Title 5, while away from their homes or regular places of business in the performance of services for the Board.

**(j) Staff**

**(1) Appointment and compensation**

The chairman of the Board, in accordance with rules agreed upon by the Board, shall appoint and fix the compensation of a full-time executive director and such other personnel as may be necessary to enable the Board to carry out its functions, without regard to the provisions of Title 5 governing appointments in the competitive service, and without regard to the provisions of chapter 51 and subchapter III of chapter 53 of such title relating to classification and General

Add.8

Schedule pay rates, except that no rate of pay fixed under this subsection may exceed the equivalent of that payable for a position at level V of the Executive Schedule under section 5316 of Title 5.

**(2) Appointment in absence of chairman**

If the position of chairman of the Board is vacant, during the period of the vacancy, the Board, at the direction of the unanimous vote of the serving members of the Board, may exercise the authority of the chairman under paragraph (1).

**(3) Detailees**

Any Federal employee may be detailed to the Board without reimbursement from the Board, and such detailee shall retain the rights, status, and privileges of the detailee's regular employment without interruption.

**(4) Consultant services**

The Board may procure the temporary or intermittent services of experts and consultants in accordance with section 3109 of Title 5, at rates that do not exceed the daily rate paid a person occupying a position at level IV of the Executive Schedule under section 5315 of such title.

**(k) Security clearances**

**(1) In general**

The appropriate departments, agencies, and elements of the executive branch shall cooperate with the Board to expeditiously provide the Board members and staff with appropriate security clearances to the extent possible under existing procedures and requirements.

**(2) Rules and procedures**

After consultation with the Secretary of Defense, the Attorney General, and the Director of National Intelligence, the Board shall adopt rules and procedures of the Board for physical, communications, computer, document, personnel, and other security relating to carrying out the functions of the Board.

**(*l*) Treatment as agency, not as advisory committee**

The Board--

**(1)** is an agency (as defined in section 551(1) of Title 5); and

**(2)** is not an advisory committee (as defined in section 1001(2) of Title 5).

**(m) Authorization of appropriations**

There are authorized to be appropriated to carry out this section amounts as follows:

**(1)** For fiscal year 2008, $5,000,000.

**(2)** For fiscal year 2009, $6,650,000.

**(3)** For fiscal year 2010, $8,300,000.

**(4)** For fiscal year 2011, $10,000,000.

**(5)** For fiscal year 2012 and each subsequent fiscal year, such sums as may be necessary.

## 42 U.S.C. § 2000ee-1.  Privacy and civil liberties officers

### (a) Designation and functions

The Attorney General, the Secretary of Defense, the Secretary of State, the Secretary of the Treasury, the Secretary of Health and Human Services, the Secretary of Homeland Security, the Director of National Intelligence, the Director of the Central Intelligence Agency, the Director of the National Security Agency, the Director of the Federal Bureau of Investigation, and the head of any other department, agency, or element of the executive branch designated by the Privacy and Civil Liberties Oversight Board under section 2000ee of this title to be appropriate for coverage under this section shall designate not less than 1 senior officer to serve as the principal advisor to--

(1) assist the head of such department, agency, or element and other officials of such department, agency, or element in appropriately considering privacy and civil liberties concerns when such officials are proposing, developing, or implementing laws, regulations, policies, procedures, or guidelines related to efforts to protect the Nation against terrorism;

(2) periodically investigate and review department, agency, or element actions, policies, procedures, guidelines, and related laws and their implementation to ensure that such department, agency, or element is adequately considering privacy and civil liberties in its actions;

(3) ensure that such department, agency, or element has adequate procedures to receive, investigate, respond to, and redress complaints from individuals who allege such department, agency, or element has violated their privacy or civil liberties; and

(4) in providing advice on proposals to retain or enhance a particular governmental power the officer shall consider whether such department, agency, or element has established--

(A) that the need for the power is balanced with the need to protect privacy and civil liberties;

(B) that there is adequate supervision of the use by such department, agency, or element of the power to ensure protection of privacy and civil liberties; and

**(C)** that there are adequate guidelines and oversight to properly confine its use.

**(b) Exception to designation authority**

**(1) Privacy officers**

In any department, agency, or element referred to in subsection (a) or designated by the Privacy and Civil Liberties Oversight Board, which has a statutorily created privacy officer, such officer shall perform the functions specified in subsection (a) with respect to privacy.

**(2) Civil liberties officers**

In any department, agency, or element referred to in subsection (a) or designated by the Board, which has a statutorily created civil liberties officer, such officer shall perform the functions specified in subsection (a) with respect to civil liberties.

**(c) Supervision and coordination**

Each privacy officer or civil liberties officer described in subsection (a) or (b) shall--

**(1)** report directly to the head of the department, agency, or element concerned; and

**(2)** coordinate their activities with the Inspector General of such department, agency, or element to avoid duplication of effort.

**(d) Agency cooperation**

The head of each department, agency, or element shall ensure that each privacy officer and civil liberties officer--

**(1)** has the information, material, and resources necessary to fulfill the functions of such officer;

**(2)** is advised of proposed policy changes;

**(3)** is consulted by decision makers; and

**(4)** is given access to material and personnel the officer determines to be necessary to carry out the functions of such officer.

**(e) Reprisal for making complaint**

No action constituting a reprisal, or threat of reprisal, for making a complaint or for disclosing information to a privacy officer or civil liberties officer described in subsection (a) or (b), or to the Privacy and Civil Liberties Oversight Board, that indicates a possible violation of privacy protections or civil liberties in the administration of the programs and operations of the Federal Government relating to efforts to protect the Nation from terrorism shall be taken by any Federal employee in a position to take such action, unless the complaint was made or the information was disclosed with the knowledge that it was false or with willful disregard for its truth or falsity.

**(f) Periodic reports**

**(1) In general**

The privacy officers and civil liberties officers of each department, agency, or element referred to or described in subsection (a) or (b) shall periodically, but not less than annually, submit a report on the activities of such officers--

**(A)**

**(i)** to the appropriate committees of Congress, including the Committee on the Judiciary of the Senate, the Committee on the Judiciary of the House of Representatives, the Committee on Homeland Security and Governmental Affairs of the Senate, the Committee on Oversight and Government Reform of the House of Representatives, the Select Committee on Intelligence of the Senate, and the Permanent Select Committee on Intelligence of the House of Representatives;

**(ii)** to the head of such department, agency, or element; and

**(iii)** to the Privacy and Civil Liberties Oversight Board; and

**(B)** which shall be in unclassified form to the greatest extent possible, with a classified annex where necessary.

**(2) Contents**

Each report submitted under paragraph (1) shall include information on the discharge of each of the functions of the officer concerned, including--

**(A)** information on the number and types of reviews undertaken;

Add.13

**(B)** the type of advice provided and the response given to such advice;

**(C)** the number and nature of the complaints received by the department, agency, or element concerned for alleged violations; and

**(D)** a summary of the disposition of such complaints, the reviews and inquiries conducted, and the impact of the activities of such officer.

## (g) Informing the public

Each privacy officer and civil liberties officer shall--

**(1)** make the reports of such officer, including reports to Congress, available to the public to the greatest extent that is consistent with the protection of classified information and applicable law; and

**(2)** otherwise inform the public of the activities of such officer, as appropriate and in a manner consistent with the protection of classified information and applicable law.

## (h) Savings clause

Nothing in this section shall be construed to limit or otherwise supplant any other authorities or responsibilities provided by law to privacy officers or civil liberties officers.