ORAL ARGUMENT NOT YET SCHEDULED
No. 25-5197

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

TRAVIS LEBLANC AND EDWARD FELTEN,
*Plaintiffs-Appellees*,

v.

U.S. PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD ET AL.,
*Defendants-Appellants*.

On Appeal from the United States District Court for the
District of Columbia, No. 1:25-cv-542

CORRECTED BRIEF OF *AMICI CURIAE* STATES OF FLORIDA,
ALABAMA, ARKANSAS, GEORGIA, IDAHO, INDIANA, IOWA,
KANSAS, KENTUCKY, LOUISIANA, MISSISSIPPI, MONTANA,
NORTH DAKOTA, OHIO, SOUTH CAROLINA, SOUTH DAKOTA,
TENNESSEE, TEXAS, UTAH, AND WEST VIRGINIA, AND THE
ARIZONA LEGISLATURE, IN SUPPORT OF APPELLANTS

JAMES UTHMEIER
  *Attorney General of Florida*

Office of the Attorney General      JEFFREY PAUL DESOUSA
PL-01, The Capitol                    *Acting Solicitor General*
Tallahassee, FL 32399-1050            *Counsel of Record*
(850) 414-3300                      NATHAN A. FORRESTER
*jeffrey.desousa@*                  JASON J. MUEHLHOFF
  *myfloridalegal.com*                *Chief Deputy Solicitors General*

August 22, 2025                     *Counsel for* Amici Curiae

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel certifies the following:

**Parties, Intervenors, and Amici**

Plaintiffs-appellees are Travis LeBlanc and Edward Felten.

Defendants-appellants are the United States Privacy and Civil Liberties Oversight Board; Beth A. Williams, in her official capacity as a Board Member of the United States Privacy and Civil Liberties Oversight Board; Jenny Fitzpatrick, in her official capacity as Executive Director of the United States Privacy and Civil Liberties Oversight Board; Trent Morse, in his official capacity as Deputy Director of Presidential Personnel; and Donald J. Trump, in his official capacity as President of the United States of America.

The following participated as amici curiae in district court: the States of Florida, Alabama, Alaska, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, and West Virginia, and the Arizona Legislature,

i

## Rulings Under Review

References to the rulings at issue appear in the Brief for Appellants.

## Related Cases

Related cases appear in the Brief for Appellants.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ...................................................................................i

TABLE OF AUTHORITIES ..................................................... v

INTEREST OF *AMICI CURIAE* ................................................ 1

SUMMARY OF ARGUMENT ................................................... 1

ARGUMENT ........................................................................ 3

I.   The President has authority to remove members of the Privacy and Civil Liberties Oversight Board at will. ...................... 3

II.  By threatening the separation of powers, "independent" executive officers and agencies in turn threaten state sovereignty. ...................................................................... 9

III. LeBlanc and Felten are not entitled to reinstatement in any event. ............................................................................. 12

   A.   LeBlanc and Felten have not invoked the exclusive avenue for challenging a federal officer's removal—a writ of quo warranto—which itself does not authorize reinstatement. ............................................................. 12

   B.   Even if LeBlanc and Felten can seek relief outside of quo warranto, the federal courts cannot grant their requested relief. .................................................................. 17

      1.   Historically, equity courts did not remedy allegedly unlawful removals. ...................................... 18

      2.   Declaratory relief is unavailable because it too is a form of equitable relief. ............................................. 26

      3.   LeBlanc and Felten have not shown a clear legal right to obtain mandamus. ........................................... 27

CONCLUSION ....................................................................................... 32

CERTIFICATE OF COMPLIANCE........................................................ 33

CERTIFICATE OF SERVICE ................................................................ 34

# TABLE OF AUTHORITIES

## Cases

*Abbott Lab'ies v. Gardner*, 387 U.S. 136 (1967).....................................26

*Andrade v. Lauer*, 729 F.2d 1475 (D.C. Cir. 1984) .............. 14, 23, 25, 26

*Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320 (2015)....................12

*Att'y Gen. v. Earl of Clarendon*, 17 Ves. Jr. 491, 34 Eng. Rep. 190
    (Ch. 1810) ...................................................................................... 18, 19

*Baker v. Carr*, 369 U.S. 186 (1962) .........................................................21

*Beebe v. Robinson*, 52 Ala. 66 (1875)......................................................20

*Berry v. Reagan*, 732 F.2d 949 (D.C. Cir. 1983) ....................................22

*Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983).....22

*Bessent v. Dellinger*, 145 S. Ct. 515 (2025) ................................ 18, 22, 23

*Bittner v. United States*, 143 S. Ct. 713 (2023)......................................17

*Case v. Beauregard*, 101 U.S. 688 (1880)................................................23

*Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793)...................................10

*Cochran v. McCleary*, 22 Iowa 75 (1867) ...............................................20

*Collins v. Yellen*, 594 U.S. 220 (2021).......................................................9

*Delahanty v. Warner*, 75 Ill. 185 (1874) ................................................20

*Delgado v. Chavez*, 140 U.S. 586 (1891) ..........................................13, 29

*Eccles v. Peoples Bank*, 333 U.S. 426 (1948)..........................................26

*Edmond v. United States*, 520 U.S. 651 (1997) ........................................5

*Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012) ........................................... 15

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010) ..................................................................................... 8

*French v. Cowan*, 10 A. 335 (Me. 1887) ......................................... 29, 30

*Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868 (1991) ............... 10

*Georgia v. Stanton*, 73 U.S. (6 Wall.) 50 (1867) .................................... 18

*Green v. Mansour*, 474 U.S. 64 (1985) .................................................. 27

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ............................................. 17

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999) .............................................................................. 18

*Hagner v. Heyberger*, 7 Watts & Serg. 104 (Pa. 1844) ...................... 19, 20

*Heckler v. Ringer*, 466 U.S. 602 (1984) ..................................... 28, 30, 31

*Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935) ................................................. 4, 5, 6, 7, 8, 11, 31

*In re Sawyer*, 124 U.S. 200 (1888) ............................ 18, 19, 20, 21, 22, 25

*In re Thornburgh*, 869 F.2d 1503 (D.C. Cir. 1989) ................................ 24

*Johnson v. Horton*, 63 F.2d 950 (9th Cir. 1933) ................................... 23

