**[ORAL ARGUMENT SCHEDULED FOR OCTOBER 28, 2025]**

No. 25-5197

# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘 𝖋𝖔𝖗 𝖙𝖍𝖊 𝕯𝖎𝖘𝖙𝖗𝖎𝖈𝖙 𝖔𝖋 𝕮𝖔𝖑𝖚𝖒𝖇𝖎𝖆 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

TRAVIS LEBLANC and EDWARD FELTEN,

*Appellees*,

*v.*

UNITED STATES PRIVACY AND CIVIL LIBERTIES
OVERSIGHT BOARD, et al.,

*Appellants*.

On Appeal from the U.S. District Court
for the District of Columbia, No. 1:25-cv-00542-RBW
(Hon. Reggie B. Walton)

## BRIEF FOR APPELLEES

Caleb Thompson
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th St.
New York, NY 10019
(212) 836-8000
Caleb.Thompson@arnoldporter.com

Elisabeth S. Theodore
Daniel R. Yablon
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
Elisabeth.Theodore@arnoldporter.com
Daniel.Yablon@arnoldporter.com

*Counsel for Appellees Travis LeBlanc and Edward Felten*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and *Amici*

(a)    <u>Defendants-Appellants</u>: The United States Privacy and Civil Liberties Oversight Board; Beth A. Williams, in her official capacity as a Board Member of the PCLOB; Jenny Fitzpatrick, in her official capacity as Executive Director of the PCLOB; Trent Morse, in his official capacity as Deputy Director of Presidential Personnel; and Donald J. Trump, in his official capacity as President of the United States of America.

(b)    <u>Plaintiffs-Appellees</u>: Travis LeBlanc; Edward Felten.

(c)    <u>Amici</u>: The States of Alabama, Alaska, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, West Virginia, and the Arizona Legislature.

### B. Rulings Under Review

The ruling under review is the opinion and final judgment issued by the Honorable Reggie B. Walton, United States District Court for the District of Columbia on May 21, 2025 in Case No. 25-cv-542 (ECF Nos. 24 and 25).

### C. Related Cases

This case has not previously been before this Court. Appellees are not aware of any related cases under Circuit Rule 28(a)(1)(C)

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF CONTENTS.......................................................................... ii

TABLE OF AUTHORITIES ..................................................................iv

GLOSSARY...................................................................................... xiii

INTRODUCTION ................................................................................1

STATUTES AND REGULATIONS.........................................................3

STATEMENT OF THE CASE................................................................3

    A.   Statutory Background ..............................................................3

          1.   Congress Creates the Privacy and Civil Liberties Oversight Board...........................................................................3

          2.   Congress Reconstitutes the Privacy and Civil Liberties Oversight Board to Remove it from Presidential Oversight ..............4

    B.   The PCLOB's Vital Role Advising Congress and the Public...................8

    C.   The President Fires Appellees Without Cause .........................................14

    D.   The District Court Finds Appellees' Terminations Unlawful and Orders Their Reinstatement ...................................................15

SUMMARY OF ARGUMENT ...............................................................19

ARGUMENT .....................................................................................20

I.   The District Court Correctly Determined that Appellees' Terminations Were Unlawful ...............................................................20

    A.   Binding Precedent Requires this Court to Consider all the Ordinary Tools of Statutory Interpretation...........................................21

    B.   The PCLOB Statute's Text and History Plainly Impose a Removal Restriction .................................................................28

C.   The PCLOB's Structure and Function Plainly Impose a Removal Restriction ...................................................................39

D.   The Constitutional Avoidance Canon Does Not Apply ...........................48

II.   Appellees Were Entitled to Reinstatement ........................................................49

A.   The District Court Had Authority to Order Reinstatement......................49

B.   The District Court Did Not Abuse Its Discretion in Permanently Enjoining Lower Federal Officials to Reinstate Appellees De Facto......52

C.   Appellees Were Also Entitled to Mandamus and Other Relief ...............56

CONCLUSION ....................................................................................................58

CERTIFICATE OF COMPLIANCE .....................................................................59

CERTIFICATE OF SERVICE ..............................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*13th Reg'l Corp. v. Dep't of Interior*,
    654 F.2d 758 (D.C. Cir. 1980)................................................................56

*ACLU v. Clapper*,
    785 F.3d 787 (2d Cir. 2015) .....................................................11, 13

*Am. Cetacean Soc. v. Baldrige*,
    768 F.2d 426 (D.C. Cir. 1985)................................................................57

*Baldrige v. Am. Cetacean Soc.*,
    478 U.S. 221 (1986)................................................................57

*Beacon Theatres, Inc. v. Westover*,
    359 U.S. 500 (1959)................................................................52

*Bessent v. Dellinger*,
    145 S. Ct. 515 (2025)................................................................51

*BNSF Ry. Co. v. Loos*,
    586 U.S. 310 (2019)................................................................31

*Carlucci v. Doe*,
    488 U.S. 93 (1988)................................................................23

*Chamber of Com. of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996)................................................................52

*Collins v. Yellen*,
    594 U.S. 220 (2021)................................................................28, 38

*Dellinger v. Bessent*,
    No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ................................52

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
    601 U.S. 42 (2024)................................................................24, 25

*In re DNI/AG 702(h) Certifications 2018*,
    941 F.3d 547 (Foreign Int. Surv. Ct. Rev. 2019)................................................13

*FEC v. NRA Pol. Victory Fund*,
    6 F.3d 821 (D.C. Cir. 1993) ...................................................................34

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    537 F.3d 667 (D.C. Cir. 2008)...........................................................34, 35, 37

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010)..............................................................................34

*FTC v. Tarriff*,
    584 F.3d 1088 (D.C. Cir. 2009) ................................................................33

*Gulfstream Aerospace Corp. v. Mayacamas Corp.*,
    485 U.S. 271 (1988)..............................................................................50

*Harris v. Bessent*,
    No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) ................................49

*Humphrey's Executor v. United States*,
    295 U.S. 667 (1935)...................................... 17, 23, 24, 26, 41, 43, 47

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004)..............................................................................30

*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022) .................................................................34

*Kennedy v. Braidwood Mgmt., Inc.*,
    145 S. Ct. 2427 (2025)......................................................................37, 38

*Koons Buick Pontiac GMC, Inc. v. Nigh*,
    543 U.S. 50 (2004)................................................................................29

*Lac du Flambeau Band of Lake Superior Chippewa Indians v.*
    *Coughlin*,
    599 U.S. 382 (2023).........................................................................24, 25

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) .................................................................55

*LeBlanc v. PCLOB*,
    2025 WL 1840591 (D.C. Cir. July 1, 2025) ......................................................19

*Marbury v. Madison*,
    5 U.S. (1 Cranch.) 137 (1803) ...........................................................49, 53, 56, 57

*Mead Corp. v. Tilley*,
    490 U.S. 714 (1989) .............................................................................................39

*MFS Sec. Corp. v. SEC*,
    380 F.3d 611 (2d Cir. 2004) ...............................................................................34

*Mistretta v. United States*,
    488 U.S. 361 (1989) .............................................................................................42

*Morrissey v. Mayorkas*,
    17 F.4th 1150 (D.C. Cir. 2021) ...........................................................................52

*Musacchio v. United States*,
    577 U.S. 237 (2016) .............................................................................................24

*Muscogee (Creek) Nation v. Hodel*,
    851 F.2d 1439 (D.C. Cir. 1988) ..........................................................................30

*Nevada Comm'n on Ethics v. Carrigan*,
    564 U.S. 117 (2011) .............................................................................................53

*NLRB v. SW Gen., Inc.*,
    580 U.S. 288 (2017) .............................................................................................29

*Parsons v. United States*,
    167 U.S. 324 (1897) .......................................................................................31, 32

*Pub. Citizen, Inc. v. Simon*,
    539 F.2d 211 (D.C. Cir. 1976) ............................................................................45

*Raines v. Byrd*,
    521 U.S. 811 (1997) .............................................................................................53

*Ross v. Blake*,
    578 U.S. 632 (2016) .............................................................................................31

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.,*
　　547 U.S. 47 (2006) ......................................................................30

*Sampson v. Murray,*
　　415 U.S. 61 (1974) ......................................................................49

*In re Sawyer,*
　　124 U.S. 200 (1888) .......................................................49, 50, 56

*Sebelius v. Auburn Reg'l Med. Ctr.,*
　　568 U.S. 145 (2013) ....................................................................24

*SEC v. Bilzerian,*
　　750 F. Supp. 14 (D.D.C. 1990) ..................................................34

*SEC v. Blinder, Robinson & Co.,*
　　855 F.2d 677 (10th Cir. 1988) ...................................................34

*SEC v. Jarkesy,*
　　603 U.S. 109 (2024) ....................................................................34

*Seila Law v. CFPB,*
　　591 U.S. 197 (2020) ........................................ 18, 22, 37, 38, 40, 48

*Severino v. Biden,*
　　71 F.4th 1038 (D.C. Cir. 2023) ......16, 21-22, 24-27, 31, 35-36, 39-42, 48, 50-51

*Soucie v. David,*
　　448 F.2d 1067 (D.C. Cir. 1971) .................................................52

*Stone v. INS,*
　　514 U.S. 386 (1995) ....................................................................30

*Swan v. Clinton,*
　　100 F.3d 973 (D.C. Cir. 1996) ...............................49, 50, 51, 56, 57

*Trump v. CASA, Inc.,*
　　145 S. Ct. 2540 (2025) ................................................................57

*Trump v. Wilcox,*
　　145 S. Ct. 1415 (2025) ................................................................55

*United States v. Hasbajrami*,
   2025 WL 447498 (E.D.N.Y. Feb. 10, 2025) ........................................14

*Vitarelli v. Seaton*,
   359 U.S. 535 (1959)..............................................................49, 50

*Webster v. Doe*,
   486 U.S. 592 (1988)..............................................................49, 50

*White v. Berry*,
   171 U.S. 366 (1898)..............................................................50, 56

*Wiener v. United States*,
   357 U.S. 349 (1958)..........................................................23, 26, 42

*Wikimedia Found. v. Nat'l Sec. Agency*,
   857 F. 3d 193 (4th Cir. 2017) ..............................................13

*U.S. ex rel. Williams v. NEC Corp.*,
   931 F.2d 1493 (11th Cir. 1991) ...........................................30

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952)..............................................................52

*Zevallos v. Obama*,
   793 F.3d 106 (D.C. Cir. 2015) ............................................57

**Statutes**

5 U.S.C.
   § 403.........................................................................................46
   § 706.........................................................................................58

6 U.S.C.
   § 142(c) ...................................................................................46

10 U.S.C.
   § 152(a)(1) ..............................................................................33
   § 9082(a) .................................................................................33

12 U.S.C.
   § 635a(c) .................................................................................33
   § 5491(a) .................................................................................38

**15 U.S.C.**
§ 78d(a) ...............................................................................34

**16 U.S.C.**
§ 5003 ...............................................................................33

**22 U.S.C.**
§ 2511(c) ...............................................................................33

**28 U.S.C.**
§ 1361 ...............................................................................56

**29 U.S.C.**
§ 671(b) ...............................................................................35
§ 1302(c) ...............................................................................35

**42 U.S.C.**
§ 1864(a) ...............................................................................35
§ 2000ee ...............................................................................6
§ 2000ee(a) ...............................................................................29, 37
§ 2000ee(b)(2) ...............................................................................1
§ 2000ee(c) ...............................................................................8
§ 2000ee(d)(1) ...............................................................................9, 45
§ 2000ee(d)(1)(D) ...............................................................................44
§ 2000ee(d)(2) ...............................................................................9
§ 2000ee(d)(2)(D) ...............................................................................45
§ 2000ee(d)(3) ...............................................................................9
§ 2000ee(d)(4) ...............................................................................9, 42
§ 2000ee(e)(1) ...............................................................................9
§ 2000ee(e)(2)(C) ...............................................................................7, 10
§ 2000ee(e)(2)(D) ...............................................................................10
§ 2000ee(f) ...............................................................................43
§ 2000ee(g) ...............................................................................8
§ 2000ee(h)(2) ...............................................................................7, 40
§ 2000ee(h)(3) ...............................................................................8
§ 2000ee(h)(4) ...............................................................................29, 33
§ 2000ee(h)(4)(D) ...............................................................................7, 14
§ 2000ee(h)(5) ...............................................................................15
§ 2000(e)(2)(B) ...............................................................................9

