ORAL ARGUMENT SCHEDULED FOR OCTOBER 28, 2025

No. 25-5197

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

TRAVIS LEBLANC AND EDWARD FELTEN,

*Plaintiffs-Appellees*,

v.

UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, ET AL.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Columbia, No. 1:25-cv-00542-RBW

# BRIEF OF MEMBERS OF CONGRESS AS AMICI CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE

Ryan Carroll
Senior Counsel
OFFICE OF SEN. RON WYDEN
221 Dirksen Senate Office Bldg.
Washington, D.C. 20510
(202) 224-5244
ryan_carroll@wyden.senate.gov

Noah Chauvin
Associate Professor of Law*
COLLEGE OF LAW
UNIVERSITY OF OKLAHOMA
300 W. Timberdell Road
Norman, OK 73019
(405) 561-1877
noahchauvin@ou.edu

Leah J. Tulin
*Counsel of Record*
Faiza Patel
Hannah James
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
1140 Connecticut Avenue NW
Suite 1150
Washington, D.C. 20036
(202) 650-6397
tulinl@brennan.law.nyu.edu
patelf@brennan.law.nyu.edu
jamesh@brennan.law.nyu.edu

*Counsel for Amici Curiae*

* Affiliation provided for identification purposes only.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A. Parties and Amici.** All parties, intervenors, and amici appearing before the district court and this Court are listed in the Brief for Appellees.

**B. Rulings Under Review.** References to the rulings at issue appear in the Brief for Appellees.

**C. Related Cases.** This case has not previously been before this Court or any other court other than the district court. We are not aware of any other related cases within the meaning of Circuit Rule 28(a)(1)(C).

## CORPORATE DISCLOSURE STATEMENT

Undersigned counsel has filed a separate disclosure statement as required by Circuit Rule 26.1.

## STATEMENT REGARDING SEPARATE BRIEFING

Pursuant to Circuit Rule 29(d), undersigned counsel for amici curiae certifies that a separate brief is necessary. Amici are current members of Congress who are uniquely familiar with the Privacy and Civil Liberties Oversight Board's mission, history, and functions. Amici offer a distinct perspective, informed by first-hand experience, on the Board's vital contributions to congressional oversight of the government's counterterrorism efforts.

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

GLOSSARY ........ vii

STATUTES AND REGULATIONS ........ vii

INTEREST OF AMICI CURIAE ........ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........ 1

ARGUMENT ........ 3

I. At-will removal is inconsistent with Congress's decision to insulate the PCLOB from presidential control ........ 3

II. The PCLOB is indispensable to Congress's ability to conduct meaningful oversight over government surveillance programs. ........ 6

A. The PCLOB is critical to effective congressional oversight over Section 702. ........ 6

B. The Board's report on surveillance under Section 215 was instrumental in Congress's decision to end the NSA's bulk telephone records program. ........ 17

C. The PCLOB's reports on Executive Order 12333 increased public transparency and facilitated stronger safeguards for surveillance conducted under the order. ........ 20

III. The PCLOB's structure as an independent, expert agency within the executive branch is critical to its ability to facilitate congressional oversight over government surveillance. ........ 23

A. At-will removal is incompatible with the PCLOB's function as a legislative aid. ........ 23

B. The PCLOB's position within the executive branch and tailored mission provide it with oversight capabilities beyond those generally available to Congress ........ 26

CONCLUSION ........ 30

APPENDIX ........ A1

## TABLE OF AUTHORITIES

### CASES

[CAPTION REDACTED], No. [REDACTED] (FISA Ct. Apr. 21, 2022), https://perma.cc/TF7S-6RJ6 ....................7

*Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431 (2014)....................4

*Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935) ....................23

*In re DNI/AG 702(h) Certification 2024-D*, No. 702(j)-24-04 (FISA Ct. Apr. 9, 2025), https://perma.cc/M2E9-BP6Q ....................17

*In re Petition to Set Aside or Modify Directive Issued to* [REDACTED], No. [REDACTED] (FISA Ct. 2022), https://perma.cc/F7D4-KSL5 ....................13

*In re Petition to Set Aside or Modify Directive Issued to* [REDACTED], No. [REDACTED] (FISA Ct. Rev. 2023), https://perma.cc/DVD7-NZ94....................13

*In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 34 F.4th 1 (D.C. Cir. 2022) ....................4

*Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020) ....................5, 23

### STATUTES

42 U.S.C. § 2000ee .................... 24, 27, 28, 29, 29–30

50 U.S.C. § 1801(e) ....................6

50 U.S.C. § 1881a ....................6, 7

FISA Amendments Act of 2008, Pub. L. No. 110-261, 122 Stat. 2436....................7, 8

FISA Amendments Act Reauthorization Act of 2012, Pub. L. No. 112-238, 126 Stat. 1631....................8

FISA Amendments Reauthorization Act of 2017, Pub. L. No. 115-118, 132 Stat. 3 (2018) ....................8

Foreign Intelligence Surveillance Act of 1978, Pub. L. No. 95-511, 92 Stat. 1783.... ....................7

Intelligence Reform and Terrorism Prevention Act of 2004, Pub L. No. 108-458, 118 Stat. 3638....................30

Reforming Intelligence and Securing America Act, Pub. L. No. 118-49, 138 Stat. 862 (2024) ........ 8, 11, 12, 13, 15, 16

USA FREEDOM Act of 2015, Pub. L. No. 114-23, 129 Stat. 268. ........20

USA PATRIOT Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 ........18

**LEGISLATIVE MATERIALS**

153 Cong. Rec. 20980 (2007) ........5

153 Cong. Rec. 20981 (2007) ........5

153 Cong. Rec. 21147 (2007) ........5

153 Cong. Rec. 21148 (2007) ........5

161 Cong. Rec. 7546 (2015) ........19

161 Cong. Rec. 7556 (2015) ........19

161 Cong. Rec. 7874 (2015) ........19

161 Cong. Rec. 8040 (2015) ........19

169 Cong. Rec. H6200 (daily ed. Dec. 6, 2023) ........10

170 Cong. Rec. H2272 (daily ed. Apr. 10, 2024) ........10

170 Cong. Rec. H2324 (daily ed. Apr. 12, 2024) ........ 10, 11

170 Cong. Rec. H2329 (daily ed. Apr. 12, 2024) ........10

170 Cong. Rec. H2332 (daily ed. Apr. 12, 2024) ........16

170 Cong. Rec. H2334 (daily ed. Apr. 12, 2024) ........ 10, 11

170 Cong. Rec. H2351 (daily ed. Apr. 12, 2024) ........16

170 Cong. Rec. S2836 (daily ed. Apr. 18, 2024) ........13

170 Cong. Rec. S2847 (daily ed. Apr. 18, 2024) ........10

*2022 Annual Worldwide Threat Assessment of the U.S. Intelligence Community: Hearing Before the S. Select Comm. on Intel.*, 117th Cong. (Mar. 10, 2022), https://perma.cc/J52R-6RWK ........22

