**[ORAL ARGUMENT SCHEDULED FOR OCTOBER 28, 2025]**

**No. 25-5197**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

TRAVIS LEBLANC; EDWARD FELTEN,

Plaintiffs-Appellees,

v.

U.S. PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, et al.,

Defendants-Appellants.

On Appeal from the United States District Court for the District of Columbia

# REPLY BRIEF

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
ADAM C. JED
*Attorneys, Appellate Staff*
*Civil Division, Room 7243*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*202-514-8280*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A. Parties and Amici

Plaintiffs-appellees are Travis LeBlanc and Edward Felten.

Defendants-appellants are the United States Privacy and Civil Liberties Oversight Board; Beth A. Williams, in her official capacity as a Board Member of the United States Privacy and Civil Liberties Oversight Board; Jenny Fitzpatrick, in her official capacity as Executive Director of the United States Privacy and Civil Liberties Oversight Board; Trent Morse, in his official capacity as Deputy Director of Presidential Personnel; and Donald J. Trump, in his official capacity as President of the United States of America.

The following participated as amici curiae in district court: the State of Alabama, State of Alaska, Arizona Legislature, State of Florida, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of North Dakota, State of Oklahoma, State of South Carolina, State of South Dakota, State of Tennessee, State of Texas, and State of West Virginia.

**B. Rulings Under Review**

Defendants-appellants are appealing from the May 21, 2025, final judgment and permanent injunction issued by the Honorable Reggie B. Walton, United States District Court for the District of Columbia, in Case No. 25-cv-542, Dkt. Nos. 24, 25. The district court's order and opinion are reproduced in the Appendix at A126 and A197 respectively and are published at 784 F. Supp. 3d 1.

**C. Related Cases**

This case has not previously been before this Court. Issues related to the removal of officials from different agencies are presented in other cases pending within this Circuit. *See Harris v. Bessent*, No. 25-5037 (D.C. Cir.), No. 25-cv-412 (D.D.C.); *Wilcox v. Trump*, No. 25-5057 (D.C. Cir.), No. 25-cv-334 (D.D.C.); *Aviel v. Gor*, No. 25-5105 (D.C. Cir.), No. 25-cv-778 (D.D.C.); *Grundmann v. Trump*, No. 25-5165 (D.C. Cir.), No. 25-cv-425 (D.D.C.); *U.S. Inst. of Peace v. Jackson*, No. 25-5185 (D.C. Cir.), No. 25-cv-804 (D.D.C.); *Slaughter v. Trump*, No. 25-5261 (D.C. Cir.), No. 25-cv-909 (D.D.C.); *Harper v. Bessent*, No. 25-5268 (D.C. Cir.), No. 25-cv-1294 (D.D.C.); *Perlmutter v. Blanche*, No. 25-5285 (D.C. Cir.), No. 25-cv-1659 (D.D.C.); *Cook v. Trump*, No. 25-5326 (D.C. Cir.), No. 25-cv-2903 (D.D.C.); *Storch v. Hegseth*, No. 25-cv-415 (D.D.C.); *Brehm v. Marocco*, No. 25-cv-660 (D.D.C.); *Cristosal Hum. Rts. v. Marocco*, No. 25-cv-857 (D.D.C); *Abramowitz v. Lake*, No. 25-cv-887 (D.D.C.); *Samuels v. Trump*, No. 25-cv-1069

(D.D.C.); *Pippenger v. U.S. DOGE Serv.*, No. 25-cv-1090 (D.D.C.); *Corporation for Pub. Broad. v. Trump*, No. 25-cv-1305 (D.D.C.); *Rural Dev. Innovations Ltd. v. Marocco*, No. 25-cv-1631 (D.D.C); *Brown v. Trump*, No. 25-cv-1764 (D.D.C.).

/s/ *Adam Jed*
Adam C. Jed
*Attorney, Appellate Staff*
*Civil Division, Room 7243*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-8280*

## TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION AND SUMMARY ..... 1

ARGUMENT ..... 2

I. The Statute Does Not Impose A Removal Restriction ..... 2

A. The Absence of a Textual Removal Restriction Is Dispositive ..... 2

B. Plaintiffs' Textual Arguments Lack Merit ..... 11

C. The Board's Structure and Function Are Not Operationally Incompatible With Presidential Removal ..... 13

D. The 2007 History Undermines Plaintiffs' Position ..... 19

II. Plaintiffs Cannot Show Entitlement To Reinstatement ..... 25

CONCLUSION ..... 30

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Calcutt v. Federal Deposit Ins. Corp.*,
37 F.4th 293 (6th Cir. 2022) ..... 12

*Carlucci v. Doe*,
488 U.S. 93 (1988) ..... 4

*Collins v. Yellen*,
594 U.S. 220 (2021) ..... 3, 4, 5, 6, 9, 13, 14

*Crenshaw v. United States*,
134 U.S. 99 (1890) ..... 27

*Edmond v. United States*,
520 U.S. 651 (1997) ..... 14

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ..... 4, 26

*Hennen, Ex parte*,
38 U.S. 230 (1839) ..... 12

*Humphrey's Executor v. United States*,
295 U.S. 602 (1935) ..... 5, 6, 7, 15

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004) ..... 22

*Kennedy v. Braidwood Mgmt., Inc.*,
145 S. Ct. 2427 (2025) ..... 2, 3, 4, 5, 9, 13, 14

*LeBlanc v. PCLOB*,
No. 25-5197, 2025 WL 1840591 (D.C. Cir. July 1, 2025) ..... 2, 7

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) ..... 26, 27

*Mead Corp. v. Tilley*,
490 U.S. 714 (1989) ..... 24

*MFS Sec. Corp. v. SEC*,
380 F.3d 611 (2d Cir. 2004) ..... 10

*Myers v. United States*,
272 U.S. 52 (1926) ....................21, 22

*Norton v. Southern Utah Wilderness All*,
542 U.S. 55 (2004) ....................27

*Parsons v. United States*,
167 U.S. 324 (1897) ....................11, 12, 21

*Sampson v. Murray*,
415 U.S. 61 (1974) ....................25, 27

*SEC v. Blinder, Robinson & Co.*,
855 F.2d 677 (10th Cir. 1988)....................10

