[ORAL ARGUMENT NOT YET SCHEDULED]

No. 25-5197

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

TRAVIS LEBLANC; EDWARD FELTEN,

Plaintiffs-Appellees,

v.

U.S. PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

# SUPPLEMENTAL BRIEF FOR APPELLANTS

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
ADAM C. JED
*Attorneys, Appellate Staff*
*Civil Division, Room 7243*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-8280*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A. Parties and Amici

Plaintiffs-appellees are Travis LeBlanc and Edward Felten.

Defendants-appellants are the United States Privacy and Civil Liberties Oversight Board; Beth A. Williams, in her official capacity as a Board Member of the United States Privacy and Civil Liberties Oversight Board; Jenny Fitzpatrick, in her official capacity as Executive Director of the United States Privacy and Civil Liberties Oversight Board; Trent Morse, in his official capacity as Deputy Director of Presidential Personnel; and Donald J. Trump, in his official capacity as President of the United States of America.

The following participated as amici curiae in district court: the State of Alabama, State of Alaska, Arizona Legislature, State of Florida, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of North Dakota, State of Oklahoma, State of South Carolina, State of South Dakota, State of Tennessee, State of Texas, and State of West Virginia.

The following participated as amici curiae in this Court: the Arizona Legislature; Sen. Ron Wyden; Sen. Richard Blumenthal; Sen. Cory A. Booker; Sen.

Martin Heinrich; Sen. Mazie K. Hirono; Sen. Edward J. Markey; Sen. Elizabeth Warren; Rep. Sara Jacobs; Rep. Pramila Jayapal; Rep. Ted Lieu; Rep. Zoe Lofgren; the States of Alabama, Florida, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Montana, North Dakota, Ohio, South Carolina, South Dakota, Tennessee, Texas, Utah, and West Virginia; and Peter Swire.

### B. Rulings Under Review

Defendants-appellants are appealing from the May 21, 2025, final judgment and permanent injunction issued by the Honorable Reggie B. Walton, United States District Court for the District of Columbia, in Case No. 25-cv-542, Dkt. Nos. 24, 25. The district court's order and opinion are reproduced in the Appendix at A126 and A197 respectively and are published at 784 F. Supp. 3d 1.

### C. Related Cases

This case has not previously been before this Court. Issues related to the removal of officials from different agencies are presented in other cases pending within this Circuit. *See Wilcox v. Trump*, No. 26-5 (U.S.), No. 25-5057 (D.C. Cir.), No. 25-cv-334 (D.D.C.); *U.S. Inst. of Peace v. Jackson*, No. 25-5185 (D.C. Cir.), No. 25-cv-804 (D.D.C.); *Harper v. Bessent*, No. 25-5268 (D.C. Cir.), No. 25-cv-1294 (D.D.C.); *Perlmutter v. Blanche*, No. 25-5285 (D.C. Cir.), No. 25-cv-1659 (D.D.C.); *C.S. Lawn & Landscape, Inc. v. Department of Lab.*, No. 26-5114 (D.C. Cir.), No. 23-cv-1533 (D.D.C.); *Cook v. Trump*, No. 25-cv-2903 (D.D.C.); *Storch v.*

*Hegseth*, No. 25-cv-415 (D.D.C.); *Cristosal Hum. Rts. v. Marocco*, No. 25-cv-857 (D.D.C.); *Abramowitz v. Lake*, No. 25-cv-887 (D.D.C.); *Pippenger v. U.S. DOGE Serv.*, No. 25-cv-1090 (D.D.C.); *Rural Dev. Innovations Ltd. v. Marocco*, No. 25-cv-1631 (D.D.C.); *Brown v. Trump*, No. 25-cv-1764 (D.D.C.).