*King v. Mayor of Colchester*, 100 Eng. Rep. 141 (K.B. 1788) ................ 30

*Manuel v. Convergys Corp.*, 430 F.3d 1132 (11th Cir. 2005) ................. 26

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1 (1981) ............................................................................... 12, 13

*Morrison v. Olson*, 487 U.S. 654 (1988) ........................................... 4, 7, 8

*Newman v. United States ex rel. Frizzell*, 238 U.S. 537 (1915) ............. 15

vi

*Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77 (1981) ................................................................. 13

*People ex rel. Arcularius v. City of New York*, 3 Johns. Cas. 790 (N.Y. Sup. Ct. 1802) ...................................................... 28, 30

*People ex rel. Dolan v. Lane*, 55 N.Y. 217 (Ct. App. 1873) ..................... 29

*PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75 (D.C. Cir. 2018) .............................................................................. 25

*Queen v. Councillors of Derby*, 112 Eng. Rep. 528 (Q.B. 1837) ............. 30

*Queen v. Phippen*, 112 Eng. Rep. 734 (Q.B. 1838) .................................. 30

*Republica v. Cobbett*, 3 U.S. 467 (Pa. 1798) ...................................... 9, 10

*Sampson v. Murray*, 415 U.S. 61 (1974) ................................................ 23

*Samuels v. Mackel*, 401 U.S. 66 (1971) .................................................. 27

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020) .......................................................... 3, 4, 5, 7, 9, 10, 11, 25, 31

*Severino v. Biden*, 71 F.4th 1038 (D.C. Cir. 2023) ....................... 5, 24, 25

*Sheridan v. Colvin*, 78 Ill. 237 (1875) .................................................... 20

*Stapf v. United States*, 367 F.2d 326 (D.C. Cir. 1966) ........................... 25

*State ex rel. McCaffery v. Aloe*, 54 S.W. 494 (Mo. 1899) ........................ 20

*State v. Otis*, 230 P. 414 (Wash. 1924) ................................................... 29

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ............. 22, 24

*Stern v. Marshall*, 564 U.S. 462 (2011) .................................................... 7

*Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996) .................................... 24

*Tappan v. Gray*, 9 Paige Ch. 506 (Ch. Ct. N.Y. 1842) ........................... 20

*Taylor v. Kercheval*, 82 F. 497 (C.C.D. Ind. 1897) ................................... 20

*Transam. Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979) ............... 16

*United States v. Arthrex, Inc.*, 594 U.S. 1 (2021) .......................... 5, 11, 12

*United States v. Old Dominion Boat Club*, 630 F.3d 1039 (D.C. Cir. 2011) ............................................................................................... 26

*United States v. Perkins*, 116 U.S. 483 (1886) ......................................... 4

*Vitarelli v. Seaton*, 359 U.S. 535 (1959) .................................... 22, 23, 24

*Walton v. House of Representatives of Okla.*, 265 U.S. 487 (1924) ... 18, 21

*Webster v. Fall*, 266 U.S. 507 (1925) ...................................................... 25

*Whitcomb v. Chavis*, 403 U.S. 124 (1971) ............................................. 18

*White v. Berry*, 171 U.S. 366 (1898) ....................................................... 21

*Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001) ................... 7

*Wiener v. United States*, 357 U.S. 349 (1958) .......................................... 5

**Statutes**

15 U.S.C. § 2805 ..................................................................................... 27

28 U.S.C. § 1361 ..................................................................................... 30

42 U.S.C. § 1983 ..................................................................................... 13

42 U.S.C. § 2000e-5 .................................................................................. 2

42 U.S.C. § 2000ee .................................................................. 1, 3, 4, 5, 6

8 U.S.C. § 1252 ....................................................................................... 27

D.C. Code § 16-3501 .......................................................................... 13, 14

D.C. Code § 16-3502 ............................................................... 15

D.C. Code § 16-3503 ............................................................... 15

D.C. Code § 16-3541 ............................................................... 14

D.C. Code § 16-3542 ............................................................... 14

D.C. Code § 16-3544 ............................................................... 14

D.C. Code § 16-3545 ......................................................... 15, 16

D.C. Code § 16-3546 ............................................................... 16

D.C. Code § 16-3547 ............................................................... 16

D.C. Code § 16-3548 ......................................................... 15, 16

Pub. L. No. 88-241, 77 Stat. 602 (1963) ................................. 14

**Constitutional Provisions**

U.S. Const. art. II, § 1, cl. 1 ..................................................... 3

U.S. Const. art. II, § 3 .............................................................. 3

**Rules**

D.C. Circuit Rule 28 .................................................................. i

D.C. Circuit Rule 29 ................................................................. 1

**Other Authorities**

1 Annals of Cong. 463 (1789) (J. Madison) ......................... 3, 31

Brief of the United States, *Vitarelli v. Seaton*, 359 U.S. 535 (1959)
    (No. 101), 1959 WL 101881 ............................................. 24

Eugene McQuillin, *A Treatise on the Law of Municipal
    Corporations* (1911) ....................................................... 21

Howard Clifford Joyce, *A Treatise on the Law Relating to Injunctions* (1909) ....................................................................21

James L. High, *Extraordinary Legal Remedies* (1896)......... 14, 21, 28, 29

John Norton Pomeroy, *A Treatise on Equity Jurisprudence* (4th ed. 1918)...........................................................................21

Joseph Story, *Commentaries on Equity Pleadings and the Incidents Thereof* (2d ed. 1840)............................................19

Letter from John Adams to the Inhabitants of the Colony of Massachusetts-Bay (Apr. 1775)........................................19

Nikolas Bowie, *Why the Constitution Was Written Down*, 71 Stan. L. Rev. 1397 (2018) ...............................................................19

Seth Davis, *Empire in Equity*, 97 Notre Dame L. Rev. 1985 (2022) ......19

*The Federalist* No. 48 (Madison) (Jacob E. Cooke, ed., 1961) .................4

*The Federalist* No. 70 (Hamilton) (Jacob E. Cooke, ed., 1961)...........3, 11

W.S. Holdsworth, *English Corporation Law in the 16th and 17th Centuries*, 31 Yale L.J. 382 (1922)......................................19

x

## INTEREST OF *AMICI CURIAE*

Under D.C. Circuit Rule 29, the Attorney General of Florida—on behalf of the States of Florida, Alabama, Alaska, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Montana, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and West Virginia, well as the Arizona Legislature—respectfully submits this brief as *amici curiae* in support of Appellants. *Amici* have an interest in ensuring that federal officials exercising significant executive authority are removable by the President, and thus democratically accountable to the people. Anything less is inconsistent with the Framers' design and risks intrusion on state sovereignty.