52 U.S.C.
    § 30106(a)(1) ...................................................................34
    § 30106(a)(2) ...................................................................34

Implementing Recommendations of the 9/11 Commission Act of 2007,
    Pub. L. 110-53, 121 Stat. 266 .........................................5, 6, 17, 29

Intelligence Authorization Act for Fiscal Year 2022,
    Pub. L. No. 117-103, 136 Stat. 963 ....................................12

Intelligence Reform and Terrorism Prevention Act of 2004,
    Pub. L. No. 108-458, 118 Stat. 3638 ....................................3, 4, 29, 36

**Rules**

Fed. R. Civ. P. 56(e)(2) ............................................................14

**Legislative Materials**

153 Cong. Rec. 20900 (2007) .....................................................5

170 Cong. Rec. H2329 (April 12, 2024)....................................13

S. Con. Res. 21 (2007) ............................................................5

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation*
    *of Legal Texts* 256-60 (2012) .............................................30

John Solomon and Ellen Nakashima, *White House Edits to Privacy*
    *Board's Report Spur Resignation*, The Washington Post (May 15,
    2007) .................................................................................5

Merriam-Webster's Collegiate Dictionary 1067 (10th ed. 2000)............................33

PCLOB, *Assessments and Recommendations: Authorities Addressing Foreign Racially Motivated Extremism & Privacy and Civil Liberties Impacts* (Jan. 21, 2025), https://documents.pclob.gov/prod/Documents/OversightReport/2810538d-331d-4316-af48-435aa88a631b/PCLOB%20Assessment%20and%20Recommendations%201.17.25%20-%20Completed%20508%20-%20Feb%206%202025.pdf ................................................................ 12

PCLOB, *Current Oversight Projects*, https://www.pclob.gov/OversightProjects ............................................ 15

PCLOB, *Recommendations Assessment Report* (Feb. 5, 2016), https://documents.pclob.gov/prod/Documents/OversightReport/8ab510df-738f-44b5-a73a-08d1336d544d/Recommendations_Assessment_Report_20160205%20-%20Completed%20508%20-%2010252022.pdf ...................................... 10

PCLOB, *Recommendations Assessments Report* (Jan. 29, 2015), https://documents.pclob.gov/prod/Documents/OversightReport/a97a9918-775d-42eb-b426-2ae01838c2a3/Recommendations_Assessment-Report_2015%20-%20Complete%20-%20Nov%202%202022%201544.pdf ......................... 10, 13

PCLOB, *Report and Recommendations on CIA Activities Conducted Pursuant to E.O. 12333*, https://www.pclob.gov/Oversight ............................. 11

PCLOB, *Report on CIA Financial Data Activities in Support of ISIL-Related Counterterrorism Efforts* (Feb. 12, 2022), https://documents.pclob.gov/prod/Documents/OversightReport/d735db57-ab33-4aa0-a4ec-b66638e834b1/PCLOB%20Report%20on%20CIA%20Activities%20-%20FINAL.pdf ........................................................................ 11

PCLOB, *Report on The National Counterterrorism Center* (Dec. 10, 2024), https://documents.pclob.gov/prod/Documents/OversightReport/4ce093a4-d28d-4996-a35b-c11d18e19018/PCLOB%20FY2024%20NCTC%20REPORT%20-%20Completed%20508%20-%20Dec%2017%202024.pdf ............................. 12

xi

PCLOB, *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* (Sept. 28, 2023), https://documents.pclob.gov/prod/Documents/OversightReport/d21 d1c6b-6de3-4bc4-b018- 6c9151a0497d/2023%20PCLOB%20702%20Report,%20508%20 Completed,%20Dec%203,%202024.pdf ............................................................ 12

PCLOB, *Report on The Terrorist Watchlist* (Jan. 23, 2025), https://documents.pclob.gov/prod/Documents/OversightReport/94c d55e0-4df0-464d-b731- 2b467c2f2fd8/PCLOB%20Terrorist%20Watchlist%20Report%20 Unclassified%20-%20Completed%20508%20- %20Feb%205,%202025.pdf ................................................................................ 11

PCLOB, *Statement on PCLOB Review Under Section 3 of Executive Order 14086* (Nov. 5, 2024), https://documents.pclob.gov/prod/Documents/EventsAndPress/ 6e6c7a7b-6036-4d6d-b635- ffb53f68e4f4/Statement%20on%20PCLOB%20Review%20Under %20Section%203%20of%20EO%2014086,%20Completed%2050 8,%20Nov%207%202024.pdf ............................................................................ 13

Transcript of Proceedings Before the Honorable Thomas F. Hogan (Oct. 20, 2025), https://www.dni.gov/files/documents/icotr/51117/ Doc%2010%20%E2%80%93%20Oct.%202015%20FISC%20Hea ring%20Transcript.pdf ...................................................................................... 13

# GLOSSARY

| | |
|---|---|
| CFPB | Consumer Financial Protection Bureau |
| FEC | Federal Election Commission |
| FTC | Federal Trade Commission |
| IRTPA | Intelligence Reform and Terrorism Prevention Act of 2004 |
| PCLOB | Privacy and Civil Liberties Oversight Board |
| SEC | Securities & Exchange Commission |

# INTRODUCTION

To ensure that Americans' security would not come at the expense of liberty, Congress struck a careful balance. Following the September 11, 2001 terrorist attacks, it conferred on the executive branch expansive new counterterrorism powers. But Congress also recognized the need for independent "checks and balances to protect the precious liberties that are vital to our way of life." 42 U.S.C. § 2000ee(b)(2). To that end, Congress created the Privacy and Civil Liberties Oversight Board (PCLOB or Board), a multimember expert body charged with oversight of counterterrorism policies and with reporting to Congress and the public when the executive branch oversteps. And when the White House Counsel meddled in the Board's reporting—redlining its inaugural report to obfuscate controversial surveillance practices—Congress amended the Board's organic statute to insulate it from presidential control. Among other changes, Congress assigned Board members staggered, fixed terms of office and deleted language stating that members served at the President's "pleasure" and under his supervision.

This appeal presents the question whether, notwithstanding those congressional amendments, Board members continue to serve at the President's pleasure and thus are removable at will. Here and below, the government has declined to argue that removal protections for Board members would violate Article II. Indeed, the Board is charged only with providing nonbinding advice and

1

oversight and wields no executive power whatsoever. Instead, the government contends that Board members are freely removable as a matter of statutory construction. In its view, only magic words—an *express* reference to removal—can guarantee the independence of a nonadjudicatory body, no matter how clearly Congress otherwise signaled its intent.

The government is mistaken. As the district court correctly determined in finding appellees' removal unlawful, the PCLOB's organic statute makes unmistakably clear Congress's intent to protect members from at-will removal. The text as a whole supports that judgment, because Congress deliberately deleted language authorizing at-will removal and subjecting the Board to presidential supervision, among myriad corroborative changes. And the Board's structure and function compel the same result. As the Board's history illustrates, and Congress recognized, independent oversight of the executive branch is possible only when Board members can perform their statutory functions free from presidential control. The government's contrary arguments conflict with this Court's repeated holdings and would eviscerate Congress's careful design.

Nor do the government's remedial arguments have merit. Since *Marbury v. Madison*, the Supreme Court has recognized that reinstatement is the appropriate remedy for a wrongfully removed federal officer. And in two recent cases, this Court has expressly held that courts may enjoin subordinate federal officials to reinstate an

2

unlawfully removed officer de facto. Anything less would deny appellees any meaningful relief and give the President license to subvert the checks and balances Congress has imposed on the expansive counterterrorism powers it conferred. Here, appellees' unlawful removal has left the PCLOB without a quorum for more than eight months, preventing the Board from completing reports Congress has requested and from fulfilling its vital statutory role.

The Court should affirm.

## STATUTES AND REGULATIONS

Statutory provisions are contained in the appellants' brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

### 1.    Congress Creates the Privacy and Civil Liberties Oversight Board

Following the September 11, 2001, terrorist attacks, Congress conferred expansive new national-security powers on the executive branch. To ensure those sweeping powers would be exercised consistent with civil liberties, Congress created the PCLOB. *See* Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA) § 1061, Pub. L. No. 108-458, 118 Stat. 3638, 3684-88. In so doing, Congress observed that the "potential shift of power and authority to the Federal Government" after September 11 "calls for an enhanced system of checks and balances to protect the precious liberties that are vital to our way of life." IRTPA

3

§ 1061(a)(2), 118 Stat. at 3684.

As originally constituted in 2004, the Board was housed "within the Executive Office of the President" and was subject to the President's direct control. *Id.* § 1061(b). The statute's "Presidential Responsibility" subsection provided that "[t]he Board shall perform its functions within the executive branch and under the general supervision of the President." *Id.* § 1061(k). By statute, the Board provided "advice" only "to the President" and the "executive branch." *Id.* § 1061(c)(1). The President appointed the majority of the Board without Senate participation, *id.* § 1061(e), meaning that the President could exercise full control over its membership at any time. There was no requirement of partisan balance among Board members; no requirement that members be appointed on the basis of any privacy and civil liberties expertise; and no requirement that members be made available to appear before Congress. *Id.* IRTPA also expressly authorized at-will removal: Board members "serve[d] at the pleasure of the President." *Id.* § 1061(e)(1)(E).

### 2.    Congress Reconstitutes the Privacy and Civil Liberties Oversight Board to Remove it from Presidential Oversight

The Board's original structure failed almost immediately. Subjecting the Board to Presidential supervision left it unable to fulfill its unique advisory and oversight roles. JA131-32. In the Board's first annual report to Congress in 2007, "the Bush administration made more than 200 revisions," "including the deletion of a passage on anti-terrorism programs that intelligence officials deemed 'potentially

4

problematic' intrusions on civil liberties." JA132. The White House explained that these revisions were "appropriate because the board remains legally under the supervision of the Executive Office of the President."[1]

One Board member, Lanny Davis, resigned in protest. At a congressional hearing, Mr. Davis testified that "it simply was not possible to have independent oversight while being treated as if [the Board Members] were part of the White House staff." JA132. Members of Congress expressed concern that "the [B]oard has not been an effective check on [the] administration" because it did not have sufficient "independence and authority." Sen. Dick Durbin, 153 Cong. Rec. 20900, 20981 (2007). The Board was "too dependent upon the goodwill of the White House to exercise its advisory and oversight roles in an impartial manner." Sen. Susan Collins, Concurrent Resolution on the Budget FY 2008, S. Con. Res. 21 at 156 (2007).

Congress acted swiftly to reconstitute the PCLOB as an independent agency and to refocus its purpose and function. JA131-36; *see* Implementing Recommendations of the 9/11 Commission Act of 2007 ("9/11 Commission Act") § 801(a),

---

[1] John Solomon and Ellen Nakashima, *White House Edits to Privacy Board's Report Spur Resignation*, The Washington Post (May 15, 2007), https://www.washingtonpost.com/archive/national/2007/05/15/white-house-edits-to-privacy-boards-report-spur-resignation/c7967467-c99f-4bb5-aa8a-261c6b6273ed/.

Pub. L. 110-53, 121 Stat. 266 (codified as amended at 42 U.S.C. § 2000ee)).  Within

days of Mr. Davis's testimony, both chambers passed a bill removing the Board from

the Executive Office of the President and establishing it "as an independent agency."