*Examining Recommendations to Reform FISA Authorities: Hearing Before the H. Comm on the Judiciary*, 113th Cong. (2014), https://perma.cc/SC5P-YJBC .....19

*Fixing FISA: How a Law Designed to Protect Americans Has Been Weaponized Against Them: Hearing Before the Subcomm. on Crime & Fed. Gov't Surveillance of the H. Comm. on the Judiciary*, 118th Cong. (Apr. 27, 2023), https://perma.cc/7ZVA-HXBB ..........9

H.R. Rep. No. 110-207 (2007)..........4

*The 2023 Annual Threat Assessment of the U.S. Intelligence Community: Hearing Before the S. Select Comm. on Intel.*, 118th Cong. (Mar. 8, 2023), https://perma.cc/CHT6-9WLA ..........22

*The Report of the Privacy and Civil Liberties Oversight Board on Reforms to the Section 215 Telephone Records Program and the Foreign Intelligence Surveillance Court: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. (2014), https://perma.cc/G465-EV8L ..........18

**EXECUTIVE ORDERS AND PROCLAMATIONS**

Exec. Order No. 12,333, 46 Fed. Reg. 59941 (Dec. 4, 1981) ..........20

**OTHER AUTHORITIES**

Adriel Orozco, *Congress Expands Warrantless Surveillance of Immigrants Traveling to the US*, Am. Immigr. Council (Apr. 26, 2024), https://perma.cc/693K-E2ME ..........15

Alfred Cumming, Cong. Rsch. Serv., *Statutory Procedures Under Which Congress Is to Be Informed of U.S. Intelligence Activities, Including Covert Actions* (2006), https://perma.cc/BM3Y-7DSK..........26

Beth A. Williams, Member, Priv. & C.L. Oversight Bd., State of the Net Keynote (Feb. 11, 2025), https://perma.cc/4FP4-CCKH ..........24

David Medine & Esteban Morin, *Privacy and Civil Liberties Oversight Board*, *in The Cambridge Handbook of Surveillance Law* (David Gray & Stephen E. Henderson eds., 2017)..........29

David Medine, Chair, Priv. & C.L. Oversight Bd., Keynote Address at the Idaho Law Review Symposium, *in* 51 Idaho L. Rev. 711 (2015) ..........27

Elizabeth Goitein, *Is Secret Law the Solution to an Overbroad Surveillance Authority?*, Just Sec. (June 11, 2024), https://perma.cc/L8LF-LCFW ................14

*History and Jurisdiction*, House Permanent Select Comm. on Intel., https://perma.cc/7KDH-RVX6 ..........................................................................28

*History and Mission*, Priv. & C.L. Oversight Bd., https://perma.cc/S8YM-HYRR ..........................................................................................................28

Jordain Carney, *House Finally Passes Surveillance Bill After Three Stumbles*, POLITICO (Apr. 12, 2024), https://perma.cc/Y2N3-3SWU ................................8

Josh Meyer, *Fentanyl Kills Thousands of Americans. Could Plugging a Gap in U.S. Intelligence Save Lives?*, USA Today (Apr. 4, 2024), https://perma.cc/VQ5D-LV5Y.........................................................................17

Letter from Carlos Felipe Uriarte, Assistant Att'y Gen., U.S. Dep't of Just., to Sen. Mark Warner, Chairman, Senate Select Comm. on Intel. (Apr. 17, 2024), https://perma.cc/VG5J-2JHU............................................................................14

Letter from Merrick Garland, Att'y Gen., U.S. Dep't of Just., to Sen. Charles Schumer, Majority Leader & Sen. Mitch McConnell, Minority Leader (Apr. 18, 2024), https://perma.cc/FJQ8-YSCA......................................................... 13dero

Letter from Sens. Martin Heinrich & Ron Wyden, to the Hon. Avril Haines, Dir., ODNI & the Hon. William J. Burns, Dir., CIA (Apr. 13, 2021), https://perma.cc/3A7V-4BSJ ............................................................................21

Mary B. DeRosa, *Congressional Oversight of US Intelligence Activities*, *in National Security Intelligence and Ethics* (Seumas Miller et al. eds., 2021).......... ................................................................................................................. 26, 27

*Overview of the Senate Select Committee on Intelligence Responsibilities & Activities*, Senate Select Comm. on Intel., https://perma.cc/MWG3-UN6V.......28

Press Release, Sen. Ron Wyden, Wyden: "I Will Do Everything In My Power" to Stop Bill Expanding Government Surveillance Under FISA 702 (Apr. 12, 2024), https://perma.cc/7ZDX-F57U ..........................................................................14

Priv. & C.L. Oversight Bd., *Executive Order 12333* (2021), https://perma.cc/XL58-4RWX.................................................................... 20, 21

Priv. & C.L. Oversight Bd., *Fiscal Year 2021 Budget Justification* (2020), https://perma.cc/4GYW-ZU5Z ..........................................................................15

Priv. & C.L. Oversight Bd., *Recommendations from PCLOB Staff* (2020), https://perma.cc/SEY4-5NCH....................................................................... 20, 22

Priv. & C.L. Oversight Bd., *Report on Certain NSA Uses of XKEYSCORE for Counterterrorism Purposes* (2020), https://perma.cc/2PQZ-AS78.............. 20–21

Priv. & C.L. Oversight Bd., *Report on CIA Financial Data Activities in Support of ISIL-Related Counterterrorism Efforts* (2020), https://perma.cc/7JA4-PCUV...20

Priv. & C.L. Oversight Bd., *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* (2014), https://perma.cc/M3D4-SUVM ..........................................................................7

Priv. & C.L. Oversight Bd., *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* (2023), https://perma.cc/L4N6-EMA8 ............................................................ 7, 9, 11, 12

Priv. & C.L. Oversight Bd., *Report on the Telephone Records Program Conducted under Section 215 of the USA PATRIOT Act and on the Operations of the Foreign Intelligence Surveillance Court* (2014), https://perma.cc/ML22-KXW7 ..............................................................................................................18

Priv. & C.L. Oversight Bd., *Semi-Annual Report: January-June 2024* (2024), https://perma.cc/A6ZD-ABX4..........................................................................9

Priv. & C.L. Oversight Bd., *Strategic Plan 2022-2026* (2022), https://perma.cc/W7Z5-DXRH........................................................................27

Priv. & C.L. Oversight Bd., *Sub-Quorum Authorities and Operations When the Position of Chair is Vacant: Policy 102-01* (2024), https://perma.cc/79QS-EFSM ...........................................................................................................25

Release Statement, CIA, Declassification of Privacy and Civil Liberties Oversight Board Executive Order 12333 Reviews (Feb. 10, 2022), https://perma.cc/4X2E-NCFZ...............................................................................................................21

## GLOSSARY

| | |
|---|---|
| EO 12333 | Executive Order 12333 |
| FISA | Foreign Intelligence Surveillance Act |
| FISC | Foreign Intelligence Surveillance Court |
| HPSCI | House Permanent Select Committee on Intelligence |
| PCLOB or Board | Privacy and Civil Liberties Oversight Board |
| RISAA | Reforming Intelligence and Securing America Act |
| SSCI | Senate Select Committee on Intelligence |

## STATUTES AND REGULATIONS

All applicable statutes, etc., are contained in the Brief for Appellants.