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) ....................7, 14

*Severino v. Biden*,
71 F.4th 1038 (D.C. Cir. 2023)....... 5, 6, 7, 8, 9, 11, 14, 15, 16, 17, 18, 21, 25, 26

*Shurtleff v. United States*,
189 U.S. 311 (1903) ....................3, 4, 5, 9

*Spicer v. Biden*,
575 F. Supp. 3d 93 (D.D.C. 2021) .................... 11-12

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996) ....................25, 26

*Taylor v. Beckham*,
178 U.S. 548 (1900) ....................27

*Trump v. Wilcox*,
145 S. Ct. 1415 (2025) ....................29

*Virginia House of Delegates v. Bethune-Hill*,
587 U.S. 658 (2019) .................... 27-28

*Vitarelli v. Seaton*,
359 U.S. 535 (1959) ....................25

*Webster v. Doe*,
486 U.S. 592 (1988) ....................25

**Statutes:**

Intelligence Reform and Terrorism Prevention Act of 2004,
Pub. L. No. 108-458, 118 Stat. 3638 .......... 20

5 U.S.C. § 412(b) .......... 18

5 U.S.C. § 415(f)(2) .......... 18

5 U.S.C. § 417(e) .......... 18

5 U.S.C. § 419(d)(2) .......... 18

5 U.S.C. § 419(f) .......... 18

5 U.S.C. § 424(e) .......... 19

6 U.S.C. § 555 .......... 18

6 U.S.C. § 793 .......... 17

6 U.S.C. § 1500(b)(2) .......... 23

10 U.S.C. § 181 .......... 18

10 U.S.C. § 430c .......... 18

10 U.S.C. § 4701(a)(2)(D) .......... 17

10 U.S.C. § 4701(g)(5) .......... 18

15 U.S.C. § 657 .......... 18

15 U.S.C. § 657u .......... 18

15 U.S.C. § 9058a(i) .......... 18

19 U.S.C. § 2171(b) .......... 23

21 U.S.C. § 1703(a)(1)(A) .......... 23

21 U.S.C. § 1703(a)(1)(B) .......... 23

28 U.S.C. § 541 .......... 21

28 U.S.C. § 561 ....................21

42 U.S.C. § 1320a-7k(a)(2) ....................19

42 U.S.C. § 18117 ....................19

42 U.S.C. § 2000ee(a) ....................13, 16

42 U.S.C. § 2000ee(c)-(d) ....................16

42 U.S.C. § 2000ee(d)(1) ....................17

42 U.S.C. § 2000ee(d)(1)(C) ....................16

42 U.S.C. § 2000ee(d)(3) ....................16

42 U.S.C. § 2000ee(h)(4) ....................11, 12

42 U.S.C. § 4342 ....................23

42 U.S.C. § 6634(b) ....................23

49 U.S.C. § 5329(c) ....................18

50 U.S.C. § 3033(h)(1) ....................19

50 U.S.C. § 3033(h)(2)(A) ....................19

**Legislative Materials:**

H.R. Rep. No. 110-259 (2007) (Conf. Rep.) ....................24

**Other Authorities:**

*Oversight*, Merriam-Webster Dictionary, https://perma.cc/8HWS-GLQV ....................17

*Oversight*, Oxford English Dictionary, https://www.oed.com/dictionary/oversight_n ....................17

PCLOB, *Oversight Reports,* https://www.pclob.gov/Oversight ....................17

Jed Handelsman Shugerman, *Presidential Removal: The* Marbury *Problem and the Madison Solutions*, 89 Fordham L. Rev. 2085 (2021)....................27

U.S. Dep't of Just., *Attorney General's Manual on the Administrative Procedure Act* (1947)....................26

## GLOSSARY

| | |
|---|---|
| A | Appendix |
| APA | Administrative Procedure Act |
| FEC | Federal Election Commission |
| Gov.Br. | Government's Brief for Appellants |
| PCLOB or Board | U.S. Privacy and Civil Liberties Oversight Board |
| Pl.Br. | Plaintiffs' Brief for Appellees |
| SEC | Securities and Exchange Commission |

## INTRODUCTION AND SUMMARY

The Privacy and Civil Liberties Oversight Board (PCLOB) is appointed by the President, is part of the Executive Branch, advises on national security programs, and is integrated into other agencies' similar functions. No statutory provision purports to restrict the President's power to remove Board members. The President may therefore remove Board members at will.

Plaintiffs' merits argument reduces to three main points: (1) it is immaterial that the statute does not address removal; (2) when Congress reconstituted the PCLOB in 2007, Congress "clearly" (albeit implicitly) established an unspecified removal restriction by making various textual changes without addressing removal; and (3) the PCLOB's structure and functions are incompatible with the President's removal power because the PCLOB provides expert advice and submits reports to both Congress and the President. Each contention lacks merit.

Under governing Supreme Court precedent, there would have to be "clear and explicit language" restricting removal. And, in any event, it is implausible that when Congress significantly rewrote the statute in 2007, it intended to establish a removal restriction through inferences rather than statutory text. The PCLOB's structure and function do not establish any such intent, let alone a clear intent. The PCLOB is structured like other multi-member boards that have no removal protections. Like inspectors general, the Administrative Conference, and others, it is established in the

Executive Branch to provide candid and expert analysis on important subjects while ultimately remaining accountable to the President.

Plaintiffs also insist that the district court was empowered to restore them to office "de facto." Plaintiffs, however, disregard the district court's order, which does far more, as well as black-letter law governing remedies. And even if the district court had the power to order some form of reinstatement in extraordinary cases, this is not such a case.

## ARGUMENT

### I. The Statute Does Not Impose A Removal Restriction

#### A. The Absence of a Textual Removal Restriction Is Dispositive

**1. a.** For an agency like the PCLOB, there must be "'very clear and explicit language' to restrict the President's removal power," and courts should not "impl[y]" a "removal protection." *LeBlanc v. PCLOB*, No. 25-5197, 2025 WL 1840591, at *1 (D.C. Cir. July 1, 2025) (per curiam); *see* Gov.Br.21-28. The district court's freewheeling and amorphous effort to guess at what Congress intended contradicts governing precedent.

Plaintiffs offer no convincing answer to that precedent. Despite the motions panel's and the government's reliance on *Kennedy v. Braidwood Management, Inc.*, 145 S. Ct. 2427, 2444, 2448-2449 (2025), plaintiffs' only mentions of *Braidwood* concern subsidiary issues. Pl.Br.36-38.