/s/ *Adam Jed*
Adam C. Jed
*Attorney, Appellate Staff*
*Civil Division, Room 7243*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-8280*

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION AND SUMMARY ........................................ 1

ARGUMENT ........................................ 2

A. The Statute Does Not Impose An Atextual Removal Restriction ........................................ 2

B. Grave Constitutional Doubts Counsel Against Inferring An Atextual Removal Restriction Here ........................................ 11

C. Plaintiffs Cannot Possibly Establish A Clear And Indisputable Right To Mandamus ........................................ 17

CONCLUSION ........................................ 19

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Al Bahlul v. United States*,
967 F.3d 858 (D.C. Cir. 2020) ....................5

*Andrade v. Lauer*,
729 F.2d 1475 (D.C. Cir. 1984) ....................18

*Collins v. Yellen*,
594 U.S. 220 (2021) ....................2, 5, 6, 7, 11

*Department of the Navy v. Egan*,
484 U.S. 518 (1988) ....................15

*Duty of President as to a Register of Wills*,
1 Op. Att'y Gen. 212 (1818) ....................4

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ....................16

*Greene v. McElroy*,
360 U.S. 474 (1959) ....................16

*Humphrey's Executor v. United States*,
295 U.S. 602 (1935) .................... 4, 5, 7, 11, 12, 14, 16

*Illinois v. Ferriero*,
60 F.4th 704 (D.C. Cir. 2023) ....................18

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) ....................11

*Jones v. Hendrix*,
599 U.S. 465 (2023) ....................15

*Kalaris v. Donovan*,
697 F.2d 376 (D.C. Cir. 1983) ....................6

*Kennedy v. Braidwood Mgmt., Inc.*,
606 U.S. 748 (2025) ....................2, 6, 11, 16

*LeBlanc v. PCLOB*,
No. 25-5197, 2025 WL 1840591 (D.C. Cir. July 1, 2025), *reh'g en banc denied* (July 18, 2025) ....2

*Lee v. Garland*,
120 F.4th 880 (D.C. Cir. 2024) ....15

*Myers v. United States*,
272 U.S. 52 (1926) ....12, 13

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ....5

*Scott-Anderman v. Martinez*,
60 F.4th 680 (D.C. Cir. 2023) ....1

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) ....10, 11, 12, 15

*Severino v. Biden*,
71 F.4th 1038 (D.C. Cir. 2023) ....6, 9, 10, 12, 14

*Shurtleff v. United States*,
189 U.S. 311 (1903) ....2, 6

*Tennessee v. Condon*,
189 U.S. 64 (1903) ....1

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ....17

*Trump v. Cook*,
146 S. Ct. 2234 (2026) ....1, 2, 6, 7, 8, 17

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) .... 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15

*United States v. Arthrex, Inc.*,
594 U.S. 1 (2021) ....5

*Wiener v. United States*,
357 U.S. 349 (1958) ....5, 6, 12

**Statutes:**

Act of Sep. 26, 1914, ch. 311, § 1, 38 Stat. 717, 718 .............................................. 5

Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 93 .............................................. 14

Pub. L. No. 91-358, § 145(n),
84 Stat. 473, 561-562 (1970)
(codified at D.C. Code §§ 16-3501-16-3502) .............................................. 18

5 U.S.C. § 7511(b) .............................................. 18

12 U.S.C. § 242 .............................................. 7

42 U.S.C. § 2000ee(a) .............................................. 6, 13

42 U.S.C. § 2000ee(c) .............................................. 15

42 U.S.C. § 2000ee(d) .............................................. 15

42 U.S.C. § 2000ee(d)(1)(C) .............................................. 14

# GLOSSARY

| | |
|---|---|
| A | Appendix |
| Gov.Br. | Government's Brief for Appellants |
| PCLOB or Board | U.S. Privacy and Civil Liberties Oversight Board |
| Pl.Br. | Plaintiffs' Brief for Appellees |
| Reply.Br. | Government's Reply Brief |