## SUMMARY OF ARGUMENT

The statute establishing the Privacy and Civil Liberties Oversight Board ("PCLOB"), 42 U.S.C. § 2000ee, does not even attempt to restrict the President's authority to remove the members of the Board. This Court thus can resolve this case without reference to any constitutional questions about the scope of the presidential removal power. If this Court nevertheless finds it necessary to address those questions, core separation-of-powers principles, bolstered by long historical understanding, require

1

that the President have the authority to remove at-will officials like Le-Blanc and Felten who wield substantial executive power. That constitutional design preserves state sovereignty by ensuring that "independent agencies" are democratically accountable should they attempt to intrude in state affairs.

The district court thus erred reading a restriction on the President's authority to remove into the PCLOB statute. Compounding the error, the district court issued a declaratory judgment and directed the reinstatement of LeBlanc and Felten without any authority to do so. Those remedies flouted Congress's decision to channel removal challenges through quo warranto proceedings. Declaratory and injunctive relief violate the longstanding rule that courts may not use their equitable powers to remedy unlawful removals absent an act of Congress. *See, e.g.*, 42 U.S.C. § 2000e-5(g) (authorizing courts to "reinstate[]" employees who suffer discrimination). And the district court wrongly assumed it could sidestep that limit by reinstating LeBlanc and Felten through a writ of mandamus. This Court should reverse.

## ARGUMENT

## I.  The President has authority to remove members of the Privacy and Civil Liberties Oversight Board at will.

PCLOB members lack statutory removal protections. 42 U.S.C. § 2000ee. But even if that were not the case, President Trump still lawfully removed LeBlanc and Felten. "'[T]he 'executive Power'—all of it—is 'vested in a President, who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3). And "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." 1 Annals of Cong. 463 (1789) (J. Madison). That necessarily includes the authority to remove executive officers. Indeed, "lesser officers must remain accountable to the President," for it is his "authority they wield." *Seila Law*, 591 U.S. at 213. Without the power to remove, the President lacks the ability to compel compliance with his directives, *id.* at 213–14, and thus to fulfill his oath to execute the law, U.S. Const. art. II, § 3.

Given the "necessity of an energetic executive," *The Federalist* No. 70, at 472 (Hamilton) (Jacob E. Cooke, ed., 1961), and the legislative branch's historic tendency to "draw[] all power into its impetuous vortex,"

3

*The Federalist* No. 48, at 333 (Madison) (Jacob E. Cooke, ed., 1961), it is critical that the President's authority to direct and supervise the executive branch in the performance of its functions be protected from legislative encroachment. As a result, the Supreme Court has recognized only two exceptions to the President's otherwise "exclusive and illimitable power of removal." *Humphrey's Ex'r v. United States*, 295 U.S. 602, 627 (1935); *see also Seila Law*, 591 U.S. at 215 (referring to the President's "unrestricted removal power"). Neither exception covers a member of PCLOB.

The first exception is for certain inferior officers, and it has been applied to only two: a naval cadet-engineer, *United States v. Perkins*, 116 U.S. 483 (1886), and the so-called independent counsel, *Morrison v. Olson*, 487 U.S. 654 (1988). Whatever its continuing vitality, that inferior-officer exception is inapplicable to members of PCLOB. Members of PCLOB, who are appointed by the President and confirmed by the Senate, 42 U.S.C. § 2000ee(h)(1), do not have a superior other than the President. *See, e.g.*, *id.* § 2000ee(e)(1)(B)(i)(II) (Board reports directly to the President). They thus qualify as principal officers under the chief criterion the Supreme Court has recognized for determining whether an

4

Officer of the United States is principal or inferior. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 13 (2021); *Edmond v. United States*, 520 U.S. 651, 662–63 (1997).

The second exception, recognized in *Humphrey's Executor* and later in *Wiener v. United States*, 357 U.S. 349 (1958), is for "a multimember body of experts, balanced along partisan lines, that perform[s] legislative and judicial functions and [i]s said not to exercise any executive power." *Seila Law*, 591 U.S. at 216. That exception does not apply here either, because PCLOB exercises substantial executive power. First, it is expressly situated "within the executive branch." 42 U.S.C. § 2000ee(a). Pursuant to its duty to "ensure that liberty concerns are appropriately considered in the development and implementation of laws, regulations, and policies related to" combating terrorism, *id.* § 2000ee(c)(2), PCLOB "advise[s] the President and the departments, agencies, and elements of the executive branch," *id.* § 2000ee(d)(1)(C). "Producing advice for the President and to his delegees is a quintessential example of a 'purely executive' function," *Severino v. Biden*, 71 F.4th 1038, 1048 (D.C. Cir. 2023) (quoting *Wiener*, 357 U.S. at 352), and PCLOB thus exercises

quintessentially executive power. *Cf.* 42 U.S.C. § 2000ee(*l*)(1)–(2) (clarifying that the Board is formally an "agency" and not an "advisory committee").

In addition to their authority to "make recommendations to [] privacy officers and civil liberties officers regarding their activities," PCLOB members may "coordinate the activities of such privacy officers and civil liberties officers on relevant interagency matters." *Id.* § 2000ee(d)(3)(B)–(C). The Board also conducts investigations under its authority to "interview, take statements from, or take public testimony from personnel of any department, agency, or element of the executive branch" and its authority to solicit subpoenas from the Attorney General. *Id.* § 2000ee(g)(1)(B)–(D). Finally, the Board reports its findings directly to Congress and the President. *Id.* § 2000ee(e)(1)(B)(i). PCLOB therefore exercises a significant "part of the executive power vested by the Constitution in the President" and should be considered part of the executive department. *Humphrey's Ex'r*, 295 U.S. at 628. The members of PCLOB must be fully accountable to the President, like any other executive officers, and cannot be shielded from presidential supervision by a statute.