*Id.* § 801(a).

The 9/11 Commission Act revised the PCLOB's organic act in multiple ways

to insulate Board members from presidential control and to confirm their non-exec-

utive role.  *Id.* § 801; *see* JA134-37.  Most critically, Congress deleted language stat-

ing that members "serve at the pleasure of the President" and "under the general

supervision of the President."   JA101, 103 (redline comparing 2004 Act to 2007

Act).   Congress eliminated the "Presidential Responsibility" subsection entirely.

JA103.  It removed the Board from the Executive Office of the President and added

language designating it as "independent."  JA96.  It required Senate confirmation

for all members.  JA101.  It added language expressly requiring the Board to assist

Congress with legislation and oversight, including by assisting in "develop[ing] …

laws," providing "review" of executive-branch counterterrorism policy in required

semi-annual reports to Congress, and advising Congress if the executive imple-

mented policies "notwithstanding" the Board's opposition.  JA96, JA99.  It added a

section requiring the Board to "inform the public" of its activities and conclusions.

JA99.  It removed language cabining the Board's advice function to "providing ad-

vice to the President."  JA96.  And it added a guaranteed tenure provision, instructing

that Board members "*shall* serve a term of 6 years," ensuring continuity across Presidential terms.  JA101 (emphasis added).  Subsequently, to avoid lapses in Board membership, Congress provided that, after the expiration of a member's term of office, the member "may continue to serve for up to one year after the date of expiration, at the election of the member," until appointment of a successor.  42 U.S.C. § 2000ee(h)(4)(D).

In addition to insulating the Board from presidential control, the 9/11 Commission Act also added substantive requirements to ensure that the Board's advice and oversight would be nonpartisan, and that its members would be independent experts selected on nonpolitical grounds.  Congress newly mandated that the Board report to Congress not only its bottom-line recommendations, but also "minority views."  *Id.* § 2000ee(e)(2)(C).  Congress further required that members "shall be selected solely on the basis of their professional qualifications, achievements, public stature, expertise in civil liberties and privacy, and relevant experience, and without regard to political affiliation," with "no more than 3 members" belonging "to the same political party."  *Id.* § 2000ee(h)(2).  And the President "shall, before appointing an individual who is not a member of the same political party as the President, consult with [congressional] leadership of that party."  *Id.*  Congress retained a prohibition on the appointment of any sitting "elected official, officer, or employee of the Federal Government"—that is, individuals who could be beholden to the

7

President despite PCLOB's removal from presidential supervision—and forbade PCLOB members from taking on those roles during their tenure. *Id.* § 2000ee(h)(3).

Congress did not authorize the Board to exercise any executive power. It cannot fine or punish anyone. It does not exercise any enforcement power, any power to prescribe regulations, or any power for compulsory process. To obtain information from outside the executive branch, it must ask the Attorney General to issue a subpoena, which the Attorney General may issue or deny in her absolute discretion. 42 U.S.C. § 2000ee(g).

### B.    The PCLOB's Vital Role Advising Congress and the Public

Pursuant to its organic statute, the Board now serves two purposes: to "(1) analyze and review actions the executive branch takes to protect the Nation from terrorism, ensuring that the need for such actions is balanced with the need to protect privacy and civil liberties; and (2) ensure that liberty concerns are appropriately considered in the development and implementation of laws, regulations, and policies related to efforts to protect the Nation against terrorism." *Id.* § 2000ee(c). To fulfill those purposes, the Board by statute performs four principal functions, each designed to provide an independent voice informing Congress and the public of the extent to which the executive branch protects civil liberties and operates consistent with law.

8

First, the Board reviews proposed and existing legislation, regulations, and policies relating to counterterrorism—as well as their implementation—to provide advice to Congress, the executive branch, and the courts on compliance with privacy and civil liberties protections and on proposals to retain or enhance government counterterrorism powers. *Id.* § 2000ee(d)(1). Second, the Board performs an "oversight" function: it is charged to "continually review" executive branch counterterrorism policies, practices, and activities to "determine whether such actions (i) appropriately protect privacy and civil liberties; and (ii) are consistent with governing laws, regulations, and policies regarding privacy and civil liberties." *Id.* § 2000ee(d)(2). Third, the Board reviews reports from executive branch privacy officers and civil liberties officers, making recommendations as appropriate. *Id.* § 2000ee(d)(3). Fourth, "[t]he members of the Board shall appear and testify before Congress upon request." *Id.* § 2000ee(d)(4).

To carry out these functions, the Board must "periodically submit, not less than semiannually, reports" to Congress and the President—reports eventually made public so far as classification authorities permit. *Id.* § 2000ee(e)(1). Those reports, which are directed to the Intelligence, Judiciary, and Homeland Security Committees, must include "information on the findings, conclusions, and recommendations of the Board resulting from its advice and oversight" of the executive branch. *Id.* § 2000(e)(2)(B). And the Board must report "the minority views on any findings,

conclusions, and recommendations of the Board resulting from its advice and over-sight functions," as well as whether the executive branch refused to implement any of its recommendations. *Id*. § 2000ee(e)(2)(C), (D).

The Board's independent status has allowed it to issue a series of ground-breaking reports, often at Congress's specific request, that have been integral to Congress's legislation and oversight concerning counterterrorism activities. JA159-62. For example, after the Edward Snowden leaks in 2013, Congress asked the Board to investigate and report on the operation of two large-scale NSA surveillance programs detailed in those leaks. JA160-61. The Board issued two reports about those programs, ultimately offering 22 recommendations to better protect Americans' civil liberties. JA161.[2]

As the district court recognized, these and other reports have been "weighed … heavily" by Congress. JA159-62. Every single one of the Board's 22 recommendations was ultimately implemented in full or in part—most notably, Congress passed legislation to end the NSA's bulk telephone records program.[3] The Second

---

[2] *See* PCLOB, *Recommendations Assessments Report* at 1 (Jan. 29, 2015), https://documents.pclob.gov/prod/Documents/OversightReport/a97a9918-775d-42eb-b426-2ae01838c2a3/Recommendations_Assessment-Report_2015%20-%20Complete%20-%20Nov%202%202022%201544.pdf.

[3] *See* PCLOB, *Recommendations Assessment Report* at 1-2 (Feb. 5, 2016), https://documents.pclob.gov/prod/Documents/OversightReport/8ab510df-738f-44b5-a73a-08d1336d544d/Recommendations_Assessment_Report_20160205%20-%20Completed%20508%20-%2010252022.pdf.

Circuit also relied on the PCLOB's public analysis of the program in holding that it exceeded the executive's statutory authority. *ACLU v. Clapper*, 785 F.3d 787, 798-99, 815-18 (2d Cir. 2015).

In 2014, the Board announced that it would investigate and report on certain activities of the CIA pursuant to Executive Order 12333.[4]  The report, which identified various privacy and training issues, took eight years to complete,[5] reflecting the Board's unique ability to conduct long-running studies of highly classified and complex programs even as presidential administrations change.

Other examples of the Board's advice and oversight work include the Board's reports from December 2024 and January 2025 examining the standards and procedures for adding and removing individuals on the Terrorist Watchlist, a database which affects approximately 1.1 million people;[6] an oversight report recommending

---

[4] *See* PCLOB, *Report on CIA Financial Data Activities in Support of ISIL-Related Counterterrorism Efforts* at 4, 20-21, 67 (Feb. 12, 2022), https://documents.pclob.gov/prod/Documents/OversightReport/d735db57-ab33-4aa0-a4ec-b66638e834b1/PCLOB%20Report%20on%20CIA%20Activities%20-%20FINAL.pdf.

[5] *See* PCLOB, *Report and Recommendations on CIA Activities Conducted Pursuant to E.O. 12333*, https://www.pclob.gov/Oversight (reflecting filed date for CIA reports of February 12, 2022).

[6] PCLOB, *Report on The Terrorist Watchlist* at 2 (Jan. 23, 2025), https://documents.pclob.gov/prod/Documents/OversightReport/94cd55e0-4df0-464d-b731-2b467c2f2fd8/PCLOB%20Terrorist%20Watchlist%20Report%20Unclassified%20-%20Completed%20508%20-%20Feb%205,%202025.pdf.

that National Counterterrorism Center personnel be required to document justifications for queries seeking information about U.S. citizens;[7] and a congressionally-required report on recommendations to mitigate privacy and civil liberties impacts associated with the government's effort to counter foreign racially motivated violent extremism.  *See* Intelligence Authorization Act for Fiscal Year 2022, § 824(b)(3), Pub. L. No. 117-103, 136 Stat. 963, 1022, 1025.[8]

In addition, the Board is often called upon to provide recommendations to Congress when counterterrorism authorities approach their statutory sunset.   In 2023, in the lead-up to Congress's consideration of the re-authorization of the Section 702 surveillance program, the PCLOB issued a comprehensive report about that program, closing with 19 recommendations.[9]  Congress invited two Board members

---

[7] PCLOB, *Report on The National Counterterrorism Center* at 21 (Dec. 10, 2024), https://documents.pclob.gov/prod/Documents/OversightReport/4ce093a4-d28d-4996-a35b-c11d18e19018/PCLOB%20FY2024%20NCTC%20REPORT%20-%20Completed%20508%20-%20Dec%2017%202024.pdf.

[8] *See* PCLOB, *Assessments and Recommendations: Authorities Addressing Foreign Racially Motivated Extremism & Privacy and Civil Liberties Impacts* at 4 (Jan. 21, 2025), https://documents.pclob.gov/prod/Documents/OversightReport/2810538d-331d-4316-af48-435aa88a631b/PCLOB%20Assessment%20and%20Recommendations%201.17.25%20-%20Completed%20508%20-%20Feb%206%202025.pdf.

[9] PCLOB, *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* at 12-16 (Sept. 28, 2023), https://documents.pclob.gov/prod/Documents/OversightReport/d21d1c6b-6de3-4bc4-b018-6c9151a0497d/2023%20PCLOB%20702%20Report,%20508%20Completed,%20Dec%203,%202024.pdf.

to testify in advance of its reauthorization of Section 702. JA159-60. And multiple members of Congress referenced the PCLOB's Section 702 report during the reauthorization debate. *E.g.*, 170 Cong. Rec. H2329, H2332, H2346 (April 12, 2024).

In addition to advice and congressional oversight, the Board fulfills a number of important roles with several courts. The Board oversees and certifies the procedures of the Data Protection Review Court.[10] The Board also issues recommendations to the Foreign Intelligence Surveillance Court,[11] which has relied upon the Board's findings in assessing whether the executive branch's counterterrorism activities comply with law. *See, e.g.*, *In re DNI/AG 702(h) Certifications 2018*, 941 F.3d 547, 551 n.10, 552 n.24, 553 n.27 (Foreign Int. Surv. Ct. Rev. 2019); Transcript of Proceedings Before the Honorable Thomas F. Hogan (Oct. 20, 2025), at 15-16.[12] Other Article III courts frequently rely on the Board's independent reports in assessing the legality of government surveillance programs. *E.g.*, *ACLU*, 785 F.3d at 798-99, 815, 817-18; *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F. 3d 193, 201-

---

[10] *See* PCLOB, *Statement on PCLOB Review Under Section 3 of Executive Order 14086* (Nov. 5, 2024), https://documents.pclob.gov/prod/Documents/EventsAndPress/ 6e6c7a7b-6036-4d6d-b635- ffb53f68e4f4/Statement%20on%20PCLOB%20Review%20Under%20Section%20 3%20of%20EO%2014086,%20Completed%20508,%20Nov%207%202024.pdf.

[11] PCLOB, *Recommendations Assessments Report* at 1, *supra* note 2.

[12] *Available at* https://www.dni.gov/files/documents/icotr/51117/ Doc%2010%20%E2%80%93%20Oct.%202015%20FISC%20Hearing%20Transcr ipt.pdf.