## INTEREST OF AMICI CURIAE

Amici curiae eleven members of Congress file this brief with the written consent of all parties.[1] *See* Appendix (listing amici). Amici are committed to maintaining the system of checks and balances that ensures the government's counterterrorism efforts are balanced with the protection of Americans' privacy and civil liberties. In their capacity as members of Congress, amici rely on the investigations, reports, and recommendations of the Privacy and Civil Liberties Oversight Board (the PCLOB or the Board) to inform their oversight of powerful government surveillance programs and their development of legislative proposals. As a result, amici have deep familiarity with the PCLOB's work and its critical role in this system of checks and balances. Amici also have a strong interest in preserving the PCLOB's independence. Indeed, the Board's value to Congress, including amici, derives from its independent, nonpartisan expertise.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress created the Board in 2004 to ensure that the federal government's efforts to prevent terrorism are balanced with the need to protect privacy and civil liberties. When it became clear that executive branch influence was preventing the

[1] No counsel for a party authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person other than amici curiae and counsel made a monetary contribution to its preparation or submission.

PCLOB from fulfilling its oversight role, Congress reconstituted the Board by establishing it as an independent agency outside the White House's control and expanding its duties to Congress. Allowing the President to remove PCLOB members without cause would undermine those deliberate legislative reforms.

Since the PCLOB's reconstitution, its independent and expert analysis has been a vital resource for Congress. The Board, at times at the behest of members of Congress, has performed comprehensive investigations into the government's implementation of foreign intelligence authorities such as Section 702 of the Foreign Intelligence Surveillance Act (FISA) (Section 702), Section 215 of the USA PATRIOT Act (the Patriot Act), and Executive Order 12333. Members of Congress frequently rely on the reports and recommendations generated by these investigations in conducting oversight and developing legislation. Indeed, Congress has enacted many of the PCLOB's suggested reforms.

The Board's statutory structure as an independent, expert agency within the executive branch is critical to its ability to serve these functions. Interpreting the statute to permit at-will removal authority would reintroduce the intrusive White House influence that Congress sought to prevent when it reconstituted the Board in 2007. No longer could Congress reliably conclude that the PCLOB's reports and recommendations are nonpartisan, independent, and guided only by the facts, undermining its value as a legislative aid. With at-will removal power, the President

could also remove members until the PCLOB falls below the quorum required to perform its core duties, crippling the Board and hampering congressional oversight.

At the same time, the PCLOB's position as part of the executive branch is essential to its functions. Within the executive branch, the Board has access to intelligence-related information, much of which is formally or practically unavailable to most of Congress. The PCLOB's focused mission, relative to the congressional intelligence committees, also allows it to devote greater oversight capacity and resources to in-depth reviews of specific programs. The Board's contributions to congressional oversight of intrusive mass surveillance programs depend on insulating Board members from at-will removal while maintaining its position within the executive branch.

## ARGUMENT

### I. At-will removal is inconsistent with Congress's decision to insulate the PCLOB from presidential control.

As Appellees explain, Congress created the PCLOB in 2004 to ensure that expanded post-9/11 counterterrorism authorities were accompanied by increased oversight. Appellees' Br. 3; *see also* A128. Congress initially provided the President with the authority to remove PCLOB members at will, and members served under the general supervision of the President. *See* Appellees' Br. 28–29 (citing Intelligence Reform and Terrorism Prevention Act of 2004, § 1061, Pub. L. No. 108-458, 118 Stat. 3638). But it quickly "became clear that the Board—as then

constituted—was too closely tied to the President, and the Executive Branch more broadly, to be meaningfully independent." A131. To address these concerns, Congress amended the PCLOB's organic statute in 2007 to remove it from the President's supervision and establish it as an independent agency. *See* A131–36.

Appellees detail the changes to the statutory text that illustrate Congress's decision to shield PCLOB members from at-will removal, including the removal of language stating that Board members "serve at the pleasure of the President." Appellees' Br. 28–29. The legislative history also makes clear that Congress's primary concern when it reconstituted the PCLOB was insulating it from presidential control. *See Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431, 439–42 (2014) (relying on legislative history to interpret statutory changes); *In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 34 F.4th 1, 9 (D.C. Cir. 2022) ("In interpreting a statute, this court begins 'with the language of the statute itself' and, if necessary, 'may turn to other customary statutory interpretation tools, including structure, purpose, and legislative history.'" (quoting *Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 637 (D.C. Cir. 2021))).

Members of Congress were particularly "concerned about the extensive editing made by the Administration to the first report to Congress of the Board, the motivation for those edits, and how such editing may be detrimental to the independence of the Board." H.R. Rep. No. 110-207, at 33 (2007); *see also* A131–

32 (discussing testimony before Congress about the White House's extensive redlining). They recognized that the "lack of independence has clearly undermined [the PCLOB's] ability to act as a true civil liberties watchdog," making it necessary to "remove the Board from the [Executive Office of the President] and make it an independent agency within the executive branch." 153 Cong. Rec. 21148 (2007) (statement of Rep. Holt); *see also id.* at 20981 (statement of Sen. Durbin) (noting that "the [B]oard has not been an effective check on [the] administration" because it lacked sufficient "independence and authority"); *id.* at 20980 (statement of Sen. Akaka) (expressing support for "increas[ing] the independence of the [PCLOB], so that there will be no undue influence exerted on them"); *id.* at 21147 (statement of Rep. Udall) ("The Conference Report before us today gives the Board independence by finally removing it from the administration's control.").

It would have been entirely inconsistent with Congress's goal of insulating the PCLOB from presidential influence to preserve "the most direct method of presidential control—removal at will." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 225 (2020). It is no surprise, then, that Congress removed the statutory language granting the President at-will removal authority. Reading such authority back into the statute would not only nullify that change, as Appellees point out, but also squarely conflict with Congress's aim in reconstituting the Board.

## II. The PCLOB is indispensable to Congress's ability to conduct meaningful oversight over government surveillance programs.

Since its reconstitution as an independent agency, the Board has been an indispensable resource for Congress. As part of the PCLOB's reconstitution, Congress expanded the Board's statutory functions to include additional duties to Congress and the public. *See* A133–35 (citing 42 U.S.C. § 2000ee(d)–(f)) (detailing additional responsibilities, including reviewing proposed legislation, reporting conclusions, recommendations, and minority views to Congress, and educating the public). In fulfilling these duties, the reconstituted PCLOB has facilitated congressional oversight and public transparency of powerful government surveillance authorities, including Section 702, Section 215 of the Patriot Act, and Executive Order 12333.