Even setting aside *Braidwood*, the pertinent reasoning in *Collins v. Yellen*, 594 U.S. 220 (2021), is not limited to single-headed agencies (Pl.Br.21, 27-28) and did not contemplate implied removal restrictions for any "type" of Executive Branch agency (Pl.Br.28). 594 U.S. at 247-250 & n.18. The Court repeatedly pointed to *Shurtleff* and twice reiterated (not just in "a footnote," Pl.Br.27-28) that it "generally presume[s]" that "the President holds the power to remove at will executive officers and that a statute must contain 'plain language to take [that power] away.'" 594 U.S. at 248, 250 (second alteration in original) (quoting and citing *Shurtleff v. United States*, 189 U.S. 311, 316 (1903)). The Court then responded to the contention that this is "not a hard and fast rule" by acknowledging *Wiener* (in a footnote), explaining the limited reach of that case, and clarifying that for an agency (like the PCLOB) that "is not an adjudicatory body … *Shurtleff* … is the more applicable precedent." *Id.* at 250 & n.18.

Plaintiffs take that to mean that when an agency (like the PCLOB) "is not an adjudicatory body" a statute "~~must~~ <u>need not</u> contain 'plain language'" to restrict the President's default removal authority. *Collins*, 594 U.S. at 250 & n.18. That is wrong. And, in any event, *Braidwood* subsequently refused "to read a for-cause removal restriction into a statute that does not explicitly provide for one" (and for a multi-member body), reiterating that "to 'take away' the power of at-will removal

from an appointing officer, Congress must use 'very clear and explicit language.'" 145 S. Ct. at 2448 (quoting *Shurtleff*, 189 U.S. at 315).[1]

**b.** Contrary to plaintiffs' contention (Pl.Br.24-25), "plain language" does not mean debatable inferences. Gov.Br.24. Plain language means "very clear and explicit language," "explicit language to that effect," "plain and explicit language," and "plain and unambiguous language." *Shurtleff*, 189 U.S. at 315-318; *see Braidwood*, 145 S. Ct. at 2448-2449; *Collins*, 594 U.S. at 250. "'[M]ere inference or implication' does not suffice.'" *Braidwood*, 145 S. Ct. at 2448 (quoting *Shurtleff*, 189 U.S. at 315). "Congress must speak clearly." *Id.* at 2448-2449; *see id.* (explaining that Congress "knows how to do so" and listing express removal restrictions). That different "clear-statement rules" may be less demanding (Pl.Br.24-25) does not alter that conclusion. *See also Franklin v. Massachusetts*, 505 U.S. 788, 800-801 (1992) (requiring an "express statement" before a statute is read to restrict the President).

[1] *Carlucci v. Doe*, 488 U.S. 93, 99 (1988) (discussed at Pl.Br.23) involved only a claimed right to a "preremoval hearing" for an employee assertedly removed for cause. *Id.* at 95-99. In determining who held the removal power, the Court noted that removal normally follows appointment and added that no party "question[ed] this general proposition" or "show[ed] that Congress expressly or impliedly indicated" otherwise. *Id.* at 99. That has nothing to do with whether plain language is required to restrict the President's removal power.

**c.** Plaintiffs underscore the error of their position when they stress that *Collins* did not "purport to overrule *Humphrey's Executor* [*v. United States*, 295 U.S. 602 (1935)]." Pl.Br.28; *see* Pl.Br.23-24, 26-27. Even if *Humphrey's Executor* found a removal restriction in the absence of "plain language" (which it did not), *Collins* and *Braidwood* postdate *Humphrey's Executor* and establish the current rule.

*Humphrey's Executor* also did not come close to establishing plaintiffs' proposed standard, and no reason existed for *Collins* to deem it "overrule[d]." Pl.Br.28. *Humphrey's Executor* concerned an "express textual restraint on dismissals." *Severino v. Biden*, 71 F.4th 1038, 1047 (D.C. Cir. 2023). The text was "definite and unambiguous," 295 U.S. at 623, providing that a "'commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office,'" *id.* at 619-620. The statutory question was whether that plain language stating when the President "may" remove officials "restrict[ed] or limit[ed]" the power to remove them for other reasons. *Id.* at 619 (certified question); *id.* at 621 (describing the question).

In deciding the meaning of that textual removal provision and the bounds of *Shurtleff*—which held that a similarly-worded statute was not clear enough to restrict removal—*Humphrey's Executor* considered structure and function. 295 U.S. at 621-626. The Court explained that *Shurtleff*'s concerns about reading a similar

removal provision to confer "life tenure" were inapplicable for an agency with "term[s] of office." *Id.* at 623-624. The "face of the statute" was thus "clear." *Id.* at 624. The Court added that if that were not "clear" enough (which the Court "th[ought] it is"), the meaning "would be made clear" by "the character of the commission," *i.e.*, its function, and "legislative history." *Id.*[2] This Court has explained that "quasi-judicial functions" (acting "'as a master in chancery'") were "determinative," with a "quasi-legislative" function "bolster[ing]" that conclusion. *Severino*, 71 F.4th at 1048-1049 (quoting 295 U.S. at 628-629). The PCLOB statute contains no removal provision and establishes no quasi-judicial functions. *Humphrey's Executor* is therefore doubly inapplicable.

**d.** Plaintiffs' approach also does not follow from *Severino*. *Compare* Pl.Br.21-22, 25-27, *with* Gov.Br.26-28. *Severino* pointed to *Wiener* and *Humphrey's Executor* and described "quasi-judicial functions" as having been "determinative" in both cases, citing the key part of *Collins*. 71 F.4th at 1048-1049 (citing 594 U.S. at 250 n.18). *Severino* also rejected the plaintiff's argument, albeit in a discussion more than "one sentence long." Pl.Br.26. *Severino* asked if there

[2] *Humphrey's Executor* thus did not "alternatively h[o]ld that the 'character of the commission' and the history … sufficed to independently" limit removal "even absent express language so stating." Pl.Br.23-24 (quoting 295 U.S. at 624). The "express textual restraint," structure, and function were "*taken together*." *Severino*, 71 F.4th at 1047 (emphasis added).

was an express removal restriction. 71 F.4th at 1044-1047. Finding none, the panel described *Wiener* and *Humphrey's Executor* and emphasized the stark contrast between the Administrative Conference's functions and the "quasi-judicial jobs" at issue in those cases. *Id.* at 1047-1049. However one slices it, if there is neither an express removal restriction nor "quasi-judicial functions," then no removal restriction exists. *See LeBlanc*, 2025 WL 1840591, at *1.