## INTRODUCTION AND SUMMARY

The U.S. Privacy and Civil Liberties Oversight Board (PCLOB or Board) is appointed by the President, is part of the Executive Branch, advises on national security programs, and is integrated into other agencies' similar functions. No statutory provision purports to restrict the President's power to remove Board members. The Supreme Court's recent decisions in *Trump v. Cook*, 146 S. Ct. 2234 (2026), and *Trump v. Slaughter*, 146 S. Ct. 2283 (2026), confirm that the President may therefore remove Board members at will. *Cook* and *Slaughter* both demonstrate the well-established, general rule that a statute must use "very clear and explicit language" to restrict removal. They also further undermine plaintiffs' claim that because the PCLOB serves to provide candid and expert advice, Congress clearly must have intended to shield it from removal but did so through inferences rather than statutory text. *Slaughter* also underscores the grave constitutional doubts that would arise if Congress chose to restrict the President's power to remove PCLOB members. Finally, if there were any lingering doubts, *Cook* confirms that plaintiffs here would have to satisfy an extraordinary mandamus burden, which they cannot possibly meet.[1]

[1] Had plaintiff Edward Felten not been removed, his term would have expired in 2025, and he could not have served in a holdover capacity past January 29, 2026. A137. His claim for reinstatement is therefore moot. *See Tennessee v. Condon*, 189 U.S. 64, 69-71 (1903); *Scott-Anderman v. Martinez*, 60 F.4th 680, 683 (D.C. Cir. 2023).

## ARGUMENT

### A. The Statute Does Not Impose An Atextual Removal Restriction

**1. a.** The Supreme Court's decisions in *Trump v. Cook*, 146 S. Ct. 2234 (2026), and *Trump v. Slaughter*, 146 S. Ct. 2283 (2026), confirm the general rule (Gov.Br.22-28; Reply.Br.2-9) that "a statute 'must use "very clear and explicit language"' to restrict the President's removal power." *LeBlanc v. PCLOB*, No. 25-5197, 2025 WL 1840591, at *1 (D.C. Cir. July 1, 2025) (per curiam) (quoting *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 771 (2025) (quoting *Shurtleff v. United States*, 189 U.S. 311, 315 (1903))), *reh'g en banc denied* (July 18, 2025). The Supreme Court has long refused "to read a for-cause removal restriction into a statute that does not explicitly provide for one." *Braidwood*, 606 U.S. at 770-771. "'[M]ere inference or implication' does not suffice." *Id.* at 771 (alteration in original); *see Collins v. Yellen*, 594 U.S. 220, 248-250 & n.18 (2021). A statute "must" use "plain language" to restrict removal. *Collins*, 594 U.S. at 250 (quoting *Shurtleff*, 189 U.S. at 316).

In *Cook*, the Court again addressed the circumstances where officials appointed for a term of years "are not removable at will." 146 S. Ct. at 2253 n.5 (emphasis omitted). The Court made clear that "without some form of protection from removal—whether 'for cause,' 'during good behavior,' or something else

entirely," an official "may be fired at *any* time for *any* reason." *Id.* (Court's emphasis). Plaintiffs take the opposite position here.

In *Slaughter*, the Court applied the same rule in its discussion of the "Revolutionary War Debt Commission." 146 S. Ct. at 2308. That commission "was composed solely of Presidential appointees, with a statute that did not purport to limit the President's power of removal." *Id.* Echoing some of the arguments that plaintiffs make here, the dissent stated that the commission was viewed as "[i]ndependent" and that while that "statute did not expressly speak of removal," textual clues suggested that commissioners were shielded from removal—they "would 'continue' in office" until a fixed date. *Id.* at 2333 (Sotomayor, J., dissenting). Nonetheless, with a statute that did not address removal, the Court confirmed that those commissioners were "removable by the President at will." *Id.* at 2308 (majority opinion).

*Slaughter* also underscores the particular force of this interpretive rule for presidential appointees. From the very first positions established in the Executive Branch, Congress "assumed the power of removal to be in the President." *Slaughter*, 146 S. Ct. at 2296 (quotation marks omitted). Among other things, "the Vesting Clause of Article II … establish[es] a general default presidential removal power." *Id.* at 2306 (alterations in original). Even those who believed that Congress could

constitutionally restrict the President's removal power understood that Congress would affirmatively have "to reverse" that presumption, such as by providing that an official "could be 'removed [only] on conviction for misbehaviour.'" *Id.* at 2331-2332 (Sotomayor, J., dissenting) (alteration in original) (quoting Daniel Webster). Congress would have to do so "clearly and explicitly." *Id.* at 2331 (quoting *Duty of President as to a Register of Wills*, 1 Op. Att'y Gen. 212, 213 (1818)).