If there were any question about that analysis, the *Humphrey's Executor* exception should be interpreted as narrowly as possible. *Humphrey's Executor* indulged the fiction that a so-called "independent" agency "exercises no part of the executive power vested by the Constitution in the President." 295 U.S. at 628. It went so far as to propose the existence of a new class of officers—"a *de facto* fourth branch of Government," *Seila Law*, 591 U.S. at 240 (Thomas, J., concurring)—that acted "in part quasi-legislatively and in part quasi-judicially." *Humphrey's Ex'r*, 295 U.S. at 628. *Humphrey's Executor* did so based on reasoning "devoid of textual or historical precedent for the novel principle it set forth." *Morrison*, 487 U.S. at 726 (Scalia, J., dissenting). If an officer exercises "quasi-legislative" power, that officer belongs in the legislative branch. If, on the other hand, an officer exercises "quasi-adjudicative" power, that officer belongs in the judicial branch. It could hardly be otherwise, since Congress "lacks the authority to delegate its legislative power." *Seila Law*, 591 U.S. at 247 (Thomas, J., concurring) (citing *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001)). Congress also "cannot authorize the use of judicial power by officers acting outside of the bounds of Article III." *Id.* (citing *Stern v. Marshall*, 564 U.S. 462, 484 (2011)). In suggesting the

7

opposite, *Humphrey's Executor* defied one of the most basic principles of the separation of powers embodied in the American experiment.

Not surprisingly, *Humphrey's Executor* has seen its already shaky foundations erode over the years. In *Morrison*, the Supreme Court side-stepped *Humphrey's Executor*'s troublesome reliance "on the terms 'quasi-legislative' and 'quasi-judicial,'" instead grounding its endorsement of tenure protection for the independent counsel on the conclusion that tenure protection did not "unduly trammel[] on executive authority." 487 U.S. at 689, 691. The decision similarly avoided scrutiny in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, in part because the parties there "agree[d] that the Commissioners [of the Securities and Exchange Commission] cannot themselves be removed by the President except under the *Humphrey's Executor* standard of 'inefficiency, neglect of duty, or malfeasance in office.'" 561 U.S. 477, 487 (2010) (quoting *Humphrey's Ex'r*, 295 U.S. at 620). But the majority opinion in *Free Enterprise Fund* is replete with reminders that allowing officers to "execute the laws" without plenary presidential supervision "is contrary to Article II's vesting of the executive power in the President"—a principle squarely in conflict with *Humphrey's Executor*. 561 U.S. at 496. And

most recently, in *Seila Law* and again in *Collins v. Yellen*, 594 U.S. 220 (2021), the Supreme Court took particular care not to widen the application of *Humphrey's Executor* beyond its essential facts.

This history counsels in favor of narrowly applying the exception for politically balanced, multi-member commissions "said not to exercise any executive power." *Seila Law*, 591 U.S. at 216. And because that exception does not fit PCLOB, the members of the Board are not entitled to any removal protections—let alone protections discernible only by implication. But if this Court finds it necessary to enter that thicket, it should not create a PCLOB exception to the President's absolute removal authority.

## II.  By threatening the separation of powers, "independent" executive officers and agencies in turn threaten state sovereignty.

Federalism concerns also weigh in the balance. Indeed, whether Congress may shield executive officials from presidential oversight has grave ramifications for *amici* States. Before joining the union, "the several States had absolute and unlimited sovereignty within their respective boundaries." *Respublica v. Cobbett*, 3 U.S. 467, 473 (Pa. 1798). By entering a compact under the Constitution, the States "surrendered"

9

some of that sovereignty to the United States. *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 435 (1793) (Iredell, J., dissenting). But "in every instance where [their] sovereignty ha[d] not been delegated to the United States, [the States remained] completely sovereign." *Id*. The result was a "system of government" that "differ[ed], in form and spirit, from all other governments, that ha[d] [t]heretofore existed in the world"—a carefully calibrated balance of power between States and the federal government. *Respublica*, 3 U.S. at 473. "[T]he United States ha[s] no claim to any authority but such as the States have surrendered to [it]." *Chisholm*, 2 U.S. at 435 (Iredell, J., dissenting).

When ceding that sovereign power, the States ensured that it would be divided among distinct branches of the federal government. They "viewed the principle of the separation of powers as the central guarantee of a just government." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 870 (1991). To protect their sovereignty and preserve individual liberty, the founding States "scrupulously avoid[ed] concentrating power in the hands of any single individual." *Seila Law*, 591 U.S. at 223. The one exception was the executive branch. Because an "energetic executive" is "essential" to perform that branch's "unique responsibilities," the

Framers decided to "fortif[y]" that power in "one man." *Id.* at 223–24. To mitigate their concerns over power consolidation, they made the executive branch "the most democratic and politically accountable" in the federal government. *Id.* at 224. Only the President and Vice President are "elected by the entire Nation." *Id.* And because of the nature of the electoral college, they are elected not just by the People, but also by the States.

Independent agencies threaten this compact. *See, e.g.*, *Seila Law*, 591 U.S. at 246 (Thomas, J., concurring) (observing that cases like *Humphrey's Executor* "laid the foundation for a fundamental departure from our constitutional structure"). They represent one of the founding States' worst fears: the consolidation of power in one or a few democratically unaccountable officials. 591 U.S. at 222–24. Without "a politically accountable officer [to] take responsibility" for the exercise of executive power, "the public [and the States] can only wonder 'on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall.'" *Arthrex*, 594 U.S at 16 (quoting *The Federalist* No. 70, at 476 (A. Hamilton) (Jacob E. Cooke, ed., 1961)). By eviscerating the "clear and effective chain of command down from the

President, on whom all people vote," the actions of independent agencies are deprived of "legitimacy and accountability to the public." *Id.* at 11 (internal quotation marks omitted).

## III. LeBlanc and Felten are not entitled to reinstatement in any event.

Finally, whatever the Court's views on the merits, LeBlanc and Felten are not entitled to reinstatement. First, they did not seek a writ of quo warranto under the D.C. Code, the exclusive remedial process for removed officials. Second, courts sitting in equity have historically lacked the power to reinstate public officials.

### A. LeBlanc and Felten have not invoked the exclusive avenue for challenging a federal officer's removal—a writ of quo warranto—which itself does not authorize reinstatement.