04, 211, 218 (4th Cir. 2017); *United States v. Hasbajrami*, 2025 WL 447498, at *1-3, *8 (E.D.N.Y. Feb. 10, 2025).

### C.    The President Fires Appellees Without Cause

When President Trump took office in January 2025, four of the Board's five seats were filled.  One seat was filled with an appointee who is a Republican—appellant Beth Williams.  JA138-40.  Three seats were filled with appointees who are Democrats—appellees Travis LeBlanc and Edward Felten, as well as chair Sharon Bradford Franklin.  *Id.*  Mr. LeBlanc's term expires January 29, 2028; Dr. Felten's term expired January 29, 2025, but he is entitled by statute to serve one additional year at his "election," until January 29, 2026, unless a successor is confirmed.  JA137; 42 U.S.C. § 2000ee(h)(4)(D)).

On January 21, 2025, Deputy Director of Presidential Personnel Trent Morse emailed appellees requesting that they resign from the PCLOB and threatening to terminate them if they did not.  JA137-38.  Appellees declined to resign.  JA138.  On January 27, Morse instructed Williams—the sole Republican member of the PCLOB—to effectuate the terminations.  JA138-39.[13]  Ms. Bradford Franklin was also terminated.  Later that day, appellees received, via their non-government email

---

[13] The district court was not "mistaken[]" in labeling facts about appellant Williams' role undisputed.  *Contra* U.S.Br.7 n.2.  The court held that they were undisputed as a matter of law under Fed. R. Civ. P. 56(e)(2), because the government did not deny them on the merits and instead purported to "dispute" them based on a meritless procedural argument.  JA138-39 n.9.

14

addresses, identically-worded "termination" emails from appellant Morse. JA139. Neither the President, Morse, nor any other appellant has cited any cause for appellees' purported terminations. JA140.

With only a single part-time member, the Board now lacks the quorum necessary to perform its statutorily-mandated functions. 42 U.S.C. § 2000ee(h)(5). And in the eight months since appellees' terminations, the President has made no nominations to the Board. At that time, the Board was working on a number of critical issues that impact Americans' privacy and civil liberties, including reports that will educate Congress and the American public on the FBI's use of open-source information; potential First Amendment violations in executive branch efforts to counter domestic terrorism; and the role of tactical terrorism response teams at the border.[14] The Board was also drafting a report to Congress concerning Section 702 of FISA, which authorizes the government to engage in warrantless surveillance involving the incidental collection of emails and other communications from Americans on American soil. *Id.* This report will be critical to Congress's decision whether or how to re-authorize the program before its statutory sunset early next year. JA187-90.

### D.  The District Court Finds Appellees' Terminations Unlawful and Orders Their Reinstatement

Appellees sued, seeking reinstatement. The district court granted summary

---

[14] PCLOB, *Current Oversight Projects*, https://www.pclob.gov/OversightProjects (last visited Sept. 5, 2025).

judgment in their favor on May 21, 2025, holding that the Board's organic statute "clearly indicate[s] that Congress intended to" restrict the President's removal authority. JA126-27. The court explained that, under *Severino v. Biden*, 71 F.4th 1038 (D.C. Cir. 2023), Congress may clearly restrict the President's removal power "in one of two ways: (1) through the 'plain text of the statute,' or 'through the statutory structure and function of an office.'" JA145 (cleaned up) (quoting *Severino*, 71 F.4th at 1044).

As the district court determined, the "structure and function of the PCLOB, as set forth in the statutory text as a whole, makes clear that Congress intended to restrict the President's removal authority regarding members of the PCLOB." JA163. The Board's independence from executive interference, the court found, is "mission critical," because fulfilling its statutory oversight duties necessarily requires it to independently assess executive-branch policies and criticize those policies when appropriate. JA159-60.

The court also noted several textual indicia that Congress designed the Board to operate independent from executive supervision without the threat of at-will removal. When it "reoriented" the PCLOB from an executive advisory board to an oversight body, Congress "clearly patterned [the Board] on the classic multi-member expert board at issue in *Humphrey's Executor*." JA157-59 (quotation marks omitted). Congress mandated "nonpartisan" membership; set staggered terms for

16

members that would prevent a single President from controlling the Board's compo-sition;[15] and assigned it express oversight functions incompatible with at-will re-moval. JA157-59. As reconstituted as an independent agency in 2007, its "function, first and foremost—and consistent with the very name of the Board—is to conduct *oversight*" on Congress's behalf. JA158-59. Ultimately, the "PCLOB's structure and function as a multimember, nonpartisan, expert oversight board is 'operationally incompatible with at-will Presidential removal,' and thus, it is obvious that Congress intended for the Board to perform its statutory duties without "the Damocles' sword of removal by the President' over members' heads." JA162 (quoting *Severino*, 71 F.4th at 1047, and *Wiener v. United States*, 357 U.S. 349, 356 (1958)).

The court then rejected the government's constitutional avoidance argument, determining that the canon was "inapplicable" because the statute "makes clear that Congress intended to restrict the President's removal authority." JA163. Although the government declined to argue that those restrictions contravene Article II—an argument it does not press on appeal either—the district court further held that re-moval restrictions for PCLOB members comported with the Constitution. JA163 n.27. Those restrictions were constitutional under *Humphrey's Executor v. United*

---

[15] The court mistakenly stated that staggering was only "a matter of practice," and not required by statute. JA158 n.19. The staggering was implemented via a "Transition Provisions" section in the 2007 statute that altered the term lengths for the first five Board members. Pub. L. No. 110-53, § 801(c)(2)(B).

*States*, 295 U.S. 667 (1935), and *Seila Law v. CFPB,* 591 U.S. 197 (2020), the court determined, because the PCLOB is a multi-member expert commission that does not exercise substantial executive power. Indeed, the court "doubt[ed]" that the Board exercises any executive power whatsoever. JA164-71.

Finally, the court determined that reinstatement was the appropriate remedy for appellees' unlawful removals. JA171-88. D.C. Circuit precedent is "clear that courts may 'reinstate a wrongly terminated official '*de facto*.'" JA176 (quoting *Severino*, 71 F.4th at 1042-43, and *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996)). And appellees were entitled to that remedy, the court found, because they faced irreparable harm in the form of the deprivation of their "statutory right to function" as Board members, with grave consequences for the Board. JA186, 188. The balance of the equities likewise favored an injunction requiring reinstatement, including because the removals have made it impossible for the Board to function as Congress intended as an "independent watchdog." JA188-91. Absent reinstatement, moreover, the Board would be unable to assist Congress in considering reauthorization of the Section 702 program, as the Board has done at Congress's request in advance of prior statutory sunsets. JA186-87. In the alternative, the court determined that appellees were entitled to reinstatement via mandamus. JA191-94.

The court declared appellees' terminations unlawful and entered a permanent injunction against all appellants other than the President to reinstate them as Board

18

members de facto.  JA197-98.  Appellees then resumed their work on the Board.

On May 28, 2025—a week after the decision—the government moved for a stay pending appeal, which the district court denied on the ground that, because the PCLOB exercises no executive power, the government would suffer no irreparable harm.  JA205-06.  A special panel of this Court granted a stay pending appeal, *Le-Blanc v. PCLOB*, 2025 WL 1840591, at *1 (D.C. Cir. July 1, 2025), and the Court subsequently expedited merits consideration.

## SUMMARY OF ARGUMENT

As this Court has repeatedly held, Congress may clearly express its intent to shield members of multimember expert bodies from at-will removal both through statutory text and through the structure and function of the agency.  That well-established rule comports with the Supreme Court's treatment of other federal officers and clear statement rules in every other context.  The government's position that Congress must instead use magic words expressly referencing for-cause removal conflicts with precedent and would be an aberration in the law.

The district court correctly determined that both the text of the PCLOB's organic statute as a whole and the Board's structure and function clearly express Congress's design to safeguard the Board's independence by protecting its members from removal at will.  Following interference by the White House in the Board's first report, Congress amended the PCLOB's organic statute to remove authorization

19

for removal at will and all references to presidential supervision—statutory history that this Court must give effect. And it adopted myriad other changes, mirroring the structure of other bodies long understood to enjoy removal protections, to safeguard the Board's ability to criticize executive-branch policies and provide Congress its independent advice. Congress recognized, consistent with precedent and common sense, that the Board cannot conduct oversight of the executive's counterterrorism activities if the President can exercise total control over the Board by removing its members at will.

The government's remedial arguments fare no better. Since *Marbury v. Madison*, the Supreme Court has recognized that the reinstatement of wrongly removed federal officials falls squarely within the federal courts' remedial powers. This Court has expressly held that the appropriate remedy for a wrongfully removed officer is to compel subordinate federal officials to reinstate the officer de facto. Moreover, the equities strongly favor such relief here. No remedy short of reinstatement would provide meaningful relief. The district court's permanent injunction and alternative holding that appellees were entitled to the same remedy by mandamus should be affirmed.

## ARGUMENT

## I.    The District Court Correctly Determined that Appellees' Terminations Were Unlawful

The government's theory of this case is that when Congress made sweeping

20

amendments to the PCLOB's organic statute to remove the PCLOB from presidential "supervision" and to eliminate language specifically authorizing at-will removal, Congress in fact intended that the PCLOB members would remain subject to presidential supervision and removal at will. That interpretation is untenable. Traditional tools of statutory interpretation confirm that Congress intended to confer removal protections. The government's principal theory—that Congress can restrict removal only with magic words explicitly referencing removal—is foreclosed by binding precedent.

## A.    Binding Precedent Requires this Court to Consider all the Ordinary Tools of Statutory Interpretation

In *Severino v. Biden*, this Court instructed courts to apply traditional tools of statutory construction to ascertain whether Congress has restricted at-will removal. The Court held that Congress may clearly manifest its intent to do so in two ways. "First, Congress may impose a removal restriction in the plain text of a statute. Second, Congress may clearly indicate its intent to restrict removals through the statutory structure and function of an office." *Severino*, 71 F.4th at 1044 (citation omitted). Those alternative tests apply here: if the text of the PCLOB's organic statute creates a removal protection, or if the PCLOB's structure and function is "operationally incompatible with at-will Presidential removal," *Severino*, *id.* at 1047, the Court must conclude that Congress intended to impose a removal restriction.

21

1.    The government's lead argument is that *Severino*'s test does not apply because, in a series of cases involving single agency heads, the Supreme Court has stated that Congress must speak clearly if it intends to restrict removal power. U.S.Br.22-31.  But as *Severino* explained, its two-part test was an *application* of Supreme Court precedents establishing that "Congress must make it clear in a statute if it wishes to restrict the President's removal power," *Severino*, 71 F.4th at 1044 (citing *Carlucci v. Doe*, 488 U.S. 93, 99 (1988), and that "removal power is the rule, not the exception," *id.* at 1043 (quoting *Seila Law*, 591 U.S. at 228).  That is so because Congress may make its intent to restrict removal power clear through the statutory text as a whole, including if the statutory text reflects that an agency does not wield substantial executive power and instead serves functions that require insulation from executive control.

And where an agency's function does *not* involve exercising executive power, *Severino* explained, there is no cause to apply a "presumption of removability" in the first place.  *Id.* at 1047; *cf. Seila Law*, 591 U.S. at 204 (describing the President's "power to remove—and thus supervise—*those who wield executive power on his behalf*") (emphasis added).  Such removal protections do not implicate the President's Article II power, and indeed the government has never argued here that protecting PCLOB members from at-will removal would pose any constitutional problem.  In those cases, the question is simply whether "Congress may fairly be

22

said to have conferred" the "power of removal." *Wiener*, 357 U.S. at 353.