### A. The PCLOB is critical to effective congressional oversight over Section 702.

Section 702 poses serious privacy and civil liberties risks and thus requires close congressional oversight. The provision authorizes the government, acting inside the United States, to warrantlessly collect the communications of any foreigner located abroad if a significant purpose of the collection is to obtain broadly defined "foreign intelligence information." *See* 50 U.S.C. § 1881a (setting forth collection authority); 50 U.S.C. § 1801(e) (defining "foreign intelligence information"). Enacted in 2008, Section 702 marked a stark departure from the

individualized court orders previously required to conduct most foreign intelligence surveillance inside the United States. *Compare* FISA Amendments Act of 2008, Pub. L. No. 110-261, sec. 101, § 702, 122 Stat. 2436, 2438–48, *with* Foreign Intelligence Surveillance Act of 1978, Pub. L. No. 95-511, §§ 101–103, 92 Stat. 1783, 1783–88 (codified as amended at 50 U.S.C. § 1801 *et seq.*).

Because Americans communicate with foreigners, warrantless collection under Section 702 "inevitably" sweeps in vast amounts of Americans' communications. Priv. & C.L. Oversight Bd., *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* 82 (2014), https://perma.cc/M3D4-SUVM. FISA does not require the government to obtain a warrant before searching through data obtained under Section 702 to find the communications of specific Americans, *see* 50 U.S.C. § 1881a(f), a practice that "poses significant privacy and civil liberties risks." Priv. & C.L. Oversight Bd., *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* 170 (2023), https://perma.cc/L4N6-EMA8 [hereinafter PCLOB 2023 Report]. These risks have been compounded by "persistent and widespread" violations of the internal agency procedures meant to mitigate the impact of Section 702 on Americans' privacy and civil liberties. [CAPTION REDACTED], No. [REDACTED], slip op. at 49 (FISA Ct. Apr. 21, 2022), https://perma.cc/TF7S-6RJ6.

Recognizing the potency of this warrantless surveillance authority, Congress has never permanently authorized Section 702. Instead, it regularly reevaluates the balance between Section 702's national security value and Americans' privacy and civil liberties interests. *See* FISA Amendments Act of 2008 § 403(b) (authorizing Section 702 for four years); FISA Amendments Act Reauthorization Act of 2012, Pub. L. No. 112-238, § 2, 126 Stat. 1631, 1631 (reauthorizing Section 702 for six years); FISA Amendments Reauthorization Act of 2017, Pub. L. No. 115-118, § 201(a), 132 Stat. 3, 19 (2018) (same). In 2024, Congress reauthorized Section 702 for only two years, *see* Reforming Intelligence and Securing America Act, Pub. L. No. 118-49, § 19(a), 138 Stat. 862, 891 (2024) [hereinafter RISAA], a compromise reached with members who had serious concerns about the authority. *See* Jordain Carney, *House Finally Passes Surveillance Bill After Three Stumbles*, POLITICO (Apr. 12, 2024), https://perma.cc/Y2N3-3SWU ("In a bid to get his holdouts on board, [Speaker] Johnson shortened the reauthorization period for the program from five years to two years . . . ."). These short renewals create opportunities for Congress to amend the statute, which it regularly does.

Congress relies on the PCLOB's reports and recommendations to inform its regular evaluations of Section 702 and development of reforms. The Board's role in the most recent reauthorization is illustrative. Before the April 2024 sunset date, the House Judiciary Subcommittee on Crime and Federal Government Surveillance

invited two PCLOB members, then-Chair Sharon Bradford Franklin and Appellant Beth Williams, to testify at a hearing on Section 702. *See Fixing FISA: How a Law Designed to Protect Americans Has Been Weaponized Against Them: Hearing Before the Subcomm. on Crime & Fed. Gov't Surveillance of the H. Comm. on the Judiciary*, 118th Cong. (Apr. 27, 2023), https://perma.cc/7ZVA-HXBB. Both members highlighted specific privacy and civil liberties concerns and proposed reforms. *See id.* at 24–25, 31–32 (statement of Sharon Bradford Franklin) (recommending Foreign Intelligence Surveillance Court review of U.S. person query terms, amicus reform, and a prohibition on "abouts" collection); *id.* at 33–34 (statement of Beth Williams) (recommending Congress codify or strengthen the FBI's sensitive query policy and authorize queries of 702 data for visa vetting).

The PCLOB also released a detailed report on Section 702, including a nearly 300-page public report with several classified annexes. *See generally* PCLOB 2023 Report. The report included twenty-six recommendations for legislative and policy changes. *Id.* at 202–25 (presenting nineteen recommendations supported by a majority of the Board); *id.* at B48–B56 (presenting seven recommendations supported by two members of the Board). Board members also provided "multiple briefings on Capitol Hill regarding congressional deliberations on the reauthorization of Section 702." Priv. & C.L. Oversight Bd., *Semi-Annual Report: January-June 2024*, at 6 (2024), https://perma.cc/A6ZD-ABX4.

The PCLOB's report and recommendations were central to congressional debate over reforms. Members relied on the Board's report to understand the privacy and civil liberties risks posed by Section 702. *See, e.g.*, 169 Cong. Rec. H6200 (daily ed. Dec. 6, 2023) (statement of Rep. Spartz) (highlighting the PCLOB's finding that "section 702 poses significant privacy and civil liberties risks, most notably from U.S. person queries and batch queries"); 170 Cong. Rec. H2324 (daily ed. Apr. 12, 2024) (statement of Rep. Lofgren) (noting that the PCLOB "concluded that there was little justification on the relative value of the close to 5 million [U.S. person queries] conducted by the FBI from 2019 to 2022"); 170 Cong. Rec. H2272 (daily ed. Apr. 10, 2024) (statement of Rep. Roy) (citing the PCLOB's observation that ordinary Americans may be in contact with 702 targets for business or personal reasons, without any connection to wrongdoing). The PCLOB's recommendations also served as a benchmark against which members compared proposed reforms. *See, e.g.*, 170 Cong. Rec. H2329 (daily ed. Apr. 12, 2024) (statement of Rep. Himes) (comparing proposed amendment to the Board's recommendation); 170 Cong. Rec. S2847 (daily ed. Apr. 18, 2024) (statement of Sen. Durbin) (noting the PCLOB Chair's support for a particular reform); 170 Cong. Rec. H2334 (daily ed. Apr. 12, 2024) (statement of Rep. Jordan) (noting the Board's support for a particular reform). Moreover, members invoked the PCLOB's status as an "independent government agency" with "access to all the classified intelligence that the agencies cite," to give

weight to its recommendations. *See, e.g.*, *id.* (statement of Rep. Jayapal); *id.* at H2324 (statement of Rep. Lofgren).