Plaintiffs emphasize (Pl.Br.21) *Severino*'s statement that "Congress may clearly indicate its intent to restrict removals through the statutory structure and function of an office." 71 F.4th at 1044. That sentence must be understood in light of the accompanying citations and explanations of those cited cases. Gov.Br.26-27. *Severino* made clear that *Wiener* turned on "judicial functions," 71 F.4th at 1047, and *Humphrey's Executor* turned on an "express textual restraint on dismissals" "taken together" with that agency's structure and function, *id.*, then clarifying that "quasi-judicial functions" were "determinative" but that the conclusion was "bolstered" by the "'quasi-legislative[]' duty of giving definition to the general prohibition on 'unfair methods of competition,'" *id.* at 1048-1049 (alteration in original). The cited page of *Seila Law* also emphasized the President's removal power and refused to craft a removal restriction not rooted in statutory text. Gov.Br.27.

Plaintiffs briefly suggest transforming *Severino*'s statutory analysis into an "executive power" test where there is no "presumption of removability" if "removal protections do not implicate the President's Article II power." Pl.Br.22. *Severino* described no such test, which would be irreconcilable with the Court's emphasis that Congress would, in all events, have to make its intent "clear," including for the advisory body at issue there. Gov.Br.31; *see also Severino*, 71 F.4th at 1044 n.2 (confirming that the statutory and constitutional questions are distinct). Plaintiffs' theory is also hard to square with their focus on agency structure, Pl.Br.39-42, and their apparent suggestion that any function deemed "'incompatible with at-will Presidential removal'" would suffice, regardless of whether that function involves executive power or an agency's other powers, *see, e.g.*, Pl.Br.21, 33-34, 42-44.

Plaintiffs would also fail their own test here because the PCLOB "[p]roduc[es] advice for the President" and "his delegees"—"a quintessential example of a 'purely executive' function." *Severino*, 71 F.4th at 1048; *see also id.* (stressing that "the Constitution gives pride of place in Article II to the President's power to seek advice from principal officers"). That advice informs how others in the Executive Branch, all of whom ultimately answer to the President, execute the law and wield their powers, specifically in the national security realm. "[R]emoval protections" therefore *do* "implicate the President's Article II power." Pl.Br.22. The Executive

Branch is full of officials who advise others but do not themselves wield formal "power." And the PCLOB also has other powers. Gov.Br.5-7, 33-35.

Finally, even if there were any material tension between *Severino* and the Supreme Court's decisions in *Collins* and *Braidwood,* the Supreme Court's decisions would control. Any lack of clarity in *Severino* may stem from the plaintiff's focus there on an argument that terms meant "removals" were "off the table" altogether. 71 F.4th at 1044. And while "*Severino* post-dated (and relied on) *Collins*," Pl.Br.27, *Braidwood* post-dated *Severino* and described and applied the test even more plainly (and for an inferior officer subject to removal by an agency head). *See* 145 S. Ct. at 2444, 2448-2449; *cf.* Pl.Br.28 (dismissing *Collins* as having just "observed in a footnote that *Shurtleff* was a 'more applicable precedent' than *Wiener*"). Read separately or together, *Collins* and *Braidwood* establish the standard and govern.

**2.** In any event, it is implausible that when Congress rewrote the statute in 2007, it established a removal restriction through inferences rather than statutory text. Gov.Br.28-31. By 2007, statutory text was preeminent, and Congress contemporaneously established a number of entities with express removal restrictions. Gov.Br.28-29. Plaintiffs misunderstand a provision in the 2007 statute concerning another position that monitors certain national-security programs for

privacy concerns and submits reports to Congress. Gov.Br.29, 39. The provision did not "specifically authorize 'remov[al].'" Pl.Br.46 (alteration in original). It mandated congressional notification upon removal. Under plaintiffs' approach, if Congress had not selected this tool to address removal (or perhaps notwithstanding that Congress did), courts would potentially infer a removal restriction.

By 2007, judges and the Executive Branch had also questioned the idea of implied removal restrictions. Gov.Br.30. Plaintiffs note that one district court (in 1990) and two courts of appeals (in 1988 and 2004) had assumed or stated in passing that the SEC is removable for cause and that this Court (in 1993) stated that is likely true of the FEC. Pl.Br.34 (citing, *inter alia*, *SEC v. Blinder, Robinson & Co.*, 855 F.2d 677, 681 (10th Cir. 1988) ("[F]or the purposes of this case, we accept appellants' assertions … that it is commonly understood that the President may remove a commissioner only for [cause]."); *MFS Sec. Corp. v. SEC*, 380 F.3d 611, 619 (2d Cir. 2004) (repeating that this is "'commonly understood'")). But those handful of cases did not purport to establish any general formula for implicit removal restrictions or say anything about agencies with different histories and no adjudicative functions, like the PCLOB. Nor could they counter the significant doubts that had arisen by 2007.

Plaintiffs also disregard "the fact that Congress revised the statutory text and still failed to include an express protection." Gov.Br.31. Plaintiffs stress that Congress in 2007 made various textual changes assertedly aimed at facilitating nonpartisan, expert advice. *See* Pl.Br.6, 28-29, 36-39. And plaintiffs emphasize "Congress's careful design." Pl.Br.2. It is implausible that Congress "clearly" expressed its intent to restrict removal by making these textual changes but not addressing removal.