**b.** *Slaughter* also further undermines plaintiffs' claimed support in earlier Supreme Court cases for finding a removal restriction that appears nowhere in the statutory text. Plaintiffs rely heavily on *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). Pl.Br.23-24, 26-28, 39, 41, 43. They mistakenly urge that separate from the "textual authorization of removal for-cause," *Humphrey's* "alternatively held that the 'character of the commission' and [its] history … sufficed to independently establish" a removal restriction "even absent express language so stating." Pl.Br.23-24. But as the government has explained (Gov.Br.36-37; Reply.Br.5-6 & n.2), the statutory holding in *Humphrey's* simply interpreted an express removal restriction. Quoting that provision, *Slaughter* again explained that the "statute" in *Humphrey's* "permitt[ed] removal of Commissioners only for 'inefficiency, neglect of duty, or malfeasance in office.'" 146 S. Ct. at 2299 (quoting

Act of Sept. 26, 1914, ch. 311, § 1, 38 Stat. 717, 718); *see id.* at 2291-2292; *id.* at 2312-2313 (Gorsuch, J., concurring); *id.* at 2320-2321 (Sotomayor, J., dissenting).

That leaves *Wiener v. United States*, 357 U.S. 349, 352-356 (1958). *See* Pl.Br.22-23, 26, 28, 42, 48. *Wiener*'s approach to whether a statute limits the President's removal power is a relic from a bygone era of statutory interpretation. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 40-42 (2021) (Breyer, J., concurring in the judgment in part and dissenting in part) (offering *Wiener* as an example of a "functional approach" where courts resort to "purposes and consequences"). *Compare Wiener*, 357 U.S. at 352-356 (describing "a problem in probabilities" "for drawing an inference" about what "Congress … wish[ed]"), *with Al Bahlul v. United States*, 967 F.3d 858, 872 (D.C. Cir. 2020) ("the power of removal is incident to the power of appointment" and without "explicit tenure provisions," an official is "removable at will" (quotation marks omitted)). Today, "words are how the law constrains power." *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021). *Wiener*'s statutory holding also rested on "[t]he philosophy of *Humphrey's Executor*," 357 U.S. at 356, which has now been "overrule[d]," *Slaughter*, 146 S. Ct. at 2302.

But whatever might remain of *Wiener*, it has no application here. Gov.Br.22-24, 35-37; Reply.Br.3; *see Collins*, 594 U.S. at 250 n.18; *cf. Slaughter*, 146 S. Ct. at 2301 (explaining that the Court had long "read" the *Humphrey's*

constitutional rule "on its own terms" and not "extend[ed]" it "to a new situation"). As *Slaughter* summarized, *Wiener* concerned a "solely adjudicatory body that dealt with a limited category of claims for compensation from those imprisoned or interned in the Second World War." 146 S. Ct. at 2303. *Wiener* also seems to have rested on a view that the War Claims Commission was not "Executive," noting the "judicial character" of the Commission's "task" and explaining that Congress could distribute foreign funds by "appropriat[ing] directly," "utiliz[ing] the Executive," or "resort[ing] to the adjudicatory process." 357 U.S. at 353, 355; *see Kalaris v. Donovan*, 697 F.2d 376, 394 (D.C. Cir. 1983) (stating that Congress had placed the Commission in *Wiener* "outside the Executive Branch"). The PCLOB is undisputedly in "the executive branch," 42 U.S.C. § 2000ee(a), performs no "judicial" tasks, bears no resemblance to the tribunal at issue in *Wiener*, and performs "quintessential" "'purely executive' function[s]," *see Severino v. Biden*, 71 F.4th 1038, 1048 (D.C. Cir. 2023). *Shurtleff*, *Collins*, *Braidwood*, *Cook*, and *Slaughter* govern.