Congress may "foreclose" freestanding legal avenues for relief and instead channel legal challenges through a statutory enforcement scheme. *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 328–29 (2015); *see Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 19–20 (1981). To express such an "intent," *Armstrong*, 575 U.S. at 328, Congress typically codifies a "comprehensive" enforcement and "remedial scheme" for a given context, *Nw. Airlines, Inc. v. Transp.*

*Workers Union of Am., AFL-CIO*, 451 U.S. 77, 93–94 (1981). In *Sea Clammers*, for example, the Supreme Court determined that two federal environmental laws were "elaborate enforcement provisions" sufficient to foreclose alternative enforcement through other causes of action. 453 U.S. at 13–15. Those federal laws "conferr[ed] authority to sue . . . both on government officials and private citizens" for violations of those laws, and "specified procedures" that must be complied with and the particular remedies available. *Id*. at 13–14. Given that "comprehensive enforcement scheme," the Court concluded that Congress "must be chary" in allowing other means of enforcement—even other express causes of action like 42 U.S.C. § 1983. *Id.* at 14–15, 20.

Congress has similarly erected a broad remedial scheme for federal officers challenging their removals: the D.C. Code's quo warranto process. *See* D.C. Code § 16-3501 *et seq*.

Historically, the writ of quo warranto was the exclusive process for clearing one's title to office. *Delgado v. Chavez*, 140 U.S. 586, 590 (1891) ("[Q]uo warranto is a plain, speedy, and adequate, as well as the recognized, remedy for trying the title to office[.]"). That writ derived from ancient England and was used by "the king, against one who usurped or

13

claimed any office, franchise or liberty of the crown, to inquire" into whether that individual had the right to exercise that office, franchise, or liberty. James L. High, *Extraordinary Legal Remedies* §§ 591–92 (1896) (quo warranto literally means "by what right"). The king's attorney general "prosecuted" the suit, *id.* § 603, though eventually private individuals were able to use the writ to litigate their own disputes over title to office and "quiet the possession" of that office, *id.* § 602.

Congress built upon that common law in enacting the modern quo warranto framework. *See* Pub. L. No. 88-241, § 1, 77 Stat. 602 (1963). The result is a reticulated process for a removed federal officer to challenge her removal. *See Andrade v. Lauer*, 729 F.2d 1475, 1497–98 (D.C. Cir. 1984). It dictates what situations are covered: where a person "usurps, intrudes into, or unlawfully holds or exercises" a federal office. D.C. Code § 16-3501. It provides how the law is enforced: a "civil action" against the intruder, *id.*, with specific rules about pleading, *id.* §§ 16-3541, 3544; and "notice" to the alleged intruder, *id.* § 16-3542. And the Code tells litigants where to sue: in "the United States District Court for the District of Columbia." *Id.* § 16-3501.

The statute also details who may enforce the provisions: usually, the Attorney General or a United States attorney. *Id.* §§ 16-3502, 3503. But "[i]f the Attorney General or United States attorney refuses" to sue, an "interested person may apply to the court" to proceed anyway. *Id.* §§ 16-3503; *see also Newman v. United States ex rel. Frizzell*, 238 U.S. 537, 544, 550–51 (1915) (explaining that the Code "gives a person who has been unlawfully ousted before his term expired, a right, on proof of interest, to the issuance of the writ").

Last, as critical here, the Code outlines the available remedies. If quo warranto is issued, the district court must "oust[] and exclude[]" the intruder from office and allow "the relator [to] recover his costs" from the litigation. *Id.* § 16-3545. And the Code authorizes compensatory damages, permitting the "relator" to sue "the party ousted and recover the damages sustained by the relator" after obtaining judgment in the initial quo warranto case. *Id.* § 16-3548.

"Given the painstaking detail with which the [D.C. Code] sets out the method" for challenging a removal, "Congress intended" the Code to be the "exclusive" process for testing one's title to office. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 11–13 (2012). Yet LeBlanc and Felten did not so

much as mention "quo warranto" in their complaint, let alone invoke the D.C. Code's quo warranto process or allege facts showing that they have complied with its procedural requirements. *See generally* DE1.

One way or another, the Code does not permit the reinstatement LeBlanc and Felten seek. It authorizes just three remedies for federal officers challenging their removals: (1) legal "oust[er]" of the "intrude[r]," (2) physical "exclu[sion]" of the intruder from the office, and (3) "damages" for the removed official. D.C. Code §§ 16-3545, 16-3548. Nowhere does the code authorize reinstatement, either through an injunction or a writ of mandamus. *See Transam. Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979) (When a statute "expressly provides a particular remedy or remedies," courts "must be chary of reading others into it."). That silence is deafening, given that Congress did authorize reinstatement in the Code for quo warranto proceedings involving D.C.-based corporations. *See* D.C. Code §§ 16-3547 ("[T]he court may render judgment . . . that the relator, if entitled to be declared elected, be admitted to the office."), 16-3546 (authorizing the court to "perpetually restrain[] and enjoin[] [defendants] from the commission or continuance of the acts complained of"). "When Congress includes particular language in one section of a statute

16

but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning." *Bittner v. United States*, 143 S. Ct. 713, 720 (2023). Here, the difference is that Congress permitted reinstatement for corporate officers, but left to the President the power to reinstate federal officers. *Cf. Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("[T]he character of those who [may] exercise government authority" "is a decision of the most fundamental sort for a sovereign entity[.]").

In sum, LeBlanc and Felten failed to travel under the D.C. Code—Congress's chosen mechanism for adjudicating federal-officer removals. Nor does the Code authorize the relief they seek. For either reason, this Court should reverse the district court's award of summary judgment to LeBlanc and Felten.

### B. Even if LeBlanc and Felten can seek relief outside of quo warranto, the federal courts cannot grant their requested relief.

Independent of that, LeBlanc and Felten's claim fails because courts sitting in equity have never been empowered to reinstate public officials. LeBlanc and Felten cannot dodge that limitation by requesting a declaration or a writ of mandamus.

### 1. Historically, equity courts did not remedy allegedly unlawful removals.

"The remedial powers of an equity court . . . are not unlimited." *Whitcomb v. Chavis*, 403 U.S. 124, 161 (1971). Federal courts may issue only equitable remedies "traditionally accorded by courts of equity." *Bessent v. Dellinger*, 145 S. Ct. 515, 517 (2025) (Gorsuch, J., joined by Alito, J., dissenting) (quoting *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). And history teaches that "[a] court of equity has no jurisdiction over the appointment and removal of public officers." *Walton v. House of Representatives of Okla.*, 265 U.S. 487, 490 (1924); *Dellinger*, 145 S. Ct. at 517 (Gorsuch, J., dissenting) (finding it "well settled that a court of equity has no jurisdiction over the appointment and removal of public officers" (quoting *In re Sawyer*, 124 U.S. 200, 212 (1888)).