*Severino*'s two-part test follows directly from the Supreme Court's removal precedents, which recognize that Congress may bar at-will removal without including language explicitly referencing "at-will removal." For example, the government repeatedly cites *Carlucci* for the proposition that, "absent a 'specific provision to the contrary, the power of removal from office is incident to the power of appointment.'" U.S.Br. 14, 19 (quoting *Carlucci*, 488 U.S. at 99). But the very next sentence of *Carlucci* explained that removal was permissible because the respondent had not "shown that Congress expressly *or impliedly* indicated a contrary purpose in the 1959 NSA Act." *Carlucci*, 488 U.S. at 99 (emphasis added).

Likewise, in both *Wiener* and *Humphrey's Executor*, the Supreme Court held that an agency's structure and function, as reflected in the statutory text, could clearly establish Congress's intent to impose removal protections. *Wiener* analyzed the "nature of the function that Congress vested in" an Article II commission as well as the "history of [the] legislation" to conclude that Congress forbade removal at-will, even absent explicit text referencing removal. 357 U.S. at 353-54. *Humphrey's Executor* held that a reference to a fixed term of years, combined with textual authorization of removal for-cause but no express provision barring at-will removal, made it "clear upon the face of the statute" that removals without cause of FTC commissioners were prohibited. *Humphrey's Executor*, 295 U.S. at 623-24. But

*Humphrey's Executor* alternatively held that the "character of the commission" and the history of the FTC's organic statute sufficed to independently establish that Congress intended to restrict removal even absent express language so stating. *Id.* at 624. As this Court has explained, *Humphrey's Executor* held that an agency that "acts 'as a legislative agency' in reporting to Congress and 'as an agency of the judiciary'" is not subject to at-will removal, because the "'character' of both functions is inconsistent with allowing at-will removal by the President." *Severino*, 71 F.4th at 1047 (quoting *Humphrey's Executor*, 295 U.S. at 628-29).

*Severino*'s holding is compelled not just by *Wiener* and *Humphrey's Executor*, but by Supreme Court precedent on clear-statement rules more generally. As the Court has repeatedly held, Congress need not "incant magic words in order to speak clearly." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013). Rather, courts apply all the "'traditional' tools of statutory interpretation" to discern whether Congress clearly intended a particular result—including "text and structure," *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 388 (2023); history, *Musacchio v. United States*, 577 U.S. 237, 246 (2016); and "context, including [the] Court's interpretations of similar provisions," *Sebelius*, 568 U.S. at 153-54. Courts also must consider the statute's function as a whole, particularly whether one interpretation would "effectively negate" other aspects of the statute. *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 51 (2024)

24

(cleaned up). In any clear-statement context, "[w]hat matters is whether" Congress's intent is "'clearly discernible' from the sum total of its work." *Id.* at 54-55. And that is true across contexts that implicate important constitutional principles, including clear statement rules aimed at protecting sovereign immunity. *E.g.*, *Lac du Flambeau*, 599 U.S. at 388; *Kirtz*, 601 U.S. at 48.

2. The government nonetheless contends (U.S.Br.21-28) that *Severino* applies only to "adjudicatory bodies" akin to the War Claims Commission in *Wiener*. For all other agencies, the government apparently contends, a magic-words test applies: not only is structure and function irrelevant, but so too is all text that does not expressly reference removal.

This argument, which the government never made in its summary judgment briefing, JA203, is simply irreconcilable with *Severino*: "[W]hen Congress assigns to an agency quasi-judicial *or quasi-legislative* functions that are deemed to be operationally incompatible with at-will Presidential removal, that can be a relevant signal that Congress meant for members of that agency to be shielded from Presidential removal, even without an explicit textual statement to that effect." 71 F.4th at 1047 (emphasis added). That is, *Severino* expressly rejected the government's theory that structure and function is *only* relevant to quasi-judicial agencies. The government does not cite or address this language and selectively quotes *Severino*'s discussion of quasi-judicial functions while ignoring all

discussion of quasi-legislative functions.  U.S.Br.26-27.

*Severino*, moreover, applied its two-part test to the Administrative Conference of the United States[16]—undisputedly not an "adjudicatory body" and one whose organic statute contained no express reference to for-cause removal.  *See* 71 F.4th at 1048-49.  If the government were right that *Severino*'s "structure and function" test only applied to adjudicatory agencies, *Severino*'s discussion of the statute could have been one sentence long.

Nor is the government's argument persuasive on its own terms.  The government offers no principled or logical reason to conclude that a "quasi-judicial" function can be operationally incompatible with at-will removal while a quasi-legislative function cannot.  The relevant question is whether the function "require[s] absolute freedom from Executive interference."  *Wiener*, 357 U.S. at 353.  As the district court noted, congressional oversight of the executive branch self-evidently requires absolute freedom from executive interference; otherwise, it wouldn't be oversight.  *See* JA158-63.  The principal point of *Humphrey's Executor* was to distinguish the purely executive officer in *Myers v. United States* from a multi-member expert commission that functioned as *both* a "legislative" and a "judicial aid."  *Humphrey's Executor*, 295 U.S. at 628.  A body intended as a legislative aid,

---

[16] References to the Conference in this brief also include the smaller Administrative Council.

no less than a body intended as a judicial aid, "must be free from executive control." *Id.* at 628-31. There is no reason in law or logic why only the latter and not the former function could signal congressional intent to confer removal protections. As this Court specifically recognized, *Humphrey's Executor* determined that "the 'character' of *both* functions is inconsistent with allowing at-will removal by the President." *Severino*, 71 F.4th at 1047 (emphasis added) (quoting *Humphrey's Executor*, 295 U.S. at 628-29).

3.    The government also contends that a footnote in *Collins v. Yellen* forbids this Court from engaging in ordinary, holistic statutory interpretation. U.S.Br.23-24 (citing *Collins v. Yellen*, 594 U.S. 220, 250 n.18 (2021)). A non-precedential motions panel agreed that the *Collins* footnote renders *Severino*'s structure-and-function test inapplicable to agencies that function as legislative aids. U.S.Br.27-28. But appellees respectfully suggest that the motions panel's view was erroneous and foreclosed by *Severino*. *Severino* post-dated (and relied on) *Collins*, and so that case cannot establish that *Severino* was wrong and that a magic-words requirement governs removal for agencies that principally function as a legislative aid, or that consideration of structure and function is prohibited.

Moreover, the government significantly overreads the *Collins* footnote. *Collins* concerned the Federal Housing Finance Agency, an agency with a single head that exercised significant executive power. En route to deciding the

constitutionality of a removal restriction for the FHFA's director, *Collins* held that acting directors enjoyed no similar protection in light of the act's "silence on the matter." *Collins*, 594 U.S. at 250. The court noted that it saw "no grounds for an exception" to the principle that a statute "must contain 'plain language to take'" away the President's "power to remove at will executive officers," *id.* (quoting *Shurtleff v. United States*, 189 U.S. 311, 316 (1903)), and observed in a footnote that *Shurtleff* was a "more applicable precedent" than *Wiener* because the "FHFA is not an adjudicatory body," *id.* at 250 n.18.

*Collins* did not purport to overrule *Humphrey's Executor* or suggest that *Wiener* was the *only* type of non-executive body that might need freedom from executive interference. There is no indication that anyone ever argued that the FHFA served as a legislative aid. As the district court noted, moreover, both *Collins* and *Shurtleff*—unlike *Wiener*, *Humphrey's Executor*, and this case—involved agencies with single heads. JA203-04. And, in any event, *Severino*'s test—which simply considers ordinary tools of interpretation like text, history, structure, and function—is fully compatible with a plain-statement requirement. *See supra* pp.21-25.

## B. The PCLOB Statute's Text and History Plainly Impose a Removal Restriction

As the district court held, the "statutory text as a whole," as well as the PCLOB's "structure" and "function," reflect Congress's unmistakable intent to confer removal protection. JA149, 163. In 2004, Congress established the Board

28

"within the Executive Office of the President," declared that the "Board shall perform its functions within the executive branch and under the general supervision of the President," and stated that all Board members "serve[d] at the pleasure of the President," with no defined tenure of office.  IRTPA § 1061(b), (e)(1)(E), (k), 118 Stat. at 3684, 3687-88.

In 2007, after the President took a red pen to the Board's initial report to Congress, Congress removed the Board from the Executive Office of the President, deleted the prior statute's "serve at the pleasure of the President" provision, deleted language stating that the "Board shall perform its functions … under the general supervision of the President," provided that members "shall serve a term of 6 years," and declared the Board "independent."  9/11 Commission Act, § 801(a), 121 Stat. at 352, 355-56; 42 U.S.C. § 2000ee(a), (h)(4); *see* JA96-104 (2007 redline).

"Statutory construction is a 'holistic endeavor.'"  *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004) (citation omitted).  These key features of the PCLOB's revised organic statute, independently and taken together, confirm Congress's explicit intent to confer removal protections.

1.    Congress's deletion of the "serve at the pleasure of the President" language plainly precludes removal-at-will.  The choice to "remove[] language that expressly" authorized removal without cause would be inexplicable and meaningless if the statute still authorized removal without cause.  *See NLRB v. SW Gen., Inc.*, 580

U.S. 288, 306 (2017).  Such a result would contravene the blackletter interpretive principle that a "significant change in language is presumed to entail a change in meaning."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 256-60 (2012).  The Supreme Court and this Court have reiterated time and again that courts must "give effect" to statutory revisions when interpreting statutory text, and may not adopt interpretations that render a "legislative change" a nullity.  *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 57-58 (2006) (refusing to interpret statute "in a way that negates its recent revision"); *see Stone v. INS*, 514 U.S. 386, 397 (1995); *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444 (D.C. Cir. 1988) ("Where the words of a later statute differ from those of a previous one on the same or related subject, the Congress must have intended them to have a different meaning."); *U.S. ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1502 (11th Cir. 1991).

This rule requires courts to give effect to the deletion of statutory language. In *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), the Supreme Court interpreted 28 U.S.C. § 1782, a statute governing authorization of discovery to assist proceedings in foreign tribunals.  The statute had undergone a "complete revision" in 1964.  *Id.* at 248.  Because the 1964 revision "deleted the requirement that a proceeding be 'pending,'" the Court held, it was bound to interpret the word "proceeding" to include proceedings at the investigative, pre-litigation stage.  *Id.* at

30

248-49, 258-59.  Similarly, in *Ross v. Blake*, 578 U.S. 632 (2016), the Court held that the Prison Litigation Reform Act's exhaustion requirement was mandatory in light of Congress's deletion of language in a predecessor act, because the Court could not adopt an interpretation that "reintroduces [the predecessor law's deleted] requirement."  *Id.* at 641.  Nor can this Court do so here.

The government's interpretation reads the words Congress deleted right back into the statute.  Under the government's reading, Board members *still* "serve at the pleasure of the President."[17]  As Justice Gorsuch, joined by Justice Thomas, has noted, unlike "legislative history," the "record of *enacted* changes Congress made to the relevant statutory text over time" itself constitutes "textual evidence" of meaning.  *BNSF Ry. Co. v. Loos*, 586 U.S. 310, 329 (2019) (Gorsuch, J., dissenting).  Here, the "statutory text as a whole," JA149, demonstrates that PCLOB members no longer "serve at the pleasure of the President."

*Parsons v. United States*, 167 U.S. 324 (1897), confirms that this Court must give effect to Congress's decision to delete the "serve at the pleasure" language.  In

---

[17] The district court did not "reject[]" this argument.  *Contra* U.S.Br.9.  The court rather considered it under *Severino*'s "structure and function" prong because the court interpreted *Severino*'s "text" prong to focus exclusively on explicit references to for-cause removal, and regarded other text as informing the "structure and function" prong.  JA153 & n.17.  While appellees believe that *Severino*'s "text" prong is not so limited, *see Severino*, 71 F.4th at 1044-47, what ultimately matters is that courts must give effect to the text Congress enacts—including its amendments to prior statutory language.