The Board's recommendations proved influential to the legislation Congress ultimately passed. Almost half of the recommendations made by PCLOB members were included in the final reauthorization bill, illustrating the Board's immense value to Congress during the most recent 702 reauthorization cycle (see table below).

| PCLOB Recommendation | RISAA Section |
|---|---|
| 2. Prohibit NSA from resuming "abouts" collection absent exigent circumstances. PCLOB 2023 Report at 203–04. | § 22 |
| 7. Require declassification of significant Foreign Intelligence Surveillance Court opinions within 180 days. *Id.* at 214. | § 7 |
| 14. Require public reporting of the numbers of sensitive queries and FBI queries intended solely to uncover evidence of a crime. *Id.* at 220. | § 11 (adopted in part) |
| 15. Strengthen the FBI's internal auditing and compliance processes. *Id.* at 221–22. | § 2(c) |
| 16. Require DOJ to perform annual compliance reviews at each FBI field office. *Id.* at 222–23. | §§ 2(c), 4(b) |
| 17. FBI should explore automated methods of supplementing its Section 702 compliance auditing. *Id.* at 223–24. | § 18(b) |

| Separate Statement Recommendation | RISAA Section |
|---|---|
| 2. Place limits on FBI queries of Section 702 data. *Id.* at B49–B51. | §§ 2(d), 3(b) (implemented or partially implemented several suggested limits) |
| 3. Improve FBI compliance and auditing. *Id.* at B51–B52. | §§ 2(c), 2(e), 13 (implemented several suggested auditing reforms) |
| 6. Create a new criminal statute penalizing leaks of Section 702 information regarding U.S. persons. *Id.* at B54–B55. | § 13(c) |
| 7. Allow the government to query Section 702 information for the purpose of vetting visa applicants. *Id.* at B55. | § 24 |

The Board's independent expertise and analysis will be valuable in assessing the implementation of RISAA's reforms to determine whether and how well they are protecting privacy. Indeed, that independent expertise and analysis will be particularly important during the upcoming reauthorization cycle because of changes in RISAA that have potentially significant implications for privacy and civil liberties. These changes include expansion of the definition of "electronic communication service provider" (ECSP), authorization to search Section 702-obtained information for travel-vetting purposes, and revision of FISA's definition of "foreign intelligence information" to include information related to international narcotics trafficking. *See* RISAA §§ 23–25.

*Expanded ECSP Definition*

RISAA substantially broadened the definition of "electronic communication service provider"—private entities that can be compelled to assist the government

in conducting Section 702 surveillance—in response to a heavily redacted opinion of the Foreign Intelligence Surveillance Court (FISC) finding that a particular type of provider was not covered by the previous definition. *See In re Petition to Set Aside or Modify Directive Issued to* [REDACTED], No. [REDACTED], slip op. at 20 (FISA Ct. 2022), https://perma.cc/F7D4-KSL5, *aff'd*, No. [REDACTED] (FISA Ct. Rev. 2023), https://perma.cc/DVD7-NZ94. Although the change was described as a narrow fix to ensure that the government could compel assistance from a specific type of provider, *see* Letter from Merrick Garland, Att'y Gen., U.S. Dep't of Just., to Sen. Charles Schumer, Majority Leader & Sen. Mitch McConnell, Minority Leader (Apr. 18, 2024), https://perma.cc/FJQ8-YSCA, the new definition was drafted in exceedingly expansive terms, *see* 170 Cong. Rec. S2836–37 (daily ed. Apr. 18, 2024) (statement of Sen. Warner) (acknowledging the provision "could have been drafted better"). Under the new definition, the government may compel assistance not only from companies that provide electronic communications services, but from "any other service provider who has access to equipment that is being or may be used to transmit or store wire or electronic communications," with certain narrow exceptions. RISAA § 25(a).

This expanded definition created substantial concern among members of Congress and civil society experts. Senator Wyden described it as "one of the most dramatic and terrifying expansions of government surveillance authority in history."

Press Release, Sen. Ron Wyden, Wyden: "I Will Do Everything In My Power" to Stop Bill Expanding Government Surveillance Under FISA 702 (Apr. 12, 2024), https://perma.cc/7ZDX-F57U. Privacy professionals shared these concerns. *See, e.g.*, Elizabeth Goitein, *Is Secret Law the Solution to an Overbroad Surveillance Authority?*, Just Sec. (June 11, 2024), https://perma.cc/L8LF-LCFW (expressing concern that under the expanded definition, the government could compel assistance from an enormous range of businesses, "including laundromats, barber shops, fitness centers, dentists' offices, . . . [and] the commercial landlords that lease the office space where tens of millions of Americans go to work every day"). To help allay concerns, the Department of Justice committed to applying the new definition only to the type of service provider at issue in the FISC opinion. *See* Letter from Carlos Felipe Uriarte, Assistant Att'y Gen., U.S. Dep't of Just., to Sen. Mark Warner, Chairman, Senate Select Comm. on Intel. (Apr. 17, 2024), https://perma.cc/VG5J-2JHU. That commitment, however, may not bind the current administration or future ones.

As Congress begins reauthorization discussions, the PCLOB's planned report on Section 702 is critical to helping Congress understand how this provision has been implemented. Congress needs to know how the executive branch interprets the definition, what kinds of entities have received directives under it, and what information the government has accessed pursuant to those directives. PCLOB

members and staff all have high-level security clearances, meaning they would have access to the classified portions of the FISC decision underlying the expanded ECSP definition. *See* Priv. & C.L. Oversight Bd., *Fiscal Year 2021 Budget Justification* 13 (2020), https://perma.cc/4GYW-ZU5Z. The Board would therefore be well-positioned to review the implementation of the ECSP definition and work with the intelligence community to develop and propose improved statutory language that meets the government's needs while reducing any unnecessary breadth in the provision.

*Travel Vetting*

The Board's investigation into the new travel-vetting provision of Section 702 would also benefit Congress. *See* RISAA § 24 (requiring agencies to develop procedures for using Section 702-obtained information in "the vetting of all non-United States persons who are being processed for travel to the United States"). Allowing warrantless searches of Section 702 databases for the private communications of anyone seeking to travel, work, or study in the United States, even absent any indication that the individual poses a national security threat, raises significant privacy concerns and heightens the risk that individuals will be screened based on ideology or political beliefs. *See* Adriel Orozco, *Congress Expands Warrantless Surveillance of Immigrants Traveling to the US*, Am. Immigr. Council (Apr. 26, 2024), https://perma.cc/693K-E2ME.

It is vital for Congress to understand how this authority has been implemented and its impact, including the effectiveness of the updated procedures in identifying individuals who pose a legitimate national security threat and the privacy and civil liberties consequences of the authority. The PCLOB's planned report would play an important role in helping Congress assess these questions.