### B. Plaintiffs' Textual Arguments Lack Merit

**1.** Plaintiffs' efforts to rely on statutory language further underscore the error of their position, as well as their disagreements with the district court. The district court properly rejected (A150-152), as foreclosed by precedent and common sense, plaintiffs' argument (Pl.Br.33-36) based on the provision stating: "Each member of the Board shall serve a term of 6 years." 42 U.S.C. § 2000ee(h)(4). Rejecting a similar argument in *Severino*, 71 F.4th at 1044-1046, the Court explained that "a fixed statutory term of service leaves untouched the President's presumptive removal power," *id.* at 1045. A term is "a ceiling, not a floor." *Id.*

The accompanying word "shall" does not change that. A151-152; *see, e.g.*, *Parsons v. United States*, 167 U.S. 324, 327-328 (1897) ("'shall be appointed for a term of four years'"); *Spicer v. Biden*, 575 F. Supp. 3d 93, 95 (D.D.C. 2021) ("'shall

continue to serve until [a] successor is appointed'"). Although "shall" often means "must," plaintiffs do not read the statute as "mandat[ing]" that PCLOB members "serve a term of 6 years." Pl.Br.33. That would seem to "create an 'absolute' ban on removal even if the President has an excellent reason (like fraud)," *Calcutt v. Federal Deposit Ins. Corp.*, 37 F.4th 293, 338 (6th Cir. 2022) (Murphy, J., dissenting), leaving "incumbent[s] subject only to removal by … impeachment," *Parsons*, 167 U.S. at 343. And in contrast to other statutes, the "term" and the word "shall" do not modify the "appoint[ment]," *e.g.*, *id.* at 327-328, but rather are directed at Board members. 42 U.S.C. § 2000ee(h)(4) ("Each member of the Board shall serve … ."). Much as plaintiffs "would doubtless claim the right to resign" earlier if they "chose," the President also has "a right to put an end to it, at [his] election." *Ex parte Hennen*, 38 U.S. 230, 260-261 (1839).

Plaintiffs are mistaken that in 2007, "unanimous precedent from multiple courts of appeals established that materially equivalent language in the SEC statute conferred removal protection." Pl.Br.34-35. As the district court explained, the passing comments in a few cases about removal were not based on "the particular statutory language governing those agencies." A152.

**2.** The district court also properly rejected (A153) plaintiffs' argument (Pl.Br.37-39) based on the provision: "There is established as an independent agency

within the executive branch a Privacy and Civil Liberties Oversight Board." 42 U.S.C. § 2000ee(a). The term "independent" is commonly used to describe an entity that "is not part of and is therefore independent of any other unit of the Federal Government." *Collins*, 594 U.S. at 248-249 (also listing examples); *see Braidwood*, 145 S. Ct. at 2449.

Context confirms that meaning here. Plaintiffs themselves stress that Congress in 2007 responded to concerns about White House advisers "redlining" PCLOB recommendations based on a view that a Board in "the Executive Office of the President" is properly "treated" as "part of the White House Staff." Pl.Br.1, 5. Congress then reconstituted the PCLOB "as an independent agency within the executive branch" but not the Executive Office of the President. 42 U.S.C. § 2000ee(a); *see* A96 (statutory redline). That says nothing about removal.

### C. The Board's Structure and Function Are Not Operationally Incompatible With Presidential Removal

**1.** Plaintiffs likewise err when they urge that Congress "clearly" restricted removal through a "statutory structure and function" that is "incompatible with at-will removal." Pl.Br.39-48. The PCLOB is part of the Executive Branch, is structured like other agencies that lack removal protections, advises on national security programs, and is integrated into other agencies' similar functions.

Gov.Br.31-37. Its work is "meant to be integrated within the Executive Branch, not isolated from it." *Severino*, 71 F.4th at 1049.

**2.** Plaintiffs do not dispute that "[m]ulti-member boards exist throughout the government that are not generally understood to have removal protections and that share various combinations of the structural features that plaintiffs rely on here." Gov.Br.31. The PCLOB has certain structural features that sometimes go along with removal restrictions, *see* Pl.Br.39-41, and sometimes do not, *see Collins*, 594 U.S. at 249 (listing agencies where Congress did not "impos[e] any restriction on the President's power to remove the agency's leadership"). Various mechanisms exist to facilitate expert advice and decision-making—including directives to exercise independent judgment, non-partisan selection, terms, Senate confirmation, partisan balance, and independent budget, litigation, and other authority—each with various tradeoffs. One need not imply another. *See, e.g.*, *Braidwood*, 145 S. Ct. at 2450; *Edmond v. United States*, 520 U.S. 651, 664 (1997).[3]

Plaintiffs state that *Seila Law* "identified" these various features as "supporting for-cause removal restrictions." Pl.Br.39-40 (citing *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 216 (2020)). *Seila Law* described these

[3] Merit-based selection is also not "fundamentally incompatible" with at-will removal. Pl.Br.40. A replacement can be chosen based on qualifications and without regard to political affiliation.

features when summarizing the constitutional holding of *Humphrey's Executor*, *i.e.*, the validity of "congressional limits" on the President's removal power, where there was an express protection "from removal." 591 U.S. at 215-216. Just because Congress may have the "ability to impose such removal restrictions," *id.* at 215, does not mean that Congress has done so.

**3.** Plaintiffs do not advance their argument by urging that an "adjudicatory or legislative feature that would 'signal a need for some measure of independence'" implies a removal restriction. Pl.Br.42. A mere "signal" is not enough; Congress, if nothing else, would have to be "clear." *See* Gov.Br.31. Plaintiffs do not seriously embrace the district court's repeated comparisons to *Wiener*, and their comparisons to *Humphrey's Executor* miss the mark. Gov.Br.35-37. *Humphrey's Executor* interpreted an express removal provision. The PCLOB has none. In *Humphrey's Executor*, "quasi-judicial functions" were "determinative." *Severino*, 71 F.4th at 1048. The PCLOB has no such functions. *Humphrey's Executor* also stressed the absence of other functions, *i.e.*, that the agency there "could not 'in any proper sense be characterized as an arm or an eye of the executive.'" Gov.Br.36 (quoting 295 U.S. at 628). The PCLOB serves as both. Gov.Br.36-37.

Plaintiffs mischaracterize the PCLOB as a "legislative aid" that reviews Executive Branch programs on Congress's behalf and serves to "assist" Congress.

Pl.Br.42-47. The PCLOB (like the Administrative Conference) is "housed squarely within the Executive Branch" and "serves to advise personnel in and components of the Executive Branch," *Severino*, 71 F.4th at 1048, not to mention its other functions. Plaintiffs do not explain how a court could go about weighing an agency's varied functions and decide what balance "clearly" indicates an intent to restrict removal.