**c.** *Cook* also shows that in the absence of a textual removal restriction, finding an implied restriction by divining Congress's intent risks trenching on the prerogatives of the political branches. In addressing the statutory rules governing removal, *Cook* emphasized that it "comes down to the words Congress chose."

146 S. Ct. at 2251. The Court thus stressed that "[t]he statute" at issue there limits the President's power to remove Federal Reserve Governors, stating that they be removed only "'for cause.'" *Id.* at 2246-2247 (quoting 12 U.S.C. § 242). And the Court emphasized that it therefore had to determine "what precisely" the statute "means by 'cause.'" *Id.* at 2247.

The Court's "decipher[ing]" of "'cause' (a term of art)" shows that Congress must not just decide whether to restrict removal but must also choose among many possible standards. *Cook*, 146 S. Ct. at 2248-2249. Different statutes establish different "form[s] of [removal] protection." *Id.* at 2253 n.5. Some just concern "'ineligibility' for office in the first place." *Id.* at 2248. Others concern "poor performance in office," such as "'inefficiency,' 'neglect of duty,' or 'malfeasance.'" *Id.* And the permissible bases for removal vary. *See id.* at 2249 (suggesting that "cause" is different from "inefficiency, neglect of duty, malfeasance, and ineligibility"); *id.* at 2267 (Thomas, J., dissenting) (similar); *see also Collins*, 594 U.S. at 255-256 (listing different "removal provisions" that grant different "removal authority").[2]

---

[2] *Cook* thus also makes clear that certainly by the time Congress reconstituted the PCLOB in 2007, Congress knew how to impose a removal restriction and chose varied restrictions for varied agencies. *See* Gov.Br.18-19, 28-29; Reply.Br.9-11; *see also, e.g.*, *Slaughter*, 146 S. Ct. at 2339 (Sotomayor, J., dissenting) (explaining that right after *Humphrey's*, the House "amended the bill establishing" the National

*Continued on next page.*

*Cook* repeatedly emphasized that "the Federal Reserve's independence" "allows it to pursue" its critical "mandate," 146 S. Ct. at 2249—an understanding drawn from the Founders' "experience," *id.* at 2254, and shared by "[e]conomic experts of all stripes," *id.* at 2259 (Jackson, J., concurring). Under plaintiffs' view, even without a textual removal restriction, "[b]ecause 'independence from Presidential control' is critical" to the Federal Reserve's "function," a court would presumably draw an "inference" that Congress intended that body to have some form of removal restriction and then, when necessary, decide what kind. *See, e.g.*, Pl.Br.41. That would be so despite the Supreme Court's recognition in *Cook* that "Congress could of course" decide to make Federal Reserve Governors removable "at will." 146 S. Ct. at 2247.

Plaintiffs believe that certain functions require insulation from political control. Under plaintiffs' view, courts should decide what those functions are and what to do when agencies have other functions and then decide whether a removal restriction is warranted and, if so, what form of removal restriction. Those are decisions for the political branches. *See also Slaughter*, 146 S. Ct. at 2337 (Sotomayor, J., dissenting) ("Balancing all these concerns, and the tradeoffs they

---

Labor Relations Board "to include removal protections").

entail, has historically fallen to those who know the most about them: the political branches.”).

**2.** In any event, *Slaughter* further undermines plaintiffs’ repeated assertion that because the PCLOB reviews government programs and provides expert advice, Congress must have intended Board members to have some unspecified removal restriction—a conclusion that, according to plaintiffs, is so obvious that Congress did not bother putting the restriction in the statutory text. *See* Gov.Br.31-42; Reply.Br.13-19.

*Slaughter* reenforces this Court’s observations in *Severino* that “[p]residential influence is completely consistent” with an advisory mission and can be “vital to the successful accomplishment of [a] consultative role.” 71 F.4th at 1049. As the Court quoted in *Slaughter*, “What faith can an Executive put in officials forced upon him?” 146 S. Ct. at 2299. That may be why Congress has set up bodies like the Administrative Conference, inspectors general, and various agencies’ privacy officers that evaluate, advise, and report, and may be removed at will. *See* Gov.Br.31-32, 38-42; Reply.Br.9-10, 18-19.