That rule flows from English common law. Recognizing the critical "distinction between judicial and political power," English courts would not wield equity to vindicate a litigant's "political right[]" to office. *Georgia v. Stanton*, 73 U.S. (6 Wall.) 50, 71, 76 & n.20 (1867) (collecting cases); *see Sawyer*, 124 U.S. at 212 (collecting cases, including *Att'y Gen. v. Earl of Clarendon*, 17 Ves. Jr. 491, 498, 34 Eng. Rep. 190, 193 (Ch. 1810)). In

18

*Earl of Clarendon*, for instance, the English Court of Chancery declined to remove public-school officers for lack of necessary legal qualifications. 34 Eng. Rep. at 191. According to that court, a court of equity "has no jurisdiction with regard either to the election or the [removal] of" officers. *Id.* at 193. Contemporary English cases agreed. *See* Joseph Story, *Commentaries on Equity Pleadings and the Incidents Thereof* §§ 467–70 (2d ed. 1840) (explaining that equity courts would not adjudicate rights of a "political nature"); Seth Davis, *Empire in Equity*, 97 Notre Dame L. Rev. 1985, 2011–12 (2022).[1]

---

[1] Although *Earl of Clarendon* and some cases cited in *Sawyer* involved corporate officers, those legal entities were treated more like governments and public entities. Colonial governments, for instance, were created through corporate charters, with "shareholders" acting like modern-day voters and voting for corporate boards that looked like modern-day state and local governments. Nikolas Bowie, *Why the Constitution Was Written Down*, 71 Stan. L. Rev. 1397, 1416–21 (2018); *see also* Letter from John Adams to the Inhabitants of the Colony of Massachusetts-Bay (Apr. 1775), https://founders.archives.gov/documents/Adams/06-02-02-0072-0015. And as noted in *Hagner v. Heyberger*, limits on equitable jurisdiction that applied to "private corporations" apply "*à fortiori*" to "public officer[s] of a municipal character." 7 Watts & Serg. 104, 105 (Pa. 1844); *see also* W.S. Holdsworth, *English Corporation Law in the 16th and 17th Centuries*, 31 Yale L.J. 382, 383–84 (1922) (For both public and private corporations, "creation by and subordination to the state are the only terms upon which the existence of large associations of men can be safely allowed to lead an active life.").

American courts imported that principle after the Framing. In the early 19th century, courts nationwide denied equitable relief to removed officials, even when the official's ouster was illegal and unauthorized. *Tappan v. Gray*, 9 Paige Ch. 506, 508-09 (Ch. Ct. N.Y. 1842); *see also Hagner*, 7 Watts & Serg. at 105; *Sawyer*, 124 U.S. at 212 (collecting cases). *Hagner* is emblematic. There, the Supreme Court of Pennsylvania declined to enjoin a defendant from unlawfully acting as a school director because it possessed no more power than "an English court of chancery." 7 Watts & Serg. at 106–07. Because chancery courts traditionally "would not sustain the injunction proceeding to try the election or [removal] of corporators of any description," Pennsylvania's high court held that it could not either. *Id*. Other courts took a similar tack throughout Reconstruction.[2]

---

[2] *See, e.g.*, *Cochran v. McCleary*, 22 Iowa 75, 91 (1867) ("The right to a public office or franchise cannot, as the authorities above cited show, be determined in equity."); *Delahanty v. Warner*, 75 Ill. 185, 186 (1874) (similar); *Sheridan v. Colvin*, 78 Ill. 237, 247 (1875) (similar); *Beebe v. Robinson*, 52 Ala. 66, 73 (1875) (similar); *Taylor v. Kercheval*, 82 F. 497, 499 (C.C.D. Ind. 1897) (similar); *State ex rel. McCaffery v. Aloe*, 54 S.W. 494, 496 (Mo. 1899) (similar).

The Supreme Court confirmed that equitable constraint in *Sawyer*. A locally elected officer there obtained a federal injunction barring local officials from removing him. 124 U.S. at 204–06. After the local officials were held in contempt of that injunction, the Court issued a writ of habeas corpus to vacate their convictions because the injunction was issued without jurisdiction. The Court explained that a federal equity court "has no jurisdiction . . . over the appointment and removal of public officials." *Id.* at 210.[3] And a wall of contemporary treatises echoed that understanding.[4] As one 19th-century commentator put it, "[n]o principle of the law of injunctions" "is more definitely fixed or more clearly established than that courts of equity will not interfere by injunction to determine questions concerning the appointment of public officers or their title to office." 2 High, *Law of Injunctions* § 1312.

---

[3] *See also White v. Berry*, 171 U.S. 366, 377 (1898); *Walton*, 265 U.S. at 490; *Baker v. Carr*, 369 U.S. 186, 231 (1962).

[4] *See* 2 James L. High, *Treatise on the Law of Injunctions* § 1312 (2d ed. 1880); 1 Howard Clifford Joyce, *A Treatise on the Law Relating to Injunctions* § 55 (1909); 4 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 1760 (4th ed. 1918); 2 Eugene McQuillin, *A Treatise on the Law of Municipal Corporations* § 582 n.98 (1911).

By contrast, there is no established tradition of equity courts remedying unlawful removals, at least not without statutory authorization. *See Dellinger*, 145 S. Ct. at 517 (Gorsuch, J., dissenting) ("'No English case' involved 'a bill for an injunction to restrain the appointment or removal of a municipal officer.'" (quoting *Sawyer*, 124 U.S. at 212)). We know of only two cases[5] in which a federal court sitting in equity reinstated a removed officer, both of which were decided in the later 20th century, and neither of which grappled with limits on federal remedial power. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("[D]rive-by" rulings have "no precedential effect."). The lack of historical pedigree for removal-related remedies proves that they were "unknown to traditional equity practice." *Grupo Mexicano*, 527 U.S. at 327.