*Parsons*, the Supreme Court relied on statutory history—Congress's decision to delete a provision *limiting* at-will removal—to determine that the amended statute necessarily *permitted* at-will removal. The *Parsons* statute originally provided that United States Attorneys "shall be entitled to hold [their] office until a successor shall have been in like manner appointed and duly qualified," i.e., until a successor was Senate-confirmed. 167 U.S. at 339. Ten years before *Parsons*, that portion of the statute was repealed. *Id.* at 342. In light of the repeal, the Supreme Court explained, it could not interpret the remaining phrase "shall be appointed for a term of four years" to grant an entitlement to hold office, because that would nullify the 1887 amendment. *See id.* at 327-28, 342-43. The deletion in *Parsons* of language *limiting* the President's removal power meant that the amended statute permitted at-will removal; the opposite history here compels the opposite result.

The government's only response is to hypothesize that, because Congress created six-year terms for PCLOB members in 2007, Congress preferred no longer to "emphasize" that members serve at the President's pleasure. U.S.Br.44. But the government's logic—that when Congress deletes a statutory provision, it might really intend to *keep* but "de-emphasize" it (whatever that means)—could be applied to nullify any statutory change. And if Congress wanted to render the new six-year-term a mere "default period," as the government claims (U.S.Br.44), it would have *kept* rather than deleted the "serve at the pleasure" language.

32

Indeed, Congress has repeatedly done just that. *See, e.g.*, 10 U.S.C. § 152(a)(1) ("Chairman [of the Joint Chiefs] serves at the pleasure of the President for a term of four years"); 10 U.S.C. § 9082(a) (same for Chief of Space Operations); 16 U.S.C. § 5003 (commissioners "shall be appointed for a term of office not to exceed 4 years" and "serve at the pleasure of the President"); 22 U.S.C. § 2511(c) (Peace Corps Advisory Council members "shall be appointed to 2-year terms" and "serve at the pleasure of the President"); 12 U.S.C. § 635a(c) (Export-Import Bank director "term" is "four years, except that [they] serve at the pleasure of the President"). Congress's choice to enact different language here must be given effect.

2.      Congress's addition of a mandatory tenure provision stating that "[e]ach member of the Board *shall serve* a term of 6 years" constitutes additional explicit language prohibiting at-will removal. 42 U.S.C. § 2000ee(h)(4) (emphasis added). "It is . . . fixed usage that 'shall' means something on the order of 'must' or 'will.'" *FTC v. Tarriff*, 584 F.3d 1088, 1090 (D.C. Cir. 2009). The most relevant definition of "serve" is "to hold an office." *See* Merriam-Webster's Collegiate Dictionary 1067 (10th ed. 2000). The plain statutory text thus mandates that members will hold office for a fixed six-year term, not only so long as the President chooses to keep them.

Courts have repeatedly held that appointment statutes using "shall serve" language or its equivalent confer tenure protections even without explicit language

33

referencing removal.  Most notably, SEC commissioners "shall hold office for a term of five years," 15 U.S.C. § 78d(a), and it is "commonly understood" that they may only be removed for cause.  *MFS Sec. Corp. v. SEC*, 380 F.3d 611, 619 (2d Cir. 2004).  This Court has expressly so held.  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667, 680 (D.C. Cir. 2008), *aff'd in part*, 561 U.S. 477 (2010) (President can remove SEC commissioners "for cause").  The United States itself has argued that SEC commissioners have tenure protection, *Free Enter. Fund*, 561 U.S. at 487, the Supreme Court has assumed as much, *id.*, and multiple lower courts have so held, *see, e.g.*, *Jarkesy v. SEC*, 34 F.4th 446, 464 (5th Cir. 2022), *aff'd and remanded,* 603 U.S. 109 (2024); *SEC v. Bilzerian*, 750 F. Supp. 14, 17 (D.D.C. 1990); *MFS Sec.*, 380 F.3d at 619; *SEC v. Blinder, Robinson & Co.*, 855 F.2d 677, 681 (10th Cir. 1988).  Likewise, FEC commissioners "shall serve for a single term of 6 years," 52 U.S.C. § 30106(a)(1), (2), and this Court has long assumed that they enjoy for-cause removal protection.  *FEC v. NRA Pol. Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993).

The government's argument that Congress "knew how" to "furnish for-cause protection" in 2007, U.S.Br.28 (citing *Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427, 2448 (2025)), accordingly backfires.  At the time Congress was revising the PCLOB statute, unanimous precedent from multiple courts of appeals established

34

that materially equivalent language in the SEC statute conferred removal protection, even though the SEC statute did not reference for-cause removal.[18]

Moreover, Congress has repeatedly paired "shall serve" language with explicit removal carveouts in other appointment statutes. *See, e.g.*, 42 U.S.C. § 1864(a) (director of National Science Foundation "shall serve for a term of six years unless sooner removed by the President"); 29 U.S.C. § 1302(c) (similar); 29 U.S.C. § 671(b) (similar). If "shall serve" standing alone permitted at-will removal, Congress's express removal authorization in each of these statutes would be pure surplusage, as would the "shall serve" language here.

The district court concluded that, under *Parsons* and *Severino*, "a defined term of office" operates as a "cap rather than an entitlement." JA150-51. But *Severino* simply held that "the word 'term,'" standing alone, did not create a "guaranteed minimum period of service." 71 F.4th at 1045. The statute in *Severino* lacked the crucial "shall serve" language, and *Severino* did not purport to hold that text can never confer removal protections merely because it uses the word "term." Such a holding would have been inconsistent with *Free Enterprise Fund*, 537 F.3d 667.

---

[18] The SEC and FEC statutes also show that appellees' interpretation does not require the Court to conclude that PCLOB members are protected from for-cause termination. Congress has long legislated against a background understanding that tenure protections do not foreclose for-cause removal—precisely the extent of the protection permitted in *Humphrey's Executor*. In any event, appellees were concededly fired without cause.

*Parsons* likewise involved no equivalent "shall serve" language. The statute there provided that officers "shall be appointed for a term of four years." *Severino*, 71 F.4th at 1045 (quoting *Parsons*, 167 U.S. at 327-28). That language is satisfied once the office-holder is appointed. Moreover, as the government notes (U.S.Br.43-44), *Parsons*, which involved a single officer who exercised substantial executive power, reasoned that an at-will-removal provision was "not necessary" because at the time the President was "regarded as being clothed with such power in any event." U.S.Br. 6 (quoting 167 U.S. at 339). Not so here: the government has never contended that removal protections for members of the PCLOB, a multi-member expert board that exercises no executive power, would pose any constitutional problem. And, as discussed above, *see supra* pp.31-32, *Parsons* relied heavily on Congress's deletion of an express removal protection—the mirror image of Congress's deletion of an express removal *authorization* in the PCLOB's organic statute. Both background constitutional principles and statutory history thus warrant the opposite result here.

3.     Congress's 2007 deletion of language requiring the Board to work "under the general supervision of the President," and its deletion of the section entitled "Presidential Responsibility," is likewise incompatible with retaining at-will removal. IRTPA § 1061(k). As the Supreme Court held in *Seila Law* and *Free Enterprise Fund* and reiterated in *Braidwood*, at-will removal means an agency *is*

subject to presidential supervision.  The "most direct method of presidential control" is "removal at will." *Seila Law,* 591 U.S. at 225; *see id. at* 204 (referencing "[t]he President's power to remove—and thus supervise—those who wield executive power on his behalf"); *id.* at 238 (similar); *Free Enter. Fund*, 561 U.S. at 499 (emphasizing the "importance of removal as a tool of supervision"); *Braidwood*, 145 S. Ct. at 2444 ("The Secretary's authority to remove Task Force members at will in turn enables him to supervise and direct them.").

The government again contends that Congress might have deleted the "presidential responsibility" and "presidential supervision" provisions so as "no longer to emphasize" that the Board would be supervised by the President. U.S.Br.45.  But when Congress deletes statutory language, courts are required to give that decision effect, *see supra* pp.29-31—not to assume that Congress didn't really mean it and secretly intended to retain the deleted language.

Congress's addition of language declaring the Board "independent" confirms its intent to foreclose at-will removal.  42 U.S.C. § 2000ee(a).  Although "the word 'independent' *alone* in a statute does not make an officer removable only for cause," *Braidwood*, 145 S. Ct. at 2449 (emphasis added), it can be a relevant signal in combination with other textual evidence.  In *Seila Law*, the Supreme Court held that Congress's use of the phrase "independent bureau" to describe the CFPB meant that Congress intended to preclude removals based on policy disagreements, because

CFPB could not "be 'independent' if its head were required to implement the President's policies upon pain of removal."  591 U.S. at 230; *see* 12 U.S.C. § 5491(a).

The key distinction is whether the word "independent" signals independence from the *President*.  In *Collins*, for example, the Court held that "independent" might not alone signal a removal protection if Congress intended the agency to be independent of another "unit of the Federal Government," but not of the "President." *Collins*, 594 U.S. at 248.  Likewise in *Braidwood*, "independent" was "best read" to signal a task force's independence from outside-the-government influence, not from executive branch influence, and indeed other provisions in the statute explicitly allowed the HHS Secretary to block the task force's recommendations.  145 S. Ct. at 2449-50.

Here, Congress's addition of the word "independent" in 2007 necessarily signaled an intent to confer independence from the President.  Before the amendments, the PCLOB was housed in the Executive Office of the President and was thus *already* independent of all other "unit[s] of the Federal Government." *Collins*, 594 U.S. at 248.  When Congress—prompted by a presidential effort to block the Board's recommendations in its first report—removed the Board from the Executive Office of the President and re-established it as an "independent" agency,

the only plausible understanding is that Congress intended independence from the President.[19]

\* \* \*

A holistic reading of the PCLOB's organic statute—required under *Severino* and this Court's plain statement cases—leaves no doubt that Congress clearly intended to protect PCLOB members from at-will removal. Any other conclusion would render the 2007 statutory changes entirely ineffectual.

## C.   The PCLOB's Structure and Function Plainly Impose a Removal Restriction

Congress also "clearly indicate[d] its intent to restrict removals through the statutory structure and function" of the PCLOB, which are incompatible with at-will removal. *Severino*, 71 F.4th at 1044; JA154-55.

***Structure.***   The Board's composition, appointment criteria, and term provision reflect Congress's design to insulate members from presidential control and removal. PCLOB "is clearly 'patterned on the classic' multimember expert board at issue in *Humphrey's Executor*." JA157. The Board has all the "organizational features" the Supreme Court identified in *Seila Law* as indicating that an agency is "non-executive" and supporting for-cause removal restrictions.

---

[19] The government's argument about the meaning of an unenacted Senate bill (U.S.Br.45-46) is unpersuasive. "[M]ute intermediate legislative maneuvers are not reliable indicators of congressional intent." *Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) (internal quotation marks omitted).

591 U.S. at 216. It is "[c]omposed of five members—no more than three from the same political party." *Id.* Its "duties [are] 'neither political nor executive,' but instead call[] for 'the trained judgment of a body of experts' 'informed by experience.'" *Id.* "And the [Board members'] staggered, [six]-year terms enable[] the agency to accumulate technical expertise and avoid a 'complete change' in leadership 'at any one time'"—a goal that would be impossible if the statute permitted removal at will. *Id.*; *see Severino*, 71 F.4th at 1049 ("staggered terms promote 'the independence, autonomy, and non-partisan nature' of an agency").

In addition, Board members must be selected "solely on the basis of their professional qualifications, achievements, public stature, expertise in civil liberties and privacy, and relevant experience, and without regard to political affiliation, but in no event shall more than 3 members of the Board be members of the same political party." 42 U.S.C. § 2000ee(h)(2). Those appointment criteria are fundamentally incompatible with at-will removal based on political preferences. It makes no sense to require Board members to be "selected" "solely" based on expertise and qualifications, but to allow their removal based on the very considerations that are off-limits in appointing them. The maxim that "the power of removal from office is incident to the power of appointment," *Severino*, 71 F.4th at 1044 (quoting *Carlucci*, 488 U.S. at 99), here weighs decidedly against at-will removal. Removing someone

from office is not "incident" to the power of appointment if the removal is based on considerations that are prohibited in the context of appointment.