*Expanded Definition of Foreign Intelligence Information*

The Board's analysis would also be especially valuable to Congress's assessment of the new definition of "foreign intelligence information," which RISAA expanded to include information related to the "international production, distribution, or financing of illicit synthetic drugs, opioids, cocaine, or other drugs driving overdose deaths," or their "precursors." RISAA § 23. This expansion was intended to "enhance[]" the intelligence community's ability "to counter drug cartels as they attempt to bring deadly fentanyl to our shores." 170 Cong. Rec. H2332 (daily ed. Apr. 12, 2024) (statement of Rep. Houlahan); *see also id.* at H2351 (statement of Rep. Crenshaw) ("My amendment would . . . ensure that we can collect intelligence on the Chinese [fentanyl] precursor being shipped into Mexico and into our own country . . . .").

This new definition raises serious civil liberties questions. As Representative Jim Himes, the ranking member of the House Permanent Select Committee on Intelligence (HPSCI) noted, expanding Section 702 to explicitly allow surveillance

targeting foreign narcotics trafficking "may impact U.S. persons more than you would on counterproliferation for example, or counterterrorism," leading to "heightened [privacy] concerns and sensitivities." Josh Meyer, *Fentanyl Kills Thousands of Americans. Could Plugging a Gap in U.S. Intelligence Save Lives?*, USA Today (Apr. 4, 2024), https://perma.cc/VQ5D-LV5Y. The FISC similarly expressed "concern[] that NSA and CIA might acquire a larger number of communications of or concerning U.S. persons, including those engaged purely in legitimate business" due to the "breadth and nature" of the authority. *In re DNI/AG 702(h) Certification 2024-D*, No. 702(j)-24-04, slip op. at 6 (FISA Ct. Apr. 9, 2025), https://perma.cc/M2E9-BP6Q. It is imperative that Congress have a thorough understanding of how the counternarcotics authority has been implemented so it can consider whether to impose additional safeguards.

Consistent with its recurrent role as an invaluable aid in congressional oversight over Section 702, the Board's review of how RISAA has been implemented and its suggestions for reforms will be critical to Congress as it contemplates future legislation regarding Section 702.

### B. The Board's report on surveillance under Section 215 was instrumental in Congress's decision to end the NSA's bulk telephone records program.

The PCLOB has also played a key role in Congress's evaluation of other surveillance programs, including those operated pursuant to Section 215 of the

Patriot Act. *See* Pub. L. No. 107-56, sec. 215, § 501, 115 Stat. 272, 287–88 (2001). Following Edward Snowden's leaks regarding NSA surveillance programs, a bipartisan group of senators asked the PCLOB to investigate the NSA's use of Section 215 to collect the metadata of most Americans' phone calls, including the time, duration, and phone numbers on the other end. *See* Priv. & C.L. Oversight Bd., *Report on the Telephone Records Program Conducted under Section 215 of the USA PATRIOT Act and on the Operations of the Foreign Intelligence Surveillance Court* 1 (2014), https://perma.cc/ML22-KXW7. The Board's report concluded that the NSA's telephone records program, which the FISC had approved, was highly invasive of Americans' privacy but provided only limited intelligence value. *Id.* at 146, 167–68. The Board recommended that the NSA end the program and substantially bolster privacy protections for all bulk collection performed pursuant to Section 215. *Id.* at 168–72.

Members of Congress analyzed the Board's report extensively in their consideration of reforms to Section 215. The Senate Judiciary Committee held a standalone hearing focused on the PCLOB's report. *The Report of the Privacy and Civil Liberties Oversight Board on Reforms to the Section 215 Telephone Records Program and the Foreign Intelligence Surveillance Court: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. (2014), https://perma.cc/G465-EV8L. The House Judiciary Committee also held a hearing on Section 215, during which it

considered recommendations made by the PCLOB as well a special commission formed by President Obama to review intelligence and communications technologies. *Examining Recommendations to Reform FISA Authorities: Hearing Before the H. Comm on the Judiciary*, 113th Cong. (2014), https://perma.cc/SC5P-YJBC.

Senators also repeatedly discussed the PCLOB's report and recommendations in their floor statements regarding proposed reform legislation. Senators who supported limits on the NSA's bulk collection program relied on the PCLOB's finding that the program had limited intelligence value. *See* 161 Cong. Rec. 7874 (statement of Sen. Wyden); *id.* at 7556 (statement of Sen. Daines) (emphasizing that the "nonpartisan, independent" PCLOB found minimal intelligence value from the bulk metadata collection). Others relied heavily on the PCLOB's characterizations of the metadata program to understand its scope. *See, e.g.*, *id.* at 7546 (statement of Sen. Paul) ("[The PCLOB] really had some insightful comments. . . . They said that an order was given so that the NSA is to collect nearly all call detail records generated by certain telephone companies in the United States."). Senators also emphasized the PCLOB's legal analysis in arguing that the program required reform. *Id.* at 8040 (statement of Sen. Leahy) (relying on the PCLOB's "detailed constitutional and statutory analysis"). Consistent with the Board's recommendation,

Congress ultimately ended the bulk telephone records program. *See* USA FREEDOM Act of 2015, Pub. L. No. 114-23, §§ 101, 103, 129 Stat. 268, 269–72.

### C. The PCLOB's reports on Executive Order 12333 increased public transparency and facilitated stronger safeguards for surveillance conducted under the order.

The Board's reports on Executive Order 12333 (EO 12333) have similarly facilitated congressional oversight over surveillance conducted pursuant to that authority. EO 12333 is a "foundational document for the United States' foreign intelligence efforts," governing surveillance of foreigners conducted overseas and other collection that falls outside the scope of FISA. Priv. & C.L. Oversight Bd., *Executive Order 12333*, at 4 (2021), https://perma.cc/XL58-4RWX [hereinafter PCLOB 12333 Report]; *see generally* Exec. Order No. 12,333, 46 Fed. Reg. 59941 (Dec. 4, 1981). Over several years, the PCLOB conducted in-depth investigations into three counterterrorism-related surveillance programs operated under EO 12333, known as Deep Dives I, II, and III. *Id.* at 7–8. The investigations culminated in classified reports and a 26-page public overview of EO 12333. *See* Priv. & C.L. Oversight Bd., *Report on CIA Financial Data Activities in Support of ISIL-Related Counterterrorism Efforts* (2020), https://perma.cc/7JA4-PCUV; Priv. & C.L. Oversight Bd., *Recommendations from PCLOB Staff* (2020), https://perma.cc/SEY4-5NCH; Priv. & C.L. Oversight Bd., *Report on Certain NSA*

*Uses of XKEYSCORE for Counterterrorism Purposes* (2020), https://perma.cc/2PQZ-AS78; PCLOB 12333 Report.