Even if a court could do so, moreover, that inquiry would have to be guided by the statutory text. *See Severino*, 71 F.4th at 1044, 1047-1049. Here, the text places the PCLOB in "the executive branch." 42 U.S.C. § 2000ee(a). It directs the PCLOB to "advise the President" and other executive officials. *Id.* § 2000ee(d)(1)(C), (d)(3). It lists the PCLOB's functions in many detailed parts that make only one mention of Congress, directing Board members to testify upon request. Gov.Br.37-38. And it directs the PCLOB to submit periodic reports to both Congress and the President. *See* Gov.Br.38-40. More generally, the purposes and functions described in the statute are focused primarily, even if not exclusively, on the Executive Branch. *See* 42 U.S.C. § 2000ee(c)-(d); *cf. Severino*, 71 F.4th at 1048. That the PCLOB would "provid[e] advice on proposals" regarding a "governmental power" or would "review proposed legislation"—not to mention "regulations" and "policies" and "implementation" of legislation—does not indicate that Congress is

even a recipient of that advice, let alone that it is the sole or clearly more important recipient. *See, e.g.*, 42 U.S.C. § 2000ee(d)(1) (quoted in part at Pl.Br.43-45).

Plaintiffs dismiss the observation that the PCLOB is Executive Branch focused (Gov.Br.37-39) as "not serious." Pl.Br.44-45. That is just ipse dixit. Plaintiffs (like the district court) reference their view of "what the Board has been doing since 2007." Pl.Br.45. This is not "*statutory* structure and function." *Severino*, 71 F.4th at 1044 (emphasis added).[4] Contrary to their repeated objection to any "magic-words test" (*e.g.*, Pl.Br.25), plaintiffs suggest that the statutory term "oversight" is dispositive. Pl.Br.45-46. That term is used throughout the U.S. Code, consistent with its ordinary meaning, to refer to review rather than congressional superintendence. *See Oversight*, Merriam-Webster Dictionary[5] ("watchful and responsible care" and "regulatory supervision") (def. 1); *Oversight*, Oxford English Dictionary[6] ("The action of overseeing something; supervision, inspection … .") (def. 2.a.).[7] Plaintiffs note that when Congress revised the statute in 2007, it deleted "prefatory language" (Pl.Br.45) about advising "the President or … head of any

[4] The PCLOB has also done far more than make recommendations "to Congress" (Pl.Br.45). *See, e.g.*, PCLOB, *Oversight Reports,* https://www.pclob.gov/Oversight.

[5] https://perma.cc/8HWS-GLQV.

[6] https://www.oed.com/dictionary/oversight_n.

[7] *See, e.g.*, 6 U.S.C. § 793; 10 U.S.C. § 181; *id* § 430c; *id.* § 4701(a)(2)(D); 15 U.S.C. § 657; *id.* § 657u; 49 U.S.C. § 5329(c).

department or agency." A96-97 (statutory redline). That history is a thin reed, especially in a statute that directs the PCLOB to "advise the President" and other executive entities and that has no stated purpose of advising Congress, let alone primarily serving Congress.[8]

In any event, many officials, including inspectors general, the Administrative Conference at issue in *Severino*, and privacy and civil liberties officers, have functions that comprise reviewing (and sometimes criticizing) programs operated by the Executive Branch, providing advice to the Executive Branch, and generating reports for both Congress and the President—without any implicit removal protection. Gov.Br.32; *see* Gov.Br.37-42. That some statutes (but not others) involve supervision by "agency heads" (Pl.Br.46) does not bear on whether these functions are "operationally incompatible with at-will Presidential removal." *Severino*, 71 F.4th at 1047. The critical difference also cannot be whether a statute "mentions oversight." Pl.Br.46. Indeed, various statutes direct inspectors general to engage in "oversight." *See, e.g.*, 5 U.S.C. §§ 412(b), 415(f)(2), 417(e), 419(d)(2), (f); 6 U.S.C. § 555; 10 U.S.C. § 4701(g)(5); 15 U.S.C. § 9058a(i);

[8] Accompanying revisions suggest a shift from advising department "head[s]" to advising entire "<u>departments, agencies, and elements</u> of the executive branch." A97; *see also* A98 (addition of the PCLOB's role with respect to agencies' newly-created privacy and civil liberties officers).

42 U.S.C. §§ 1320a-7k(a)(2), 18117; 50 U.S.C. § 3033(h)(1), (2)(A); *see also* 5 U.S.C. § 424(e) (establishing "Oversight.gov" "to consolidate all public reports from each Office of Inspector General").

**4.** Plaintiffs also erroneously dismiss (Pl.Br.47-48) the significance of the PCLOB's national-security role. Plaintiffs do not dispute that presumptions about presidential power have special force in the national-security realm. Gov.Br.34-35. And while the PCLOB does not "implement or decide national security policy" (Pl.Br.47), it advises on such policy and assists those who wield national security powers. Plaintiffs also disregard the PCLOB's need for classified information subject to the President's control. Gov.Br.35. It is implausible that Congress intended to bar the President from removing PCLOB members when he could simply deny them access to information necessary to perform their duties. And if the PCLOB statute were read to supplant the President's control over classified information, the very serious resulting constitutional questions would further weigh against inferring a restriction on the President's power to remove PCLOB members given access to that information.

### D. The 2007 History Undermines Plaintiffs' Position

**1.** Despite embracing "'structure and function'" (Pl.Br.21), plaintiffs lead with and return to history. *See* Pl.Br.28-33, 36-39, 45-47. Far from helping

plaintiffs, however, the history undermines them. Gov.Br.42-46. Plaintiffs' argument hinges on the idea that removal protections are necessary for the PCLOB to provide "oversight" and "report to Congress." And plaintiffs seek to distinguish myriad other officials who perform the same functions by resting on the statutory term "oversight." But the 2004 PCLOB had substantially the same role as the current PCLOB, and the 2004 statute also used the term "Oversight." Gov.Br.43; *accord*, *e.g.*, Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, § 1061(c)(2), 118 Stat. 3638, 3685 ("oversight" including "review" of "related laws").

Plaintiffs deem this aspect of the history irrelevant given their view that "the 2004 version of the statute" was not "effective" because there was too much "presidential control." Pl.Br.47. But presidential control and independence are not all-or-nothing propositions. As noted, many mechanisms exist to facilitate "independent" decision-making, and the 2007 revisions were partially a response to concerns about being in the White House—which the 2007 statute plainly addressed.