Even the dissent in *Slaughter* undermines plaintiffs’ leap from an asserted need for independence to an implicit removal restriction. The dissent reiterated the government’s point here that “[v]arious mechanisms exist to facilitate expert advice

and decision-making." Reply.Br.14; *see* Gov.Br.40-41; Reply.Br.20; *Severino*, 71 F.4th at 1049. The dissent explained that "a 'wealth of features' other than at-will removal … determines an agency's responsiveness to the President." *Slaughter*, 146 S. Ct. at 2337 (Sotomayor, J., dissenting) (quoting *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 283 (2020) (Kagan, J., concurring in the judgment with respect to severability and dissenting in part)). Consequently, officials can be given "forms of independence from Presidential control" separate from "removal protections." *Id.* at 2333 n.11. Congress incorporated several such features into the PCLOB statute without purporting to restrict removal. In fact, the *Slaughter* dissent referenced a Civil War era Comptroller of the Currency, *id.* at 2325 (Sotomayor, J., dissenting), which Congress initially shielded from removal but then instead required the President to report to the Senate his "reasons" for removal, if any, *Seila Law*, 591 U.S. at 220-221 & n.5; *id.* at 274 (opinion of Kagan, J.). That is similar to the notification requirement for the Department of Homeland Security's Privacy Officer that Congress established in the very next section of the 2007 statute that reconstituted the PCLOB—again, while not purporting to restrict the PCLOB's removal. *See* Gov.Br.29, 39; Reply.Br.9-10.

### B. Grave Constitutional Doubts Counsel Against Inferring An Atextual Removal Restriction Here

**1.** *Slaughter* also further underscores the role of constitutional avoidance in this case. *See* Gov.Br.46-47; Reply.Br.19. It is a "cardinal principle" that, when "a serious doubt" is raised about a statute's constitutionality, a court must "first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018). That is all the more so when one reading would render a statute unconstitutional. *Braidwood*, 606 U.S. at 775.

Even before *Slaughter*, "the President's removal power" was "the rule, not the exception." *Seila Law*, 591 U.S. at 228. Removal "helps the President maintain a degree of control over the subordinates he needs to carry out his duties as the head of the Executive Branch." *Collins*, 594 U.S. at 252; *see id.* at 251-254. Because the PCLOB is a multi-member body that does not itself determine private rights or obligations, the district court believed (A164-171) that the PCLOB fit what *Seila Law* summarized as the *Humphrey's Executor* "exception[]" for "multimember expert agencies that do not wield substantial executive power." 591 U.S. at 218. *But see Collins*, 594 U.S. at 273 (Kagan, J., concurring in part and concurring in the judgment) (stating that *Collins* "broaden[ed]" *Seila Law* by clarifying that "'the constitutionality of removal restrictions' does not 'hinge' on 'the nature and breadth

of an agency's authority'" (alteration omitted)). But the PCLOB did not fit *Humphrey's* itself, which "limited its holding 'to officers of the kind [there] under consideration.'" *Seila Law*, 591 U.S. at 215 (quoting *Humphrey's Ex'r*, 295 U.S. at 632). The PCLOB's functions are unlike "the weighty quasi-judicial jobs at issue in *Wiener* and *Humphrey's Executor*." *Severino*, 71 F.4th at 1049. And while *Humphrey's* stressed that the President must retain control over "purely executive" functions, 295 U.S. at 627-628, 632, "[p]roducing advice for the President and to his delegees," as the PCLOB does, is "a quintessential example of a 'purely executive' function." *Severino*, 71 F.4th at 1048; *see* Reply.Br.8-9. The PCLOB also coordinates and imposes legal obligations on other agencies. Gov.Br.33-34, 37.