The absence of a historical equitable remedy is confirmed by the presence of a historical *legal* remedy: the writ of quo warranto. As this Court has acknowledged, "the exclusive remedy" for "direct[ly] attack[ing]" one's removal has traditionally been "a *quo warranto* action."

---

[5] *Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983); *Vitarelli v. Seaton*, 359 U.S. 535 (1959).

*Andrade*, 729 F.2d at 1497; *see also Johnson v. Horton*, 63 F.2d 950, 953 (9th Cir. 1933) (agreeing with appellees that "the question of the title to the office cannot be tried by a proceeding in equity, but that the exclusive remedy is by a writ of quo warranto" (quotation omitted)). And because a "court of equity will not entertain a case for relief where the complainant has an adequate legal remedy," quo warranto undercuts any "novel equitable power to return an agency head to his office." *Dellinger*, 145 S. Ct. at 517 (Gorsuch, J., dissenting) (quoting *Case v. Beauregard*, 101 U.S. 688, 690 (1880)).

The district court's decision to award injunctive relief thus defies limitations imposed by Congress in the federal quo warranto statute as well as Supreme Court precedent. *See Walton*, 265 U.S. at 490 (a federal "court of equity has no jurisdiction over the appointment and removal of public officers"). The Supreme Court has not backtracked from this precedent. In *Sampson v. Murray*, far from blessing reinstatement, the Court questioned whether it was a permissible equitable remedy and avoided the question by denying relief for lack of irreparable harm. 415 U.S. 61, 69–72, 91–92 (1974). And in *Vitarelli v. Seaton*, 359 U.S. 535 (1959), the Court actually conceded the statutory authority of the Secretary of the

23

Interior to "discharge summarily an employee in petitioner's status, without the giving of any reason," but faulted the Secretary for having departed from self-imposed procedural standards. *Id.* at 539. In defending the removal of the employee in that case, the government did not raise limits on the equitable authority of the Court. *See* Brief of the United States, *Vitarelli v. Seaton*, 359 U.S. 535 (1959) (No. 101), 1959 WL 101881. Nor did the Court address any in its opinion. On the question of remedy, therefore, *Vitarelli* constitutes a mere "drive-by" ruling with "no precedential effect." *Steel Co.*, 523 U.S. at 91.

Similarly unavailing to LeBlanc and Felten are this Court's decisions in *Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996), and *Severino v. Biden*, 71 F.4th 1038 (D.C. Cir. 2023). Those cases addressed the redressability prong of standing, not the ultimate remedial authority of the Court. "[T]he redressability prong of the standing test is not an inquiry into the scope of the court's power to grant relief." *In re Thornburgh*, 869 F.2d 1503, 1511 (D.C. Cir. 1989). The redressability prong "*assumes* that a decision on the merits would be favorable and that the requested relief would be granted" and asks only "whether that relief would be likely to redress the party's injury." *Id*. Thus, previous determinations that some

plaintiffs "sufficiently allege[d]" the availability of "*de facto*" reinstatement for standing purposes, *Severino*, 71 F.4th at 1043, have no bearing on whether a court in fact can provide such relief.[6]

Neither the panels nor the parties in those cases mentioned the *Sawyer* line of decisions, and "it is black-letter law that cases are not precedent for issues that were not raised or decided." *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 195 (D.C. Cir. 2018) (Kavanaugh, J., dissenting), *abrogated on other grounds by Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020). Whether *Sawyer* bars the injunctions theorized in those cases "merely lurk[ed] in the record," *Webster v. Fall*, 266 U.S. 507, 511 (1925), so neither *Swan* nor *Severino* "constitute[s] precedent[]" on the issue, *Stapf v. United States*, 367 F.2d 326, 330 (D.C. Cir. 1966).

Any other reading of *Swan* and *Severino* would conflict with this Court prior precedent in *Andrade v. Lauer*. In *Andrade*, the court

---

[6] It is unclear how "*de facto*" reinstatement—a court order requiring executive branch officials to permit someone to exercise the power of an office he does not hold—would be any less an encroachment on the separation of powers than formal reinstatement. In any event, the district court here ordered both de facto and formal reinstatement. DE24 at 66; DE25 at 1–2.

accepted that "the exclusive remedy" for a "'direct' attack" on removal "is a *quo warranto* action," not a suit in equity. 729 F.2d at 1497. Though the court carved out a narrow equitable exception through which a court may "indirect[ly]" remedy a removal by "restrain[ing] invalidly appointed officers" from performing their duties, *id.* at 1496–98, it left intact the general principle that direct efforts to confirm entitlement to office must travel through quo warranto, *see id.* at 1497–99. That principle contradicts the injunctions proposed in *Swan* and *Severino* and the injunction imposed by the district court here. And because *Andrade* predates both cases, it controls. *United States v. Old Dominion Boat Club*, 630 F.3d 1039, 1045 (D.C. Cir. 2011).

## 2. Declaratory relief is unavailable because it too is a form of equitable relief.

The same considerations foreclose declaratory relief. After all, "declaratory judgment action[s] are equitable in nature." *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 (11th Cir. 2005); *see also Eccles v. Peoples Bank*, 333 U.S. 426, 431 (1948) (calling "declaratory judgment[s]" a "form[] of equitable relief"); *Abbott Lab'ies v. Gardner*, 387 U.S. 136, 155 (1967) (holding that "[t]he declaratory judgment and injunctive remedies are equitable in nature"). Congress, as well as the courts, has adopted

26

that view. *See* 15 U.S.C. § 2805(b)(1) (stating that "the court shall grant such equitable relief as the court determines is necessary . . . including declaratory judgment"); 8 U.S.C. § 1252(e)(1) (prohibiting "declaratory, injunctive, or other equitable relief" in certain circumstances).

That rule makes sense. A declaration "has virtually the same practical impact as a formal injunction would," *Samuels v. Mackel*, 401 U.S. 66, 72 (1971), such that "equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment," *id.* at 73. "Congress had explicitly contemplated that the courts would decide to grant or withhold declaratory relief on the basis of traditional equitable principles." *Id.* at 70. "[A] declaratory judgment is" therefore "not available when," as here, "the result would be a partial end run around" other equitable precedents. *Green v. Mansour*, 474 U.S. 64, 73 (1985).

As a result, declaratory relief—like its injunctive sibling—provides no quarter for LeBlanc and Felten.