Likewise, the Board's statutory partisan balance requirement—which mirrors the FTC's partisan balance requirement in *Humphrey's Executor*, 295 U.S. at 620— would be nugatory if the President could simply fire all the Board members for political reasons. The statutory requirement that no more than 3 members of the Board may be members of the same political party serves to ensure that the Board reflects the views of both parties, and not simply a single party (or President's) views. Reading the statute to permit the President to fire all members who belonged to the opposing political party without cause (as happened here) would thus fundamentally undermine the scheme of non-partisan agency independence that Congress deliberately designed.

These structural features fully distinguish the PCLOB from the Administrative Conference of the United States at issue in *Severino*. JA155-57. There, conference members served three-year terms, meaning that none could "outlast a President," 71 F.4th at 1049; about half were required to be employees of the executive branch in other capacities and were "subject to at-will removal in their day jobs," which is prohibited for the PCLOB, *id.*; only the conference's "initial batch of members … served staggered terms," *id.*; there was no partisan balance

requirement, JA156 n.18; and many members automatically "change[d] with the administration," JA156.

*Function.* "[T]he most reliable factor for drawing an inference regarding the President's power of removal . . . is the nature of the function that Congress vested in" the agency. *Wiener*, 357 U.S. at 353; *see also Mistretta v. United States*, 488 U.S. 361, 411 (1989). Courts thus look for an adjudicatory or legislative feature that would "signal a need for some measure of independence from Presidential control." *Severino*, 71 F.4th at 1049. If "Congress assigns to an agency quasi-judicial or quasi-legislative functions that are … operationally incompatible with at-will Presidential removal," Congress plainly intended to preclude at-will removals even absent "an explicit textual statement to that effect." *Id.* at 1047.

Because "independence from Presidential control" is critical to the PCLOB's oversight function, *id.* at 1049, *Severino*'s second prong is satisfied. As the district court correctly recognized, "the PCLOB's function, first and foremost—and consistent with the very name of the Board—is to conduct oversight" of the executive branch on behalf of Congress. JA158-59. The PCLOB has fulfilled that role by producing at Congress's request a series of reports and recommendations on complex surveillance programs that Congress has relied on in enacting legislative reforms, and PCLOB members have repeatedly testified before Congress pursuant

to a specific statutory requirement added in 2007.    JA158-62; 42 U.S.C. § 2000ee(d)(4).

That function—making "investigations and reports thereon for the information of Congress"—is precisely the function that *Humphrey's* described as "legislative."  295 U.S. at 628.  And as in *Humphrey*'s, the Board cannot function as a "legislative aid" if the President can fire any Board member who intends to advise Congress of privacy and civil liberties concerns about the executive branch's activities.  Indeed, the entire point of the 2007 amendments was to *prevent* the President from unilaterally blocking the PCLOB from providing candid advice and information to Congress.  *Supra* pp.4-8.  If the President could freely fire members who "criticize[d] the policies of the Executive," the Board would be unable to fulfill its statutory duty to do just that.  JA160.  And the President could simply block information about the executive branch's treatment of privacy and civil liberties from reaching the public, notwithstanding Congress's command that such information be made "available to the public to the greatest extent" possible, 42 U.S.C. § 2000ee(f).

To take a specific example, the Board is charged with advising Congress on "proposals to retain or enhance a particular governmental power," and in so doing must "consider whether … *the executive branch has established* (i) that the need for the power is balanced with the need to protect privacy and civil liberties; (ii) that

43

there is adequate supervision of the use by the executive branch of the power to ensure protection of privacy and civil liberties; and (iii) that there are adequate guidelines and oversight to properly confine [the power's] use." *Id.* § 2000ee(d)(1)(D) (emphasis added). This legislative oversight function would be totally meaningless if the President who was proposing the retention or enhancement of the power could also control whether the Board opines that such authority is justified.

Congress further required the Board to advise it not only of conclusions and recommendations "resulting from its advice and oversight functions," but also of "minority views" as to those conclusions. JA135 (quoting 42 U.S.C. § 2000ee(e)(2)(A)-(C)). That function too—that the Board must provide Congress with a multitude of competing views, and not serve as the mouthpiece of either political party—is operationally incompatible with at-will removal power. This case could not be a starker example. At-will removal authority would permit the President to fire all the members of one political party, ensuring that there will never be any minority views and subverting Congress's plain intent.

In response, the government invents an agency that does not exist. The government contends that the PCLOB is similar to an internal executive branch consulting firm, like the Administrative Conference in *Severino*, and that its "*raison d'etre* is to produce advice for the Executive Branch." U.S.Br.32-34, 37-38. This

44

argument is not serious.  The PCLOB is an *oversight* board.  And as the district court noted, in 2007 Congress *deleted* prefatory language in the statute stating that the Board's advice functions were for the "purpose" of advising the President or executive agencies.  JA159; *see* JA96-104 (statutory redline).  Although the Board is still authorized to advise the President, that function is collateral to its principal oversight function.  The government notably does not dispute that, as a matter of fact, what the Board has been doing since 2007 is producing oversight reports to Congress.

The government asserts (U.S.Br.38) that the word "Congress" appears only once in § 2000ee(d), the "functions" subsection of the statute.  But § 2000ee(d)(2) sets forth an "Oversight" function, and "oversight is a function of Congress." *Pub. Citizen, Inc. v. Simon*, 539 F.2d 211, 217 (D.C. Cir. 1976).  Section 2000ee(d)(1), moreover, requires the Board to "review proposed legislation" and to "provid[e] advice on proposals to retain or enhance a particular governmental power," advice that plainly is directed to the branch of government that *decides* whether the executive may retain the power.  The next subsection, § 2000ee(e), lays out in detail how the Board must report to Congress on everything it does pursuant to § 2000ee(d), including whether the executive branch has ignored the Board's advice about a particular policy proposal, *id.* § 2000ee(d)(2)(D).  That the President is copied on these reports does not diminish the fact that their primary purpose—as

reflected in Congress's highly detailed specification of the reports' content—is to assist congressional oversight.

The government also notes that other officials, including inspectors general and internal agency privacy officials, create reports that are sent to Congress. U.S.Br.38-39. But neither statute mentions oversight. These officials are internal auditors who Congress placed "under the general supervision" of the agency heads. 5 U.S.C. § 403 (inspector general); 6 U.S.C. § 142(c) (DHS privacy officials). That is the very language Congress deleted from the PCLOB statute. Moreover, the point is not that occasionally submitting reports to Congress automatically renders an official "legislative" rather than executive. *Contra* U.S.Br.39-40. The PCLOB is an oversight Board that is principally occupied with assisting in legislative oversight of executive branch activities. The government also notes Congress's decision to specifically authorize "remov[al]" of DHS privacy officials in § 802 of the 2007 statute while not mentioning removal in § 801, which reconstituted the PCLOB. U.S.Br.29. That difference in statutory language supports appellees, not the government.

Finally, the government notes that the PCLOB has some vague powers to "coordinate" privacy officials or to designate agencies that must appoint a privacy officer. U.S.Br.37. The government does not argue that these collateral provisions, the latter of which does not even appear in the PCLOB's organic statute, have ever

46

been used since 2007. But to the extent the PCLOB "exercises any executive function"—and the government does not argue that these minor responsibilities constitute executive "power" in any "constitutional sense"—"it does so in the discharge and effectuation of its quasi-legislative" role. *Humphrey's Executor*, 295 U.S. at 628. Moreover, these provisions are so "collateral to the main design of the act" that they do not "detract from" the PCLOB's quasi-legislative and oversight function. *Id.* at 628 n.*.

The government baldly asserts that there is nothing "fundamentally incompatible" between at-will removal and "candid assessments and even criticisms" of executive branch policies. U.S.Br.40-41. But the entire reason for the 2007 amendment was that unchecked presidential supervision of an oversight board *was* irreconcilable with candid assessment and criticism, because the President could just delete any criticism from PCLOB's reports. The government puzzlingly points to the 2004 version of the statute as evidence that oversight does not require freedom from executive interference. U.S.Br.43. But Congress recognized that the 2004 version of the statute *precluded* effective oversight by subjecting the Board to presidential control.

As for the government's vague references to national security deference, the PCLOB cannot implement or decide national security policy; it cannot even declassify its own reports. The risks—borne out by history—of unchecked

47

executive-branch surveillance powers confirm that Congress could not possibly have wanted to incapacitate the expert board it put in place to assist it in imposing checks. As the district court concluded, "[i]t is obvious that Congress intended for the Board to perform its statutory duties without 'the Damocles' sword of removal by the President' over members' heads." JA162 (quoting *Wiener*, 357 U.S. at 356). Any clear statement requirement is amply satisfied. JA163.

### D. The Constitutional Avoidance Canon Does Not Apply

The government's half-hearted constitutional avoidance argument fails. *See* U.S.Br.46-47. First, *Severino* instructs courts how to account for "the background presumption that the President may remove anyone he appoints," and a statute that satisfies *Severino*'s test does not implicate constitutional avoidance. *Severino*, 71 F.4th at 1044; JA163. Second, the constitutional question has been decided: Congress may constitutionally restrict removals of officers from "multimember expert agencies that do not wield substantial executive power." *Seila Law*, 591 U.S. at 216, 218. The government does not claim that PCLOB members wield substantial executive power. U.S.Br.46. And the "functions" it points to, U.S.Br.46-47, are either non-existent (the Board lacks subpoena power, *see* JA136) or not executive at all ("access" to executive-branch records is a power Congress holds).

## II.    Appellees Were Entitled to Reinstatement

### A.    The District Court Had Authority to Order Reinstatement

The court had authority to order appellees' de facto reinstatement.  JA176.

"[T]he D.C. Circuit has made clear that courts may 'reinstate a wrongly terminated

official *de facto*, even without a formal presidential reappointment.'"  JA176 (some

quotation marks omitted) (quoting *Severino*, 71 F.4th at 1042-43)); *see Swan*, 100

F.3d at 980 (similar); *Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *2 (D.C.

Cir. Apr. 7, 2025) (en banc) (rejecting argument that "there is no available remedy"

for wrongful removal).  A wealth of history and precedent supports that result.

1.    Since the advent of federal judicial review, the Supreme Court has

recognized the federal courts' authority to order the instatement of federal officials

to positions they lawfully hold.  *Marbury v. Madison*, 5 U.S. (1 Cranch.) 137, 172-

73 (1803).  When a claimant "has a right to [an] office," mandamus lies to order

officials to take steps necessary to permit the claimant to "obtain the office."  *Id.* at

173.  Since *Marbury*, the Supreme Court has repeatedly reaffirmed the authority of

federal courts to order reinstatement, including under "traditional equitable

principles."  *Webster v. Doe*, 486 U.S. 592, 604-05 (1988); *see, e.g.*, *Sampson v.

Murray*, 415 U.S. 61, 92 n.68 (1974) (courts have "injunctive power" to order

reinstatement); *Vitarelli v. Seaton*, 359 U.S. 535, 537, 546 (1959) (holding that

official was "entitled to the reinstatement" and reversing denial of "an injunction

requiring his reinstatement"); *In re Sawyer*, 124 U.S. 200, 212 (1888) (mandamus and quo warranto permit a court to "determine the title to a public office"). The government does not so much as address, much less dispute, the two and half centuries of precedent supporting the federal courts' power to order reinstatement.