The Board's reports brought new information about EO 12333 collection to Congress's attention. Indeed, "[u]ntil the PCLOB report was delivered . . . the nature and full extent of the CIA's collection was withheld even from the Senate Select Committee on Intelligence." Letter from Sens. Martin Heinrich & Ron Wyden, to the Hon. Avril Haines, Dir., ODNI & the Hon. William J. Burns, Dir., CIA (Apr. 13, 2021), https://perma.cc/3A7V-4BSJ. The reports revealed that the CIA was conducting a bulk collection program "entirely outside the statutory framework that Congress and the public believe[d] govern[ed]," prompting the Senators to request declassification review for the classified reports to ensure that "the American public not be misled." *Id.* In response to the request, the CIA declassified, with redactions, the Deep Dive I report and the staff recommendations related to Deep Dive II. *See* Release Statement, CIA, Declassification of Privacy and Civil Liberties Oversight Board Executive Order 12333 Reviews (Feb. 10, 2022), https://perma.cc/4X2E-NCFZ. By bringing new information about EO 12333 to both Congress's and the public's attention, the PCLOB increased transparency around one of the government's most secretive surveillance authorities.

That transparency ultimately resulted in Congress's ability to hold the CIA publicly accountable for implementing stronger safeguards. The declassified Deep

Dive II staff recommendations suggested that the CIA require written justifications for queries of U.S. person information, to enable such queries to be audited. *See* Priv. & C.L. Oversight Bd., *Recommendations from PCLOB Staff* 2 (2020), https://perma.cc/SEY4-5NCH. At an intelligence committee hearing shortly after the recommendations were declassified, Senator Wyden sought a public commitment from then-CIA Director William Burns that the agency would update its internal policies to implement the recommendation. *See 2022 Annual Worldwide Threat Assessment of the U.S. Intelligence Community: Hearing Before the S. Select Comm. on Intel.*, 117th Cong. 17 (Mar. 10, 2022), https://perma.cc/J52R-6RWK. Director Burns committed to doing so within six months, *id.*, and a year later, testified before Congress that the CIA had fulfilled its commitment, *The 2023 Annual Threat Assessment of the U.S. Intelligence Community: Hearing Before the S. Select Comm. on Intel.*, 118th Cong. 28 (Mar. 8, 2023), https://perma.cc/CHT6-9WLA. The Board's contributions to congressional oversight thus do more than inform legislation—by increasing transparency around secret surveillance programs, the Board's in-depth reviews and reports allow Congress and the public to hold the executive branch accountable for strengthening Americans' privacy and civil liberties protections.

## III. The PCLOB's structure as an independent, expert agency within the executive branch is critical to its ability to facilitate congressional oversight over government surveillance.

### A. At-will removal is incompatible with the PCLOB's function as a legislative aid.

Allowing the President to remove PCLOB members without cause would compromise Congress's ability to rely on the PCLOB to provide independent, expert analysis and enable the President to deprive the PCLOB of the quorum required to perform many of its functions.

As discussed in Part II, Congress relies heavily on the PCLOB's in-depth investigations, reports, and legislative recommendations to facilitate transparency and inform its oversight of powerful government surveillance programs. But "one who holds his office only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's will." *Humphrey's Ex'r v. United States*, 295 U.S. 602, 629 (1935). Consequently, authorizing the President to remove PCLOB members without cause would undermine Congress's ability to trust that PCLOB reports and recommendations are the "trained judgment of a body of experts" "act[ing] with entire impartiality." *Seila L.*, 591 U.S. at 216 (quoting *Humphrey's*, 295 U.S. at 624). Such a result would severely diminish the Board's value to Congress. Indeed, it was precisely this lesson that Congress had learned by 2007 and that prompted reforms. *See supra* Part I.

Beyond influencing the Board, at-will removal would allow the President to prevent the PCLOB from performing several core functions at all. Without a quorum of at least three members, the PCLOB "may not, *inter alia*: issue advice in the name of the Board, issue any Board reports, submit its statutorily required Semi-Annual Report, or request a subpoena from the Attorney General." A186 (citing Priv. & C.L. Oversight Bd., *Sub-Quorum Authorities and Operations When the Position of Chair is Vacant: Policy 102-01*, at 5 (2024), https://perma.cc/79QS-EFSM [hereinafter Policy 102-01]); *see also* 42 U.S.C. § 2000ee(g)(1)(D). Nor can the Board initiate any new projects, even at the request of Congress. *See* Beth A. Williams, Member, Priv. & C.L. Oversight Bd., State of the Net Keynote (Feb. 11, 2025), https://perma.cc/4FP4-CCKH ("[U]ntil I am joined by two more members, the Board cannot officially open new projects."). A quorum is essential for the Board to "act at its fullest capacity." *Id.*

At-will removal authority would allow the President to unilaterally deprive the Board of a quorum by dismissing PCLOB members and declining to nominate replacements, thereby preventing the Board from performing its core functions for extended periods. Indeed, that reality is currently unfolding—President Trump fired three PCLOB members in January and has not made any nominations to restore a quorum. A139–40. The Board's current sub-quorum status is particularly

problematic in light of the upcoming Section 702 reauthorization deadline in April 2026. A187.

While the Board is operating in sub-quorum status, internal PCLOB policy does permit the staff to issue reports for projects initiated before the loss of quorum. *See* Policy 102-01 § 6(I)(C). But staff reports have several shortcomings. Most notably, any remaining Board member can unilaterally prevent publication of a staff report, *see id.*, allowing that single member effective control over such reports. Staff reports are also constrained by the scope of the project as it stood when the Board had a quorum—staff may not expand the scope, even if new information is discovered while writing the report. *See id.* § 6(I)(A). Finally, reports published by the staff do not carry the authority of reports published by a quorate Board or include separate statements by individual Board members, meaning they lack the "ventilation of disparate views [that] is of particular importance in the context of the government's counterterrorism authorities given their significant implications for privacy and civil liberties interests." A169. Congress values the input and recommendations in separate statements—as noted above, in 2024, Congress enacted more than half of the recommendations proposed in the separate statement to the Board's 2023 report on Section 702. *See supra* Part II.A. At-will removal power would thus permit significant presidential interference with the PCLOB's contributions to congressional oversight.

### B. The PCLOB's position within the executive branch and tailored mission provide it with oversight capabilities beyond those generally available to Congress.

Congress cannot simply replace an independent PCLOB with its own oversight tools. The PCLOB's position within the executive branch and focused mission are essential to its function as an aid in congressional oversight over government surveillance programs.

First, although the executive branch has a constitutional and statutory responsibility to provide information on intelligence programs to congressional intelligence committees, the committees have faced challenges to their oversight in the form of "Gang of Eight"[2] briefings that exclude the full committees and committee staff. *See* Mary B. DeRosa, *Congressional Oversight of US Intelligence Activities*, *in National Security Intelligence and Ethics* 216, 223–24 (Seumas Miller et al. eds., 2021). Even highly consequential programs have been subject to these limited briefings. For example, only the Gang of Eight was briefed on the President's Surveillance Program, a controversial post-9/11 warrantless surveillance program. *See* Alfred Cumming, Cong. Rsch. Serv., *Statutory Procedures Under Which Congress Is to Be Informed of U.S. Intelligence Activities, Including Covert Actions* 6–8 (2006), https://perma.cc/BM3Y-7DSK. These limited notifications impede

[2] The "Gang of Eight" includes the House and Senate majority and minority leaders and the chairs and ranking members of the House and Senate intelligence committees.

congressional oversight because "[w]ithout being able to discuss the matter with staff, lawyers or any colleagues other than the few who ha[ve] also been briefed, members of Congress have few avenues to raise concerns or take corrective action." DeRosa, *supra*, at 224.