**2.** Congress's 2007 deletion of language stating that Board members "serve at the pleasure of the President" and operate "under the general supervision of the President"—without the addition of a removal restriction—does not alter that conclusion. *Compare* Pl.Br.28-33, 36-37, *with* Gov.Br.43-45. The absence of text

is not "plain text." *Severino*, 71 F.4th at 1044. And Congress sometimes includes language referencing the President's removal power and sometimes does not, without the absence of such language establishing an implicit removal restriction. *See Myers v. United States*, 272 U.S. 52, 119, 145-147 (1926); *Parsons*, 167 U.S. at 339.

Plaintiffs nonetheless urge that the "deletion" of such language "plainly" establishes a removal restriction because "courts must 'give effect' to statutory revisions." Pl.Br.29-30; *accord* Pl.Br.37 ("courts are required to give that decision effect"). But many statutes once expressly provided for at-will removal or other supervision. *Compare, e.g.*, *Parsons*, 167 U.S. at 338 (describing an 1820 act providing for "district attorneys" (now U.S. Attorneys) that "'shall be removable from office at pleasure'"), *with* 28 U.S.C. § 541 (current statute), *and Myers*, 272 U.S. at 145 (describing the Marshals in the Judiciary Act of 1789 who were "'removable … at pleasure'" (alteration in original)), *with* 28 U.S.C. § 561 (current statute). Changes in statutory language can be a relevant interpretive tool, but it is just a tool. And particularly when deleting language that the Supreme Court has confirmed to be unnecessary, that presumption can only go so far.

Moreover, the 2007 revisions must be understood "as a whole." Pl.Br.2. When Congress amended the statute in 2007, it significantly rewrote the language,

including "various non-substantive changes." Gov.Br.44; *see* A96-104 (statutory redline). It would not be "inexplicable and meaningless" (Pl.Br.29) to remove unnecessary language, particularly when making other changes and significantly rewriting the statute.[9]

Other changes in the 2007 statute also explain why Congress would not carry forward the "serve at the pleasure" and "general supervision" language. When Congress established six-year terms, it may no longer have wanted to emphasize that Board members serve at pleasure. Gov.Br.44-45. This is not just "the government's logic." Pl.Br.32. The district court described the 2004 statute as "prescrib[ing] that all members of the PCLOB … 'serve at the pleasure of the President'" "*rather than delineating a term of service*." A129 (emphasis added). Congress may also have decided that when removing the PCLOB from the Executive Office of the President, it would no longer include common language for White House components stating

[9] Plaintiffs' chosen example of a "complete revision" (Pl.Br.30-31) does not establish otherwise. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), involved the revision of one U.S. Code section that, *inter alia*, changed "judicial proceeding *pending* in" to "a proceeding in." *Id.* at 248. The modifier "pending" did not simply "make express what would have been understood," *Myers*, 272 U.S. at 145. The Court stressed that the text was not "limit[ed]" to "pending" proceedings, also noting that courts "presume" amendments to have real effects and that the "legislative history" was "in sync." *Intel*, 542 U.S. at 258-259.

that officials there serve at the President's pleasure.[10] And when Congress removed the PCLOB from the Executive Office of the President, it was sensible no longer to emphasize that the Board operates "under the general supervision of the President" (language that also may have distinguished the 2004 PCLOB from its Justice Department predecessor chaired by the Deputy Attorney General, *see* Gov.Br.2). Far less sensible is plaintiffs' view that Congress went about revising the text to establish a removal restriction but did not bother to put that restriction in the text.

**3.** Despite trying to draw inferences from the 2007 history, plaintiffs dismiss (Pl.Br.39 n.19) the fact that the Senate voted to make virtually all of the changes that plaintiffs treat as significant while also placing that reconstituted PCLOB "within the Executive Office of the President." Gov.Br.45-46. Plaintiffs do not dispute that at least when the Senate passed that bill soon before the final law, "[i]t is implausible" that the Senate understood these changes as restricting the President's removal power and "doubly implausible that the Senate thought that intent was so clear that there was no need to say so in the statute." Gov.Br.45-46.

[10] *See* 6 U.S.C. § 1500(b)(2) (Office of the National Cyber Director); 19 U.S.C. § 2171(b) (Office of the U.S. Trade Representative); 21 U.S.C. § 1703(a)(1)(A), (B) (Office of National Drug Control Policy); 42 U.S.C. § 4342 (Council on Environmental Quality); *id.* § 6634(b) (President's Committee on Science and Technology).

Plaintiffs correctly note (Pl.Br.39 n.19) that this was not the final version of the statute: after the Senate passed that bill, the Senate and House struck a compromise that "adopt[ed] [a] House provision regarding the removal of the Board from the Executive Office of the President and adopt[ed] [a] Senate provision regarding the Board's subpoena power." H.R. Rep. No. 110-259, at 321 (2007) (Conf. Rep.). But plaintiffs are relying on structural and functional features, not to mention the deletion of 2004 text, that were in both the original bill passed by the Senate and the final law. A bill passed by a house of Congress is not just a "legislative maneuver[]." Pl.Br.39 n.19 (quoting *Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) (declining to "attach decisive significance to the unexplained disappearance of one word" that had "appeared in a House version" of a statute)). And it is plaintiffs who ask the Court to engage in a "holistic endeavor," Pl.Br.29, and draw "inference[s]," Pl.Br.42, about what "Congress intended," *e.g.*, Pl.Br.21, 24. The fact that the Senate voted to adopt the changes that plaintiffs view as restricting the President's removal power while also placing that PCLOB in the Executive Office of the President strongly suggests that members of the Senate did not attach the same meaning as plaintiffs do to those changes.

## II. Plaintiffs Cannot Show Entitlement To Reinstatement

**A. 1.** A court's equitable powers do not extend to remedies regarding the reinstatement of officials removed by the President. Gov.Br.48-50. Plaintiffs do not dispute the government's reading of a host of cases. *Cf.* Pl.Br.50 (noting that two cases suggested other remedies like mandamus might be available). Nor do their citations "hold" that courts can "order reinstatement … in equity." Pl.Br.49-50. *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 604-605 (1988) ("remand[ing]" to consider "the propriety of the equitable remedies sought"); *Sampson v. Murray*, 415 U.S. 61, 71, 83-84, 91-92 (1974) (noting the "well-established principle" barring such equitable remedies but declining to address the question for an employee given the absence of an extraordinary, irreparable injury); *Vitarelli v. Seaton*, 359 U.S. 535, 537, 545-546 (1959) (stating that an employee was "entitled to reinstatement" on the merits where no party disputed the court's equitable authority).