But more to the point, *Humphrey's* has now been "overrule[d]." *Slaughter*, 146 S. Ct. at 2302. Consequently, the *Myers* rule applies, and without the "*Humprey's Executor* exception" "to the President's unrestricted removal power," the governing constitutional rule is that the President has the "prerogative to remove executive officials." *Seila Law*, 591 U.S. at 214-215; *see, e.g.*, *Myers v. United States*, 272 U.S. 52, 127 (1926) (describing "the plan of government devised by the framers" in which there is an "independent executive branch"). The Constitution "establish[es] a hierarchy" in which the President serves as "a 'Chief Magistrate' with whom the buck stops" and "below him" other officials in the Executive Branch

"who 'derive their offices from his appointment' and remain 'subject to his superintendence.'" *Slaughter*, 146 S. Ct. at 2293; *see id.* at 2310 ("Our Constitution creates three branches, but only one President."). "Although it is up to the Senate to decide whether to confirm those with whom the President would prefer to work, neither Congress nor the courts may saddle him with those with whom he cannot work." *Id.* at 2310 (emphases omitted). "[T]he President may remove his subordinates at will." *Id.* at 2297.

**2.** The Court should decline to infer a removal restriction that—particularly after *Slaughter*—would, at a minimum, quite likely be unconstitutional. The PCLOB is undisputedly in "the executive branch." 42 U.S.C. § 2000ee(a). It is therefore part of the "hierarchy" that ultimately remains subject to the President's "superintendence." *Slaughter*, 146 S. Ct. at 2293; *see, e.g.*, *id.* at 2298 (embracing James Madison's argument "to give the President the sole power of removal in his responsibility for the conduct of the executive branch" (quoting *Myers*, 272 U.S. at 117)). That the PCLOB's reports may also be useful to Congress does not alter that rule. *Cf.* Pl.Br.42-47. "If Congress wishes to establish independent agencies to assist it with its functions, it may do so," but Congress "may not foist those agencies upon the President." *Slaughter*, 146 S. Ct. at 2302.

The PCLOB also "advise[s] the President" and "departments, agencies, and elements of the executive branch" and does so on highly-sensitive, national security programs. 42 U.S.C. § 2000ee(d)(1)(C). As discussed, that is "a quintessential example of a 'purely executive' function." *Severino*, 71 F.4th at 1048; *see also Slaughter*, 146 S. Ct. at 2299. Officials with "'purely executive functions' … must be removable at will by the President." *Slaughter*, 146 S. Ct. at 2306; *see also id.* at 2301-2302 (confirming that even under *Humphrey's*, "'purely executive' powers must be controlled by the President"). Indeed, the first Judiciary Act assigned just two responsibilities to the Attorney General, one of which was to give "advice and opinion[s]" to the President and other "departments" (the other being litigation in the Supreme Court at a time that the Court had a very limited docket). Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 93; *cf. Slaughter*, 146 S. Ct. at 2296 (looking to the first Secretaries of Foreign Affairs, War, and Treasury). And today, the Executive Branch is replete with officials that primarily review and advise, ranging from agency general counsels to chiefs of staff to the head of the Office of Legal Counsel. In fact, much of what the Intelligence Community does is gather information and advise.

The PCLOB's national security role further bolsters this conclusion. Its review and advice specifically concern how other Executive Branch entities that

answer to the President are executing the law when "protect[ing] the Nation from terrorism." 42 U.S.C. § 2000ee(c), (d). Even the dissenting Justices in *Seila Law* recognized that when such a "constitutional duty is implicated," the President must have greater leeway to remove officials at will. *See Seila Law*, 591 U.S. at 280 n.9 (opinion of Kagan, J.). And while the government believes that the President can deny PCLOB members access to classified information—thereby rendering any removal restriction "illogical," *Jones v. Hendrix*, 599 U.S. 465, 480 (2023); *see* Gov.Br.34-35; Reply.Br.19—a contrary mandate would compound the constitutional problem with restricting the President's power to remove the Executive Branch officials given access to that information. *See Department of the Navy v. Egan*, 484 U.S. 518, 527 (1988); *Lee v. Garland*, 120 F.4th 880, 886, 888, 891-894 (D.C. Cir. 2024).