### 3.    LeBlanc and Felten have not shown a clear legal right to obtain mandamus.

The district court determined finally that "if injunctive relief were found to be unavailable to" LeBlanc and Felten, it "would have to

27

conclude that mandamus would be appropriate." DE24 at 69. The court was mistaken for two reasons. First, as noted above (Part III.A), Congress displaced any use of mandamus to reinstate federal officers through the quo warranto statute. Second, even if federal courts could use mandamus to reinstate officers, mandamus may issue only if the defendant has shirked a "clear" legal duty, and the duties implicated here are far from clear. *Heckler v. Ringer*, 466 U.S. 602, 615–16 (1984).

1. It is still uncertain whether LeBlanc and Felten hold legitimate title to office, and they may not establish that title for the first time in a mandamus proceeding. Rather, they must first settle the cloud over their title through the quo warranto process. *See, e.g.*, *People ex rel. Arcularius v. City of New York*, 3 Johns. Cas. 79, 79–80 (N.Y. Sup. Ct. 1802) ("The proper remedy, in the first instance, is by an information in the nature of a quo warranto, by which the rights of the parties may be tried."); High, *Extraordinary Legal Remedies* § 49. Only then would their titles be sufficiently "clear" to justify reinstatement through mandamus. *Heckler*, 466 U.S. at 615–16.

That staged process has stood for centuries. Courts used mandamus to "compel" only "clear and specific dut[ies]" that were "positively

required by law." High, *Extraordinary Legal Remedies* § 24. Yet at common law, "the only efficacious and specific" way to clear up one's "title to an office" was through the writ of quo warranto. *Id.* § 49; *see also Delgado v. Chavez*, 140 U.S. 586, 590 (1891); *State v. Otis*, 230 P. 414, 458 (Wash. 1924) ("The petition here shows that the title to an office is involved, and that is a question which may arise just as well where there is only one person asserting title as where there are two."); *People ex rel. Dolan v. Lane*, 55 N.Y. 217, 219 (Ct. App. 1873) ("Indeed, it is doubtful whether the title to an office ought ever to be tried collaterally on proceedings by mandamus instituted in behalf of a party out of possession."). Until quo warranto issued to clarify one's title to office, disputes over title precluded the clarity necessary for reinstatement through mandamus. *See French v. Cowan*, 10 A. 335, 340 (Me. 1887).

For that reason, the common law developed a two-step process for a removed officer seeking to oust an intruder and obtain reinstatement. First, officers would resolve clouds on their title through quo warranto: Through "*quo warranto*," the courts would "test the title to the office." *Id.*

at 340.[7] Then, the aggrieved official would seek mandamus if the executive refused to restore them to their office: "[B]y *mandamus* the legal officer is put in his place." *Id.*; *see also Chi. Sch. Finance Auth. v. City Council of City of Chi.*, 472 N.E.2d 805, 808 (Ill. 1984) (refusing to issue writ of mandamus because the court had "confidence that the city council will perform its [legal] duty"); *Murray v. Lewis*, 576 So. 2d 264, 267 (Fla. 1990) (similar). Congress presumptively incorporated the same limitations into the modern mandamus framework. *See Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 538 (2013) (Congress legislates against the backdrop of common law); *see also Heckler*, 466 U.S. at 616 (noting that "[t]he common-law writ of mandamus" is "codified in 28 U.S.C. § 1361").

LeBlanc and Felten do not lay a glove on that common-law analysis. The common law teaches that removed officials must first clear title through quo warranto, and only then seek reinstatement through mandamus. Yet LeBlanc and Felten have neither sought quo warranto nor

---

[7] *See also King v. Mayor of Colchester*, 100 Eng. Rep. 141, 141–42 (K.B. 1788); *City of New York*, 3 Johns. Cas. at 79; *Queen v. Councillors of Derby*, 112 Eng. Rep. 528, 528–29 (Q.B. 1837); *Queen v. Phippen*, 112 Eng. Rep. 734, 735 (Q.B. 1838); *Bonner v. State*, 7 Ga. 473, 479–80 (1849).

met the procedural prerequisites for that writ. *See supra* Part III.A. They thus are not entitled to a writ of mandamus.

2. Finally, even if the Court could determine rights and restore officers through mandamus in one fell swoop, LeBlanc and Felten are not "clear[ly]" right on the merits. *Heckler*, 466 U.S. at 616–17. Given the President's nearly "unrestricted removal power" over officers "who wield executive power," he and his subordinates have no duty to reinstate LeBlanc and Felten. *Seila Law*, 591 U.S. at 204. PCLOB wields "executive power" and does not fall into either of the two narrow exceptions to the President's at-will removal authority. Under our constitutional system, "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." *Id.* at 213 (quoting 1 Annals of Cong. 463 (1789) (J. Madison)). That "illimitable power" has been confirmed by the Supreme Court again and again. *Humphrey's Ex'r*, 295 U.S. at 631; *see also Seila Law*, 591 U.S. at 215. LeBlanc and Felten thus have not shown a clear legal right to interfere with the President's removal of them from an executive office through judicial reinstatement.

31

## CONCLUSION

The Court should reverse.

August 22, 2025                          Respectfully submitted,

                                         JAMES UTHMEIER
                                         *Attorney General of Florida*

                                         */s/ Jeffrey Paul DeSousa*
                                         JEFFREY PAUL DESOUSA
                                         *Acting Solicitor General*
                                         *Counsel of Record*
                                         NATHAN A. FORRESTER
                                         JASON J. MUEHLHOFF
                                         *Chief Deputy Solicitors General*

                                         State of Florida
                                         Office of the Attorney General
                                         PL-01, The Capitol
                                         Tallahassee, FL 32399-1050
                                         (850) 414-3300
                                         *jeffrey.desousa@myfloridalegal.com*
                                         *jenna.hodges@myfloridalegal.com*

                                         *Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

This amicus brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,437 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in 14-point Century Schoolbook, a proportionally spaced typeface.

*/s/ Jeffrey Paul DeSousa*
Jeffrey Paul DeSousa
Acting Solicitor General

## CERTIFICATE OF SERVICE

I certify that on August 22, 2025, I caused this document to be electronically filed with the Clerk of Court using this Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Jeffrey Paul DeSousa*
Jeffrey Paul DeSousa
Acting Solicitor General