To the extent the government contends that an *injunction* specifically is the wrong form for such an order, it significantly overreads the cases it relies on and neglects more recent, on-point authority. *See* U.S.Br.48-49. *White* and *Sawyer* each channeled removal claims to "the courts of law" for disposition "by certiorari, error, or appeal, or by mandamus, prohibition, [or] quo warranto." *White v. Berry*, 171 U.S. 366, 377 (1898); *In re Sawyer*, 124 U.S. 200, 212 (1888). But those decisions predated "the merger of law and equity, which was accomplished by the Federal Rules of Civil Procedure"—a distinction that has "lost all connection with the reality of the federal courts' procedural system." *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 283 (1988). And neither imposed any limit on the *substance* of the relief within the federal judicial power. Since those cases, moreover, both the Supreme Court and this Court have repeatedly held that federal courts may order reinstatement of wrongfully removed officials in equity. *See Webster*, 486 U.S. at 604-05; *Vitarelli*, 359 U.S. at 537, 546; *Severino*, 71 F.4th at 1042-43; *Swan*, 100 F.3d at 980.

2.    Binding Circuit precedent prescribes the appropriate remedy when a

federal official is unlawfully removed from office: the Court should "enjoin 'subordinate executive officials' to reinstate [the] wrongly terminated official 'de facto,' even without a formal presidential reappointment." *Severino*, 71 F.4th at 1042-43 (quoting *Swan*, 100 F.3d at 980). This Court's holding in *Severino* was essential to its judgment: to find standing and reach the merits, as the Court did, it first determined that the courts could provide Severino an effectual reinstatement remedy. *Id.*; *see also Swan*, 100 F.3d at 976-81 (holding that an Article III controversy existed because lower federal officials could be ordered to "treat[] Swan as [an officeholder] and allow[] him to exercise the privileges of that office"). That holding was reasoned, express, and unambiguous. And while a minority of the Supreme Court has raised questions as to whether "a court of equity" may order *preliminary* reinstatement, the Court has never suggested—much less held—that the remedy Circuit precedent authorizes is unavailable at law or on final judgment. *See Bessent v. Dellinger*, 145 S. Ct. 515, 517 (2025) (Gorsuch, J., dissenting).

Consistent with that precedent, the district court correctly rejected the government's argument, U.S.Br.49-51, that the injunction here effectively operated against the President. *See* JA177. Both *Severino* and *Swan* recognized that ordering lower federal officials to reinstate an officer de facto does not implicate the "difficult question" whether an injunction may properly be directed to the President to require him "to perform a 'purely ministerial duty.'" *Severino*, 71 F.4th at 1042 (some

quotation marks omitted) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992)); *see Swan*, 100 F.3d at 979. The government's contrary argument directly contravenes this binding precedent and would seemingly bar injunctive relief against unlawful actions by subordinate officials whenever they acted pursuant to the President's command. This Court has repeatedly rejected this "breathtakingly broad claim of non-reviewability of presidential actions." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996); *see, e.g.*, *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *6 n.1 (D.C. Cir. Feb. 15, 2025) ("a court can unquestionably review the legality of the President's action by enjoining the officers who would attempt to enforce the President's order"); *Soucie v. David*, 448 F.2d 1067, 1072 (D.C. Cir. 1971) (that subordinate officials act under orders from the President "does not leave the courts without power to review the legality" of those actions); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952) (affirming injunction against Secretary of Commerce against implementing presidential order).

Finally, the Declaratory Judgment Act authorizes the court's declaratory judgment. 28 U.S.C. § 2201. The government forfeited any contrary argument by not raising it below. D.Ct.Dkt. 12-1.

### B. The District Court Did Not Abuse Its Discretion in Permanently Enjoining Lower Federal Officials to Reinstate Appellees De Facto

The district court acted well within its discretion in determining that equitable

factors favored a permanent injunction.  In making that discretionary judgment, the district court enjoys "a range of choice," and its decision should "not be disturbed as long as it stays within that range and is not influenced by any mistake of law." *Morrissey v. Mayorkas*, 17 F.4th 1150, 1156 (D.C. Cir. 2021) (internal quotation marks omitted).

The court held that appellees' unlawful removal inflicted irreparable harm both by depriving them of the benefits of their office and by preventing the Board from fulfilling its statutory oversight responsibilities.  JA181-89.  Either ground would adequately support the permanent injunction, and the government does not even attempt to argue that any relief short of reinstatement would remedy either of those harms.

As to loss of office, the government's sole argument is that the loss of formal authority is not a judicially cognizable harm.  U.S.Br.54.  But the cases it relies on lend no support to that position; in both, the Supreme Court held only that an *individual legislator* lacks standing to complain of a claimed injury to the *legislative power* exercised by Congress.  *See Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126 (2011); *Raines v. Byrd*, 521 U.S. 811, 821 (1997).  In contrast, a federal officer "has a right to the office itself," which is irreparable by other remedies short of reinstatement.  *Marbury*, 5 U.S. at 173 (holding that mandamus would be warranted from a court of proper jurisdiction because money damages were

inadequate).  The government's irreparable harm argument essentially amounts to the position—rejected by the Supreme Court and this Court—that no wrongly removed officer can ever obtain effectual relief.

As to disruption of the PCLOB's statutory oversight functions, the government merely quibbles with the district court's factual findings—neglecting even to argue that those findings reflect clear error.  *See* U.S.Br.55-56.  The district court found that appellees' removal would frustrate the PCLOB's ability to "comply with its statutory mandate."  JA187.  In so finding, the court expressly rejected the argument the government makes here that there is no irreparable harm because the Board can, in the government's mistaken view, operate effectively without a quorum.  *See* U.S.Br.55; JA186.  "[W]ithout a quorum the PCLOB may not, *inter alia*: issue advice in the name of the Board, issue any Board reports, [or] submit its statutorily-required Semi-Annual Report" to Congress.  JA186.  Nor can the Board provide "minority views" to Congress, as the statute requires, when the President has removed all Board members of the opposing political party.  JA187.  The government's position that an inquorate Board with a single member can fulfill its critical oversight role through informal advice and "staff reports," U.S.Br.55, flouts Congress's design.

And those harms are particularly acute—and urgent—given the Board's critical role in advising Congress in advance of the April 2026 statutory sunset of

the controversial warrantless wiretapping program authorized by Section 702 of the Foreign Intelligence Surveillance Act.  *See* JA187.  As the government did not dispute below, "the Board cannot issue its Section 702 report without a quorum," and Congress has relied heavily on the Board's advice in its prior reauthorizations of that authority, including in determining limitations necessary to protect Americans' civil liberties.  *Id.*

Nor is there any countervailing interest that could tip the equitable scales. Citing the Supreme Court's stay decision in *Wilcox*, the government contends that the President's Article II prerogatives outweigh any harm to appellees or disruption to the oversight regime Congress has carefully crafted.  *See* U.S.Br.56-57.  But *Wilcox* addressed the equities for *preliminary* relief where the government asserted that statutory removal restrictions contravened Article II.  In that posture, it held, there was a "*risk* of harm" if an officer continued exercising executive power notwithstanding lawful removal "*during the pendency of th[e] litigation*."  *Trump v. Wilcox*, 145 S. Ct. 1415 (2025) (emphasis added).  But there is no such risk, after final judgment, if this Court determines that appellees were unlawfully removed. PCLOB members do not exercise executive power, and the government does not contend that removal protections violate Article II.  The Executive has no cognizable interest in violating a statute that Congress has lawfully enacted.  *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

55

## C.    Appellees Were Also Entitled to Mandamus and Other Relief

The Court should also affirm the district court's alternative holding that reinstatement "would be appropriate in this case" as a legal remedy, whether by mandamus or otherwise, if an injunction were unavailable. JA193.

1.    In the alternative to a permanent injunction, appellees are entitled to a writ of mandamus directing their reinstatement. There is no dispute that mandamus is an appropriate remedy for wrongfully removed officers, as the Supreme Court has held for more than two hundred years and even the cases the government cites make clear. *See White*, 171 U.S. at 377; *Sawyer*, 124 U.S. at 212; *Marbury*, 5 U.S. at 173; US.Br.49 (citing *White* and *Sawyer*). A legal writ, mandamus lies to compel performance of a duty where "the duty to be performed is ministerial and the obligation to act peremptory, and clearly defined." *13th Reg'l Corp. v. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980); *see* 28 U.S.C. § 1361. As discussed above, the 9/11 Commission Act's text, its history, and the PCLOB's structure and functions unmistakably bar Board members' at-will removal, which would thwart the Board's vital oversight role. And providing appellees the benefits of an office they lawfully hold is a quintessentially "ministerial" duty. *Marbury*, 5 U.S. at 158.

While the relevant statutory text is clear, mandamus would be appropriate even if it contained some ambiguity. In *Swan*, the D.C. Circuit rejected the same argument appellants make here, *see* U.S.Br.52-53, that if a "statute nowhere

*expressly* limits the President's removal power, the statute cannot impose a nonremoval duty of sufficient clarity to create a ministerial duty." *Swan*, 100 F.3d at 978 (emphasis added). Instead, the Court explained, "clarity" for mandamus purposes means that the relevant duties are ascertainable and nondiscretionary: "a ministerial duty can exist even 'where the interpretation of the controlling statute is in doubt,' provided that 'the statute, once interpreted, creates a peremptory obligation for the officer to act.'" *Id.* (quoting *13th Reg'l Corp.*, 654 F.2d at 760); *see also Am. Cetacean Soc. v. Baldrige*, 768 F.2d 426, 433 (D.C. Cir. 1985) ("If, after studying the statute and its legislative history, the court determines that the defendant official has failed to discharge a duty which Congress intended him to perform, the court should compel performance, thus effectuating the congressional purpose."), *rev'd on other grounds*, 478 U.S. 221 (1986). The government's position that a difficult interpretative question can never give rise to a ministerial duty is flatly wrong. *See, e.g.*, *Marbury*, 5 U.S. at 158.

2.     Finally, although the district court declined to reach appellees' claim under the Administrative Procedure Act, *see* JA 176 n.31, its judgment should be affirmed on the alternative ground that the APA entitles appellees to the same legal relief. The government declined to oppose summary judgment on appellees' APA claim and accordingly has forfeited any argument that the APA does not entitle appellees to reinstatement. *See* D.Ct.Dkt. 12-1 (summary judgment opposition

ignoring appellees' APA claim); *see Zevallos v. Obama*, 793 F.3d 106, 114 (D.C. Cir. 2015) (arguments "not made below" are "forfeited").  Limitations on the federal courts' general equitable powers have no bearing on the APA's statutory remedies. *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2567 (2025) (Kavanaugh, J., concurring). The district court's reinstatement order should be upheld on the ground that the APA requires appellees' unlawful terminations to be set aside and subordinate officials to be compelled to provide appellees the rightful benefits of their office.  *See* 5 U.S.C. § 706.

## CONCLUSION

The Court should affirm.


Dated: September 5, 2025

Caleb Thompson
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 West 55th St.
New York, NY 10019
(212) 836-8000
Caleb.Thompson@arnoldporter.com

Respectfully submitted,

*/s/ Elisabeth S. Theodore*

Elisabeth S. Theodore
Daniel R. Yablon
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
Elisabeth.Theodore@arnoldporter.com
Daniel.Yablon@arnoldporter.com


*Counsel for Appellees Travis LeBlanc and Edward Felten*

58

**CERTIFICATE OF COMPLIANCE**

I certify, pursuant to Federal Rule of Appellate Procedure 32(g)(1) and Circuit Rule 40(d), that the foregoing petition contains 12,998 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f). I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point Times New Roman font.

Dated: September 5, 2025                  Respectfully submitted,

                                          */s/ Elisabeth S. Theodore*
                                          Elisabeth S. Theodore

                                          *Counsel for Appellees Travis LeBlanc
                                          and Edward Felten*

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2025, I caused the foregoing document to be electronically filed using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

*/s/ Elisabeth S. Theodore*
Elisabeth S. Theodore

*Counsel for Appellees Travis LeBlanc
and Edward Felten*