The PCLOB's position as an independent agency within the executive branch, by contrast, grants the Board access to deliberative materials and other information that the executive branch may otherwise seek to withhold from Congress. *See* David Medine, Chair, Priv. & C.L. Oversight Bd., Keynote Address at the Idaho Law Review Symposium, *in* 51 Idaho L. Rev. 711, 711 (2015) (explaining the PCLOB's access to information). Congress explicitly gave the PCLOB this authority, providing that the Board "is authorized to have access from any department, agency, or element of the executive branch, or any Federal officer or employee of any such department, agency, or element, to all relevant records, reports, audits, reviews, documents, papers, recommendations, or other relevant material, including classified information consistent with applicable law." 42 U.S.C. § 2000ee(g)(1)(A). In practice, the Board engages in a dialogue with other executive branch components to access information. *See* Priv. & C.L. Oversight Bd., *Strategic Plan 2022-2026*, at 16 (2022), https://perma.cc/W7Z5-DXRH. In the event a department or agency denies the PCLOB's request for information, the Board must report the circumstances to the agency head, who "shall ensure that the Board is given access

to the information, assistance, material, or personnel the Board determines to be necessary to carry out its functions." 42 U.S.C. § 2000ee(g)(4). The PCLOB's position within the executive branch and robust statutory authority thus facilitate a unique level of access to information.

Second, the PCLOB's focused mission, relative to the broad responsibilities of the congressional intelligence committees, allows it to devote more resources to reviewing particular counterterrorism authorities and programs. The Board is specifically mandated to "ensure that the federal government's efforts to prevent terrorism are balanced with the need to protect privacy and civil liberties." *See History and Mission*, Priv. & C.L. Oversight Bd., https://perma.cc/S8YM-HYRR; *see also* 42 U.S.C. § 2000ee(c). This allows the Board to concentrate resources on in-depth reviews of specific programs to evaluate their impact on privacy and civil liberties. By contrast, the congressional intelligence committees are responsible for overseeing the entirety of the intelligence community, including budgetary, policy, legal, personnel, and other matters at each of the community's eighteen entities, as well as considering annual authorizing intelligence legislation.[3] "[G]iven the other responsibilities of SSCI and HPSCI members and their staffs, there are practical

---

[3] *See Overview of the Senate Select Committee on Intelligence Responsibilities & Activities*, Senate Select Comm. on Intel., https://perma.cc/MWG3-UN6V; *History and Jurisdiction*, House Permanent Select Comm. on Intel., https://perma.cc/7KDH-RVX6.

limitations to the committees' work" that prevent them from regularly performing the extensive reviews characteristic of the PCLOB's work. David Medine & Esteban Morin, *Privacy and Civil Liberties Oversight Board*, *in The Cambridge Handbook of Surveillance Law* 677, 683 (David Gray & Stephen E. Henderson eds., 2017). The Board's ability to focus its resources on these reviews serves as a vital supplement to the intelligence committees' work.

Third, the PCLOB is tasked with researching, writing, and, to the extent possible, publicly disseminating detailed reports. *See* 42 U.S.C. § 2000ee(f)(1) (requiring the Board to make its reports public "to the greatest extent that is consistent with the protection of classified information and applicable law"); 42 U.S.C. § 2000ee(f)(2) (requiring the Board to "hold public hearings and otherwise inform the public of its activities"). Congressional committees, by contrast, are focused on day-to-day oversight and rarely produce public reports. Reports specifically on the civil liberties implications of particular programs are rarer still. The PCLOB's comprehensive reports are thus a critical and unique resource for Congress, including the intelligence committees, as well as the public.

Finally, PCLOB members must be selected "solely on the basis of their professional qualifications, achievements, public stature, expertise in civil liberties and privacy, and relevant experience, and without regard to political affiliation." 42

U.S.C. § 2000ee(h)(2). As a result, PCLOB members have experience and technical expertise tailored to the Board's privacy and civil liberties mandate.

The Board's focused mission and access to information make it a vital part of the "enhanced system of checks and balances" that Congress viewed as necessary after 9/11. Intelligence Reform and Terrorism Prevention Act of 2004, Pub L. No. 108-458, § 1061(a), 118 Stat. 3638, 3684. To maintain that system of checks and balances, the PCLOB's status as an independent agency within the executive branch, insulated from at-will removal, must be preserved.

## CONCLUSION

At-will removal would undermine Congress's choice to insulate PCLOB members from presidential control and is incompatible with the Board's function as an aid to congressional oversight. This Court should hold that the President lacks the authority to remove PCLOB members at will.

Dated: September 12, 2025

Respectfully submitted,

*/s/ Leah J. Tulin*

Leah J. Tulin
*Counsel of Record*
Faiza Patel
Hannah James
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
1140 Connecticut Avenue NW
Suite 1150
Washington, D.C. 20036
(202) 650-6397
tulinl@brennan.law.nyu.edu
patelf@brennan.law.nyu.edu
jamesh@brennan.law.nyu.edu

Ryan Carroll
Senior Counsel
OFFICE OF SEN. RON WYDEN
221 Dirksen Senate Office Bldg.
Washington, D.C. 20510
(202) 224-5244
ryan_carroll@wyden.senate.gov

Noah Chauvin
Associate Professor of Law*
COLLEGE OF LAW
UNIVERSITY OF OKLAHOMA
300 W. Timberdell Road
Norman, OK 73019
(405) 561-1877
noahchauvin@ou.edu

*Counsel for Amici Curiae*

* Affiliation provided for identification purposes only.

# APPENDIX

## LIST OF AMICI CURIAE

**Ron Wyden**
Senator from Oregon

**Richard Blumenthal**
Senator from Connecticut

**Cory A. Booker**
Senator from New Jersey

**Martin Heinrich**
Senator from New Mexico

**Mazie K. Hirono**
Senator from Hawaii

**Edward J. Markey**
Senator from Massachusetts

**Elizabeth Warren**
Senator from Massachusetts

**Sara Jacobs**
Representative from California

**Pramila Jayapal**
Representative from Washington

**Ted Lieu**
Representative from California

**Zoe Lofgren**
Representative from California

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1), it contains 6,496 words. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 29(a)(4) and 32(a)(5)-(6) because it has been prepared using Microsoft Word in 14-point Times New Roman, a proportionally spaced typeface.

*/s/ Leah J. Tulin*
Leah J. Tulin

**CERTIFICATE OF SERVICE**

I hereby certify that on September 12, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will cause it to be served on all parties and counsel of record.

*/s/ Leah J. Tulin*
Leah J. Tulin