Plaintiffs fall back on the broadest possible reading of *Severino*, 71 F.4th at 1042-1043, and *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996). Pl.Br.50-52. But they do not deny that the injunction in this case goes beyond what this Court even suggested, let alone held, may be available. Gov.Br.50-51. And while they stress that the possibility of a remedy in those cases was a "holding" "essential" to the "judgment[s]," Pl.Br.51, plaintiffs disregard the government's argument about

the scope of that remedy. All that was necessary was the possibility of providing "some of the privileges of [an] office." *Severino*, 71 F.4th at 1043. Any suggestion that a court could order full reinstatement was dicta and conflicts with Supreme Court precedent. Gov.Br.51-52.

**2. a.** Plaintiffs' alternative arguments (Pl.Br.56-58) lack merit. Mandamus is available only if a statutory duty is clear. Gov.Br.52-53. Plaintiffs would thus have to meet the double burden of showing that it was clear that Congress clearly intended to restrict the President's removal power. Gov.Br.52-53. *Swan*, 100 F.3d 973 (discussed at Pl.Br.56-57) concerned an injunction, not mandamus; ordered no remedy (the plaintiff lost on the merits); and stressed (in dictum about whether a duty is "ministerial") that there would have to be "sufficient clarity." *Id.* at 974, 976-979, 988. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), did not involve "removed officers" (Pl.Br.56), and the cited discussion addressed whether delivery of a commission was a "ministerial act." 5 U.S. at 155-158.

**b.** Plaintiffs are also not entitled to a remedy under the APA. Plaintiffs were removed by the President. The APA does not apply to the President. *Franklin*, 505 U.S. at 800-801. The APA's remedies are also subject to longstanding equitable principles. *See* U.S. Dep't of Just., *Attorney General's Manual on the Administrative Procedure Act* 93 (1947). And its reference to "compel[ing]" agency

action incorporates mandamus principles and is available only to enforce an "*unequivocal* command." *Norton v. Southern Utah Wilderness All*, 542 U.S. 55, 63-64 (2004) (emphasis added).

**B.** Even if a court has the power to order some form of reinstatement in truly extraordinary cases, this is not such a case. Gov.Br.53-57. Plaintiffs' loss of authority is not a cognizable harm. Gov.Br.54-55. Plaintiffs quote *Marbury*'s passing statement that Marbury had "a right to the office itself." 5 U.S. at 173. That may conflate the emoluments of office with the powers of an office, and it also seems to have rested on a since-repudiated view of offices as "vested" rights akin to "property." *See id.* at 155, 162; *see also Taylor v. Beckham*, 178 U.S. 548, 576-577 (1900); *Crenshaw v. United States*, 134 U.S. 99, 104 (1890). *See generally* Jed Handelsman Shugerman, *Presidential Removal: The* Marbury *Problem and the Madison Solutions*, 89 Fordham L. Rev. 2085, 2089, 2105-2110 (2021). Regardless, an office separate from its authority is distinct from the "statutory rights to *function*" that the district court treated as dispositive. A185-186, 188 (emphasis added). And the loss of an office in vacuo is not a harm of sufficient magnitude to overcome the government's countervailing interests. *See Sampson*, 415 U.S. at 83-84, 92 n.68.

Plaintiffs disregard the argument that any possible disruption to the PCLOB's work is not a harm to them, as would be necessary. Gov.Br.54-55; *see Virginia*

*House of Delegates v. Bethune-Hill*, 587 U.S. 658, 667 (2019). Nor do they respond to the point that any such harm is not sufficiently certain or great as to warrant extraordinary relief. Gov.Br.55. Plaintiffs try to couch the district court's remedial decision as a series of "factual findings" reviewed for "clear error." Pl.Br.54. But that misses the court's legal premises. There also does not appear to be a material factual dispute: While the Board lacks a quorum and has only one member, it will not issue "Board advice" or "Board reports," or have "minority views." Pl.Br.54 (quoting A186-187). But the Board will only lack a quorum until the President fills two seats, and the PCLOB (which has often not had a quorum) can issue advice and oversight reports as "Staff Reports." Gov.Br.55. Plaintiffs may also be able to share their views without serving on the Board. Additionally, plaintiffs ignore the concern that "de facto" Board members could call into question the validity of actions taken by the asserted "Board." Gov.Br.56.[11]

In any event, any ordinary and speculative delay in the PCLOB's work cannot overcome the far greater harms imposed by the district court's injunction.

[11] Plaintiffs' present reliance on the PCLOB's forthcoming report on Foreign Intelligence Surveillance Act Section 702, which is to be issued before an April 2026 statutory sunset (Pl.Br.54-55) is in some tension with their representations that the report "will take many months" and then "need to clear an extensive" review. A40. In any event, if the PCLOB continues to lack a quorum, it can issue that report as a "Staff Report"—much as it might have to do if plaintiffs were serving "de facto"—and plaintiffs might share their views separately.

Gov.Br.56-57. Plaintiffs seek to distinguish the equitable analysis in *Trump v. Wilcox*, 145 S. Ct. 1415 (2025)—which rejected the analysis that the district court relied on here when balancing the equities (A190)—without responding to the litany of clear and significant harms imposed by the district court's injunction. The district court's order requires Executive Branch officials, who report to the President; to treat plaintiffs, who were removed by the President; as if they were still on the PCLOB, even though they could only be reinstated by the President; to share national security information with them, which is ultimately controlled by the President; and to let plaintiffs coordinate others in the Executive Branch, who work for the President, and formulate recommendations to be sent to the President and his delegees. That remedy was improper.

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
*/s/ Adam Jed*
ADAM C. JED
*Attorneys, Appellate Staff*
*Civil Division, Room 7243*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-8280*

SEPTEMBER 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,426 words according to the count of Microsoft Word. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Adam Jed*
ADAM C. JED