The PCLOB also "coordinates" certain other agency's senior officials, holds one of the two keys needed to issue administrative subpoenas under the statute, and can even impose legal obligations on other agencies. *See* Gov.Br.33-34, 37. The PCLOB therefore itself has certain "administrative control" over other parts of the Executive Branch. *Slaughter*, 146 S. Ct. at 2291, 2301. If the President were not ultimately responsible for the PCLOB, then other Executive Branch agencies and officials in the national security space would in some instances have multiple

masters, one of whom was not the "'Chief Magistrate' with whom the buck stops." *Id.* at 2293.

**3.** The district court dismissed constitutional concerns on the theory that it was "clear that Congress intended to restrict the President's removal authority," A163, and that the PCLOB fell within the *Humphrey's* exception, A164-171; *see* Pl.Br.48 (similar). But certainly with *Humphrey's* overruled, a PCLOB removal restriction would, at a minimum, quite likely be unconstitutional. *See Braidwood*, 606 U.S. at 775 ("[E]ven if we perceived ambiguity," "constitutional avoidance would counsel against … read[ing] the statute in a way that makes … [it] unconstitutional."). And if nothing else, the now stronger—and indeed grave—constitutional doubts must weigh even more heavily against implying a removal restriction that Congress did not actually put in the statutory text. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-801 (1992); *see also Greene v. McElroy*, 360 U.S. 474, 507 (1959) ("[E]xplicit action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws.").

### C. Plaintiffs Cannot Possibly Establish A Clear And Indisputable Right To Mandamus

Finally, *Cook* confirms that plaintiffs in this case must satisfy the very high burden for mandamus, which they cannot possibly meet. The district court issued an equitable order comprising a multi-part injunction and declaratory judgment. A171-191, 197-198. But echoing the government's arguments here (Gov.Br.48-52; Reply.Br.25-26), *Cook* confirmed that historically, "a court of equity has no jurisdiction over the appointment and removal of public officers." 146 S. Ct. at 2250; *see Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) (equitable powers limited to remedies that were "traditionally accorded by courts of equity"). Thus, "a court of equity would not and could not finally determine whether a plaintiff was validly removed," *Cook*, 146 S. Ct. at 2250, which is what the district court did here. That "was a question only a court of law could settle," traditionally through "*quo warranto* or mandamus." *Id.* Relevant to Ms. Cook, who had obtained a preliminary injunction, a court can issue an "interim" equitable order "pending a litigation at law to determine" who properly holds a "title." *Id.* But this case is at final judgment, with plaintiffs seeking a final determination about whether they were validly removed—exactly what an equitable order cannot do.

The standard of review applicable here, where plaintiffs must rely on mandamus and claim only an implicit removal restriction, is dispositive. Plaintiffs

are not among the class of officials for whom Congress has provided a statutory reinstatement remedy. *See* 5 U.S.C. § 7511(b) (excluding those appointed "by and with the advice and consent of the Senate" (among other groups)). And they have neither sought *quo warranto*, A29-32, nor attempted to meet its various requirements, *see* Pub. L. No. 91-358, § 145(n), 84 Stat. 473, 561-562 (1970) (codified at D.C. Code §§ 16-3501-16-3502); *Andrade v. Lauer*, 729 F.2d 1475, 1497-1498 (D.C. Cir. 1984). That leaves mandamus, which the district court stated that it would issue if equity were "unavailable," A172, 191-194. But mandamus is not just an injunction by another name. It is a particularly extraordinary order that is available under the narrowest and most extreme circumstances. *See Illinois v. Ferriero*, 60 F.4th 704, 714 (D.C. Cir. 2023) ("Few legal standards are more exacting than the requirements for invoking mandamus jurisdiction … ."). Mandamus is available only if the applicant has a "clear and indisputable" right to relief. Gov.Br.52-53; Reply.Br.26. It is one thing when a statute expressly limits removal. But it is quite another here, where plaintiffs' claim to relief rests on an assertedly implied removal restriction.

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
*/s/ Adam Jed*
ADAM C. JED
*Attorneys, Appellate Staff*
*Civil Division, Room 7243*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-8280*

AUGUST 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's supplemental briefing order of August 5, 2026, because it contains 3,958 words according to the count of Microsoft Word. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Adam Jed*
ADAM C. JED